1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF ARKANSAS
2                       FAYETTEVILLE DIVISION
                                  )
3       UNITED STATES OF AMERICA,  )
                                  )
4           Plaintiff,             )
                                  )
5       VS.                        )  CASE NO.
                                  )  5:15-CR-50087-001
6       ANTHONY ALLEN JEAN,        )
                                  )
7           Defendant.             )

8

9                    TRANSCRIPT OF MOTION HEARING
                BEFORE THE HONORABLE TIMOTHY L. BROOKS
10                    June 23, 2016; 1:08 p.m.
                     FAYETTEVILLE, ARKANSAS
11

12      FOR THE GOVERNMENT:

13          **MR. DENIS DEAN**
            United States Attorney's Office
14          414 Parker Avenue
            Fort Smith, AR 72901
15          (479) 249-9040
            Denis.Dean@usdoj.gov
16

17      FOR THE DEFENDANT:

18          **MR. JOSE MANUEL ALFARO**
            Federal Public Defender's Office
19          Western District of Arkansas
            3739 N. Steele Blvd., Suite 280
20          Fayetteville, Arkansas 72703
            (479) 442-2306 Phone
21          Joe_Alfaro@fd.org

22      Proceedings recorded in realtime via machine shorthand.
        _____
23
                     **Dana Hayden, CCR, RMR, CRR**
24                 **Federal Official Court Reporter**
                     **35 East Mountain Street**
25                 **Fayetteville, Arkansas 72701**

1                          **I N D E X**
                         (MOTION HEARING)
2
                                                        Page
3   June 23, 2016

4   Government Rests.............................   96

5   Defendant Rests.............................  174

6   Closing Argument by the Government...........  174

7   Closing Argument by the Defendant............  183

8   Motion taken under advisement................  203

9   Adjournment..................................  204

10  Court Reporter's Certificate.................  205

11
    GOVERNMENT WITNESSES
12
                                                        Page
13  Daniel Alfin

14          Direct Examination by Mr. Dean............   14
            Cross-Examination by Mr. Alfaro...........   50
15          Examination by the Court..................   80
            Cross-Examination by Mr. Alfaro...........   91
16          Examination by the Court..................   93
            Redirect Examination by Mr. Dean..........   94
17

18  DEFENDANT WITNESSES

                                                        Page
19
    Christopher Soghoian
20
            Direct Examination by Mr. Alfaro...........   97
21          Cross-Examination by Mr. Dean..............  152
            Redirect Examination by Mr. Alfaro.........  169
22

23

24

25

```
 1                     EXHIBIT INDEX

 2

 3   GOVERNMENT'S

 4   NO.        DESCRIPTION              OFFERED    ADMITTED

 5   1 - Website Posts                     22         22

 6   2 - Website Home Page                 25         25

 7   3 - Website Registration Page         27         27

 8   4 - Website Index Pages               31         31

 9

10   DEFENDANT'S

11   NO.        DESCRIPTION              OFFERED    ADMITTED

12   H - Shell Script                     128        129
           (Received under seal)
13
     F - Screen Shot - Wireshark          132        133
14         (Received under seal)

15   G - Communication Stream             132        133
           Between NIT and Government
16         (Received under seal)

17

18

19

20

21

22

23

24

25
```

1       THE COURT:  The next matter on the Court's

2  docket today is the case of the United States versus

3  Anthony Allen Jean.  Our docket number is

4  5:15-CR-50087-001.  The United States is represented

5  today by Denis Dean.  Mr. Jean is represented today by

6  Mr. Alfaro.

7       The matter comes before the Court today for

8  purposes of a suppression hearing.  Mr. Jean was

9  indicted on December 9th of 2015 on five counts, plus a

10  forfeiture allegation.  Counts One through Four charged

11  Mr. Jean with knowing receipt of child pornography, in

12  violation of federal law.  Count Five charged him with

13  knowingly possessing a laptop computer containing images

14  of child pornography, in violation of federal law.

15       The trial of this matter was set back in April

16  of this year, but the defense has filed a couple of

17  pretrial motions.  The first motion was a motion to

18  suppress certain evidence that was derived from the

19  execution of a search warrant, if I can use that term

20  generally at this point.

21       Since that time there has also been a motion to

22  compel discovery of certain information from the

23  government that is somewhat connected to the issues at

24  display in the motion to suppress.  The motion to

25  suppress is filed at Document 19 of the court record.

1  The motion to compel is filed at Document 28 of the

2  court record.

3          This motion is teed -- or this hearing is teed

4  up today to address the suppression motion, Document 19.

5  The Court has read the briefing on that issue, as well

6  as all of the exhibits, the warrant at issue and that

7  sort of thing, and the Court understands that each party

8  intends on calling a witness in support of their

9  respective positions on the motion.

10          I see that you have people seated at counsel

11  table, which I'm assuming are your witnesses.  Mr. Dean,

12  would you care to introduce your witness today for the

13  record?

14          MR. DEAN:  Yes, your Honor.  The government's

15  going to call Special Agent Daniel Alfin.  He's FBI

16  headquarters, and he is going to testify about the NIT

17  and all the stuff related to that.  He is the lead agent

18  on this case.

19          THE COURT:  All right.  Pleasure to have you

20  here today, Agent --

21          AGENT ALFIN:  Thank your honor.

22          THE COURT:  Is it Alfin?

23          AGENT ALFIN:  Yes, your Honor.

24          THE COURT:  Pleasure to have you here today.

25          Mr. Alfaro, would you like to introduce your

1  witness?

2            MR. ALFARO:  Yes, your Honor.  We have

3  Dr. Christopher Soghoian, principal technologist with

4  the ACLU, here to testify to similar issues, your Honor.

5            THE COURT:  All right.  Dr. Soghoian, pleasure

6  to have you in our courtroom here today.

7            Seeing you here reminds me, and I think it

8  appropriate to put this on the record.  I have actually

9  met Dr. Soghoian before, although I couldn't have told

10  you his name until Mr. Alfaro mentioned it.  There was a

11  national judicial conference back in, I think, the last

12  week of April in Charleston, South Carolina, and there

13  were a couple hundred district court judges.  And it was

14  a judicial education program, and one of the topics on

15  the program generally was the -- pertained to the issue

16  that is before the Court today.

17            I elected to attend a different session, and I

18  did not actually participate or attend the session in

19  which Dr. Soghoian was a speaker, but there was a

20  reception at the end of that particular day, a social

21  function at which the judges and the speakers were

22  invited, and I actually ran into Dr. Soghoian in the

23  hallway and had about a five-minute conversation with

24  him, not realizing that he might be present here, but I

25  thought I should disclose that on the record today.

1   That obviously has no impact on the Court's views of the

2   issues.

3           I also wanted to note for the record that the

4   Court's law clerk on this case, Erika Esterbrook, is on

5   vacation today, but she is nevertheless, given the fact

6   that she is a very fine public servant, wanted to be

7   able to hear the proceedings today.  So we have her

8   piped in over the Court's conference call system.  Her

9   end is muted, but she is capable of hearing what is said

10  in the courtroom today and I wanted to advise everyone

11  of that fact.

12          Generally speaking, the Court understands that,

13  at least from the government's allegations in the

14  indictment, that Mr. Jean, who is a resident of the

15  Western District of Arkansas, was a user of a website

16  known as the Playpen website.

17          It is alleged that the Playpen website was

18  created for the purpose of allowing users to access

19  child pornography and to also engage in discussion

20  boards pertaining to child pornography or the abuse of

21  children in a sexually deviant manner.

22          The Court understands that the government found

23  its way to Mr. Jean after it had, through its

24  investigative efforts, located where the server of the

25  Playpen website was located, which was actually in North

1    Carolina, as I understand it; and in the course of its

2    investigation, law enforcement actually seized the

3    website server, made a copy, and placed a copy of that

4    website on a server under the FBI's control and

5    management in -- somewhere in the Eastern District of

6    Virginia.

7            And the FBI then maintained the server for a

8    period of time, two to four weeks, something like that,

9    and continued its investigation into persons who might

10   be using or gaining access to this website for -- in a

11   manner that would be in violation of federal law.

12           There came a point in time -- I don't have the

13   precise dates, but the dates are set forth in the

14   parties' motions and responses and are not in dispute --

15   but there came a point in time when law enforcement,

16   through the U.S. Attorney's Office, sought a warrant

17   from a magistrate judge in the Eastern District of

18   Virginia in which they requested authority to place what

19   has been referred to in the paperwork as a NIT, which

20   stands for a network investigative technique, into play.

21           I think of that as some sort of malware, but

22   that may not be the technically correct term.  Hopefully

23   I'll be educated about that today.  But in any event, in

24   a very summary, simplified fashion, the Court

25   understands that, as relevant to the motion here today,

the government asked a magistrate judge to issue a search warrant that would allow them to place this malware on the website in such a way that users who typed in their user ID and password, thereby gaining access to the website while the malware was -- or while the website was under the government's control and while the malware was to be sent out, would attach itself to the user's computer in such a fashion that it would collect the IP address of the user, along with some other identifying information, and transmit the IP address back to law enforcement.

According to the application and affidavit for the warrant, that technique, or malware as I refer to it, was necessary because this Playpen website operated on what is known as the Darknet, also known as The Onion Router, or Tor for short.

The Court understands that Tor is similar to or a place on the Internet that operates in some respects similar to the Internet except that unlike the regular Internet, users' identities, IP addresses, that sort of thing are concealed or masked from all other persons who are using that platform.  And while there may be legitimate uses for Tor -- and certainly there are.  The Court understands it was actually developed by the Navy -- it is also known in technology circles as a

1  place where people who might have a motivation to engage
2  in criminal activities would conduct business because it
3  readily allows them to conceal their identities and to
4  engage in Internet activities with anonymity.
5         And so the government laid this out in its
6  warrant to the magistrate judge in the Eastern District
7  of Virginia, claiming that this was the most effective
8  way and a necessary way to obtain information that would
9  ultimately lead them to the identity and location of the
10 users of this website.
11        The magistrate judge signed off on that
12 warrant, and the FBI proceeded to maintain the website,
13 again, two- to four-week period, and according to the
14 government, it did exactly what it represented to the
15 magistrate judge that it was going to do.  And as the
16 Court understands, this malware allegedly attached
17 itself to Mr. Jean's computer when he accessed the
18 website.
19        It sent back his IP address to the FBI.  With
20 the IP address, the FBI then used an administrative
21 subpoena to obtain from the provider the name and
22 address of the user of that IP address, and subsequently
23 with that information in hand, the government applied
24 locally in the Western District of Arkansas for a
25 residential search warrant, which was signed by

1  Magistrate Judge Setser, at which point law enforcement

2  ultimately obtained a computer or other computer-related

3  paraphernalia from Mr. Jean's residence which, according

4  to the government, had evidence that he had received and

5  possessed images of pornography.

6         And incident to this chain of events and series

7  of warrants, Mr. Jean gave statements, which can

8  probably be labeled confessions, or at least culpable

9  admissions, to the government.

10        The Court understands that the defense is

11  seeking to suppress all of the information and evidence

12  and statements that flowed from the first link in the

13  chain, which was the warrant issued by the magistrate

14  judge in the Eastern District of Virginia, which then

15  led to the administrative subpoena for information about

16  Mr. Jean's IP address, which then led to the residential

17  subpoena issued by Judge Setser, which then led to

18  evidence of child pornography on Mr. Jean's computer,

19  which also was incident to certain culpable statements

20  made by Mr. Jean incident to the government's interview

21  of him.

22        And so the defense motion has multiple

23  components to it, but the Court understands at its root

24  that the warrant was either not validly issued and/or

25  constitutionally permissible.  Again, there are various

1    issues, and I'm not going to try to restate what is

2    contained in Mr. Alfaro's 20- or 30-page motion, but one

3    of the core issues goes to the notion that Rule 41 of

4    the Federal Rules of Criminal Procedure is a source

5    where certain issuance of warrant powers are delegated

6    to magistrate judges, and there is a contention that the

7    magistrate judge in the Eastern District of Virginia did

8    not have geographical jurisdiction to issue a warrant

9    that would pertain to a seizure of persons or property

10   outside the Eastern District of Virginia.  And obviously

11   the Eastern District of Virginia magistrate judge's

12   warrant was the first link in this series of warrants

13   that led law enforcement to Mr. Jean.

14          In response, the government indicates -- and

15   again, to paint this with a fairly broad brush -- that

16   there is nothing improper that the warrant is valid, and

17   even if there were any technical violations, that there

18   are various doctrines developed in the case law that

19   would not require the evidence to be suppressed, even if

20   the Court were to conclude that there was a technical

21   violation.

22          Substantively, the government contends that

23   the -- under Rule 41, I believe, (b)(2) and/or 41(b)(4)

24   that the warrant spelled out the activities of how the

25   government sought to use this malware and that the

1   magistrate judge was fully within her Rule 41(b)

2   authority in issuing that warrant.

3          So that's the Court's, again, big-picture

4   understanding of what the issue is.  It would be the

5   Court's understanding that in a motion such as this that

6   ultimately the government bears the burden of proving

7   that the warrant at issue, which is the magistrate

8   judge's warrant out of the Eastern District of Virginia,

9   was valid and/or constitutionally firm, or that the

10  fruits of the search, I should say, were the result of

11  either a valid warrant or otherwise constitutionally

12  proper and within the constraints of the Fourth

13  Amendment.

14         So with that in mind, Mr. Dean, I would ask the

15  Government to proceed at this time.

16         MR. DEAN:  Thank your Honor.

17         Government calls Special Agent Dan Alfin.

18         THE COURT:  Agent, if you'd please pause right

19  there to be sworn.

20         (Whereupon, the witness was duly sworn.)

21         THE COURT:  Sir, you may take a seat in our

22  witness stand.

23         MR. DEAN:  Your Honor, I did not prepare a

24  trial notebook, but I do have -- or an exhibit notebook,

25  but I do have some exhibits, if I can use the ELMO.

```
1           THE COURT:  Sure.
2                    DANIEL ALFIN,
3    having been first duly sworn, testified as follows:
4                   DIRECT EXAMINATION
5    BY MR. DEAN:
6    Q.    Please state your name for the record.
7    A.    My name is Daniel Alfin, last name spelled
8    A-l-f-i-n.
9    Q.    How are you employed, sir?
10   A.    I am a special agent with the Federal Bureau of
11   Investigation.  I am currently assigned to FBI
12   headquarters, Criminal Investigative Division, Violent
13   Crimes Against Children section, Major Case Coordination
14   unit, located in Maryland.
15   Q.    How long have you been with the Federal Bureau of
16   Investigation?
17   A.    I've been a special agent with the FBI since April
18   2009.  Between September 2009 and approximately July
19   2014, I was assigned to the Albany, New York division of
20   the FBI; and since July 2014, I have been assigned to my
21   current duties in Maryland.
22   Q.    What were your responsibilities with that unit up in
23   Albany, New York?
24   A.    When I was assigned to the Albany, New York
25   division, I investigated a variety of criminal and
```

1  national security matters, including child pornography

2  crimes, criminal hacking crimes, national security

3  hacking crimes, and other violations of that nature.

4  Q.   And what are your responsibilities with your unit

5  now in Maryland?

6  A.   As a special agent with the major case coordination

7  unit, I investigate individuals who use various types of

8  technology to facilitate the production, advertisement

9  and trade of child pornography and other child

10  exploitation crimes.

11  Q.   And what is -- what training have you had in

12  relation to that type of investigation?

13  A.   I received approximately five months of training at

14  the FBI academy in Quantico, Virginia.  Since that time,

15  I have attended a number of other trainings related to

16  investigations involving crimes against children,

17  computer forensic work, other computer security matters.

18          I am currently certified as a instructor with

19  the FBI, certified to teach matters involving crimes

20  against children.

21  Q.   Agent Alfin, have you ever accessed child

22  pornography websites on the Tor, T-O-R, network as part

23  of your job duties?

24  A.   I have.

25  Q.   Briefly -- and we heard the judge talk about it.  So

1  I think he has a great understanding of it.  But briefly

2  for the record what is the Tor network?

3  A.   The Tor network is accessible initially through use

4  of the regular Internet.  It runs on top of the regular

5  Internet, and it is made up of hundreds of thousands of

6  computers all around the world.

7         Tor affords its users two primary uses.  The

8  first is the user using the Tor network can use it to

9  connect to a website or other type of Internet service

10  on the regular Internet in an anonymous capability.  So

11  a user could use the Tor software or the Tor browser

12  software to connect to a regular Internet website,

13  Google.com, CNN.com, any normal website.

14         In doing so through the Tor network, that

15  website cannot see where you're actually coming from.

16  So if I were to access Google.com from this courtroom

17  using the Tor software, Google would not know that I was

18  here in Arkansas.  It may pull an IP address somewhere

19  else in the country or somewhere else in the world.  It

20  wouldn't be able to locate me here.

21         Another use of the Tor network are what are

22  referred to as hidden services.  So when you run a

23  website or other Internet service within the Tor

24  network, that service is now referred to as a hidden

25  service and so when a website is configured to operate

1    as a hidden service, it can only be accessed through use

2    of the Tor software.  It can no longer be accessed on

3    the traditional Internet in the manner that you would

4    normally access Google.com.  You need to use special

5    software to access the hidden service.

6            And so the hidden service affords the same --

7    the same benefits that I described earlier in that a

8    user who accesses a hidden service, his or her IP

9    address and other identifying information is concealed.

10   The owner and operator of the hidden service cannot see

11   it.

12           The additional benefit that Tor provides to

13   operators of hidden services is that the true IP address

14   and location of the hidden service is similarly

15   concealed.  As an example, if I were to run a hidden

16   service here in this room and have a laptop connect to

17   it also here in this room, neither one of those two

18   services or laptop would know that they were here in the

19   same room.

20           As far as they were concerned, they could be

21   anywhere in the world.  And so Tor hidden services are

22   frequently used to host child pornography websites

23   because of these types of security benefits afforded to

24   operators of such websites, and these are the areas

25   where I focus the majority of my investigative work.

1  Q.   Thank you.  Did you participate in the investigation

2  of the website that is involved in this case, the

3  website that has been alternatively referred to as

4  website A, or Playpen?

5  A.   I did.

6  Q.   How did you become aware of Playpen initially?

7  A.   In approximately August 2014, links to the Playpen

8  website were advertised on websites that contained links

9  to numerous child pornography websites.  And so when the

10  Playpen link became active, I accessed it around that

11  time, and I observed that it was, in fact, a website

12  whose primary purpose was the advertisement and

13  distribution of child pornography.

14  Q.   And just to be clear, was Playpen located on the Tor

15  network?

16  A.   It was.  It was configured to operate as a hidden

17  service.

18  Q.   Now, you've kind of already gotten into this, but

19  just specifically to Playpen, how would somebody find

20  Playpen or know of its existence?  Could you Google it?

21  A.   Generally, no.  Websites that operate as hidden

22  services, first of all, you need to download special

23  software.  Common software used to access the Tor

24  network is called the Tor browser.  It looks and

25  functions similarly to any regular Internet Web browser.

1   However, its connections go through the Tor network, and

2   it has the capability to access Tor hidden services.

3          So a user would first have to learn of the Tor

4   network, and they would have to download the Tor browser

5   software, which is freely available.  You can download

6   it from the Tor Project website.

7          So a user would have to download this and

8   install this software on their computer.  And at that

9   point in order to access a site such as Playpen, they

10   would still need to find the link to the website such as

11   Playpen which, again, you would have to have some level

12   of knowledge in order to find it.  Generally links to

13   websites like Playpen can only be found on index sites

14   that list links to child pornography websites.

15          Websites that exist on the Tor network, hidden

16   services, there are a number of lists of websites that

17   you can find on both the regular Internet and the -- and

18   within Tor configured as hidden services.

19          These sites do not function as traditional

20   search engines.  They don't have the same functionality

21   as Google or Bing.  Generally they are just lists of

22   websites that are updated manually.  And in fact, the

23   most popular Tor site that is sometimes referred to as a

24   Tor search engine actively bans child pornography

25   websites from showing up in its results.  It has a

1    disclaimer and a warning saying such websites will not

2    be allowed to be listed here and they will be

3    blacklisted if someone attempts to access -- to list

4    them there.

5              And so there are other websites who

6    generally -- that exist whose purposes are entirely

7    dedicated to advertising links to child pornography

8    websites.  And so again, a user would have to find their

9    way to one of these websites that list links to other

10   child porn websites and find it from there.

11   Q.   So in your opinion what are the -- what's the

12   possibility of somebody happening upon the Playpen

13   website, when it existed?

14   A.   It would be incredibly unlikely for someone to

15   accidentally stumble on the Playpen website without

16   knowing what its purpose was.

17   Q.   Okay.  I'm going to show you -- attempt to show

18   you -- what has been marked as Government's Exhibit 1,

19   if you'll look at the monitor there.  Do you see that?

20   A.   I see it in front of me.

21   Q.   Okay.  What are we looking at?

22   A.   This is a post that was made on the Playpen website.

23   It is dated December 15, 2014, and this post was created

24   by the creator and primary administrator of the Playpen

25   website.

1        In this post the administrator states, in
2    response to a question, that he will change the server
3    location and URL of Playpen every so often just to keep
4    them guessing.
5        Based on my training and experience, I
6    understand "them" to be me or other law enforcement
7    agencies.  And then the administrator further states
8    that he will always post the new link to Playpen on two
9    websites, and he provides the link to those two
10   websites.  Those two websites are the Hard Candy section
11   of the hidden wiki.
12       The hidden wiki itself contains links to
13   various Tor hidden services.  Not all of them are child
14   porn; not all of them are illegal.  However, the Hard
15   Candy section where the administrator has linked to is
16   dedicated to child exploitation sites such as Playpen
17   and that is where the administrator states that he will
18   advertise his website.
19   Q.   And what's the other one?
20   A.   That is a mirror of the same Hard Candy section of
21   the hidden wiki.
22   Q.   And just to reiterate, this post was actually
23   located on the Playpen website by the administrator of
24   Playpen?
25   A.   Correct.

1        MR. DEAN:  Your Honor, at this time I'd like to

2   have this exhibit admitted as Government's 1.

3        MR. ALFARO:  No objection.

4        THE COURT:  Government's 1 will be received.

5   (By Mr. Dean:)

6   Q.   Agent Alfin, I am showing you what has been

7   premarked as Government's Exhibit 2 for identification

8   purposes.  What are we looking at here?

9   A.   This is the -- after a user found the link to the

10  Playpen website, after clicking on that link, this is

11  the page that that user would be presented with upon

12  first accessing the Playpen website.

13       It gives the user the opportunity to log in to

14  the website with an existing account.  There is also a

15  link on the page to register a new account.

16  Q.   Okay.  Up in the upper left-hand corner, there's two

17  images.  What do those images appear to be?

18  A.   There are two prepubescent females depicted on

19  either side of the logo that says "Playpen."  They are

20  both clothed, their legs are spread, but their genitals

21  are not nude, posing next to the Playpen logo.

22  Q.   Okay.  Just below that it says "No cross-board

23  reposts, .7z preferred, encrypt filenames, include

24  preview.  Peace out."

25       What do those terms mean to you, if anything?

1  A.   Based on my training and experience, I know these

2  terms to be a trade craft associated with child

3  pornography websites.   These terms and variations of

4  them appear on multiple child pornography websites.  And

5  so no cross-board reposts is a warning indicating that a

6  user of Playpen should not go to another child porn

7  website, find a link to an image or a video of child

8  porn and then come back to Playpen and post that link

9  there and claim credit for it themselves.

10          ".7z preferred" indicate users who share child

11 pornography on the Playpen website should use 7-Zip --

12 that's 7-Z-i-p -- compression software to share their

13 material.

14          7-Zip is, again, certainly not illegal.  It's

15 freely available software that can be used to compress

16 files, multiple files, into a smaller one.  It also adds

17 security benefits.

18          Material provided in a 7-Zip encrypted file can

19 be encrypted with fairly strong encryption that can be

20 difficult or impossible to break, which is why it is the

21 preferred method of distributing child pornography.

22          "Encrypt filenames" is another reference to an

23 option within the 7-Zip software and so if you have

24 placed child pornography inside one of these 7-Zip

25 archives, you encrypt both the material and the

1  filenames of the material inside of it and so an outside

2  observer who obtained that file, if they don't have the

3  true password, they would have no idea what is contained

4  in that file.  It could be innocent material; it could

5  be illegal material.  They would have no way of knowing.

6         "Include preview" is a reference to how users

7  should post material on the website.  Generally material

8  that was distributed on Playpen and other such websites

9  is done through an encrypted archives as described

10  previously.  However, users are encouraged to post a

11  preview of the material that they are sharing.

12         So generally if a user were to post, say, a

13  30-minute video, a user would post a link to the 7-Zip

14  file that contains that video, and they would also post

15  some screen captures from the video so a user could see

16  what the video depicts before deciding whether or not

17  they want to download the entire video.  And so all of

18  those lines up there, aside from "peace out" are, based

19  on my training and experience, trade craft common to

20  child pornography websites.

21  Q.   And just to be clear, during your investigation,

22  there was a period of time where this was the first

23  page, the login page that you would come to if you

24  access the Playpen site; is that correct?

25  A.   Correct.  From the time that the Playpen website

1  came online in approximately August 2014 until sometime

2  on February 19th, 2015, this, or slight variations of

3  this, page were what a user would be presented with.

4  During that entire time period, the logo was as it is

5  now.

6  Q.   Okay.  Now --

7        MR. DEAN:  Your Honor, at this time I'd like to

8  have this admitted as Government's 2.

9        MR. ALFARO:  No objection, your Honor.

10       THE COURT:  Government's 2 will be received.

11 (By Mr. Dean:)

12 Q.   Describe how one would log on to the Playpen site.

13 A.   After a user arrived at the homepage of the Playpen

14 website, a user would have to do one of two things.  If

15 they had been there previously, they would have to enter

16 their username and password that they previously created

17 and log in to the Playpen website with that previously

18 established account.

19       If a user did not have an existing account or

20 did not wish to use their existing account, they could

21 click on the link that I believe read "register a new

22 account."  And so if a user were to register a new

23 account, they would be taken to the registration page of

24 the Playpen website.

25 Q.   I feel like the least tech-savvy person in this

1   courtroom.  I've got this thing where you can read it

2   now.

3           I'm showing you what's been premarked as

4   Government's Exhibit 3.  What is this on your computer

5   monitor?

6   A.   This is the registration page that I just spoke of a

7   second ago.  This is what a user would have been

8   presented with after clicking on the link to register a

9   new account.  And so these -- this is the registration

10  message that was created by the creator of the Playpen

11  website.  It contains several things, again, that I

12  understand, based on my training and experience, to be

13  trade craft related to child pornography websites.

14  Q.   What are those things?

15  A.   Specifically this -- these instructions state that

16  in order to register an account on the Playpen website,

17  because of the software being used, a user has to enter

18  a e-mail address.

19          The board administrator cautioned users not to

20  enter a real e-mail address.  He stated that "The

21  software requires it, but we're not going to send you

22  any e-mail address.  Don't enter anything real; just

23  enter in something that looks like an e-mail address for

24  your own safety."  And so this, again, I understand to

25  be a trade craft common with these websites.

1        There is also other information contained on

2   the bottom of the page recommending security settings

3   that a user should enable on their computer when

4   accessing websites such as the Playpen website.

5        MR. DEAN:  At this time, your Honor, I'd like

6   to have this admitted as Government's Exhibit 3.

7        MR. ALFARO:  No objection, your Honor.

8        THE COURT:  Government's 3 will be received.

9   (By Mr. Dean:)

10  Q.   Special Agent Alfin, once you log in -- register,

11  log in, or log in as a returning user to Playpen, what

12  do you see when you get into the website?

13  A.   After logging in to the Playpen website, you are --

14  you were presented with the index page of the website.

15  And so Playpen was configured as a message board-style

16  website and so the index page contains various subforums

17  on the website that a user could then go to.  The

18  subforums had names and titles indicative of the type of

19  material that was advertised in those sections of the

20  website.

21        As an example, one of the most popular sections

22  of the website was the Preteen Videos Girls Hardcore

23  section, which would purport to advertise links to

24  videos of child pornography depicting prepubescent

25  females engaged in penetrative sexual activity.

1    Q.   And again, you have spent time going through the

2    Playpen website and are familiar with the contents

3    therein?

4    A.   I have.

5    Q.   Approximately all, part -- what percentage of this

6    website is dedicated to the furtherance or the

7    production, receipt, or possession of child pornography?

8    A.   Well, not every single subforum generally contains

9    links to images and videos.  The website in its entirety

10   is dedicated to the advertisement and distribution of

11   child pornography.

12   Q.   Thank you.  And you said that a lot better than I

13   said it.  Appreciate that.

14        What are we looking here that I've premarked as

15   Government's Exhibit 4?

16   A.   This is the top of the index page and so this

17   exhibit is -- was split up into multiple images because

18   the index page was very long and so this was the first

19   five subforums that would be displayed on the index

20   page.

21   Q.   Okay.  So we're doing this for ease of use, but as

22   you would pull it up, there would be a bunch, bunch of

23   topics that we're about to go through here?

24   A.   Correct.

25   Q.   Okay.

1   A.   And so all of these would display on one single Web

2   page, but they couldn't be shown properly on the slide

3   and so this is just a continuation of the names and

4   titles of these sections and subforums on the Playpen

5   website.

6   Q.   Based on your experience, what does the term

7   "jailbait" mean?

8   A.   "Jailbait" is generally a reference to under 18 boys

9   and girls who have started to show some signs of sexual

10  development, whether it be penis growth or breast

11  development but still child pornography, still children

12  under the age of 18.   Those images and videos in my

13  experience generally depict children aged between 13 and

14  17.

15  Q.   Girls SC/NN?

16  A.   SC is an abbreviation for soft core.   NN is an

17  abbreviation for nonnude.   Also appearing on the page is

18  an abbreviation HC, which is an abbreviation for

19  hardcore.

20  Q.   And on this index that we're looking at, you have

21  those, just call them subcategories, but then you have a

22  black line above that that says what?

23  A.   The black line at the top says preteen videos and

24  then the subforums listed under it are the subcategories

25  of preteen videos, girls, boys, et cetera.

1  Q.   Okay.  I have on this page a black box or category

2  entitled "Potpourri."  Does that mean anything?

3  A.   The Potpourri section is just a section for various

4  fetishes and other topics that don't necessarily fit

5  with the other areas.  Specifically, the toddlers

6  section is listed here because people searching out

7  generally prepubescent child pornography aren't always

8  interested in toddler material as well.  So the toddler

9  section had its own section on the website.

10 Q.   What was contained in the toddler section?

11 A.   As indicated and as would be expected on a website

12 such as this, it contained links to images and videos of

13 toddlers being sexually abused.

14      And this, these are the various subforums in

15 what was labeled the Kinky Fetish section of the Playpen

16 website including sections such as Bondage, Peeing,

17 Scat, which is a reference to feces, Zoo, which was the

18 bestiality child pornography website section of Playpen.

19 Q.   What's it say below "Zoo"?

20 A.   Below Zoo it says "Kids who really love their pets."

21 Q.   And again, that depicts pretty much what it says

22 there?

23 A.   Yes.  I reviewed the content from that section and

24 it does, in fact, contain child pornography involving

25 the abuse of both children and animals.

1   Q.   What's this next page say?

2   A.   This is the "Other Language" section of the Playpen

3   website.   There were various foreign language sections

4   where users could share and trade child pornography and

5   discuss that child pornography with people who spoke the

6   same language that they did.   They were not as heavily

7   trafficked as other sections of the Playpen website.

8   The majority of the Playpen website was in English.

9   Q.   And this final page?

10  A.   And this is the last two sections available on the

11  Playpen website for distributing both fictional and

12  nonfictional stories of real world child abuse.

13          MR. DEAN:   Your Honor, I'd like to have this

14  exhibit that I've paper-clipped -- it's about seven

15  pages -- together admitted as Government's Exhibit 4.

16          MR. ALFARO:   No objection, your Honor.

17          THE COURT:   Exhibit 4 will be received.

18  (By Mr. Dean:)

19  Q.   So we just saw a bunch of categories or forums.

20  Once you clicked on that forum, you would then -- what

21  would happen?   What would the user see?

22  A.   After -- for example, after clicking, viewing the

23  Preteen Videos Girls Hardcore forum link, after a user

24  clicked on that link, they would be taken to the Preteen

25  Videos Girls Hardcore section of Playpen.   And so on

1  that page, they would see topic titles for all of the

2  current posts in that section.

3          Those titles would generally describe the

4  images and videos of child pornography contained within

5  those posts.

6  Q.   And then once you clicked on that, you would

7  actually see previews or thumbnails like you previously

8  described?

9  A.   After clicking on one of these posts in the -- this

10  particular section of the website, you would generally

11  see a link to download videos or images.  In some

12  instances preview images would immediately be displayed

13  on your screen.

14  Q.   So once you discovered Playpen website and got on

15  there and discovered its contents, did you attempt to

16  find out who the administrator of the website was?

17  A.   Between August 2014 and December 2014, because

18  Playpen was operating as a hidden service, we were

19  unable to identify where the service was located and we

20  were unable to identify who was running it.

21  Q.   So for that period of time, would it be safe to say

22  that you could -- you knew about the website, you could

23  see it, you knew people were using it, but you had no

24  idea how to stop it?

25  A.   That is correct.  We did not have any viable

1   investigative means at that time to take down the

2   website.

3   Q.   Okay.

4   A.   And so in December 2014, the FBI received

5   information about the true location of the server

6   hosting Playpen.  I was able to independently verify

7   that information, and I was able to confirm that the

8   website was, in fact, being hosted in North Carolina.

9   Q.   Okay.  And what happened next in the investigation?

10  A.   We -- at that time we began the work to seize a copy

11  of the website.  We also began working to identify the

12  owner and operator of the website.

13  Q.   Was that person found?

14  A.   He was.  We were able to identify him, and he was

15  arrested at his residence in Naples, Florida, on

16  February 19th, 2015.

17  Q.   Were you present at the execution of that search

18  warrant?

19  A.   I was.

20  Q.   What of interest was found in the Naples, Florida

21  residence of the administrator of the Playpen site?

22  A.   Of most importance was found a laptop in the

23  residence, and at the time that I encountered the

24  laptop, it was actively logged in to the website, the

25  Playpen website, as the administrative account.  It was

1  also logged in to the servers hosting the Playpen

2  website as the root or administrative account of those

3  servers as well, and --

4  Q.   Which you testified to at that time was located in

5  North Carolina?

6  A.   Correct.

7  Q.   Okay.  I'm showing you what's been premarked

8  Government's Exhibit 5.  What are we looking at here?

9  A.   This is a picture of the home page as it was changed

10 to on sometime in the evening hours approximately of

11 February 19th, 2015.  This is the -- importantly on this

12 page, the logo has been changed and so this is the logo

13 that was active on the website when I encountered the

14 administrator's laptop in his residence on February

15 19th, 2015.

16       The logo has been changed slightly.  The text

17 and trade craft that I described earlier remains.

18 However, the two prepubescent females that I described

19 earlier have been replaced with what appears to be a

20 single prepubescent female posed in a sexually

21 suggestive manner.

22 Q.   Now, you don't know exactly, but you seem to have a

23 pretty good idea of when the logo change occurred.  Was

24 there something on the Web site that indicated when the

25 logo change?

1   A.   In the hours leading up to his arrest, review after

2   the fact found that the administrator had made a post

3   earlier that day indicating that he had just put the new

4   logo on the website.

5   Q.   Now, at the time that you were present in the home

6   of the administrator on February 19th, do you recall

7   taking specific notice of the fact that there was a logo

8   change on the homepage of the website?

9   A.   I did see the administrator's laptop screen.  I did

10  see that he was logged in to Playpen and so I did see

11  the new logo.

12         I did not observe the new logo at the time.  It

13  did not jump out to me as a significant or material

14  change to the website.  The website itself remained

15  unchanged.  It was still the same Playpen website.  It

16  was still a website dedicated to the advertisement and

17  distribution of child pornography.

18  Q.   Now, did you prepare the affidavit for the NIT

19  warrant that was sought in the Eastern District of

20  Virginia specific to this case?

21  A.   I did contribute information to that warrant, yes.

22  Q.   How did you describe the logo in that NIT warrant?

23  A.   In that NIT warrant, which reflects how the logo

24  appeared on a specific date and time, it did depict the

25  previous logo which featured the two prepubescent

1  females as opposed to the single prepubescent female.

2       And that, the warrant affidavit, I don't

3  remember the exact date, but it does say that that is

4  how the logo appeared on February, I believe it was

5  February 3rd, 2015, but there is a specific date of

6  review identified in that warrant.

7  Q.   Okay.  Was it your intent to try to mislead the

8  magistrate or --

9  A.   Absolutely not.

10  Q.   So what happened to the server that was located in

11  North Carolina?

12  A.   The server located in North Carolina was seized by

13  the FBI, and a copy of the Playpen website was

14  transferred to an FBI facility in the Eastern District

15  of Virginia.

16       At this time because of the nature of the Tor

17  network and how the Playpen website acted as a hidden

18  service, despite having seized the website and despite

19  having arrested the administrator, the FBI still has no

20  information at its disposal, no ability to actually find

21  and identify the members of the Playpen website.

22  Q.   What action did the FBI take once the server was

23  moved to Virginia?

24  A.   After the -- prior to putting the website back

25  online from a government facility in the Eastern

1  District of Virginia, the FBI sought and received a

2  search warrant which described the use of a network

3  investigative technique, also referred to as an NIT, as

4  the Court described previously.  And so the NIT warrant

5  was signed and the FBI put the server back online for a

6  period of approximately 13 days in an attempt to

7  identify other users and members of the Playpen website.

8  Q.   Are you familiar with the general operation of this

9  NIT that was deployed on the website?

10  A.   I am.

11  Q.   Why was it necessary to use a NIT in this case?

12  A.   As described previously, users who were connected to

13  the Playpen website, because it acted as a Tor hidden

14  service, even though it was under government control, we

15  still had no ability to determine the true location of

16  the users of the Playpen website and so the NIT was the

17  only investigative method available to the FBI that

18  would allow us to identify these users.

19  Q.   Describe for the Court generally how the NIT worked

20  in this case.

21  A.   As described in the NIT warrant application, the FBI

22  put forth an application stating that a user who logs in

23  to the Playpen website with a username and password, at

24  that point the FBI has probable cause to determine that

25  that individual is attempting to access, receive, or

1  distribute child pornography and so the actual

2  implementation was far more restricted than that.

3          In order for the NIT to be deployed, or

4  triggered, a user had to first log in to the Playpen

5  website with a username and a password.  They would then

6  have to navigate to a forum on the -- a subforum on the

7  Playpen website such as the Preteen Videos Girls

8  Hardcore forum.

9          After opening that forum and viewing the list

10 of topics contained in that forum, a user would then

11 have to open up one of those posts, and after opening

12 that post is the triggering event that would, for lack

13 of a better term, activate the NIT.

14 Q.    So the magistrate in Virginia actually gave y'all a

15 little bit broader authority than you actually utilized

16 when you employed the NIT?

17 A.    Yes.  Given the nature of the website, we had

18 probable cause to believe that anyone logging in to the

19 website was attempting to commit federal crimes

20 involving child pornography.  However, the FBI further

21 restricted how we deployed the technique for a variety

22 of reasons.

23 Q.    Agent Alfin, Judge Brooks earlier in his summary

24 referred to the NIT as malware.  Is that accurate?

25 A.    It's mostly an opinion that I personally don't

1  believe has any significant bearing on the matter at

2  hand.  However, I have noted in related hearings that my

3  personal opinion is that the NIT should not be

4  considered malware, the primary reason being malware is

5  an amalgamation of two words, "malicious" and

6  "software."  And so understandably so, individuals in

7  the computer science community have used the term "NIT"

8  to -- used the term "malware" to the refer to the FBI

9  NIT.

10          However, the word "malicious" has -- it has

11  very specific meaning within the context of a federal

12  criminal proceeding.  It appears in Title 18 of the

13  United States Code and so it is my opinion that society

14  would not deem the actions of a law enforcement officer,

15  acting under a court order, as malicious.

16          And so for that reason I do not believe the

17  NIT, in the course of a criminal proceeding, should be

18  referred to as malicious or as malware; again, my

19  opinion based on the meaning of the word "malicious" as

20  it appears in Title 18.

21          THE COURT:  But other than the fact that you

22  take exception to the word "malicious" since law

23  enforcement would be using this technique in an ethical

24  manner, a legal, permissible manner presumably,

25  structurally the way that it is deployed onto the user's

1  computer, does it work similar to the way that an

2  unethical hacker --

3        THE WITNESS:  It does, your Honor, yes.

4  (By Mr. Dean:)

5  Q.  Were reports generated regarding the users,

6  including their activity, collected by the NIT as you

7  described?

8  A.  Yes.  The FBI generated user reports for user

9  accounts on the Playpen website.  Those reports contain

10 two different sets of data.

11       One set of data is information related to the

12 website and it's collected independent of the NIT and so

13 that information contains information -- excuse me.

14 That report contains information such as the date that

15 the user account was registered; the number of hours

16 that that user account was logged in to the website.

17       It also contains information specific to the

18 time period February 20th, 2015, through March 4th,

19 2015, that shows specific actions that that user took

20 during that timeframe.

21       We're able to include that information in the

22 report -- excuse me -- only for that 13-day period

23 because that is the period where the FBI had control of

24 the website.  And so for those 13 days, we can say

25 exactly what each user on the website did, what posts

1   they went to, and what images of child pornography that

2   user downloaded and so the second --

3   Q.   I'm sorry.  Continue.

4   A.   The second set of data contained in this user report

5   is the data that was collected by the NIT.  And so the

6   data that was collected by the NIT are the items that

7   the Court described previously, and they are the items

8   that are described in the attachment to the NIT search

9   warrant from the Eastern District of Virginia.

10  Q.   Okay.  And that would be only the date and time the

11  FBI received the information, the IP address, the MAC

12  address, the hostname, the log-on name, and the

13  operating system of the computer?

14  A.   That information is displayed in that portion of the

15  report, correct.

16  Q.   Was such a report generated for a user by the --

17  that went by "regalbegal"?

18  A.   Yes.

19  Q.   According to the report, how many hours was

20  regalbegal logged onto the Playpen website during the

21  time period that you've described, the two-week time

22  period?

23  A.   Well, it doesn't get down to that level for that

24  piece of information.

25  Q.   Sorry.

1  A.   The actual, the regalbegal account over the course

2  of approximately five or six months between the time it

3  was registered and between March 4th, 2015, spent just

4  under 30 hours logged in to the Playpen website.

5  Q.   And you were able to see how many posts were

6  accessed by regalbegal during the time that the FBI took

7  over this website.  Is that accurate?

8  A.   Correct.

9  Q.   How many?

10 A.   During just the 13 days when the FBI had control of

11 the website, the regalbegal accessed approximately 70 or

12 72, 74 posts on the website.

13 Q.   Now, on this report that was of information

14 collected by the NIT -- and I'm sure the Court is

15 familiar with this, but just to make a good record, what

16 exactly is an IP address?

17 A.   An IP address can be thought of similar to a phone

18 number.  Anyone who wants to access the Internet, anyone

19 who wants to access a website, you need to connect to

20 the Internet using an IP address.  And your IP address

21 is assigned to you by your Internet service provider, be

22 it Verizon, Comcast, Cox, AT&T, whoever your Internet

23 service provider is.

24        And so you receive your IP address from that

25 provider and that allows you to communicate with other

1    computers, with other devices across the Internet.

2         At any given time, only one -- only one modem

3    connected to the Internet can have an IP address and so

4    if you are able to identify an IP address and a date and

5    a time that it's associated with criminal activity, you

6    can take that information, put it into an administrative

7    subpoena, provide it to an Internet service provider,

8    and they can tell you who was using that IP address on

9    that date and time.

10   Q.   So to simplify, if there was an Internet -- one

11   Internet connection in this courtroom right now,

12   wireless connection, four or five people were on it,

13   there would be one IP address for this Internet

14   connection?

15   A.   When you have a household or a business or other

16   organization that has multiple devices connecting to the

17   Internet, it's common that that organization or that

18   household will use something called network address

19   translation, and what that means in layman's terms is it

20   allows multiple computers, phones, devices to connect to

21   the Internet all through the same IP address.

22        So generally if you have Internet service at

23   your home, your -- the modem, the device given to you by

24   your Internet service provider will have one IP address,

25   and all the devices accessing the Internet from your

1  home will share that IP address through the technology

2  that I referred to as network address translation.

3  Q.   Okay.  And then going further, what is the MAC

4  address?  What does that refer to?

5  A.   An MAC address is a unique identifier associated

6  with a particular network adapter.  And so if you use a

7  wi-fi card on the laptop or a hardwired network

8  connection on a desktop computer or other device, or

9  even on a cellphone, every single network adapter that

10 you use to connect to an Internet has a unique MAC

11 address associated with it, and that MAC address

12 generally does not change.

13         And so even if your -- even if your IP address

14 from your Internet service provider changes, the MAC

15 address on, say, your laptop computer will not.  That is

16 essentially hardwired into that device.  It is a unique

17 identifier.

18 Q.   Are you aware in this specific case what regalbegal

19 did to trigger -- what user regalbegal did to trigger

20 the NIT?

21 A.   Yes.  In the matter at hand, a user using the

22 regalbegal account logged in to the Playpen website with

23 the previously established regalbegal account.  After

24 arriving at the index page of the website, that user

25 went to the Preteen Videos Girls Hardcore section of the

1   Playpen website and then that user opened a post that

2   purported to advertise prepubescent female children

3   engaged in penetrative sexual activity.

4   Q.   And at that point the NIT was deployed on that

5   computer?

6   A.   That's correct.

7   Q.   Once the data was collected by the NIT, where was it

8   returned?

9   A.   It was returned to and collected by a government

10   FBI-controlled server in the Eastern District of

11   Virginia.

12   Q.   And once that information was returned, how were

13   investigating agents able to access it?

14   A.   After that information was collected, it was put

15   into the reports that we described earlier.  Using the

16   information that was collected, we sent out

17   administrative subpoenas using the IP addresses that

18   were collected in order to identify the users of the

19   Playpen website.

20          The reports that we generated were sent to the

21   various FBI field offices containing the summary of the

22   user accounts, the activities that those user accounts

23   performed, and the information collected by the NIT.

24   Q.   And I should have asked earlier.  In terms of the

25   deployment of the NIT, when the user clicked on the

1  particular message that you described earlier, is that

2  an active process or a passive process?

3  A.   The user actively, they browse through the website

4  and they open up that post.  The NIT was deployed

5  silently in the background without the user's knowledge.

6  Q.   So just to be clear, the NIT did not deploy for

7  anybody who merely logged onto the website?

8  A.   That is not always the case.  In a number of

9  instances, specific users who had previously been

10  determined to be involved in -- as an example, if any

11  administrator of the website logged in, the NIT would be

12  triggered for that user.

13  Q.   Okay.  But --

14  A.   But in general, for users such as the regalbegal

15  account, who were not moderators and administrators, for

16  those users generally they would have to navigate down

17  into the website and actually access material on the

18  website.

19  Q.   And that's what I was getting to.  Poorly worded

20  question.

21        Does the IP address come from a user's computer

22  or someplace else?

23  A.   So because of the technology that I described

24  earlier, network address translation, the IP address

25  that the NIT collects generally isn't actually resident

1    on that device.  It's resident on the modem that that

2    user is using to connect to the Internet.

3            And so when the NIT collects the information

4    that it's authorized to collect and sends it back to the

5    government over the Internet, we can see what IP address

6    that information is coming from, and that is the IP

7    address that we use to identify the users of the

8    website.

9    Q.   How?

10   A.   So because we have now collected that IP address, we

11   have a specific date and time that that IP address was

12   collected.  We know that it was associated with a

13   particular user on the Playpen website.  We were able to

14   use that IP address to issue an administrative subpoena,

15   and the Internet service provider will then identify

16   that user to us.

17   Q.   So in this case the defendant, Anthony Jean, was

18   physically located in Benton County, Arkansas, at the

19   time the NIT was deployed.  Did that information pop up

20   when the NIT was deployed, that you had a computer in a

21   house in Benton County, Arkansas?

22   A.   After the FBI received the IP address from the NIT,

23   we were able to generally geolocate the area.  If you

24   know an IP address, there are a number of databases and

25   websites that you can use to try to figure out which

1    part of the country that IP address is in and so we

2    could reasonably determine that IP address belonged to

3    an individual in the Arkansas area.  However, we could

4    not get the street address or subscriber name without

5    sending a subpoena first.

6    Q.   Okay.  And that was next question:  What further

7    steps did you have to take to narrow it down to an

8    individual's residence?

9    A.   We sent a subpoena to the Internet service provider.

10   The IP address also is publicly registered to a specific

11   Internet service provider and so you look up who that

12   provider is and that is who you serve the subpoena on.

13   Q.   So the NIT gives you a number, an IP address; then

14   you have to use another tool outside of the NIT to

15   narrow that down to a regional area and get an Internet

16   service provider; and then you have to get further

17   information from that Internet service provider?

18   A.   That's fair, yes.

19   Q.   Was the information collected by the NIT in this

20   case ultimately tied to the defendant's residence in

21   Benton County, Arkansas?

22   A.   Yes, it was.

23   Q.   Okay.  And were you present for any search warrants

24   executed here in the Western District of Arkansas?

25   A.   I was not.

1    Q.   Have you reviewed reports and talked to agents about

2    the execution of the search warrants here?

3    A.   I have been informed that a search warrant was

4    executed.

5    Q.   Okay.

6    A.   I was informed that Mr. Jean made statements that

7    can be construed as admissions, and I was further

8    informed that evidence relating to child pornography was

9    seized from the residence.

10   Q.   Are there any questions that I have left out that

11   you feel you need to advise the judge of at this time?

12   A.   Not at this point in time.

13   Q.   Okay.

14            MR. DEAN:   Thank your Honor.

15            THE COURT:   Mr. Dean, I meant to say this at

16   the beginning of the hearing, but I failed to do so.

17   There is a separate motion to compel production of

18   certain information that has been briefed, but that was

19   not set for a hearing today.  But to the extent that you

20   would like to elicit testimony from either of the

21   witnesses today that go to that issue, you should feel

22   free to do so if that would avoid the necessity of

23   having to recall the witness.

24            If we need to have a hearing on that and you'd

25   like to recall them at that time, that's fine.  I'm just

1    giving you the opportunity today, if you wanted to, to

2    inquire --

3              MR. DEAN:  Your Honor --

4              THE COURT:  -- to any testimony that might

5    support or oppose that motion.

6              MR. DEAN:  I appreciate that.  Can I have a

7    second to confer with my witness?

8              THE COURT:  Well, better than that.  You can go

9    ahead and let Mr. Alfaro conduct his cross-examination

10   and then we'll -- depending on how long that is, we'll

11   probably take a break and then you can come back and go

12   over that before you rest.

13             MR. DEAN:  I appreciate that, your Honor.

14   Thank you.

15             THE COURT:  Mr. Alfaro?

16             MR. ALFARO:  Thank your Honor.

17                          CROSS-EXAMINATION

18   BY MR. ALFARO:

19   Q.   Agent Alfin, my name is Joe Alfaro.  Sometimes I

20   speak too fast.  So if I speak too fast and you don't

21   understand a question, just let me know, okay?

22   A.   Okay.

23   Q.   Thank you.

24             In your direct testimony, you were talking

25   about some language that was associated with the Playpen

1  website.  Specifically I believe it was -- here it is --

2  Government Exhibit 5.  Got it backwards.

3          MR. DEAN:  I didn't make that easy on you.  I'm

4  sorry.

5  (By Mr. Alfaro:)

6  Q.   Right there, where it says ".7z preferred"?

7  A.   Yes.

8  Q.   You said that that was indicative in your experience

9  of trade craft involving child pornography?

10  A.   Not that line on its own.  The totality of all that

11  information there.  7-Zip, as I also stated in my

12  direct, can be used for legal purposes.  I frequently

13  use it for legal purposes during the course of my work.

14  Q.   So when you said -- you provided a copy of the NIT

15  code to my office, correct, or you had that sent?

16  A.   I prepared it and I believe it was --

17  Q.   Was that deployed with 7z also?

18  A.   It was.

19  Q.   The "no cross-board posts," would that be something

20  in a general chat room?

21  A.   I'm not familiar with any chat rooms where that

22  would be utilized.

23  Q.   You're not familiar with any chat room where they

24  say don't cross-post on different topics?

25  A.   Sorry.  What are you implying that cross-board --

1    what "cross-post" means?

2    Q.   How about, can you explain to us what "no

3    cross-post" means.

4    A.   So in the context of the Playpen website, this is a

5    warning and a rule that exists on multiple child

6    pornography websites that I reviewed and so what it

7    means is generally when you share a link to a video

8    or --

9    Q.   Let's back up.  Here's my question.

10            MR. DEAN:  Your Honor, if he can answer the

11   question that he was asked and then we can move on with

12   another question.

13            MR. ALFARO:  Well, Judge, if I can clarify.  My

14   question was what does "cross-board post" mean, not

15   reference to the specific website.  Just what does that

16   mean.  So that's the -- where I'd like to start.

17            MR. DEAN:  And it sounded to me like he was

18   attempting to answer that before he was cut off.

19            THE COURT:  Well, I'm going to let you rephrase

20   your question one more time.  And to the extent that the

21   witness can answer that in a generic sense, he may.

22            MR. ALFARO:  Thank your Honor.  I'll rephrase.

23   (By Mr. Alfaro:)

24   Q.   Is it possible for there to be this prohibition of

25   cross-board posts on chat rooms not associated with

1  child pornography?

2  A.   Certainly.

3  Q.   You testified on your direct that you first came

4  into knowledge about this Playpen website in August of

5  2014?

6  A.   Approximately August 2014, yes.

7  Q.   Then in December of 2014, you received information

8  from a foreign law enforcement agency about the Playpen

9  website.  Would that be correct?

10 A.   That's correct.

11 Q.   Around that time Playpen had been accessible on the

12 normal Internet, correct?

13 A.   Very briefly, to very select individuals, yes.  Due

14 to a misconfiguration in the server that was hosting the

15 Playpen website, if you knew the true IP address of the

16 Playpen website, such as an administrator would, you

17 could actually use a regular Internet browser and access

18 the Playpen website, despite the fact that it was

19 configured as a Tor hidden service.

20 Q.   Are there type of technologies that someone can use

21 to just access every single website in a matter of

22 minutes?

23 A.   I'm sorry.  Could you clarify the question?

24 Q.   Sure.  Is there a type of technology where someone

25 could access all the IP addresses on the Internet and

1  look at those pages?

2  A.  In a matter of minutes?  No.  There are millions and

3  billions of websites that exist on the Internet.  That

4  could not be done.  You could not review that material

5  in a matter of minutes.

6  Q.  You testified that you participated in the search

7  warrant in Florida for the administrator's website,

8  correct?

9  A.  I participated in the execution of the search

10  warrant at the residence of the individual who created

11  the Playpen website.

12  Q.  Okay.  Agent, and just so I can move things faster,

13  a lot of my questions are going to be yes or no.  If it

14  can't be explained with a yes or no, just let me know,

15  and I'll give you the opportunity.  I'm certainly not

16  going to try and ask anything that's going to trip you

17  up, okay?

18  A.  Okay.

19  Q.  Thank you, agent.

20      When you executed the search warrant of the

21  administrator, did you see his laptop?

22  A.  I did.

23  Q.  When you saw his laptop, did you see the homepage?

24  A.  I don't recall if it was the homepage, but a page of

25  the Playpen website was displayed on the laptop screen.

1   Q.   Did you see this page (indicating)?

2   A.   Well, no.  That is the prelog-on page.  When I

3   observed the laptop, the administrator had logged on to

4   the website already.

5        However, in the effort of being direct, the

6   logo that is displayed on this page was displayed on the

7   page that I saw at the administrator's residence.

8   Q.   So when you saw the page, you saw the logo, this

9   logo right here in Government Exhibit 5?

10  A.   That is correct.

11  Q.   And you test- -- is it true that you testified on

12  direct that this logo is not the same logo that's

13  mentioned in the application for the NIT warrant?

14  A.   That is correct.

15  Q.   Did you also testify that you aided in the

16  preparation of the application for the NIT warrant?

17  A.   Prior to leaving for Florida, I did aid in preparing

18  that warrant, yes.

19  Q.   The search warrant, the NIT search warrant, that was

20  prepared after the search of the residence in Florida,

21  correct?

22  A.   It was sworn to after the search warrant execution

23  began, but the material that I contributed to it, I

24  contributed to it before leaving my office for Florida.

25  Q.   So before it was submitted to Judge Buchanan, the

1   search had already occurred --

2   A.   The search in Florida --

3   Q.   -- in Florida?

4   A.   -- had already occurred, yes, that's correct.

5   Q.   And you had already seen this image?

6   A.   That's correct.

7   Q.   Did you convey this discrepancy to the affiant of

8   the warrant in the Eastern District of Virginia, that

9   NIT warrant?

10  A.   I did not.

11  Q.   Was Judge Buchanan in any way notified of the change

12  in the logo?

13           MR. DEAN:  Your Honor, I'm going to object to

14  this line of questioning.  The defense counsel has not

15  asked for a Franks hearing.  It's kind of getting close

16  to that.  We've kind of gone over the fact that the logo

17  has changed; he didn't notice it; he didn't put it in

18  the warrant.  I think we should move on.

19           THE COURT:  Well, I'm going to overrule your

20  objection, but I would say to Mr. Alfaro, I think I've

21  got the point.

22           MR. ALFARO:  Thank your Honor.

23           THE COURT:  You can proceed.

24           MR. ALFARO:  Your Honor, that was the last line

25  of questioning for that.

1    (By Mr. Alfaro:)

2    Q.   Do you know if Judge Buchanan had any questions

3    about how the NIT worked before it was signed, the

4    warrant?

5    A.   I'm not aware of whether or not the judge asked any

6    questions.

7    Q.   Would I be correct in saying -- in summarizing your

8    direct in saying that due to the nature of the Tor

9    browser, you couldn't identify the person or the

10   location of people who were logging in to the website?

11   A.   I would say due to the nature of the Tor network

12   that that is generally true, yes.

13   Q.   So it was impossible for you to determine who and

14   where these individuals were without the use of the NIT?

15   A.   Generally, yes.

16   Q.   You testified in direct, I believe, that the FBI

17   seized the server of the Playpen from North Carolina and

18   moved it to Virginia?

19   A.   We transferred a copy of the website to Virginia.

20   We did not physically move the server from North

21   Carolina.

22   Q.   So the server in North Carolina, was that running

23   Playpen?

24   A.   As of the time that it was seized, yes.

25   Q.   How about after it was seized?

1  A.    No.

2  Q.    So would I be correct in saying that the only server

3  that was running Playpen after February 20th was the FBI

4  server in Virginia?

5  A.    I think that's accurate, yes.

6  Q.    Once the server or the copy of the server of Playpen

7  was under the control of the FBI, did you shut it down

8  immediately?

9  A.    We shut down the server in North Carolina

10 immediately after seizing it and then we took the copy

11 of the website to our server in the Eastern District of

12 Virginia and then we brought the website back online

13 there.

14 Q.    So it was still operational when it was in Virginia?

15 A.    We made it operational in Virginia.

16 Q.    So you had -- it was not operational, transferred to

17 Virginia, and then you restarted it to make it

18 operational?

19 A.    Yes.  It was shut down for a period of time while it

20 was being transferred, the data was being transferred

21 from North Carolina to Virginia.

22 Q.    And individuals -- once it was operational in

23 Virginia, people were still allowed to access it by

24 logging on?

25 A.    Yes, that's correct.  They could continue to access

1  the website as they had done previously.

2  Q.   And then at that point in time, the FBI wanted to

3  utilize this thing, the NIT?

4  A.   The NIT warrant was signed prior to the FBI turning

5  the website back on.

6  Q.   And was I -- did I hear correct that the warrant

7  that you received authorized you to deploy the NIT

8  automatically when someone logged in to the website?

9  A.   Correct.  After logging in to the website, the

10  warrant authorized us to utilize the NIT at that time.

11  Q.   And on some users that occurred, and on some users

12  it didn't occur?

13  A.   We -- again as I stated earlier, for users such as

14  administrators of the website, if an administrator of

15  the Web site had logged in, an attempt would be made to

16  deploy the NIT against them at that time.

17  Q.   Okay.

18  A.   For the majority of users, it was more restricted.

19  Q.   When the NIT is put on the server in Virginia,

20  before anybody logs in, is it collecting any identifying

21  information?

22  A.   No.

23  Q.   Then when someone logs in, there is a triggering

24  mechanism that deploys this NIT, correct?

25  A.   That's correct.

1  Q.   Then this NIT is transmitted to these computers

2  unknowingly?

3  A.   Unknowingly to the user of the Playpen website,

4  that's correct.  They did not know that it was

5  happening.

6  Q.   And then the NIT is downloaded to the target

7  computer?

8  A.   Yes, that's correct.

9  Q.   And in this case Mr. Jean's computer, that would

10  mean it would allegedly be in Arkansas?

11  A.   That's correct.

12  Q.   Once the NIT gets to the computer in Arkansas, is it

13  the NIT -- let me rephrase that.

14        Is there a component that forces the NIT to run

15  on that computer?

16  A.   I'm sorry.  The question doesn't make sense from a

17  technical perspective, but if you'll allow me, I think I

18  know where you're going and I can answer the question.

19  Q.   Well, I guess I'll just be more direct.  Is there

20  something called an exploit, which is a -- I assume is a

21  set of computer instructions, that allows the NIT to

22  run?

23  A.   There is an exploit that is used in the case and so

24  the exploit can be thought of as an open window on the

25  computer.  And so the government, obviously we know

1  about this open window and that's what we're able to
2  send the NIT through.  And so we use this exploit, the
3  open window, and we send the NIT.
4  Q.   Could the NIT have --
5  A.   The NIT collects the --
6  Q.   I'm sorry.
7  A.   The NIT collects the information and sends it back
8  to the government.  The state of the window, it was open
9  when we got there; it was open when we left.  We did not
10 have any impact or make any change to the window.
11 Q.   Well, you said you didn't make -- you said you
12 didn't make any changes.  Did you review a copy of the
13 exploit code?
14 A.   I have not actually reviewed the source code for the
15 exploit, but I have used it on a computer under my
16 control and observed that it does not make any changes
17 to the computer.
18 Q.   It didn't make any changes to the computer that you
19 deployed it on?
20 A.   That's correct.
21 Q.   But you don't know if that exploit changed any of
22 the other computers?
23 A.   I do.  It was the same exploit that was used.  It
24 was not capable of making changes to the computer.
25 Q.   Could the NIT have run without the exploit?

1  A.   You're connecting them in an awkward way, but we

2  would not have had a mechanism to deploy the NIT without

3  the exploit.   We would not have had a mechanism, right,

4  to deploy the NIT without the exploit.

5  Q.   Did the NIT warrant mention anything about the

6  exploit?

7  A.   It did not have the word "exploit" in it, but it did

8  have a thorough breakdown of how the NIT was going to

9  work and the information that was going to be collected.

10 Q.   When the NIT is doing whatever it is it's supposed

11 to do -- you said it's collecting information, correct?

12 A.   Yes, that's a fair statement.

13 Q.   And it's collecting information on a computer

14 located outside of Virginia?

15 A.   In some instances, yes.

16 Q.   And then the NIT sends the information back to

17 Virginia?

18 A.   Yes.

19 Q.   Did the NIT in this case, Mr. Jean's case,

20 successfully -- execute successfully on Mr. Jean's

21 computer?

22 A.   It did.

23 Q.   Did it collect everything that it was supposed to

24 collect?

25 A.   It did.

1  Q.   What categories of information did the NIT collect?

2  A.   It collected items identified in the NIT warrant

3  attachment, such as the MAC address that was in use on

4  the computer, the operating system version that was in

5  use on the computer, the hostname of the computer, and

6  the active username on the computer.

7  Q.   This is -- the information you described, was that

8  provided in the document -- or the software that you

9  would call the two-way network data stream?

10 A.   Yes.  The network data that was transmitted from the

11 defendant's computer to the government's server was

12 collected, and it was provided to defense for review.

13 Q.   Where was that information received?

14 A.   Where, where did we collect the network data?

15 Q.   Yes.

16 A.   It was collected at the server in the Eastern

17 District of Virginia.

18 Q.   Is that data that the FBI received and recorded the

19 exact same data that's sent by the NIT?

20 A.   Yes.

21 Q.   Did the information sent by the NIT change when it

22 was sent from the defendant's computer to the government

23 computer?

24 A.   There was no individual or organization in existence

25 that would have had the capability to do that and so I

1  can say it with certainty that the information sent from

2  the defendant's computer to the government was not

3  changed and it was, in fact, identical to the

4  information sent from the defendant's computer.

5  Q.   How many computers were targeted with the NIT?

6  A.   Any user who accessed the website and met the

7  triggering condition would have been --

8  Q.   Do you know how many?  Can you give me an estimate

9  of how many numbers?

10  A.   I can tell you in the matter at hand, it was one

11  computer.

12  Q.   I guess -- well, my question is this.  You estimated

13  about -- a percentage of the websites dedicated to child

14  pornography and it was a rough guess.

15        Can you give me a rough guess of how many users

16  you targeted with the NIT?

17        MR. DEAN:  Objection.  I think this is

18  irrelevant to this case.  We're dealing with Mr. Jean.

19  We're not dealing with all these other cases.

20        MR. ALFARO:  I don't think it's irrelevant.

21  We're talking about the nature of the technology, how

22  many users were targeted and how the NIT worked and if

23  it was the same for every computer.

24        THE COURT:  Overruled.

25  A.   There were -- during the time that the FBI had

1  control of the website, there were approximately 100,000

2  user accounts that were active in that timeframe that

3  would have been subject to an attempted deployment of

4  the NIT.

5  Q.   So would I be correct in estimating that about

6  100,000 user accounts were subject to the NIT warrant?

7  A.   Yes, approximately 100,000 user accounts logged in

8  to the Playpen website and met the triggering condition

9  as identified in the Playpen warrant.

10          I should clarify.  It was common trade craft in

11 some cases for users to register new accounts every time

12 they logged on to the website and so that 100,000 number

13 is not an indication that there were 100,000 unique

14 individuals.  There could have been individuals using

15 multiple accounts and so I just want to be clear --

16 Q.   Sure.

17 A.   -- that it's 100,000 Playpen user accounts, which is

18 not translated into 100,000 individual computers.

19 Q.   So then my question is in your estimation, since

20 you're the lead agent for the NIT that was distributed

21 in this operation, could you please estimate how many

22 users, actual individual users, were subject to the NIT?

23          MR. DEAN:  Your Honor, I'm going to renew my

24 objection.  This is irrelevant to the case against

25 Mr. Jean.

1          THE COURT:  Overruled.

2  A.   100,000 user accounts met the triggering condition

3  and were subject to the conditions in the NIT warrant.

4  Q.   So is it --

5  A.   Approximately 100,000.

6  Q.   So it was approximately 100,000 individuals?

7  A.   No.  100,000 Playpen user accounts.

8  Q.   So then my question is approximately how many

9  individual users -- you don't have to give me an exact

10  number -- that the NIT was targeted towards?

11  A.   Again, I feel like I've answered the question and

12  detailed why I can't give you the exact user number.  It

13  was 100- -- approximately 100,000 unique Playpen user

14  accounts.  Some users reused -- did not reuse their

15  account every time.

16  Q.   So --

17  A.   In my estimation --

18  Q.   You don't know how many individual --

19          THE COURT:  Mr. Alfaro?

20          MR. ALFARO:  I'm sorry.

21          THE COURT:  We can't have two people talking at

22  the same time.

23          MR. ALFARO:  I understand, your Honor.  I

24  apologize for that.

25  A.   Based on my training and experience, in review of

1    the Playpen website, most users did reuse an account.

2    So I would estimate that the number of unique

3    individuals who were subject to the warrant would be

4    slightly less than the 100,000 number.  I think that's

5    the question that you're asking.

6    Q.   Thank you.  I'll move on.  I'm not trying to

7    strong-arm you.  I apologize if I'm coming off that way.

8              Before the NIT was deployed in your

9    investigation --

10             MR. DEAN:  Your Honor, may we approach?

11             THE COURT:  No.

12             MR. DEAN:  Okay.

13             THE COURT:  But you can object and state

14   something.  I don't know why we need to approach.

15             MR. DEAN:  It's on a related matter but not in

16   response to his question.  I wanted to do it out of the

17   purview of the witnesses.

18             THE COURT:  Oh, outside of the witnesses'

19   hearing?

20             MR. DEAN:  Yes, your Honor.

21             THE COURT:  All right.

22             (Bench conference, to wit:)

23             MR. DEAN:  Your Honor, the government is not

24   trying to be obstructive in this case but we do have

25   vast concerns with specifically witness Soghoian

1    actively tweeting information about these cases also and

2    using social media to talk about these cases.

3           He has left the courtroom a couple of times.  I

4    have no reason to believe that he has been tweeting, but

5    I would like the Court to possibly issue a gag order to

6    all the witnesses and parties in this case to not talk

7    about anything that has been going on while this

8    matter's pending because I don't want to taint a

9    possible jury panel.

10          So getting to some of the stuff -- and that's

11   why I'm objecting because some of the stuff I can

12   totally seeing it show up on social media with this guy.

13   And again, I'm not saying anything negative about him

14   but he just, he likes to use his First Amendment right

15   quite a bit.

16          In this case I don't want any of our potential

17   jury members in the Western District of Arkansas to be

18   tainted by any of this material.  So I would like a gag

19   order to be placed.

20          THE COURT:  Well, number one, Mr. Alfaro, why

21   is your witness getting up and leaving the courtroom?

22          MR. ALFARO:  My understanding, your Honor, he's

23   a lot like me.  He drinks a lot of water and has to

24   urinate frequently.  So he's asked me -- or told me on

25   at least two occasions he needs to use the rest room.

1   So that's my understanding.

2           THE COURT:  All right.  Go ask him if he has

3   been tweeting or using any other social media during the

4   course of this hearing when he's stepped outside.

5           MR. DEAN:  And I will say for the record that

6   we do have information that he tweeted probably about an

7   hour before that he was testifying.  That's my concern.

8           THE COURT:  Please go ask him.

9           MR. ALFARO:  Yes, sir.

10          He's assured me, your Honor, that he's been

11  going to the rest room.  He is not using his phone.

12  He's not tweeting, not using social media.  His phone is

13  on airplane mode, which I understand is he can't access

14  the Internet.

15          THE COURT:  Does that satisfy your inquiry?

16          MR. DEAN:  I would still like a gag order to be

17  placed on all the witnesses in this.

18          THE COURT:  I'm not going to do that.  Based on

19  the foundation that you have sketched out, which, based

20  on Mr. Alfaro's inquiry is completely -- is a completely

21  unsubstantiated premise.

22          This hearing is not closed.  Members of the

23  public could walk in.  A reporter for a national

24  publication could walk in here, take scrupulous notes

25  and walk outside afterwards and have a story online in

1    five minutes.  And so no.

2              MR. DEAN:  Okay.  Thank your Honor.

3              (End of bench conference.)

4    (By Mr. Alfaro:)

5    Q.   Agent Alfin, during your investigation with this

6    Playpen website and the Tor browser, did you ever

7    attempt to try and search for the Playpen website in a

8    Tor search engine?

9    A.   What are you referring to as a Tor search engine?

10   Q.   I believe you testified on direct examination that

11   there are things like a hidden wiki or something that

12   makes these Tor -- these websites that are being

13   operated in a Tor network searchable?

14   A.   So I just want to be -- I want to be clear.  The

15   words "search engine" typically refers to a website with

16   the capabilities and functions such as Google or Bing.

17   There are what I refer to as sometimes called hidden

18   service search engines that don't have those same

19   capabilities and so I just want to be clear that I'm not

20   implying that they have those same capabilities.

21             I did find links to the Playpen website

22   advertised on child porn index pages within the Tor

23   network.

24   Q.   Did you try to search for the Playpen website on a

25   regular Internet browser?

1  A.   On a regular search engine?

2  Q.   Yes.

3  A.   I did not.

4          MR. ALFARO:  If I may have one second, your

5  Honor.

6          THE COURT:  Sure.

7  (By Mr. Alfaro:)

8  Q.   I think I have a better way of asking my last

9  question we were hung up off of, and this will be the

10  last question I have for you now.

11          How many computers did the NIT successfully

12  deploy on?

13  A.   There are a number of ongoing investigations, both

14  domestically and internationally.  If the Court orders

15  me to answer that question, I will, of course.  However,

16  I would ask for the Court's permission to either refrain

17  from answering the question or answer that question in a

18  manner that would not make it publicly available.

19          MR. DEAN:  And, your Honor, I'm going to object

20  again to relevance.

21          MR. ALFARO:  And, your Honor, given the agent's

22  statement, we are fine with whatever the Court's

23  position is on that question.

24          THE COURT:  Well, agent, you've mentioned the

25  number of user accounts that accessed the Playpen

1   website during the period that it was monitored by the

2   FBI.  This question has been asked several times, but

3   let me try to ask it one more time a little bit more

4   succinctly.

5          Do you know, or does the FBI have data which

6   would suggest how many unique individuals accessed the

7   Playpen website during the period of time when it was

8   monitored by the FBI?

9          THE WITNESS:  I don't want to -- I don't want

10  to seem combative, but I think the two questions -- I

11  know how many individuals that the NIT successfully

12  identified.  I do know the answer to that question.

13         It is my belief that that could compromise

14  ongoing investigations but I, of course, will answer the

15  question if your Honor orders me to.

16         THE COURT:  All right.  What is secretive if

17  we're talking about orders of magnitudes?  We know that

18  there were 100,000 user accounts that accessed it.  Help

19  me understand what is sensitive about knowing the order

20  of magnitude relative to 100,000 of individuals that

21  were identified?

22         THE WITNESS:  Because of the nature of how we

23  share information with foreign law enforcement agencies,

24  all of the -- currently on the Tor network, Playpen has

25  obviously been taken offline.

1          There are other websites that have risen to

2    fill the void that have hundreds of thousands of users

3    on them and so every document that has been filed

4    unsealed in these Playpen investigations, a number of

5    tweets made by the defense expert in this case are

6    heavily scrutinized and analyzed by members of those

7    communities and so they read those and they react to

8    them and they say, well, it looks like they share

9    information with this country or that country; so we

10   should start wiping computers; or, this investigation

11   was larger or smaller than we thought it was.  So people

12   are safe; people are not safe.

13          There are a number of legal proceedings going

14   on in multiple foreign countries.  In some of those

15   countries not all -- despite the fact that our

16   investigation took place in early 2015, because of the

17   amount of time it takes to get work done in some foreign

18   countries, there are still some individuals of the

19   website who have not yet been arrested or apprehended.

20          And so my concern is that giving a clear

21   answer -- again, I will certainly do that if the Court

22   orders it, but giving that answer may jeopardize those

23   investigations that are still ongoing.

24          It is certainly my belief that at some point in

25   time, that information will come out.  There is no way

1    to prevent it, but because of the nature of the ongoing

2    investigations and my personal opinion that it is not

3    related to the defendant, that is why I would request

4    the Court's permission not to answer that.

5                THE COURT:  Well, let me be a little more

6    specific to be sure we're talking about the same thing.

7    In order to get to Mr. Jean, there were at least two

8    steps involved.  One was the information recovered from

9    the NIT; in particular, the IP address.

10               THE WITNESS:  Yes, your Honor.

11               THE COURT:  The second step was to make -- to

12   serve an administrative subpoena on the Internet service

13   provider, and that provided you with a name and

14   residential address that corresponded to the account

15   that the Internet service provider had with its

16   customer, correct?

17               THE WITNESS:  Yes, your Honor.

18               THE COURT:  When -- the question at hand about

19   how many individuals have been identified by law

20   enforcement, is the number that you are guarding and

21   seek not to answer the number of specific individuals or

22   the number of unique IP addresses that were recovered

23   that would -- in other words, IP addresses would still

24   have some measure of anonymity; the second step would

25   provide you more specifics.

1          Are you reluctant to provide the number of

2   unique IP addresses that were recovered or the number of

3   individuals through the second step of the

4   administrative subpoena that have been yielded?

5          THE WITNESS:  It would be the number of IP

6   addresses, your Honor, the reason for that being

7   public -- information about this investigation has been

8   widely disseminated and reported on and commented on in

9   the active child exploitation communities and so when we

10  give any numbers in one filing, the government was

11  forced to disclose the number of individuals that had

12  been charged within the United States.

13         And so that information was reported within the

14  child exploitation communities, it was heavily analyzed,

15  and people assumed, well, at this point I'm safe; they

16  only got this very small number of people and so I don't

17  need to worry about it.

18         If the government were to disclose the number

19  of IP addresses that were actually collected -- and the

20  government has already disclosed that there were a

21  number of subjects in foreign countries -- giving

22  further detail into the full scope of the operation

23  could cause individuals in countries where they

24  currently think they're safe to rethink that and start

25  destroying evidence or take other means to prevent law

1    enforcement in those countries from being able to

2    actually identify them.

3           THE COURT:  So of the 100,000 user accounts

4    that accessed the website during the time that it was

5    being managed by the government, were those user

6    accounts located both within and without -- and outside

7    the United States?

8           THE WITNESS:  Yes, your Honor.  My unit has

9    been working with international counterparts as part of

10   this investigation.  We did identify a number of

11   individuals in foreign countries.

12          THE COURT:  All right.

13          Mr. Alfaro, against that background, I mean, I

14   can see how this information might have a certain

15   journalistic value to it, but trying to focus on the

16   facts that are necessary for the Court to understand to

17   rule on this motion, help me understand how knowing the

18   total number of unique IP addresses goes to the validity

19   of the search warrant out of the Eastern District of

20   Virginia which you are challenging, or more generally,

21   the constitutional infirmity that you are alleging.  How

22   does knowing that information assist the Court in

23   resolving that issue?

24          MR. ALFARO:  And I'll be -- I'll do my best to

25   try and articulate that, Judge, with my extreme layman

1    understanding of all this technical aspect.

2           But the government, I think the linchpin in

3    their case is we are so confident that we got this IP

4    address correctly, there's no need to worry that there

5    was any error, that we were able to link regalbegal to

6    this IP address that they geolooked up and said oh,

7    it's in Arkansas.

8           So we want to know the number to see how many

9    IP addresses they collected to understand the validity,

10   and we think we may be able to show that this process

11   was not stronghold, as the government shows, meaning

12   they got an IP address, but can they -- can they show

13   where it's from, and how many IP addresses are they

14   dealing with and what is the level of error that could

15   have come when they're trying to associate these IP

16   addresses together.

17          THE COURT:  The Court is going to sustain the

18   government's objection.  I mean, the question is not --

19   has nothing to do with how successful the government was

20   in harvesting information after it had the search

21   warrant in hand and executed the search warrant.

22          The question is was there any impropriety in

23   the representations that were made to the issuing Court

24   that the issuing Court would not have -- that would have

25   caused the issuing Court not to have issued the search

1    warrant, had the correct information have been reported.

2         In this instance, the Court recalls that it was

3    represented in the application or the affidavit that the

4    government was aware of some 200,000 total user accounts

5    during a two-week period.

6         Frankly I'm surprised that 100,000 people

7    logged in.  But I don't see -- if we're talking just

8    order of magnitudes, I don't see how that would

9    possibly -- any of the information that you were

10   soliciting would possibly go to invalidate the warrant

11   and so for those reasons, the government's objection is

12   going to be sustained, which is not to say that that --

13   I mean, I don't know at this point whether or not, if

14   the defense is, you know, they got the wrong person or

15   that the technique was not accurate in identifying the

16   correct person if Mr. Jean and regalbegal are different

17   people.

18        If that's the angle of attack, then accuracy of

19   the technique might be relevant down the down road if

20   the defense is you got the wrong guy.  But for purposes

21   of attacking the validity of the warrant, I don't see

22   how that has any value.  So the objection will be

23   sustained.

24        MR. ALFARO:  Thank your Honor.  And just to

25   clarify, just to make a proper record, I think that if

1  you know the number and if we are able to demonstrate

2  that the collection data has some sort of error, then I

3  think when it goes to the argument to the warrant is the

4  government would and -- was and should have been aware

5  of this possible error, but they didn't communicate that

6  to the judge when they applied for the warrant.

7          So that would be akin to having a confidential

8  informant knowing that they are unreliable but not

9  disclosing that fact in the warrant.

10          So that is how I would attempt to tie together,

11  Judge.

12          THE COURT:  Or it might be that the

13  confidential informant reasonably believed that 12

14  members of a drug trafficking organization were going to

15  be present at a particular place at a particular time

16  and that information is conveyed to a judge and a

17  warrant is issued and they show up and only a fourth of

18  them are present.  I mean, so what.

19          MR. ALFARO:  And so, your Honor, I guess the

20  point isn't that the error is known with the CI.  The

21  error is known from the law enforcement officers that we

22  know this person to be untruthful, so if there's a

23  chance that the evidence could be tainted.  So I would

24  take it from that angle, Judge.

25          THE COURT:  Well, then why don't you ask the

1  witness whether he was aware of any propensity for the

2  NIT to return errant information and whether that, any

3  such information, was intentionally withheld from the

4  magistrate judge.  That seems to be a better angle of

5  attack.

6          MR. ALFARO:  I understand.  I believe I asked

7  the question of whether the information was changed, and

8  he said it wasn't.

9          THE COURT:  I think he did.  So there's your

10 answer right there.

11         MR. ALFARO:  Thank your Honor.

12         THE COURT:  All right.

13         Mr. Dean?

14         MR. DEAN:  I have no followup at this time,

15 your Honor.  I would like to save this witness for any

16 possible rebuttal.

17         THE COURT:  All right.

18                     EXAMINATION

19 BY THE COURT:

20 Q.  Agent, if I understand the sequence in the search

21 warrant that was executed at the administrator's

22 residence in Naples occurred prior to the FBI seeking

23 the warrant from the magistrate judge to deploy the NIT?

24 A.  That's correct, your Honor.  The search warrant

25 execution in Florida began the evening of February 19th,

1  2015, and the NIT warrant was sworn out the morning of

2  February 20th, 2015.

3  Q.   And where was -- out of -- what judicial officer

4  approved the warrant that was used to -- I don't need

5  their names, but what judicial officer assisted in

6  approving the warrant for the Naples residence?

7  A.   I provided a -- I provided the bulk of the

8  information that went into that warrant.  Are you asking

9  who actually was the affiant on that warrant?

10 Q.   I'm trying to find out whether there was a district

11 judge that was involved with this case, either from a

12 Title III perspective or any other perspective, that may

13 have been involved and consulted when warrants became

14 necessary and was therefore factually involved and that

15 the FBI had been presenting warrants to and why that

16 judge was not consulted for the issuance of the NIT

17 warrant.

18 A.   I'm aware that there was a separate Title III

19 authorization separate from the NIT warrant.  I believe

20 that was put in front of a district court judge as Title

21 IIIs are required to.

22 Q.   In the Eastern District of Virginia?

23 A.   Yes, your Honor.

24 Q.   All right.  Why was that judge not consulted -- two

25 questions -- or two aspects of this question, and I

1   frankly don't know the answer to this.

2           Could the request for the deployment of a NIT

3   have been included in the Title III application, and if

4   so, why was it not?

5           Second part of the inquiry is since you had a

6   judge that was involved and being consulted to review

7   your Title III applications, why was that same judge

8   not -- in the Eastern District of Virginia not consulted

9   for the deployment of the NIT in question?

10  A.   The government's understanding and interpretation of

11  Rule 41 is that a magistrate judge does have the

12  authority to issue a warrant such as the one that was

13  utilized in this investigation and so that would be the

14  reason why we didn't request that it specifically be

15  authorized by a district court judge.

16  Q.   Well, I understand that you reasonably believe that

17  the magistrate judge had that authority, but that wasn't

18  my question.  My question is why did the FBI elect to

19  seek out the magistrate judge to sign this as opposed to

20  seeking out a district court judge; for example, a

21  district court judge that already had familiarity with

22  the investigation and who was signing off on the Title

23  III warrant?

24  A.   I'm not -- I don't know if there was any conscious

25  decision made there to go to a magistrate versus a

1  district court judge.  In my experience, search

2  warrants, we generally seek approval from a magistrate

3  judge.  So it could have just been done as a normal

4  course of business.

5       I do know that the NIT warrant has since been

6  reviewed by a district court judge in the Eastern

7  District of Virginia and that that judge has ruled that

8  it did in fact comply with Rule 41, and that the

9  magistrate judge did have the authority to issue that

10 warrant, but I was not involved in the -- in any

11 conversation where we debated whether we should go to a

12 magistrate or a district court judge.  I don't know that

13 any conversation like that took place.

14 Q.   Do you personally, or to your knowledge, does the

15 FBI collectively or law enforcement collectively have

16 any knowledge or information that this NIT has returned

17 information to law enforcement that was categorically

18 outside the half-dozen or so specific items that were

19 represented to the magistrate judge would be collected?

20 A.   No.  The only information -- the entirety of the

21 information that was collected, certainly the matter at

22 hand, has been turned over to the defense.

23      I've also reviewed the information that was

24 collected in numerous other cases.  In fact, I have

25 access to the entire database of information that was

1   collected.  It did not collect, in any instance,

2   information that was not identified in the attachment to

3   that search warrant.

4   Q.   Was the code of the NIT written, to your knowledge,

5   in such a way that it would have to go room to room

6   throughout the computer looking for these half-dozen

7   different items of information and search through and

8   rummage through all of the files of the computer; or is

9   this information that has been categorically described

10  information that is stored in very discrete, specific

11  areas on a computer such that those specific cubbyholes

12  can be opened, recovered, and passed back; or did they

13  have to rummage through the whole house to find them?

14  A.   No, it would be similar to how the second

15  description.  There are very simple computer commands

16  that would -- that essentially say send the MAC address,

17  send the operating system, send the username.  It didn't

18  go searching through the computer.

19          The NIT was designed in such a manner that it

20  could only collect and report the information

21  identified.  It did not have the capability or give the

22  government the capability to rummage through files on

23  the computer.  We had no ability to look at what files

24  they had on there, legal or illegal.  It did not have

25  the ability to search the content of the computer.  It

1  could only execute the very simple commands that have

2  been -- all of those commands also have been turned over

3  to the defense.

4         They showed me a preview of an exhibit of that

5  code and so that code is what was run on the defendant's

6  computer, and it could only return the information

7  identified in the warrant attachment.

8  Q.   As I understand it, the NIT is -- you had authority

9  to deploy the NIT that was broader than the actual way

10 in which it was actually deployed?

11 A.   Yes, your Honor.

12 Q.   The authority that you sought and received to deploy

13 the NIT would have allowed you to obtain the categorical

14 information only upon, but as soon as the user entered,

15 correctly entered their username something password?

16 A.   That's correct, your Honor.

17 Q.   As a matter of how it actually works, help me

18 understand.  When a user puts in their username and

19 password and gets access to the Playpen website, then

20 their computer is communicating over the Internet with

21 the Playpen server.  Is that correct?

22 A.   Yes, your Honor.  After the user logs in to the

23 website, they are communicating with the server in the

24 Eastern District of Virginia through the Tor network.

25 Q.   And understanding that how it was actually used was

1  more narrow than what you had authority, but as you have

2  described, the NIT was actually deployed when a specific

3  forum or subforum was opened by a user.  Is that right?

4  A.   In general, the NIT was only triggered when the user

5  not just accessed the forum but actually opened a post

6  within that forum.

7  Q.   All right.  So they open up a post; the NIT is

8  deployed.  Is the categorical information that the NIT

9  harvests and sends back to the FBI something that is

10  instantaneously done, or if not instantaneous, something

11  that occurs while the two computers, the user and the

12  host computers, are communicating with each other in

13  that session?

14  A.   It's done very quickly.  As soon as a user clicks on

15  the post, they begin downloading the material from that

16  post.  Additionally they download the NIT instructions

17  to their computer, and while the post is still, is

18  downloading, the NIT does its business and sends the

19  information back to the FBI.

20       This happens very quickly.  In the matter at

21  hand, the entire transmission generated by the NIT took

22  place in approximately .27 seconds.  Again, it happened

23  very quickly because it was just transferring a very

24  limited amount of information.

25  Q.   And let's say that it could do it within -- it could

1  harvest and send back the information within .27

2  seconds.  Is that .27 seconds, does that necessarily

3  occur while the two computers are still communicating

4  with each other, while the user is downloading or

5  viewing or whatever in that session?

6  A.   Yes, it occurs while they are actively on the

7  website.  So they would click on the post on the website

8  and then the NIT would be triggered and deploy and

9  likely complete its task before that page even fully

10 loads.

11         It does not happen later after -- nothing is

12 resident on the user's computer.  There's no code left

13 behind.  There's no data changes made to it.  It happens

14 immediately and then there's nothing left behind on the

15 user's computer.

16 Q.   Help me understand whether this analogy would be

17 proper or not.  If you were attempting to gain someone's

18 phone number who was calling another phone, obviously at

19 some point caller ID was invented, and shortly after

20 that, something -- I think it's *69 or something, a user

21 can punch that code in and prevent their phone from

22 sending out their phone number on caller ID so that the

23 recipient of the phone call just sees "blocked call" or

24 no name/no number or whatever.

25         Is there any similarity, if that was the

1  objective of the investigation here in the FBI

2  developing some override that, while the two people were

3  talking on the phone, would go to their phone, override

4  the *69 feature and send the number that was being

5  called from, is that -- is that analogy on par with what

6  happened or --

7  A.   I think that's a fair analogy, your Honor.

8  Q.   Okay.  So it's not like you pick up the phone, call

9  the number that's being monitored, a NIT is deployed and

10  ten minutes after the call or ten days after the call,

11  the NIT responds?

12  A.   No, your Honor.  Per your first analogy, the user,

13  the defendant in this case, has to log in to the

14  website, or call us.  They have to initiate that

15  communication with us and then the NIT communication

16  happens during that.

17       We have no -- again, because before the NIT

18  provides us with the IP address, we have no identifying

19  information about the user.  So we have no ability to

20  just send the NIT out to them.  They have to communicate

21  to us first in the matter at hand, access the website,

22  attempt to download child pornography.

23  Q.   And it's designed such that that information is

24  harvested and relayed back while the user is still

25  online with the host server?

1  A.   Yes, your Honor.

2  Q.   So the first step and purpose of the NIT warrant

3  was, among other categorical items, to obtain the IP

4  address.  Is that right?

5  A.   That is the most important piece of information that

6  was collected, yes, your Honor.

7  Q.   The second step in finding a particular individual

8  would be to -- I mean, some information from the actual

9  numbering methodology tells you who the Internet service

10  provider is so you know who to subpoena?

11  A.   Yes, your Honor.

12  Q.   And so you subpoena a particular Internet service

13  provider for the name of the person to whom that IP

14  address has been assigned?

15  A.   Yes, your Honor.

16  Q.   When you submit that subpoena, what -- of the

17  half-dozen or so categorical pieces of information that

18  the NIT harvested, what other information is used to

19  process and provide with the subpoena to the Internet

20  service provider?

21  A.   Generally just the IP address and the date and time

22  that we are interested in.  So it would be the IP

23  address and the date and time that that IP address

24  transmitted the information collected by the NIT.

25  Q.   So if we think of these steps, these different steps

1    that the investigators use to go from an anonymous user

2    to a somewhat anonymous IP address to the particular

3    individual, as we work through those links in the chain,

4    the only two pieces of information that flow through to

5    the administrative subpoena which could then be used to

6    harvest fruits through yet another residential search

7    warrant, the only two pieces of information that

8    actually flow through each step would be the IP address

9    and the date and time?

10   A.   Yes, that's correct, your Honor.

11   Q.   So while it's interesting and may help --

12   potentially help with proof at trial if there were

13   multiple computers utilizing the same wi-fi network in a

14   house, for purposes of determining what is the fruit of

15   which branch of the tree, these other pieces of --

16   categorical pieces of information that were harvested by

17   the NIT are really unnecessary in the administrative

18   subpoena and the residential subpoena?

19   A.   That's correct, your Honor.  With just the IP

20   address alone, we still eventually get to the

21   defendant's residence.

22   Q.   All right.

23        THE COURT:  Does that prompt anything further

24   by the government?

25        MR. DEAN:  Not from the government, your Honor.

1          THE COURT:  Mr. Alfaro?

2          MR. ALFARO:  I do have a few questions.

3          THE COURT:  All right.

4                    CROSS-EXAMINATION

5    BY MR. ALFARO:

6    Q.   We're talking about sending information over the

7    Internet, correct?

8    A.   Yes.

9    Q.   Does the FBI encrypt its websites?

10   A.   I'm sorry.  Could you clarify the question?

11          MR. DEAN:  Objection.  I don't see how this is

12   relevant to the motion TO suppress.

13          MR. ALFARO:  I'll connect it in a few

14   questions, Judge.

15          THE COURT:  Better get there quick.

16   (By Mr. Alfaro:)

17   Q.   Are there benefits for sending information through

18   the Internet on an encrypted connection?

19   A.   In some instances, yes.

20   Q.   Does that prevent from tampering?

21   A.   It can help, but it does not prevent it, not

22   entirely.

23   Q.   Does it make it less likely?

24   A.   In some instances, yes.

25   Q.   Was the NIT sent back -- when it was collected from

1  the defendant's computer and sent back to Virginia, was

2  that sent over an encrypted network?  That's a yes or

3  no.

4  A.   The -- sorry then.  Can you repeat the question?  I

5  didn't hear if you said encrypted or unencrypted.

6  Q.   Yes, agent.

7       The information that was collected by the NIT,

8  was it sent back over an encrypted network?

9  A.   No.  It was sent in clear text over the regular

10  Internet.

11  Q.   Did the NIT collect the IP address from the

12  computer?

13  A.   As I stated during my direct, the NIT collects the

14  information from the computer and then sends it back to

15  the government, and the government can see what IP

16  address that information originates from.

17  Q.   So the NIT sees the IP address from, directly from

18  the computer, from Mr. Jean's computer?

19  A.   From a very low-level technical perspective, no; in

20  a high level, yes.  So I would need you to be more

21  specific in your question.

22  Q.   Would I be correct in saying that it only got --

23  that it got the IP address from whatever it was

24  receiving from the NIT?  From whatever the NIT was

25  coming back from, whatever IP address the NIT was coming

1  back from, that's the IP address that you're utilizing?

2  A.   Yes.  We saw the IP address that transmitted the

3  information collected by the NIT.

4           MR. ALFARO:  May I have one second?

5           That's all I have, Judge.  Thank you.

6           MR. DEAN:  Nothing, your Honor.

7                    EXAMINATION

8  BY THE COURT:

9  Q.   Does the NIT code, is that attached to the file that

10 the user is downloading, or is it sent separately?

11 A.   It's sent separately, your Honor.  So the user

12 starts downloading that particular page of the website,

13 and in addition to that page of the website, the NIT

14 code is sent through that same connection.

15 Q.   All right.  Thank you.

16          THE COURT:  You may stand down, agent.  We're

17 going to be in recess for 15 minutes.

18          THE WITNESS:  Thank your Honor.

19          (Recess from 3:20 p.m. to 3:35 p.m.)

20          THE COURT:  Any other witnesses the government

21 would like to call?

22          MR. DEAN:  Your Honor, I would like to recall

23 Special Agent Alfin for just one brief question.

24          THE COURT:  All right.

25          MR. DEAN:  The government calls Agent Alfin.

1          THE COURT:  You're still under oath.

2                    REDIRECT EXAMINATION

3    BY MR. DEAN:

4    Q.   Special Agent Alfin, why was the information that

5    was sent back from Mr. Jean's computer as a result of

6    the NIT not encrypted?

7    A.   For a number of reasons.  The first reason is that

8    because the data sent by the NIT was not encrypted, it

9    was collected in a forensically sound manner.  So the

10   exact same evidence that we collected that came from

11   Mr. Jean's computer was turned over to defense.

12              It is not redacted.  It contains the full data

13   transmission as a result of the deployment of the NIT.

14   You can break it down, you can analyze it, and you can

15   see the information that the NIT collected; you can see

16   the IP address.

17              The importance of this is that because it was

18   done in a clear text, unencrypted manner, it is, again,

19   forensically valid and can be analyzed without having to

20   make any alterations to the data.

21              Additionally, the concern of encryption was

22   raised earlier, and in the matter at hand, it is not a

23   concern.  I stated previously that I know that the data

24   was not tampered with, and I know that for a number of

25   reasons.

1          As stated previously, encryption can in some

2   circumstances help prevent data tampering.  However, in

3   the matter at hand, it would not have been useful, the

4   reason for that being in order for an individual to have

5   tampered with or altered the data from the NIT, that

6   individual would have had to have known a number of

7   things and had a number of capabilities.

8          First of all, that individual would have had to

9   have known about the FBI operation.  They would have had

10  to have known that the FBI took control of the Playpen

11  website and that the FBI was using a NIT to identify

12  members of the Playpen website.

13         The operation was not discovered and publicly

14  reported on until months after its conclusion.  So I

15  know that there was no entity outside of the FBI who

16  knew that.

17         However, in addition to knowing about the NIT,

18  about the FBI's operation, they would have also had to

19  have known how the NIT was configured and how it was

20  deployed.

21         In addition to that, they would have had to

22  have previous knowledge that the defendant was a member

23  of the Playpen website.  They would have had to have

24  known that Mr. Jean was regalbegal.  They would have

25  also had to have had access to Mr. Jean's computer to

1   know his MAC address, to know his computer's hostname

2   and username.  They would have had to have known all

3   these things.  They also would have had to have had the

4   capability to have received and altered the data in

5   transit from Mr. Jean's computer to the FBI without

6   being detected.

7           There is no individual or entity that could

8   have known all these things and could have had access to

9   all the various technologies that they would have needed

10  to have access to, and for that reason the data that was

11  not -- the data that was sent by the NIT was not

12  encrypted.  That was a forensically sound choice, and I

13  know based on my training and experience and the reasons

14  stated earlier that the data was not tampered with in

15  transit.

16  Q.   Thank you for clearing that up.

17          MR. DEAN:  That's all I have, your Honor.

18          THE COURT:  Thank you, Mr. Dean.

19          Does that prompt anything further, Mr. Alfaro?

20          MR. ALFARO:  No, your Honor.

21          THE COURT:  May this witness stand down?

22          MR. DEAN:  Yes, your Honor.

23          THE COURT:  Agent, you may stand down.

24          THE WITNESS:  Thank you, your Honor.

25          THE COURT:  Anything further, Mr. Dean?

1          MR. DEAN:  No, your Honor.

2          THE COURT:  All right.  Mr. Alfaro, you may

3   call any witnesses you'd like.

4          MR. ALFARO:  Defense calls Dr. Christopher

5   Soghoian.

6          THE COURT:  Sir, if you'd please pause about

7   right there and raise your right hand.

8          (Whereupon, the witness was duly sworn.)

9          THE COURT:  All right, sir.  If you'd please

10  have a seat in our witness box.

11         You may inquire.

12         MR. ALFARO:  Thank your Honor.

13             CHRISTOPHER SOGHOIAN, Ph.D.,

14  having been first duly sworn, testified as follows:

15                  **DIRECT EXAMINATION**

16  BY MR. ALFARO:

17  Q.   Sir, can you please state your name and spell your

18  last name.

19  A.   Yes.  My name is Christopher Soghoian,

20  S-o-g-h-o-i-a-n.

21  Q.   Mr. Soghoian, where are you employed?

22  A.   I am employed at the American Civil Liberties Union.

23  I am the principal technologist for the ACLU's Speech,

24  Privacy and Technology project.

25  Q.   Are you appearing today in your personal capacity?

1  A.   Yes.  I am here not representing the ACLU.  I'm

2  actually taking a day off from work to be here.

3  Q.   Are you being paid to give testimony today?

4  A.   No.  I am volunteering, and I've declined the expert

5  fee that you were able to offer me.

6  Q.   Are we paying your travel expenses?

7  A.   You're covering my flight, my hotel and my food, but

8  I'm not getting any kind of expert compensation.

9  Q.   Can you briefly explain your education and training

10  experience?

11  A.   I have a bachelor's degree in computer science from

12  James Madison University; I have a master's degree in

13  security informatics, which is computer security, from

14  the Johns Hopkins University; and I have a Ph.D. degree

15  from Indiana University which is focused on law and

16  technology.

17       I've also researched surveillance and

18  technology and cyber security for a number of years, and

19  my research has been published in leading law journals,

20  and I've been -- my research has been cited by a number

21  of federal courts, including the Ninth Circuit and also

22  the Massachusetts and New Jersey state supreme courts.

23  Q.   Have you testified in other court proceedings?

24  A.   I testified in the <u>Michaud</u> case in Washington State

25  earlier this year.  That was my first time.  This is my

1    second time testifying in federal court.

2    Q.   Have you testified in any other type of legal arena?

3    A.   I've testified as an expert at three state

4    legislative bodies and before the European parliament

5    but in no other judicial proceeding.

6    Q.   Have you testified before the Federal Rules of

7    Criminal Procedure committee?

8    A.   Yes.  The advisory committee that sets the criminal

9    rules, I testified there, I believe in the fall of 2014,

10   in their proceeding that was evaluating changes to Rule

11   41 proposed by the Department of Justice that would have

12   expanded their authority to use NITs.

13   Q.   You testified -- you stated you testified in the

14   Michaud case.  I just want to clear up.  Is that related

15   to the same warrant in this case?

16   A.   That was the same NIT warrant, not the same home

17   search warrant, but it was the same NIT warrant

18   authorized in Virginia.

19   Q.   Do you have experience training judges?

20   A.   I've spoken at several events organized by the

21   Federal Judicial Center and will be speaking at another

22   one next month in San Diego.  And at those events, I

23   have spoken about surveillance technology and NITs in

24   particular.

25   Q.   As a consultant in Mr. Jean's case, have you

1  reviewed the materials related to his case?

2  A.   Yes.   I have reviewed search warrants, affidavits.

3  I've also reviewed the code for the NIT that the

4  government turned over and the two-way network data

5  recording also that the government provided.

6  Q.   The judge was informed about what the Tor browser or

7  Tor network does.   Can you in your own words very

8  briefly describe what it is and how it works?

9  A.   Sure.   I think Special Agent Alfin's description of

10  how the Tor network works was pretty accurate, but the

11  Tor browser is a special-purpose tool that lets you

12  browse the Internet through Tor.

13        It is actually a modified version of Firefox

14  that has been modified to be even more secure.   The Tor

15  browser is designed not just to access websites on the

16  Tor network but is specifically designed to protect the

17  user of Tor from attempts to identify that user.

18        So, whereas, a normal Web browser will let you

19  experience the richness of the Web and view multimedia

20  and watch videos, the Tor browser has a reduced set of

21  functionality in order to protect users from techniques

22  that might seek to identify them.   So that's the Tor

23  browser.

24        The Tor network, as Special Agent Alfin

25  described, really you can do two things.   One is you can

1  access websites on the regular Internet, and by using

2  the Tor browser through the Tor network, you essentially

3  bounce your connections through a bunch of servers that

4  are run by volunteers, and in doing so, you mask your

5  true location.

6         You can also access what are called hidden

7  servers, or hidden services, that can only be accessed

8  through Tor.  And when you use a hidden service, both

9  the location of the user and the location of the service

10 are kept hidden from all other parties.

11 Q.   Does the government use Tor?

12 A.   So my understanding is that the government uses Tor.

13 I mean, the government is obviously a big entity.  The

14 Naval Research Lab created Tor.  There are still, I

15 think, three or four people employed full time by the

16 Naval Research Lab who do nothing but work on

17 improvements to Tor.

18        The state department and the defense department

19 have been TOR's largest funders and continued to fund

20 Tor, and I know a number of federal agencies use Tor for

21 investigative reasons.

22        The reason that the Navy created Tor was they

23 wanted a way for naval investigators to do covert

24 investigations without revealing to the world that

25 someone was being investigated by the Navy.  They knew

1  that to be able to hide their tracks, they would need to

2  be able to blend into a crowd and so the people who

3  created Tor have an expression, which is that anonymity

4  loves company.  So they created this free network in

5  order to provide a way for government employees to hide

6  their activities, but in doing so, they knew that a lot

7  of other people would also join the network.

8  Q.   You heard Agent Alfin testify on direct earlier that

9  given the nature of the Tor network and the website, it

10  was impossible for someone to stumble onto the Playpen

11  site.  Do you have an opinion about that?

12         MR. DEAN:  Objection.  I think that

13  mischaracterizes what the witness said.  I think he said

14  it would be nearly impossible or very difficult.  He

15  wasn't completely 100 percent.

16         THE COURT:  All right.  The Court is going to

17  strike Mr. Alfaro's characterization of the earlier

18  testimony, and the latter part of his question about his

19  opinion stands.

20  (By Mr. Alfaro:)

21  Q.   Can I ask the question this way:  Do you have an

22  opinion on Agent Alfin's statement that it was nearly

23  impossible for someone to stumble on this type of

24  website?

25  A.   I do have an opinion.  So from reading the documents

1  in this case and from listening to Special Agent Alfin's

2  testimony, it is clear that prior to the government

3  taking over the site, the site had been misconfigured.

4       So normally one would expect that a website

5  that is attempting to hide its existence or its location

6  from authorities in all countries would only be

7  accessible through Tor, but the server administrator who

8  was running that site had not configured the site

9  correctly.

10 Q.   What do you mean when you say "configure"?

11 A.   Essentially a website that is accessible through Tor

12 still has an Internet connection because Tor goes on top

13 of the regular Internet connection.

14      Because of a misconfiguration that essentially

15 the server administrator did not check the right boxes

16 or edit the right configuration options when he was

17 setting up the service, because it was misconfigured,

18 for some period of time the website was both accessible

19 through Tor but also through the regular Internet, which

20 meant that for some period of time, had you known the

21 real IP address of the Playpen site and typed it into

22 your Web browser, you would have seen the homepage that

23 was one of the prosecution exhibits.

24 Q.   Today we've been discussing what the government is

25 calling a NIT, or N-I-T, or network investigative

1   technique.  Do you have experience in researching what

2   the government has identified as a NIT?

3   A.   I do.  I have been researching NITs probably for

4   three or four years now.  What we know is that the FBI

5   has used software like a NIT and then eventually called

6   a NIT since about 2002.

7          The first public use of a NIT by the government

8   was in 2007, but it's only really been since 2013 or

9   2014 that the public has learned a little bit more about

10  this.  There are about a half-dozen public warrant

11  applications for NITs or the predecessor technology that

12  are public, and I've read all of those and I've reviewed

13  those.

14         I have spoken to former government employees

15  who are -- who worked in the team that delivers NITs.  I

16  have researched this.  I've spoken to a lot of people

17  involved to try and figure out how NITs work, how the

18  government uses them and what the legal rules are that

19  they follow when using this surveillance technology.

20  Q.   Have you reviewed the warrant application for the

21  NIT in this case and subsequent declarations by Agent

22  Alfin describing the NIT?

23  A.   I have reviewed the February 20th application and

24  warrant.  I've also read many, many documents that Agent

25  Alfin has either written or transcripts of his testimony

1  in various cases around the Playpen operation.

2  Q.   Based on your research and experience and your

3  review of these documents related to this case and

4  others, can you explain in your understanding step by

5  step how the NIT worked, how the information was seized

6  from the computer?

7  A.   Sure.  So as I said before, the Tor browser is

8  designed to do one thing more than anything else and

9  that is to protect the IP address.  This is the most

10 sensitive thing because the whole purpose of Tor is to

11 protect the location and identity of the user.

12      Normally a website that a user visits, if they

13 are using the Tor browser and the website asks for the

14 user's IP address, the Tor browser will refuse to

15 provide that information.  It has been designed to not

16 only reject requests but designed to reject attempts to

17 get around that.  It is a hard-end browser.

18      And so the first step for the government in

19 utilizing the NIT was to somehow get the many thousands

20 of people who visited the Playpen site and who were

21 compromised with the government's code, the first step

22 was in getting their computers to accept this -- to

23 accept and run this code that would reveal their

24 location.

25 Q.   How would that first step work?

A.   So as Special Agent Alfin described, people would
visit the Playpen site.  While visiting one or more
pages on that site, they would be given some code in the
background.  So this was not something that the user
would see.  It would happen behind the scenes.

You know, I do want to quibble with a couple
things that he said, but in general, there are flaws in
all software that exist because the people who write
software are humans, and humans make mistakes.

Some humans make more mistakes than others, but
no engineer is perfect, and Web browsers are extremely
complicated pieces of software, millions of lines of
code, and so the people who write that software,
although they try really hard to build as secure a piece
of software as possible, they make mistakes.

Q.   Are these mistakes that you're referring to, in your
training and your experience that you have, are they
fairly common, even in advanced users?

A.   There is no software that is 100 percent secure.  As
much as we would like secure software to exist, it does
not, and that is the reason why foreign governments and
criminals are able to hack into well-resourced
organizations including, you know, the U.S. Government
and the Office of Personnel Management.  It's really
hard to design secure software and to set it up

1    correctly.

2          The Tor browser and the Tor network, it's about

3    ten years old, and it's received millions of dollars of

4    U.S. Government funding, but it's still not perfect.  In

5    essence, there are flaws in the Tor browser, there are

6    flaws that have been exploited in the past by the

7    government, by criminals, by foreign governments, and

8    using one or more flaws, the government was able to --

9    well, let me pause.

10         The government wrote special software which

11   experts call a exploit that exploited a vulnerability in

12   the Tor browser.  Essentially there was some kind of

13   design flaw in the Tor browser, and when given

14   particular custom computer instructions, the government

15   could get the Tor browser to do things that it wouldn't

16   normally do.

17         So if you think of the Tor browser as having

18   some guard dogs, sort of keeping guard around the house,

19   the government maybe fed the dogs some drugged meat to

20   make the dogs go to sleep so that the government could

21   then go inside the house.

22   Q.   This exploit code that's prepared by the government,

23   is it possible that there's human error in that code?

24   A.   So just as the engineers who wrote the Firefox

25   browser, which the Tor browser's based on, just as they

are not perfect humans and they make mistakes, so too
are the engineers who probably work for defense
contractor that the FBI employed, they, too, may have
made mistakes, and some of these mistakes could be
subtle.

You know, sometimes you have software that
crashes every time you run it; sometimes you have
software that crashes one in a hundred times or one in a
thousand times.

You know, we had -- you may remember 16 years
ago there was the year 2000 concern where everyone was
worried that on the year 2000, all the software in the
world would crash because it hadn't been designed with
four-digit dates in mind.

So, you know, December 31st, the software was
fine, and if you'd run it a million times, it would have
been fine.  But people were worried the next day, the
moment that the clock struck midnight, the software
would crash.  And so it's really, really hard not just
to write secure software, to write correct software, but
it's really hard to test software to look for those
flaws.

And just as there are a team of engineers at
Mozilla and the Tor Project who make the software, they
also employ people who do nothing but test and look for

1  flaws, and they still miss mistakes.  They still miss

2  the flaws.

3  Q.   What would be the next step then in this NIT

4  process?

5  A.   So you deliver the exploit to the Web browser, to

6  the Tor browser.  If it successfully runs, then you can

7  feed it what some experts might call a second stage.  So

8  you would then give it the code that you want to run.

9        And I'll pause and say, you know, there has

10  been some disagreement that you've heard in this

11  courtroom about whether the NIT is malware.  You know,

12  the government says one thing; experts say another.

13  Malware is a term of art among computer security

14  experts.

15        The government has said that the NIT is a

16  certain thing, and that's the government's right because

17  they came up with the term "NIT."  They defined this

18  term.  They came -- they were the ones who first used

19  it.  As I understand what the government means when they

20  say "NIT," that was the next piece of code that was

21  delivered to the computer.

22        So after the exploit had gained the ability to

23  get the computer to run instructions that it would not

24  normally run, then the NIT was delivered, and the

25  purpose of the NIT was to collect information from that

1  computer, such as the MAC address, such as the operating

2  system version, and then to contact their server in

3  Virginia and transmit back to that information.

4  Q.   So when you say it's collecting the information, is

5  that process going on on the server in Virginia, or is

6  it going on in the defendant's computer in Arkansas?

7  A.   The defendant's computer would have downloaded the

8  NIT from the Playpen site -- well, first, it would have

9  downloaded the exploit, then it would have downloaded

10  the NIT, then it would have -- well, sorry.  Let me

11  start again.

12       It would have downloaded the exploit; it would

13  have run the exploit.  Then it would have downloaded the

14  NIT; it would have run the NIT.  The NIT would have done

15  its thing, collect the information and then sent it back

16  to Virginia.

17       All of the collection, the search, if you will,

18  that would have taken place on the computer that ran the

19  NIT, which is the defendant's computer.  The NIT code

20  never ran on the server that the government operated.

21  The server provided the code to the defendant's

22  computer, but the defendant -- the NIT ran on the

23  defendant's computer.

24  Q.   You testified that you reviewed the NIT warrant.

25  I'm approaching you with what's been marked as

1   Defendant's Exhibit B submitted in a motion, which is a

2   copy of the NIT warrant describing what it does.  And

3   I'll direct you to Pages 23 and 24.

4   A.   Okay.

5   Q.   Have you read those paragraphs, 31, 32, 33,

6   describing what the NIT does?

7   A.   Yes, I have.

8   Q.   Can you, in brief layman's terms, tell us what it

9   says in, I guess, layman's terms?

10  A.   So Paragraph 23 -- sorry.  Paragraphs 31, 32 and 33

11  in the NIT warrant application really describe what the

12  government intends to do with the NIT.  So they say

13  we're going to send some computer instructions to the

14  defendant's computer; we're going to collect some

15  information --

16        MR. DEAN:  Your Honor, I'm going to object

17  based on foundation.  You have lay witness that's

18  talking about legal terms in a search warrant.

19        MR. ALFARO:  Judge, he's an expert witness

20  talking about computer terms in a warrant that he's

21  already reviewed numerous times.

22        THE COURT:  Well, my understanding of what he's

23  being asked is to look at the paragraphs that have been

24  identified and to explain from a technology standpoint

25  the steps that are taking place.  If that's not the

1    question, then rephrase.

2         MR. ALFARO:  That's the question, Judge.

3         THE COURT:  All right.  Objection overruled.

4    A.   So the paragraphs 32 and 33, they are really, what

5    they are saying is that the -- that this computer code

6    will be delivered to the people who visit the site and

7    that computer code will cause certain things to be

8    collected from that computer.  And those things that

9    will be collected are actually enumerated on Page 25.

10   So it says the unique identifier that's been sent by the

11   NIT.  It's the --

12   Q.   Let's stop right there.

13   A.   Sorry.

14   Q.   What's the unique identifier?

15   A.   So there are a few pieces of information that the

16   NIT has and sends back to the government.  One of them

17   is a unique identifier that is given to the NIT when the

18   user visits the Playpen site and then that identifier's

19   transmitted back by that computer to the government

20   server.

21        You can sort of think of it as, I guess, a

22   serial number for the individual user.  It's a way of

23   the government keeping track and saying this person

24   visited the site; we heard from the NIT later; we think

25   it's the same person.

1    Q.   Okay.

2    A.   So the NIT receives this unique identifying number

3    from the government and then sends it back.  The NIT

4    also collects the MAC address, and I think Special Agent

5    Alfin's description of the MAC was pretty good here.

6    It's a serial number burned in the factory into either a

7    wi-fi card or a network card.

8         And then there's also the username, which is

9    the name that you log in to the computer with and some

10   information about the operating system.  So are you

11   using Windows, do you have a Mac, are you using Linux.

12        So those are the pieces of information.  And

13   then there's the IP address, which is a little bit more

14   complicated.

15   Q.   But before we get to that question.

16   A.   Okay.

17   Q.   Is there anything that's not in the warrant

18   describing the NIT that, in your training and experience

19   with these NITs, that's important?

20   A.   So the NIT application asks for permission -- asks

21   for a warrant authorizing the delivery of a NIT.  But

22   the NIT application does not ask for permission to

23   deliver the exploit.

24        So if you think of the NIT being the software

25   that does the search, the exploit is the software that

1    kicks down the front door.

2            There's nothing in this warrant application

3    that either a layperson or even a person skilled in the

4    art could look at and say this is how the government is

5    going to get into the target computer.

6            And we've seen this issue, this lack of a

7    description of the method of entry, come up before.  In

8    the 2007 case that I talked about, the first time the

9    government used -- or the first time we know that the

10   government used software like a NIT, in that case in

11   Timberline, Washington, we later learned that the

12   government impersonated the Associated Press in an

13   effort to trick a teenager into downloading malware onto

14   his computer.  This is a teenager who was calling in

15   bomb threats and didn't want to take an exam at school.

16   Q.   In that case, is that case cited by the government

17   in its brief?

18   A.   It was, yes.

19           So in that 2007 case, the warrant application,

20   like the Playpen warrant, described the information that

21   would be collected.  What was missing, though, was

22   information about how the government was going to get

23   the code onto the computer and get it to run.  And, you

24   know, there are a lot of people who think that that is

25   important information that a Court should get to see.

1          Certainly after it was revealed in 2014 that

2     the FBI had impersonated the Associated Press -- that

3     was an extremely controversial topic -- about a dozen or

4     more news organizations complained and the Senate

5     judiciary committee even opened an investigation into

6     that practice.  The FBI director ended up writing a

7     letter to the New York Times to defend the practice.

8          You know, in the Playpen case, what's missing

9     here really is language telling the judge that the

10    government intends to send computer code over the

11    Internet to thousands of people that will bypass, or

12    exploit, a security flaw in the Tor browser and that

13    this software is pretty dangerous.  That is, if the

14    software were to somehow get into the wrong hands, it

15    could be used by other people to break into Firefox

16    browsers of innocent law-abiding people, and there are

17    hundreds of millions of people using Firefox.

18         You know, I think there's an important question

19    as to, you know, whether the NIT is an appropriate tool,

20    but I think we should all want the Courts to be told as

21    much information as possible so that judges can evaluate

22    the facts before them and say, is this an okay

23    technology or technique to use, and the Playpen warrant

24    application doesn't tell the judge how the government's

25    going to the deliver -- how they are going to get the

1  NIT onto the computer of the defendant.  They don't tell

2  the judge what risk there is of hitting innocent people.

3        In a 2013 case, a magistrate judge in Texas

4  declined to authorize a NIT because he was concerned

5  that the government hadn't articulated what they were

6  going to do to make sure that innocent people weren't

7  going to be hit with a NIT.

8  Q.    Is that the In Re: Warrant case that you're

9  referring to?

10 A.    Yes, from Magistrate Judge Smith in Houston.

11 Q.    Based upon your review of the documents in this case

12 and other similar cases, if the NIT had not been sent to

13 the computer in Arkansas and collected this information,

14 would the website otherwise have been able to transmit

15 that information to the FBI?

16 A.    The FBI apparently a year and a half ago worked with

17 Carnegie Mellon to identify users who were visiting some

18 Tor websites, but we think that that -- and by "we," I

19 mean the computer science community thinks that that

20 flaw was fixed.

21        I think without the NIT used in this case, it

22 would have been extremely difficult for the FBI to

23 identify people visiting the Playpen site.

24        And to be clear, they could have used a

25 different exploit and they could have used a different

1  NIT, but without hacking the people visiting the site,

2  it would have been very hard.

3  Q.   You mentioned a few cases that you're familiar with

4  in your research in which the government hasn't been too

5  forthcoming as far as how it's using these tools when

6  they are putting this information in warrants for

7  judges.

8         You talked about a 2007 case.  Is there another

9  case involving Tor that you're familiar with?

10 A.   Another case involving Tor?

11 Q.   Or the Tor browser?

12 A.   So -- oh, yes.  Sorry.  So there have been three --

13 let me pause and say there are two sort of ways that the

14 government might deliver a NIT.  The first is what we

15 might call a targeted operation where they are going

16 after one person.  Maybe they know the name of that

17 person, maybe they don't, but they are going after one

18 person.  It's a targeted operation.

19        The second would be a scenario like the Playpen

20 case where they are really looking for a bunch of

21 people.  They don't know their names, but they want to

22 get all the people who visit a site.

23        The term of art in the computer science

24 community for that kind of attack or that kind of

25 operation, particularly when done by foreign governments

1   or criminals, is a watering hole attack.  And

2   essentially, you know, if you are a lion in the savannah

3   and you want to eat, what do you do?  You go to the

4   watering hole to hunt because that's where all the other

5   animals are drinking.

6        We know of three watering hole operations to

7   date where the FBI employed a NIT to target large

8   numbers of people who are visiting sites.  The first was

9   a case out of Nebraska in 2012 which is called Operation

10  Torpedo, and the second was an operation --

11        MR. DEAN:  Your Honor, relevance.

12        MR. ALFARO:  Your Honor, one of the arguments

13  that we're making in our case is if the Court were to

14  rule in our favor that there was a 41(b) violation, one

15  of the things we would have to show is reckless

16  disregard of proper procedure.

17        So if the government has a history of

18  misrepresenting information or at least inadvertently

19  keeping the Court in the dark, if we're able to at least

20  lay some sort of argument that this has been going on

21  for several years, that goes to whether the government

22  is aware of the issues and whether they're correcting

23  them or whether they are continuing to keep the judges

24  in the dark by not explaining the nature of this

25  technology.

1          MR. DEAN:  Your Honor, all the witness is doing

2     is laying a foundation that there's been NITs deployed

3     before.  There's no reckless disregard.  Sometimes they

4     get granted; sometimes they get denied.

5          THE COURT:  Well, I'm going to overrule the

6     objection.  One thing, Mr. Alfaro, that I would like to

7     better understand is the exploit and the argument that

8     you're making that the magistrate judge was not

9     presented with the knowledge of the first step in the

10    process, which was to execute the exploit.

11         What I'm not understanding is the exploit was

12    to public interstate, so to speak.  I mean, it was --

13    the Tor network is a system that anyone has free access

14    to.

15         So if you're -- if you have found a defect, you

16    know, in one part of a 1,000-mile-long public highway

17    and that is how you gain a foothold to deploy the NIT

18    that you do have authority to deploy, so what.

19         MR. ALFARO:  Well, and maybe I can bring that

20    home more with --

21         THE COURT:  And I'm not asking you.  I'm just

22    saying in your questioning, that would be helpful to me.

23         MR. ALFARO:  I'll go back to that, your Honor.

24    So we'll put a pin in this topic of the Tor cases

25    involving, I think the mail exchange that we're about to

1    get to.

2    (By Mr. Alfaro:)

3    Q.   Can you explain to the Court why that would be

4    important, the exploit, why that's an important process

5    in the NIT programming, or requesting this information,

6    and the nature of the invasion, in your experience, onto

7    the defendant's computer?

8    A.   It actually might be easier if you let me discuss

9    those two other Tor operations.  I think it will get to

10   where you want, if that's okay.

11        So the two other watering hole operations that

12   we know of to date, one was Operation Torpedo, which was

13   a Nebraska case.  The exploit that the government used

14   in that case -- let me pause.

15        There are two kinds of exploits:  Those that

16   are known to the people who write the software that

17   maybe users haven't installed the latest updates.  So

18   maybe you're running an out-of-date version of Microsoft

19   Office and you're vulnerable, but the people who make

20   Office at Microsoft, they know about it and they have

21   issued a fix.  Those are called existing vulnerabilities

22   that are known about.

23        And then there are vulnerabilities that the

24   people who write the software don't know about, and

25   there's a special name for those and they are called

1    zero-day vulnerabilities.  And zero-day vulnerabilities

2    are really powerful because even if you're running the

3    most up-to-date version of your browser software or the

4    most up-to-date version of Microsoft Office, there's

5    nothing that you can do to protect yourself.  And

6    there's an entire sort of black market where people pay

7    hundreds of thousands of dollars for these exploits.

8            We don't know what kind of vulnerability the

9    government used in Playpen, but in the Operation Torpedo

10   case in 2012, the government used a old vulnerability

11   that only worked against people who are running a

12   really, really old version of the Tor browser.  And

13   actually in that case once people were eventually

14   charged, the government turned over the exploit and they

15   turned over the NIT because the government had actually

16   just downloaded the exploit for free from the Internet.

17           The other notable thing about that Operation

18   Torpedo case is that the warrant application -- so in

19   the Playpen case, the warrant location says located in

20   the Eastern District of Virginia; in the Nebraska 2012

21   case, it said located in the District of Nebraska and

22   elsewhere.  So in that 2012 case, the cover page

23   actually said that the NIT would be used both in the

24   state and outside.

25           Fast-forward one year and there is the -- there

1   was an operation that took place in August of 2013.

2   That was against a dark web hosting service called

3   Freedom Hosting, and what was interesting about that

4   operation is that the government got caught.  Some of

5   the people who the government were targeting were

6   actually able to save a copy of the NIT and save a copy

7   of the exploit and then they published it online and

8   then computer security researchers analyzed it and saw

9   what the flaw was.

10          Now, the vulnerability that the government

11  exploited in that Freedom Hosting case, that also was

12  not a zero-day.  So it only worked against people who

13  were using an old, out-of-date version of the Tor

14  browser, but there were enough people who were using old

15  software that it was effective against a decent number

16  of users.

17          The other notable thing about the Freedom

18  Hosting case is that the website that the government

19  targeted, at least one of the websites that the

20  government targeted, according to the Washington Post,

21  was a free e-mail service called Tor Mail which billed

22  itself as an anonymous e-mail service.

23          An anonymous number of law-abiding people who

24  were using Tor Mail also received the exploit and the

25  NIT which is how the exploit and the NIT were saved and

1    then subsequently published and recorded.

2         The reason why I bring this up and the reason

3    why I think it's important to disclose in the warrant

4    application both that an exploit will be used and two

5    sort of details about the circumstances is there is a

6    real risk when the government uses an exploit in a bulk

7    manner, one of these watering hole attacks where

8    thousands or tens of thousands or 100,000 people are

9    targeted, there's a real risk that the government may --

10   that the copy of the exploit may be saved and may be

11   subsequently published online.

12        If it is a zero-day exploit, if the exploit is

13   not known to Firefox who make -- or the Mozilla people

14   who make Firefox, if that information is put out there,

15   there's going to be a period of time where the hundreds

16   of millions of people who use Firefox, they're all at

17   risk.  And we've seen this, the situation, play out.

18        A couple years ago the U.S. Government, in

19   collaboration with Israel, hacked into an Iranian

20   nuclear facility.  This was a piece of software called

21   Stuxnet.  I think there are many good reasons for the

22   U.S. Government to hack into the Iranian nuclear

23   program, but after they were caught, the software was

24   analyzed and the zero-day vulnerabilities, the zero-day

25   exploits, were published.

1            And Microsoft didn't know about them yet,

2    Microsoft hadn't patched them yet, and for months

3    criminals started hacking into innocent people's

4    computers using those exploits that had been sort of

5    inadvertently disclosed to the world by the U.S.

6    Government.

7            So I'm not saying that the FBI shouldn't use

8    zero-days, I'm not saying that they shouldn't use NITs,

9    but I do think that when the government uses an exploit,

10   particularly a zero-day exploit where hundreds of

11   millions of people are vulnerable, the judge who's

12   receiving that warrant application really needs to be

13   told what the risks are if that exploit somehow falls

14   into the wrong hands.  And, you know, if the government

15   hacks one person, there's a very, very small chance that

16   exploit will be getting out into the wild.

17           But if you send the exploit to 100,000 people,

18   there's a pretty good chance that someone is going to

19   be -- there's going to be a technically sophisticated

20   user on that site who won't be compromised, who will

21   save a copy and will publish it, and that's exactly what

22   happened in that 2013 Freedom Hosting operation.

23           Does that help to answer your question, sir?

24           THE COURT:  Well, it does.  I just don't

25   understand the relevance to the defense position

1   because -- as it relates to the validity of the warrant

2   because let me ask you this:  Had the FBI wanted to,

3   could they have added the code for the NIT to the files

4   that the users were downloading?

5         THE WITNESS:  I don't -- I don't think so -- so

6   yes, the government could have delivered poisoned

7   downloads.  Whether the NIT and the exploit -- sorry.  I

8   see what you're asking.

9         You're saying if the government had poisoned

10  the downloads, then they wouldn't have needed an

11  exploit?  They would have --

12        THE COURT:  Yes.

13        THE WITNESS:  That would be one way of doing

14  it.  And in fact, we -- in the 2007 case where the

15  government targeted that teenager in Timberline, they

16  impersonated the Associated Press, they sent him a Word

17  document purporting to be a draft article about the

18  teenager, and said please open it up, and when he

19  double-clicked on it, it called home and revealed his

20  identity.  That would have been a way for the government

21  to do that.

22        You know, I think there's a parallel here

23  between -- a really strong parallel between the

24  information that is disclosed to judges in NIT

25  applications and in a similar surveillance technology

1  called a Stingray, which is a surveillance tool that

2  tracks cellphones.

3          Stingrays have a lot of collateral risks.  They

4  can jam the phones of innocent people nearby, preventing

5  them from calling their loved ones or their office or

6  whoever.  They can also collect information about

7  innocent people.

8          It's only been -- you know, for 20 years the

9  government has used Stingrays, but it's only been in the

10 last few years that there has been enough public

11 information about them that now, in a new policy

12 published last year by DOJ and DHS, they have now

13 pledged to be transparent with the Courts.  The DHS

14 policy stresses the importance of duty of candor.

15         THE COURT:  Well, I appreciate all these policy

16 issues that we're talking about, but I think we're

17 starting to get a little far afield.

18         So, Mr. Alfaro, if you'll get back to your

19 question.

20         MR. ALFARO:  Yes, sir.  Thank you.

21 (By Mr. Alfaro:)

22 Q.   I think we were at the point where we were

23 describing the steps of the NIT?

24 A.   Yes, sir.

25 Q.   I think we're towards the end.  Can you describe

1    what was happening after the information was collected

2    in the State of Arkansas?

3    A.   Sure.  So the NIT collects certain information from

4    the computer in the State of Arkansas.  It collects the

5    MAC address, which I already described; it collects the

6    operating system information; collects the username that

7    the person logged in from -- pardon me -- and then the

8    NIT makes a connection to a computer in Virginia run by

9    the government and transmits back that information.

10          Now, there's a little bit of confusion about

11   the IP address.  Is this an okay time to describe that?

12   Q.   Please.

13   A.   So I'll be perfectly frank.  You know, I looked at

14   the source code for the NIT, and it says one thing and

15   Special Agent Alfin said another.  So I'm actually a bit

16   confused.

17          MR. ALFARO:  May I approach, your Honor?

18          THE COURT:  You may.

19   (By Mr. Alfaro:)

20   Q.   I'm showing you what's been marked for

21   identification as Defendant's Exhibit H.  Can you please

22   take a look at that?

23   A.   Sure.  So --

24   Q.   First can you tell me what it is?

25   A.   This is a shell script.  This is -- this is

1    basically computer programming that has been written by

2    a human.  It's written in English but a form of English

3    that really only nerds can really understand.

4    Q.   Did we get that from the government?

5    A.   The government gave us a file that could only really

6    be read by a machine, and I had to extract this from the

7    file that the government gave us.

8    Q.   So what you have in your hand you extracted from the

9    data that was sent by the government?

10   A.   Yes.

11   Q.   And what is the data that the government sent

12   purported to be?

13   A.   So the government basically gave us two things.

14   They gave us the code that collects the information from

15   targeted computer, and they gave us the code that sends

16   it home, calls home and says this is the MAC address,

17   this is the other stuff.

18        The code that I have in front of me, this is

19   just the code that collects the information from the

20   targeted computer.

21        MR. ALFARO:  Your Honor, at this point I move

22   to admit defense exhibit -- I believe that was G?

23        THE WITNESS:  This is H.

24        MR. ALFARO:  H -- excuse me -- H, under seal.

25        MR. DEAN:  No objection, your Honor, under

1  seal.

2          THE COURT:  Exhibit -- Defense Exhibit H will

3  be received under seal.

4  A.   So what's notable about this file, it does the kinds

5  of things that you would expect, given what has been put

6  in the warrant application.  It collects the operating

7  system information, it collects the username of the

8  person on the computer, but it also collects the IP

9  address.  On -- there is a bunch of code that collects

10 the IP address and then modifies the formatting, but at

11 the very end of the program, it prints out the username,

12 the operating system information and then the IP

13 address.

14 Q.   So the code is designed to collect the IP address?

15 A.   The code collects the IP address from the targeted

16 computer that it runs on.  And so the reason I'm

17 confused is that Special Agent Alfin testified and said

18 that the NIT did not, in fact, send its IP address back

19 to the government.  Special Agent Alfin said the way the

20 government learned the IP address was by looking to see

21 where the response from the NIT came from.

22          So think of -- think of the information that

23 this code collects as being the contents of a letter.

24 So it's printed out into a letter, put in an envelope

25 with a to and a from address on the letter.  The to

1  address would be the address of the government server;

2  the from address would be the address of the defendant's

3  computer.

4          Special Agent Alfin has testified in this case

5  and others that the way the government learned who the

6  defendant was, the way the government learned what his

7  IP address was, was essentially by looking at the from

8  address on the envelope, not by looking inside the

9  letter.  They say that the letter only had the MAC

10 address, the operating system information and the

11 username.  But the code that the government gave us that

12 ran on Mr. Jean's computer, that collected a IP address

13 and it printed out an IP address, and Special Agent

14 Alfin testified that the NIT executed successfully.

15         So I'm a bit confused as to why I couldn't find

16 the IP address in the data that the NIT transmitted

17 home.

18         MR. ALFARO:  May I approach, your Honor?

19         THE COURT:  Yes.

20 (By Mr. Alfaro:)

21 Q.  I'm now handing you what's been previously marked as

22 Defendant's Exhibit F and G.  Can you please explain

23 what Exhibit F is?

24 A.  Sure.  Exhibit F is a screen shot of a program

25 called Wireshark -- W-i-r-e, shark -- that I used that

1    opened up the two-way network recording that the FBI

2    provided to the defense.

3    Q.   This Wireshark, is that commonly used by individuals

4    in your capacity?

5    A.   Oh, yes.  It's a frequently used, free tool used by

6    researchers, college students, professionals.

7    Essentially the two-way network recording, as Special

8    Agent Alfin testified, really what it is, it's a copy of

9    every bit of data that was sent back and forth between

10   the NIT and the government's computer as recorded from

11   the government's side.

12        So they basically saved a log of all that data,

13   and then with this Wireshark program, I can actually

14   reconstruct that communication and see which messages

15   were going back and forward.

16   Q.   Can you please explain what the next exhibit is?  I

17   believe it is Exhibit --

18   A.   G.

19   Q.   -- G.

20   A.   Exhibit -- on the Internet, data, when it's

21   transmitted over the Internet, is cut up into what are

22   called packets.  So rather than sending a big parcel,

23   you use a bunch of small envelopes, and you cut the

24   contents up and put them in each envelope.

25        This Exhibit G essentially is a combination of

1  all of those small packets to show the, in a

2  human-readable way, the communication stream between the

3  NIT client and the FBI server.

4  Q.   Did you get that from the file that the government

5  provided?

6  A.   So I loaded the file that the government provided

7  into Wireshark, which is Exhibit F, and then Wireshark

8  has an option that lets you reconstruct the

9  communication in a human-readable way, and that is what

10 Exhibit G is.

11 Q.   Do both of those exhibits, those screen shots,

12 accurately represent the data that you viewed from the

13 government?

14 A.   These are the screen shots that I made that I

15 provided to you, and these, to the best of my knowledge,

16 display what the government provided to us.

17          MR. ALFARO:  Your Honor, I move to admit

18 Defense Exhibits G and H under seal.

19          MR. DEAN:  No objection under seal.

20 (By Mr. Alfaro:)

21 Q.   Now, we were talking about this --

22          THE COURT:  Hang on a second.  I think we

23 already received one of those under seal.

24          THE WITNESS:  I think that was the source code

25 as H, your Honor.

1          THE COURT:  So the other two are F and G?

2          MR. ALFARO:  Yes, your Honor.

3          THE COURT:  Exhibits F and G will be received

4    under seal.

5    (By Mr. Alfaro:)

6    Q.   We were talking about this discrepancy of what Agent

7    Alfin stated regarding the IP address.  Can you explain

8    to the Court what your interpretation is, having viewed

9    all those documents?

10         THE COURT:  Let me interrupt you.  Do you have

11   a copy of these exhibits for the Court?

12         MR. ALFARO:  Judge, I apologize.  We just got

13   this -- got this information from the 20th --

14         THE WITNESS:  We can put this on the projector

15   unless the sealing is a problem.

16         MR. ALFARO:  That's fine with me, Judge.

17         MR. DEAN:  We have somebody in the audience.

18         UNIDENTIFIED PERSON IN AUDIENCE:  I'm getting

19   ready to leave, Judge.

20         MR. DEAN:  I don't want to kick him out in this

21   open courtroom.

22         UNIDENTIFIED PERSON IN AUDIENCE:  I have

23   another appointment.

24   (By Mr. Alfaro:)

25   Q.   Which exhibit should we start with?

1  A.   Can you put the Wireshark, the colorful one, on

2  first, please?

3  Q.   Yes.

4  A.   So this is a tool made by nerds for nerds.  So

5  you'll have to forgive me that it's not the easiest

6  thing to understand.

7        There are two really important things to see on

8  this.  You'll see at the top of the program there are a

9  number of fields with names.  So there's number, time,

10  source, destination?  You see that?  Okay.

11        So essentially what you have is a series of

12  communications.  So the NIT client talks to the

13  government, the government calls back, then they go back

14  and forth for a while.  And so each line in that program

15  shows a single communication between the source, which

16  is originally the NIT, and then the destination.

17        What's relevant here is there's an IP address

18  in the source and an IP address in the destination, and

19  those IP addresses are really, really important.  And

20  the reason that this is important is that the IP address

21  information that the government has provided to us

22  that's displayed in this file, this -- Special Agent

23  Alfin has stated that the data the government received

24  is exactly the government -- the data that was

25  transmitted by the NIT.  And he said there's no way that

1   it could have been tampered with.  And the fact is the

2   way the Internet works, the data that is sent by the NIT

3   has to change at every hop along the path as it goes

4   from the NIT user to the government.  And there are two

5   particular places where this changes, and I know this is

6   complex, but I'll try and break it down into English.

7          If I call the Court and I want to speak to a

8   particular employee, I don't know that employee's

9   telephone number.  So I call the main number for the

10  Court and I say, you know, can I speak to Judge

11  so-and-so.

12         Now, the person who answers the main court

13  number, they won't transfer me to a judge just by

14  myself.  So they will transfer me to the judge's

15  chambers and then I have to speak to the clerk and then

16  the clerk will talk to me.  And if I'm, you know, a

17  colleague of the judge, then they will transfer me.

18         When the call gets transferred, you have

19  extensions within the courthouse, but the outside world

20  just sees the main number.  Then when the NIT called

21  home to the government, it thought -- it had an IP

22  address it was programmed to use, and any NIT-infected

23  computer could call home to the IP address.  That IP

24  address doesn't show up in this file.

25         So the IP address, the destination IP address

1   on the first line is a 172.30 address.  That's an

2   internal IP address that's used within organizations to

3   route data internally.

4           What this data shows me is that the NIT called

5   home to a FBI server.  The FBI server said, oh, the NIT

6   data really needs to go to this server over here, and it

7   got -- and when it forwarded the call, it changed the

8   destination IP address.

9           So at least once, the IP address information

10  was changed because the government's own IP address had

11  to have changed.  This 172 address cannot be reached.

12          If you were to open up your Web browser and

13  type in 172.30.blah, blah-blah, blah-blah, it wouldn't

14  resolve because it's an internal extension.

15  Q.   Why is this important?

16  A.   Why is it important?  So the government has said

17  that this network recording shows exactly what was

18  transmitted by the NIT client, and what I'm saying is

19  this recording could not show what was sent by the NIT

20  client because if the NIT client had tried to send data

21  to a 172.30 address, it would never have reached the

22  government.

23          When the data left the defendant's computer,

24  his Internet service provider would not have known how

25  to get the data to the 172 address.

1          So at some point there was a government address

2    and that got changed between when the data was received

3    by the first government server and when it then got

4    passed onwards and then the recording was captured

5    later.

6          Separately, so the defendant, you know, used a

7    residential Internet connection.  And when you use a

8    residential Internet connection, as Special Agent Alfin

9    testified, you don't really get the IP address yourself.

10   It's usually assigned -- you get one IP address for your

11   whole house when you sign up for broadband and what that

12   means --

13         MR. DEAN:  Your Honor, I'm going to object to

14   this.  This has nothing to do with the search warrant

15   and suppression motion.  This is a confession case.  So

16   this isn't a whodunit.

17         He's kind of getting into something that might

18   be presented at trial, but again, this is about the

19   motion to suppress and the NIT warrant.  I think we've

20   gone far afield of that.

21         THE COURT:  Well, I mean, Agent Alfin

22   testified, and the Court is curious in understanding,

23   how the defendant's IP address or how any user's IP

24   address would have been harvested by this NIT.  So I'm

25   going to overrule the objection.

1          MR. DEAN:  Thank your Honor.

2    A.   All right.  So when you have a residential Internet

3    connection, you get one IP address.  But if you have

4    multiple computers in your house, you have -- you know,

5    you have a computer, your husband or your wife has a

6    computer, you have an iPad or two and you're using

7    cellphones.  So you have all these computers and all

8    these devices in your house that all have to use the

9    Internet.

10         And so your wi-fi router does this thing that

11   Special Agent Alfin described which is called network

12   address translation, and what it essentially does is it

13   allows every device in your house to hide behind one IP

14   address.

15         What's important about that is that when -- so

16   just as the government has these internal addresses,

17   your home network has these internal addresses that are

18   not real IP addresses that the outside world can reach.

19   They are sort of fake internal addresses.

20         If you've ever logged into your wi-fi router at

21   home, you might see a 192.168 address.  Those are, like,

22   the classic internal IP addresses.

23         When the data left the defendant's computer,

24   the source would have been 192.168-dot whatever.  When

25   it reached the wi-fi router, the wi-fi router would have

1    swapped out the fake internal IP address for the wi-fi

2    router's real address that was assigned to the

3    customer's home.  The data would have been sent over the

4    Internet and then when it reached the government, the

5    destination IP would have been swapped out from the real

6    one to an internal government one.

7           So why does this matter?  The government has

8    said that the data that was transmitted by the NIT from

9    the defendant's computer never changed a single bit as

10   it was transmitted all the way over the Internet.  Even

11   if there was no nefarious activity, both the source IP

12   address and the destination IP address each changed at

13   least once.

14          We know the destination IP address changed at

15   least once, the government's address, because the

16   address that's in this file is not an address that the

17   NIT could reach.  That had to have changed.  And if the

18   defendant had a home wi-fi router, like most people do,

19   then at least that address changed one time as well from

20   the sort of internal fake address to the 70.178 address

21   that appears here.

22          So we know that the IP addresses had each

23   changed at least once and so the reason why this is

24   important is that, you know, if you have -- if we think

25   of the data that the NIT collected again as information

1    that's written on a piece of paper and put in an

2    envelope, the government doesn't know if the envelope

3    was opened or closed, at any point along the way, and

4    then you have --

5    Q.    To stop you there, I'm sorry.

6    A.    Sorry.

7    Q.    So if I can address that, is what you're saying,

8    this two-way data stream is only what they received?

9    A.    The two-way data stream is only what they received.

10   Q.    So they don't have -- this document, Defendant's

11   Exhibit F that was presented by the government and given

12   to the defendant, doesn't show what the NIT actually

13   sent across the Internet?

14   A.    It doesn't show what left the defendant's computer,

15   it doesn't show what left the defendant's home network,

16   and it doesn't even show what the government first

17   received.  It only shows what the government -- the

18   government server received once it had been processed

19   inside the government's network.

20         THE COURT:  Did it harvest and send back to the

21   government the IP address that was issued to Mr. Jean by

22   his ISP provider?

23         THE WITNESS:  So are you asking me about the

24   sort of envelope and letter analogy or just in general?

25         THE COURT:  No.  I want to know whether or not

1    the NIT harvested Mr. Jean's IP address that was

2    assigned to his household, his modem, whatever, by his

3    Internet service provider.

4         THE WITNESS:  So the code that the government

5    has provided to us would have only recorded the internal

6    network address for Mr. Jean's home network.  It would

7    not have been the address assigned to him by Cox

8    Communications.  The only record of that IP address

9    shows up in this recording, but we know that that data

10   has changed at least multiple times.  We know that when

11   the government received the data, they changed the "to"

12   address.

13        Essentially, you know, the IP address is the

14   most important thing in this case.  Without the IP

15   address, they wouldn't have been able to get the

16   administrative subpoena and then find the client.

17        THE COURT:  Well, let me back up.  And I'm

18   sorry to interrupt, Mr. Alfaro.

19        MR. ALFARO:  That's fine, your Honor.

20        THE COURT:  But if I wait until we get to the

21   end of this, I'll never be able to get back to this

22   sequence.

23        You've put up Defendant's Exhibit F.  There's

24   lots of sources IP addresses and destination IP

25   addresses.  No one has yet told me what Mr. Jean's IP

1   address is.

2          THE WITNESS:  So that would have been -- the

3   address that the government believes was Mr. Jean's was

4   the 70.178 address, the first line.

5          So each line in this file is a communication

6   and so there are only two IP addresses that ever appear

7   in these columns.

8          THE COURT:  So on Line 1 under Source, 70.178.

9          THE WITNESS:  That would be Mr. Jean's alleged

10  IP address.  And then the 172.30, that is the IP address

11  that was internal to the government's network on the

12  receiving end.

13         THE COURT:  All right.  So to your knowledge --

14  and you've testified that you have reviewed the

15  pertinent documents in this case -- when the FBI went to

16  Step 2, which was to use an administrative subpoena on

17  the --

18         THE WITNESS:  On Cox.

19         THE COURT:  -- on Cox, what number was in that

20  subpoena?

21         THE WITNESS:  That was the 70.178 address.

22         THE COURT:  Okay.  With that understanding,

23  Mr. Alfaro, proceed to ask questions to help me

24  understand why any of this makes any difference.

25  (By Mr. Alfaro:)

1   Q.   Why does it make a difference, when interpreting

2   this, that anything changed?  Why does that even matter?

3   A.   So if the government -- so as Special Agent Alfin

4   has said, the reason the government doesn't encrypt the

5   data that was going from the NIT to the government

6   server was so they could collect this recording and

7   present it later as forensic evidence.  And Special

8   Agent Alfin has testified that this recording is an

9   exact copy of the data that was sent by the NIT and

10  received by the government, and it didn't change at all.

11  Had the government encrypted the data, they would be

12  able to know if it had been tampered with along the way.

13         Encryption basically provides a few properties.

14  One of them is confidentiality.  So no one watching on

15  the Internet could see the data as it goes over the

16  network.  And the data that would have -- the data that

17  left the defendant's computer probably traveled through

18  a dozen different computers run by a dozen different

19  organizations before it reached the FBI.

20         THE COURT:  I'm sorry to interrupt you, Doctor,

21  but -- and I do find some of this very interesting, but

22  I'm going to go back to the objection that Mr. Denis

23  raised earlier and ask if you can help me understand why

24  this is relevant, Mr. Alfaro.

25         The government made application to the judge in

1    this instance and requested permission to deploy a NIT

2    that would harvest the IP address.  Among other things

3    that appears to be what was done in this case.

4           So while all this information about the

5    technology that goes on behind the scenes and about how

6    information is broken down into packets and different

7    extensions within a house or an office building, all

8    that's all well and good; what does that have to do with

9    the validity or the facial constitutionality of the

10   warrant at issue?

11          MR. ALFARO:  And, your Honor, I guess to

12   briefly summarize, the government has represented that

13   this NIT operated in a certain way, and they represented

14   that to the magistrate judge that there were certain

15   assurances they were going to send this device out and

16   it was going to return reliable information.  And the

17   importance here is what they are getting is the IP

18   address.

19          So if we can demonstrate that the government

20   knew and is making misrepresentations about the strength

21   of how they collected this IP address, then the

22   information in the NIT warrant would have been a

23   misrepresentation, thereby nullifying the search -- the

24   judgment.

25          So in essence, the dots I'm trying to connect

1  is if the government would have said, "Hey, look,

2  this -- you know, we're going to collect this a certain

3  way, but we're not going to do it over an encrypted

4  network, we're not going to be able to verify that the

5  IP address that we get to seek an administrative

6  subpoena is going to be verified, we can't verify the

7  chain of custody" or there is an argument to make that

8  there's significant breaks in the chain of custody, then

9  if they would have presented that information to the

10  magistrate, then she would have -- I think it's -- I can

11  take it a step further and say, well, there's obviously

12  holes in what you're misrepresenting to me; so I'm going

13  to deny the order.

14         THE COURT:  All right.  Well, if this were a

15  whodunit, that would be all well and good, but it would

16  be a time to present it at trial.

17         I don't know of any reviewing -- any judge that

18  is reviewing magistrate that is ever going to have the

19  ability to be presented with what to me is

20  extraordinarily complex information about the

21  technological protocols that are exercised to make all

22  of this happen.

23         I think what is significant from a Fourth

24  Amendment standpoint is did the warrant accurately

25  represent more categorically the information that was

1   sought to be collected by the deployment of the NIT and

2   was there a nexus to the investigative objective and

3   need for that.  Then we back up the chain and we've got

4   to be sure there's probable cause there.

5          But, you know, we're not attacking probable

6   cause through any of these questions.  What we're

7   attacking is the methodology and whether it was good

8   methodology or bad methodology.  But if we kind of back

9   this up to put ourselves in a position of the magistrate

10  judge, she's being asked to give permission to the FBI

11  to deploy a NIT that would have the ability to harvest

12  the account user's IP address because that is a piece of

13  information that they can then go to Step 2 and unmask

14  the identity behind that IP address and determine where

15  that Internet address is residing, in this case in

16  Benton County, Arkansas.  And that's exactly, as I

17  understand it, what happened.

18         If that's not what happened, then perhaps I'm

19  just totally clueless, but they represented what they

20  were going to do to the magistrate judge.  If my

21  understanding is correct, that is what happened and so

22  all this stuff that goes on behind the scenes is

23  interesting, but I don't see that it goes to what our

24  issue is in this suppression hearing.

25         MR. ALFARO:  And I may be mistaken, your Honor.

1    I think my response would be where we're attacking is

2    the warrant represented that the NIT was going to get

3    the IP address.  And so the line of questioning I'm

4    trying to engage with Dr. Soghoian is did the software

5    actually do that, could it have done that and is there a

6    mistake that we can -- at least that the government

7    should have known about that should have been provided

8    in the warrant.

9            THE COURT:  Well, I'm going to ask you to move

10   along because my understanding of his testimony upon my

11   questions is that Mr. Jean's IP address is the 70.178

12   and that information was, in fact, harvested by the NIT

13   and that is the IP address that was presented to Cox in

14   the administrative subpoena and that's what eventually

15   led to the residential search.

16           So --

17           MR. ALFARO:  May I -- may I ask Dr. Soghoian to

18   explain, if I am mistaken, or if we are mistaken, to see

19   if there's any point that needs to be made regarding the

20   motion to suppress and how it relates to the NIT

21   collecting the IP address?

22           THE COURT:  Yeah.  Assume that's a question,

23   Doctor.

24   A.   So I believe there is a miscommunication, and if

25   it's because of me, then I apologize ahead of time.

1          The NIT did not harvest the IP address.  The

2     NIT harvested the MAC address; the NIT harvested the

3     operating system version, the information about the

4     computer; it harvested the username, the name of the

5     person that logged into.  It put those on a letter, put

6     the letter in an envelope and sent it back.

7          Where you're seeing the 70 address in the

8     Wireshark screen shot, the government says they -- the

9     government believes they received an envelope from the

10    NIT and that the "from" address on the envelope was

11    70.178.

12         The NIT -- but the contents of the envelope

13    does not include the IP address, and Special Agent Alfin

14    testified that the government, in fact, did not harvest

15    the IP address from the computer; they merely looked to

16    see where the NIT response came from and assumed that

17    that was the IP address of the defendant.

18         And what I'm telling you is that both the "to"

19    and "from" IP address information in this recording,

20    both of them have been changed at least once.  So the

21    government is depending on the IP address that appears

22    in this file and saying "That is the defendant's IP

23    address, that's the address we put in the subpoena, that

24    led us to his house," but that address changed at least

25    once, and the government's address also changed.

1          What I'm trying to communicate here is that the

2     IP address information in this file is not particularly

3     reliable, and the government has no way of knowing what

4     the defendant's real IP address was because they didn't

5     try to collect that at the computer, and they didn't put

6     it in a sort of sealed and signed evidence bag.

7          Because they didn't use encryption, they have

8     no way of knowing if any of this stuff was tampered with

9     as it was sent from the defendant's computer to the

10    government.  What they basically did was send it out to

11    the Internet and hope that it reaches the destination;

12    and whatever address happens to be written in the "from"

13    field on the envelope by the time it shows up at the

14    government's office, that's the address they then send

15    the subpoena to.  But they have no way of knowing for

16    sure if the data was modified along the way because they

17    didn't encrypt it.

18          THE COURT:  So what -- are you testifying that

19    the NIT was not designed to, and in fact did not, obtain

20    the activating computer's actual IP address?

21          THE WITNESS:  The source code that they gave us

22    collects the IP, but the data that was sent over the

23    network does not include -- can you pull up the --

24          THE COURT:  No, sir.  Just answer my question.

25          THE WITNESS:  Okay.

1          THE COURT:  Did the NIT as deployed obtain the

2    activating computer's actual IP address?

3          THE WITNESS:  We don't know if it obtained it.

4    We do know it didn't send it back, and Special Agent --

5    the code that ran looks like it collected it, but the

6    place on the letter where it would be written is blank.

7          THE COURT:  If it didn't send the activating

8    computer's actual IP address back to the FBI, what in

9    your opinion accounts for how they were able to present

10   Mr. Jean's IP address to Cox?

11         THE WITNESS:  They received a response.  The

12   government server heard back from someone on the

13   Internet.  Whatever IP address appeared in the top

14   left-hand corner of the envelope, they assumed that was

15   the defendant's IP.  But as I've just testified, that IP

16   address changed at least once on its way to the

17   government.  They are hoping that it only changed once

18   and didn't change twice or three times or four times,

19   but that IP address information may have been modified.

20         It was not transmitted back in a way that would

21   be tamper-evident.  There are ways to transmit

22   information over the Internet from A to B so that no one

23   can mess with it along the way.

24         THE COURT:  So your criticism is that the net

25   result here is that the manner in which it was deployed

1    and harvested the IP address was subject to returning

2    false positives to the FBI?

3          THE WITNESS:  It's not just false positives.

4    It could be -- false positive suggests, like, there was

5    an accident.  What I'm saying is because they didn't

6    sign and seal the evidence bag, they don't know if it

7    was tampered with as it went from A to B.

8          THE COURT:  And that somebody intercepted the

9    letter and wrote somebody else's name in there, set them

10   up, framed them?

11         THE WITNESS:  We know that the IP address

12   changed at least once on the sending side, and we know

13   that the IP address information changed on the receiving

14   side at least once.

15         I'm saying the government has no way of knowing

16   if the IP address changed five times or ten times

17   because the only recording of the data they have is from

18   a facility that the government controls.

19         Up until the point that the government received

20   the data, they don't know what happened to it in those

21   scenarios.

22         THE COURT:  All right.  I think I've heard

23   enough on this topic.  Would you please move on,

24   Mr. Alfaro?

25         MR. ALFARO:  That's all I have right now, your

1  Honor.  Thank you.

2          THE COURT:  Mr. Dean?

3          MR. DEAN:  Thank your Honor.

4                      CROSS-EXAMINATION

5  BY MR. DEAN:

6  Q.   Dr. Soghoian, so is it your testimony that we got

7  extremely lucky in that we were happening to look for

8  somebody who was accessing the Playpen site that was

9  using the name regalbegal and it came back to somebody

10 who confessed to using the name regalbegal?

11 A.   I'm a expert on surveillance and privacy.  I'm not

12 here to say whether you got lucky or not.

13          What I'm testifying is the manner in which the

14 NIT transmitted data back to the government was not a

15 tamper-evident method.  There are tamper-evident methods

16 and the government, in fact, employs those in many other

17 areas.

18          When the FBI gave us a copy of the recording,

19 they employed encryption there, but --

20 Q.   So your testimony is that if the government had

21 encrypted this, we would have known that the data

22 wouldn't have been tampered with?  Encryption is the

23 key?

24 A.   That is why the U.S. Government now runs --

25 Q.   Yes or no?

1   A.   Yes.

2   Q.   Okay.  Did you give a speech at the University of

3   Maryland earlier this year where you said encryption is

4   no guarantee of privacy but does provide a little bit of

5   balance?

6   A.   Encryption -- encryption --

7   Q.   Did you give that speech?

8   A.   I've given many speeches.  I --

9   Q.   Did you make that statement?

10  A.   I don't know but I definitely spoke at the

11  University of Maryland.

12  Q.   It's quoted right here --

13       MR. ALFARO:  I would hope that the government

14  would give the witness a chance to speak just like I had

15  to give the government's witness a chance to speak.

16       MR. DEAN:  He's being evasive, your Honor.

17       THE COURT:  Well, the witness is instructed

18  that if the question can be reasonably answered yes or

19  no that he should answer it yes or no, and Mr. Alfaro

20  will be given an opportunity to ask any followup

21  questions that will be necessary.

22       THE WITNESS:  Okay.

23  (By Mr. Dean:)

24  Q.   And I'll back up a little bit, Doctor.  Your last

25  name is Soghoian?

1  A.   That is correct.

2  Q.   S-o-g-h-o-i-a-n?

3  A.   That is correct.

4  Q.   Quote from the University of Maryland, Franciscan

5  Kay School of law in a speech that you made:  Encryption

6  offers practical protection, legislative changes.

7  ACLU's top technologist tells --

8         THE COURT REPORTER:  Please slow down.

9         MR. DEAN:  I'm sorry.

10 A.   ACLU's top technologist tells business law

11 students -- and that is a quote -- encryption is no

12 guarantee of privacy, Soghoian says, but it does provide

13 a little bit of balance.

14        Did you make that statement?

15 A.   I don't remember, but it's quite possible.  I give

16 speeches every week.

17 Q.   Is it your testimony here today that encryption is

18 100 percent?

19 A.   100 percent what?

20 Q.   Secure.  If it's encrypted, it's perfect; we don't

21 have to worry about it?

22 A.   This is not a yes or no question.  Can I give a --

23 more than a yes or no answer?

24        THE COURT:  Well --

25 Q.   No, because I think it can be answered yes or no.

1   Either it is or it isn't.

2   A.   Well, "secure" means many things.

3   Q.   Okay.

4   A.   Can I respond and say what "secure" is?

5   Q.   I'll let the defense attorney talk.

6            THE COURT:  Yeah, please move along, Mr. Dean.

7   I --

8            MR. DEAN:  Okay.

9   (By Mr. Dean:)

10  Q.   You are here on your own?

11  A.   That is true.

12  Q.   But you are an employee of the ACLU?

13  A.   That is true.

14  Q.   Which actively supports Tor?

15  A.   No -- what do you mean by "actively supports"?  We

16  don't give money to Tor.  The ACLU doesn't give money to

17  Tor.  The ACLU --

18  Q.   You encourage people to give money to Tor?

19  A.   I'm not aware of that.

20  Q.   Okay.  So if on your website there's something where

21  it says "we encourage people to support Tor," that it is

22  this viable tool, that would be incorrect on the ACLU's

23  website?

24  A.   I don't run the ACLU website.

25  Q.   I didn't say you did, but if it's on there, would it

1  be incorrect?

2  A.   I have no idea.

3  Q.   Okay.  Well, you -- regardless, you're not here in

4  your capacity with the ACLU, and I understand that, and

5  I appreciate that.

6           You are here essentially for free?

7  A.   That is correct.

8  Q.   You are so passionate about this issue that you came

9  to Arkansas for free to testify for this, about this?

10 A.   This is not the first time I've come to Arkansas for

11 free, either.  I gave a training for the federal

12 defender's office three years ago.

13 Q.   But you are passionate about this issue, sir?

14 A.   The Fourth Amendment is defined at the margin, and

15 if you want to work on interesting issues in the Fourth

16 Amendment, you have to get involved in cases that have

17 unattractive facts.  Yes, I care about these issues.

18 Q.   Do you have a Twitter account with your picture

19 associated with it?

20 A.   Yes.

21 Q.   @cSSoghoian?

22 A.   @cSoghoian, yes.

23 Q.   CSoghoian, yeah.  And you actually post about these

24 cases on Twitter?

25 A.   I tweet about many things.

1   Q.   Okay.   When the _Levin_ decision in Massachusetts came

2   out, you were excited about that decision; is that

3   correct?  Yes or no.

4   A.   Yes, sir.

5   Q.   Okay.  And you tweeted about that?

6   A.   I've tweeted about many decisions, yes.

7   Q.   So you're an activist?

8   A.   I am a scholar, I'm a researcher, and I'm an

9   activist, yes.

10  Q.   You understand that the Playpen website is a website

11  that was dedicated to child pornography and had sections

12  on it involving the sexual abuse of babies.  You

13  understand that?

14  A.   I do.

15  Q.   And, yet, you are so passionate about this topic

16  that you're willing to come to Arkansas for free to see

17  that a man is released because of a technicality?

18  A.   My colleagues represent death penalty defendants.  I

19  mean, if you work on defense, you work with all kinds of

20  clients.

21  Q.   Guilty?

22  A.   Sorry?

23  Q.   Guilty and innocent?

24  A.   I think defense lawyers work with all kinds of

25  clients who have done many good and many bad things, but

1    if you care about the Constitution and you care about

2    the Fourth Amendment, you have to roll up your sleeves

3    and get involved in issues that some people don't like.

4    Q.   I'll move on.

5         You wrote a dissertation as part of getting

6    your Ph.D. with Indiana University in 2012?

7    A.   That's correct.

8    Q.   Tell me about the two unpleasant encounters you had

9    with the FBI that you reference in that dissertation.

10   A.   The FBI took an interest in a project that I made

11   when I was in graduate school.

12   Q.   Was that project crafting a program that would churn

13   out fake boarding passes to an airline five years after

14   9/11?

15   A.   As I demonstrated the --

16   Q.   Would that be it?

17   A.   Would you let me explain?

18   Q.   Would that be it?

19   A.   That was part of the issue, yes.

20   Q.   Okay.  Please explain further.

21   A.   I demonstrated the ease with which people could

22   bypass the no-fly list, and the FBI took an interest in

23   that and they came to my house, and three weeks later,

24   the investigation was closed.

25   Q.   Can you understand why the FBI would take an

1  interest in an investigation where somebody's creating

2  fake boarding passes five years after 9/11?

3  A.   So I didn't create fake boarding -- I didn't print

4  the boarding passes out.  I created a website that let

5  people make their own boarding passes, but I can

6  certainly understand why that issue was on their radar.

7        I can also say that Senator Schumer had

8  previously publicized the exact same method, that the

9  TSA had ignored that issue, and a year after I did

10 that -- created that website, the TSA flew me out to

11 Washington D.C. to meet with their officials.

12       Two years later they forced the airlines to fix

13 the flaw and then a few years after that, I ended up

14 working for the U.S. Government for a year, employed by

15 the Federal Trade Commission.

16 Q.   Let's talk about that.  You actually were fired;

17 didn't have your contract renewed.  It was not a -- they

18 didn't throw you a party when you left.  Would that be

19 accurate?

20 A.   My contract wasn't renewed and then they brought me

21 back as a consultant for a few months, yes.

22 Q.   And was part of the fact that your contract not

23 renewed because you used your government credentials to

24 attend a closed-door meeting with technology --

25       MR. ALFARO:  Objection, relevance.

1          MR. DEAN:  Bias.

2          THE COURT:  Well, it goes to his bias and

3    credibility as an expert, but --

4    A.   As a Federal Trade Commission employee, I had

5    permission from the general counsel's office to attend a

6    surveillance industry trade show where I made a

7    recording of one of the panels, and D.C. is a city where

8    such recordings are legal.

9          I published that recording, again, after

10   talking to the general counsel's office of the Federal

11   Trade Commission, and after that recording was public.

12         This was a recording in which an executive from

13   Sprint revealed that the company had turned over

14   customer data to the government 8 million times in one

15   year.

16   Q.   Did you tell everybody in there that you were

17   recording that?

18   A.   No.

19   Q.   So you secretly recorded it?

20   A.   That's legal in Washington D.C.

21   Q.   I understand.  I'm not accusing you of a crime, but

22   the FTC wasn't happy with you and your contract didn't

23   get renewed; isn't that accurate?

24   A.   The company complained, the FTC didn't renew my

25   contract after a year, and then as I said with, they

1   brought me back as a consultant after a few months.

2   Q.   Did that get your door kicked in or have FBI agents

3   come talk to you, or what's your second unpleasant

4   encounter with the FBI that you refer to in your

5   dissertation?

6   A.   It's been a few years.

7   Q.   I would -- you don't remember an unpleasant

8   encounter with the FBI?

9   A.   I've had plenty of unpleasant encounters with

10  government officials over the years.

11  Q.   Well, okay.  We'll just cut to the chase.  You're

12  not a big fan of the FBI, are you?

13  A.   I'm a fan of -- I've met some very nice people of

14  the FBI; I've had beers with people from the FBI.

15          Do I have problems with certain surveillance

16  technologies with the government employees?  Yes.  But I

17  believe that everyone can engage in public service in

18  their own way.  I worked for the government for a year,

19  and now I engage in public service in this way by

20  educating the public and educating the courts and

21  helping defense lawyers.

22  Q.   Did you post the tweet, "The FBI shat the bed with

23  their playpen op.  An overbroad, illegal warrant and no

24  chain of custody for the data they collected"?

25  A.   When?

1    Q.    Did you post it?  I'm not asking when.

2    A.    I see my face on it.  So probably.

3    Q.    Okay.  Fair.  Was that sent before or after you

4    testified in Washington?

5    A.    I don't know.  I've tweeted tens of thousands of

6    times.  I don't remember the dates of those specific

7    tweets.

8    Q.    Is it true, yes or no, that the homepage of Tor

9    advises people that it cannot provide perfect security?

10   A.    Yes.

11   Q.    Wouldn't it be just completely foolish for somebody

12   to guarantee perfect security nowadays?

13   A.    If someone were to guarantee perfect security, they

14   probably would not be being honest.  That is, it is very

15   difficult to deliver perfect security.  But you can

16   deliver pretty good security.

17   Q.    But the very nature of the Internet is it's just

18   communication going back and forth, correct?

19   A.    There is data that goes back and forth over the

20   Internet, yes.

21   Q.    And you testified in the Michaud case that it is

22   very hard for the average person to protect their

23   privacy online.  Is that correct?

24   A.    That is true.

25   Q.    And I think you went further to say to get privacy

1   online, you have to work very, very hard; use technical
2   software?
3   A.   That is also true.
4   Q.   Now, Tor has some legitimate purposes, right?
5   A.   Tor has many legitimate purposes, yes.
6   Q.   And it's used also by people for illegitimate, or
7   unlawful purposes?
8   A.   That is true.
9   Q.   But the main reason people are using it is because
10  they don't want their identity discovered, whether they
11  are doing something bad or not?
12  A.   That is not necessarily true.  So the people who are
13  running services may wish to provide -- so there are Tor
14  hidden services that are run by people who are not
15  trying to hide their location but, rather, are trying to
16  circumvent government filtering.  So there are dissident
17  news sites that target THASPRA (phonetic), or target
18  people in countries that filter lots of news.  That is
19  one reason why people might use Tor.
20          In fact, Facebook offers access to users over
21  the Tor network, and when you log in to Facebook, you
22  have to give them your real name.  The reason that
23  Facebook does that is to provide access to people in
24  places where the Internet is filtered.
25  Q.   Okay.  But to reiterate, you would agree that people

1   get on Tor for illegal purposes, some people, not all?

2   A.   There are people who use Tor illegally -- or who use

3   Tor for illegal purposes.

4   Q.   Do you have any direct evidence here today that this

5   NIT was tampered with?

6   A.   No.   Although I do have evidence, as I described,

7   that the recording that the government has provided the

8   defense is not the -- the packets that left the

9   defendant's computer are not the same as those that were

10  recorded by the government.

11  Q.   Even though they happen to lead right back to the

12  same defendant?

13  A.   The government's IP address changed.

14  Q.   I get it.   Would the misconfiguration that you

15  referenced in direct allow the FBI to identify the user

16  who connected to the website using Tor?

17  A.   By the misconfiguration, you mean the one that

18  mandated the website was accessible via Tor and the

19  regular Internet at the same time?

20  Q.   Yes.

21  A.   Would that have allowed what now?

22  Q.   Would that allow the FBI to identify the user who

23  connected to Tor?

24  A.   If the user -- no.   That would have not.

25  Q.   Are you aware of anyone who was identified by the

1  NIT that did not connect to the Playpen website?

2  A.   I mean, I'm only -- I'm only aware of the cases that

3  either I've been brought into or the cases that are

4  public.  My understanding --

5  Q.   So you're not aware of any so-called innocent user?

6  A.   I mean, there are many NIT cases that are not out.

7  Q.   But you are not aware?

8  A.   I am not aware.

9  Q.   Now, you seem to say that we need to kind of -- we

10  need to open the door on this exploit, make it

11  transparent?

12  A.   I mean --

13  Q.   Wouldn't you agree that if we made the exploit

14  available, we would lose that tool forever as law

15  enforcement?

16  A.   I think you're mischaracterizing my statement.

17  Q.   Okay.  Please help me with that then.

18  A.   When I said -- when I was talking about

19  transparency, I was talking about judicial transparency.

20  So I was saying the government should have described the

21  exploit to the judge and should have described how, at a

22  high level, how it worked, what risks there would be if

23  the exploit got out.

24  Q.   In a search warrant that cannot be sealed forever?

25  A.   There are search warrants that -- for NITs that are

1  still sealed three years later.

2  Q.   Okay.  But the seal is not guaranteed.  We don't

3  know for sure whether a search warrant's going to be

4  sealed.  Would you agree with that?  It's up to the

5  judge?

6  A.   That is true.  Judges ultimately control the seals

7  in their cases.

8  Q.   So if a law enforcement tool, a specific tool, not

9  the tactic, but the tool used to do something to solve

10  crimes is made public, wouldn't you agree that that

11  could have horrible repercussions either by, we lose the

12  tool to investigate people, or it gets in the wrong

13  hands and all these other people are using it for

14  malicious purposes?

15  A.   I don't see the connection between not describing

16  the technology to the judge, even at a high level.  You

17  don't have to say, "Look, on Line 3 we do this, on Line

18  4 we do this."

19       I don't understand why there's any risk to the

20  public from providing a high-level description to a

21  judge of the fact that you're going to use an exploit

22  and what the risk is to other people if the exploit

23  malfunctions or somehow gets out.  That seems like

24  something where there's no downside to being more

25  forthright with the Courts.

1   Q.   You criticize the language in the Playpen warrant

2   that said we didn't make the judge aware that it could

3   get anybody, but isn't it true that the Playpen warrant

4   specifically said that it would get people who would log

5   on to the Playpen website, wherever located?

6   A.   The government has hit innocent people in previous

7   NIT operations.

8   Q.   That is so not responsive to what I just asked you.

9   Didn't the warrant say that it would get people who

10  logged on to the Playpen website, wherever located?

11  A.   That is -- well, the warrant actually says the

12  search would be in the Eastern District of Virginia.

13  Q.   Okay.

14  A.   Is that what you're describing?

15  Q.   No.

16  A.   Sorry.

17  Q.   This is actually --

18  A.   I'm a little confused.  Why don't you --

19  Q.   You testified in the Michaud case, and the Court in

20  Michaud case, that was one of the reasons for their

21  ruling, denying the motion.

22          Are you aware that the warrant said that it

23  would attach to people who logged on to the Playpen

24  website, wherever located?

25  A.   So this is a Defendant's Exhibit B.  On the top of

1  the warrant, it says that it would be -- it would

2  authorize the delivery of the NIT to -- of the computers

3  that access.

4  Q.   Sir, are you aware --

5          THE COURT:  Let me -- I mean, it says what it

6  says.

7          MR. DEAN:  I'll move on, Judge.

8          THE COURT:  I mean, direct him to a specific

9  paragraph, like 46(a), but let's not talk about

10 generalities because the Court can read too.

11         MR. DEAN:  Thank you, Judge.  I'll move on.

12 (By Mr. Dean:)

13 Q.   You testified in direct that the FBI should not be

14 using zero-days?

15 A.   I think there are serious public policy reasons why

16 the government shouldn't use zero-days, and two White

17 House officials last week wrote a report saying the same

18 thing.

19 Q.   Do you have direct knowledge that the FBI did, in

20 fact, use the NIT to identify innocent users in the

21 Freedom Hosting investigation?

22 A.   We know that the government was caught, as in the

23 NIT was published.  We -- the Washington Post has quoted

24 ex-government officials -- or, sorry.

25         The Washington Post has quoted government

1  officials saying that the government targeted users to
2  Tor Mail.  The government delivered the NIT on the
3  homepage, not even the post-login page.  So the
4  government had no way of knowing if the people who were
5  visiting Tor Mail were criminals or innocent people.
6  Q.   But again, you have no direct knowledge that
7  innocent people were targeted?
8  A.   When you say "targeted," do you mean hit, or that's
9  what the government was aiming for?
10  Q.   I don't know what you mean by "hit."  Targeted?
11  Looked at?
12  A.   Did their computers run the NIT or is that who the
13  government was trying to hit?
14  Q.   This is frustrating.  I'm going to end my
15  questioning.
16          MR. DEAN:  No further, your Honor.
17          THE COURT:  Mr. Alfaro?
18          MR. ALFARO:  Just a few, your Honor.
19                  REDIRECT EXAMINATION
20  BY MR. ALFARO:
21  Q.   Dr. Soghoian, the government was asking you when it
22  first started about whether encryption is 100 percent,
23  flawed.  Can you briefly talk about, are there still
24  weaknesses when you send something over an encrypted
25  network?

A.   So what I was trying to explain then was that
encryption delivers many benefits.  One of them is
confidentiality.  That is, data cannot be intercepted.
Another is that data cannot be -- that data is
tamper-evident.  That is that if information is tampered
along the way, you know that it was messed with.

There are also different kinds of encryption.
There is encryption of data at rest.  So an encrypted
iPhone, there is data encryption over the network.  And
so, you know, I don't remember the specifics of that
Maryland speech that the government attorney referenced,
but I don't think I was describing this particular form
of network transport encryption.

I think I was speaking at a very high level
about the fact that encryption cannot protect us from
everything.  Privacy and data security, to be more
secure, to achieve more privacy, we need -- we need
better software, we need better regulation, we need
better default settings.

Encryption is one piece of that puzzle but, you
know, when the government lawyer asks, you know, "Isn't
it true that encryption cannot deliver perfect
security," of course it cannot deliver perfect security,
but a world without encryption has even less security
and less integrity of data.

1  Q.   So encryption could be better when we're talking

2  about the integrity of the data sent over the Internet?

3  A.   If a doctor washes his or her hands before they

4  treat you, that doesn't mean they are going to solve

5  your problem and cure your disease.  But if they don't

6  wash their hands, they're going to have a really bad

7  time.

8  Q.   Could the government have set it up to where the NIT

9  was going from the Virginia server to Arkansas and back

10 over an encrypted network?

11 A.   Yes.  Not only could the government have done that,

12 but last year the Office of Management and Budget

13 required that by the end of this year, every U.S.

14 Government website has to be encrypted, every site.  And

15 the White House is already encrypted, the FBI website is

16 now encrypted.

17         By the end of this year, we expect all U.S.

18 Government agencies to be complying with this rule and

19 so one would imagine that, you know, this time next

20 year, future NIT operations will employ encryption and

21 will gain the benefit of the integrity protection

22 provided by encryption.

23         I'd also like to note that the government could

24 actually have had its cake and eaten it too.  They could

25 have encrypted the connection between the NIT client and

1  a government server and then once the data was received

2  by the government server, they could have passed it on

3  over an unencrypted internal connection, recorded the

4  data, had their forensically sound evidence, but still

5  made sure that no one was messing with anything as it

6  was going over the open Internet.

7          I'm surprised to find anyone from the

8  government justifying not using encryption because when

9  I worked at the Federal Trade Commission, we would

10 investigate companies that didn't encrypt their

11 customers' data because when you don't encrypt data, you

12 make it more likely to be hacked, you make it more

13 likely to be stolen, and you make it more likely to be

14 changed without your knowledge.

15 Q.  The government asked you -- or talked about the

16 risks of identifying this type of exploit and being it

17 made available to the public.

18         In other NIT cases has the government turned

19 that information over?

20 A.  So in the Operation Torpedo case, the government did

21 provide the exploit; and in the operation -- or in the

22 Freedom Hosting case, the government didn't provide the

23 exploit, but they were caught and so someone, or

24 multiple people, saved a copy of the exploit and

25 published it online.

1  Q.   So at least in the Torpedo case, the government was

2  forthcoming, gave all this information up to the

3  defense?

4  A.   I'll note that while they turned over the exploit in

5  the Torpedo case, the government was not able to turn

6  over the source code to their NIT because they lost the

7  source code in that case.

8  Q.   Why does that matter?

9  A.   It's way more difficult for an expert to analyze the

10  computer-readable code --

11        MR. DEAN:  Objection, your Honor.  We're

12  talking about losing a source code in a case that's not

13  at issue here.

14        MR. ALFARO:  I'll withdraw the question, Judge.

15  (By Mr. Alfaro:)

16  Q.   Dr. Soghoian, you're under a protective order

17  regarding the contents of the NIT, correct?

18  A.   You provided me with a protective order, and I

19  understand that I'm not allowed to share anything that

20  I've obtained with anyone else, yes.

21  Q.   If you were given a copy of the exploit, would you

22  be willing to do the same thing so it doesn't turn over

23  to anyone else?

24  A.   To be perfectly honest, I don't have the skills

25  required to analyze the exploit.  I don't think I'm the

1  right person for that.  I would certainly be able to

2  help the defense find the right expert but, you know,

3  just like you wouldn't have a tax lawyer represent you

4  in a murder case, I'm the wrong kind of computer

5  scientist to look at a browser exploit.

6          MR. ALFARO:  That's all I have, your Honor.

7          THE COURT:  Does that prompt anything else?

8          MR. DEAN:  No, your Honor.

9          THE COURT:  All right.  Thank you very much,

10  sir.

11          THE WITNESS:  Thank you, sir.

12          THE COURT:  Any other witnesses?

13          MR. ALFARO:  No further witnesses, your Honor.

14          THE COURT:  All right.  Gentlemen, it's about

15  5:15.  As I indicated, I have read your motions, read

16  your briefs.  I appreciate testimony presented by both

17  sides today.

18          Could y'all wrap it up in ten or fifteen

19  minutes of argument?

20          MR. ALFARO:  Yes, your Honor.

21          THE COURT:  All right.  Mr. Dean?

22          MR. DEAN:  Thank you.

23            CLOSING ARGUMENT BY THE GOVERNMENT

24          MR. DEAN:  An investigation into a website

25  solely dedicated to illegal activity occurring in a way

1   to mask the identity of the users, that was the stated

2   purpose of the Playpen website.  This was not Google,

3   this was not Amazon, this was not something that was

4   easily accessible.  This wasn't an easily accessible

5   pornographic website.  You had to have knowledge of its

6   existence to even go looking for this particular website

7   because of the steps the administrator took to cover it

8   up.

9           Law enforcement took the steps necessary to

10  investigate this the type of particular crime.  They

11  used authority granted to them by a magistrate judge

12  every step of the way.  They completed a technical,

13  explanatory, instructive 33-page application for a

14  search warrant.

15          They were not avoiding procedure in this case.

16  They were doing everything they could to investigate

17  this technologically advanced criminal activity.

18          One of the key issues raised by the defense in

19  their brief is Rule 41.  I'm not going to repeat all

20  that, but the Supreme Court has said this rule can be

21  interpreted flexibly.

22          Now, flexibility allows the sort of search that

23  the magistrate authorized in this case.  The defense in

24  their brief talked about the fact that there's a

25  proposed rule change that means that we must have been

1  wrong in this case because we're trying to change the

2  rule to make it right.   That's not the case.   What we're

3  doing is taking a gray area of the law with this rule

4  change and making it black and white.

5            Now, I'm aware that the majority of courts have

6  ruled against the Rule 41 issue in this matter.   I'm not

7  willing to concede.   The NIT warrant satisfied Fourth

8  Amendment warrant requirements in all respects:

9  Probable cause, particularity and approaching a neutral

10  and detached magistrate.

11            In stating that the warrant was void, to me the

12  Levin decision erroneously relied on where the warrant

13  application made it clear that the place to be searched

14  for -- they relied on a case that said something

15  completely different than what happened in this case,

16  that Sixth Circuit decision.

17            The warrant in that case stated it was

18  absolutely going to be outside of her district.   In our

19  case it said anywhere, wherever the people are located.

20  There's a difference in that.   There's a big difference

21  in that.

22            I'll point the Court to a recent decision from

23  the District of Kansas regarding this premise.   It's

24  United States versus Moreno-Magana, M-a-g-a-n-a.   The

25  cite is 2016 Westlaw 409, 227.   Basically it says that

1  the warrant contemplated a search within the authorizing

2  judge's district and did not specify a search only

3  outside her district; the warrant is presumptively

4  valid.  And that's what occurred here.

5          But regardless of how this Court makes a ruling

6  on the Rule 41 issue -- and I quite frankly don't

7  believe it has to, to resolve this matter -- it is clear

8  that suppression for any possible violation of Rule 41

9  is not warranted for several reasons.

10         According to the Eighth Circuit, suppression

11 would only be warranted for prejudice in the sense that

12 the search might not have occurred, or it would have

13 been so abrasive if the rule had been followed; or

14 evidence of intentional and deliberate disregard of a

15 provision in the rule.

16         As I've previously stated, the pillars of the

17 Fourth Amendment were complied with by law enforcement

18 in this case.  FBI requested and obtained a search

19 warrant from a neutral and detached magistrate.  It was

20 based on probable cause.

21         Now the defendant wants to attack probable

22 cause, but none of the eight courts that have heard this

23 case previously across the country have said there

24 wasn't any probable cause.  The particularity

25 requirement was met as the warrants laid out in detail

1  exactly what the FBI was going to do.

2         Regarding any intentional and deliberate

3  disregard for Rule 41, there's no controlling loss, and

4  a magistrate cannot issue this type of warrant.  The

5  closest the defendant comes is citing the <u>In Re: Warrant</u>

6  case where law enforcement applied for a warrant and it

7  was rejected.

8         Your Honor, as you know, that happens all the

9  time.  We submit warrants to the Court; sometimes they

10 get granted; sometimes they get rejected.  That's not

11 precedence.  That doesn't mean anything as far as this

12 case.  That was a fact-specific case; this is another

13 fact-specific case.

14        Regarding the prejudice prong, the defendant's

15 argument that no Court anywhere could have authorized a

16 search of Jean's computer or any users of the Tor

17 network because of the steps that were taken to mask

18 their identity, thereby making them immune to criminal

19 process, is not the type of prejudice this Court or any

20 Court needs to give credibility to.  That's not what it

21 means.

22        The case law cited by the defendant has found

23 that when a magistrate issues a warrant for something

24 known to be located, that's prejudice.  And again,

25 that's not the case here.  Nobody knew where these users

1    were because of the steps that they had taken to conceal

2    their identity.

3            So there was no way in knowing what they were

4    going to get back.  Now, they had an idea and that's why

5    they said "wherever located," but they could not point

6    to Arkansas or California or Washington.  That

7    necessitated the very technique that the FBI used here.

8            So the suppression argument fails because all

9    of the steps the FBI took to draft and obtain the

10   warrant show reasonableness during this investigation

11   and a clear understanding of the purpose of the warrant

12   and what the FBI was seeking.  There's been no evidence

13   presented that the FBI agents misled the magistrate in

14   their application for the warrant.

15           The defendant in their motion, and a little bit

16   today, makes an argument for privacy and protection of

17   the home.  And while I will concede that courts in other

18   districts have come up with different levels of

19   expectation of privacy, they have consistently, when

20   confronted -- when addressing the issue, they've

21   consistently held that there is a diminished expectation

22   of privacy when one is accessing the Internet through a

23   computer.

24           The Eighth Circuit case that I found and

25   referenced in my response was U.S. versus Suing,

S-u-i-n-g.  They held there is no reasonable expectation
of privacy of an IP address when using peer-to-peer
software, and this is basically consistent with opinions
across the country.

By its very nature, the Internet is an
communication tool.  It involves information coming in
and out of a computer using a unique identifier, this IP
address that we've referenced.

To say that there's an expectation of privacy
makes no sense because as users of the Internet, your
Honor, we all know that when you get on a retail website
on the Internet and you shop for something, for the next
several weeks or months, you start getting pop-up ads
that relate to the thing that you were looking at.
People know that.  That's common knowledge.

It's disingenuous to prepare this to crawling
in through somebody's window and disabling their
security system, as the defense represented in their
motion.

All that aside, we're left with good faith.
Good faith must be considered in that the law
enforcement in this case absolutely acted in an
objectively reasonable reliance upon the authorization
of the federal magistrate, who found probable cause, who
found particularity and who ultimately authorized the

1  technique that they were seeking.

2          They didn't take the warrant and then go and

3  disobey it or disregard it or go outside its

4  authorization.  They were actually applying it more

5  narrowly than the magistrate authorized them to use it.

6  That can't be anything but good faith.  They did a

7  better job than they were allowed to do.

8          So suppression isn't necessary in this case

9  because we have no evidence of wrongful police

10  misconduct, deliberate, reckless or grossly negligent

11  conduct.  We don't have any of that.  That's not what

12  happened here.

13          This warrant, 33 pages, represents the best

14  efforts of law enforcement to comply with Rule 41 by

15  seeking approval in the jurisdiction that contained the

16  strongest known connection of criminal activity under

17  the investigation.  To ignore that would be inconsistent

18  with the Supreme Court's recent decision on the Herring

19  case regarding exclusionary rule and the cite for that

20  case is 555 U.S. 135.  It's a 2009 case.

21          This website was operating in Virginia.  The

22  users were voluntarily accessing the site that was

23  located in Virginia.  The information from those

24  computers would be retrieved in Virginia; so they sought

25  authorization in Virginia, the only known district that

1   had a connection to this case.  Nobody on earth would

2   expect these agents to go to 94 districts and apply for

3   search warrants.  So if nothing else, good faith saves

4   the day, although most other courts dealing with this

5   haven't had to get to that issue in making their

6   decision.

7        So in summary, your Honor, the scope of the

8   warrant was very limited.  It accomplished its narrow

9   goal of identifying the users who were accessing the

10  Playpen website, who were violating the law regarding

11  child exploitation, and they did not exceed the scope of

12  that warrant.  It's reasonable.  What happened here was

13  lawful conduct.

14        THE COURT:  So knowing that the NIT would be

15  sent and attached to the user's computer for purposes of

16  sending back the IP address and other things, and

17  knowing that the user would -- could be located outside

18  of Virginia, I just do not understand why it was that

19  law enforcement didn't seek a district court that would

20  have -- that wouldn't be limited geographically in the

21  scope of issuing the warrant like a magistrate judge is

22  under Rule 41.

23        Is there any particular reason why the

24  magistrate judge in this case was sought out as opposed

25  to the district court judge that we know that was

1  already familiar with the facts of the case?

2  　　　　　MR. DEAN:  I'm unaware of that, and I have

3  looked at all the other cases.  That hasn't been brought

4  up before.  Obviously Special Agent Alfin wasn't able to

5  give an answer to that.

6  　　　　　All I can think of is that it was autopilot,

7  that, you know, "Oh, you want a search warrant?  Go to a

8  magistrate.  You want a search warrant, go to a

9  magistrate."  That's the only thing that I can reason

10  because I've seen no answer to the contrary.

11  　　　　　THE COURT:  All right.  Thank you, Mr. Dean.

12  　　　　　MR. DEAN:  Thank your Honor.

13  　　　　　THE COURT:  Mr. Alfaro?

14  　　　　　MR. ALFARO:  Thank your Honor.

15  　　　　　　CLOSING ARGUMENT BY THE DEFENDANT

16  　　　　　MR. ALFARO:  Just to briefly address the

17  arguments in our motion, Judge, I think the government

18  has two problems.  The first problem is the search

19  warrant clearly says that the property to be searched

20  will be in the -- is located in the Eastern District of

21  Virginia, and the judge -- the warrant that the judge

22  signed explicitly says that.

23  　　　　　So even though the affidavit on Page, I think

24  it was 40-something in the --

25  　　　　　THE COURT:  That's -- look at Paragraph 46(a)

1    of the search warrant.

2         MR. ALFARO:  Yes, Judge.  So 46(a) I believe

3    says "wherever located" in the affidavit.

4         THE COURT:  This is the section where it says

5    what is being requested by law enforcement, that the

6    Court issue a search warrant authorizing the following:

7    A, that the NIT may cause an activating computer,

8    wherever it is located, to send a computer -- to send to

9    a computer controlled by the government the information

10   that we have discussed.

11        So the argument that you raise that somehow the

12   government misled the magistrate judge into believing

13   that this would only -- this information would only be

14   harvested from computers in the Eastern District of

15   Virginia is somewhat lost on me as to why you're making

16   that argument.

17        MR. ALFARO:  And, your Honor, I'm not making

18   the argument that the government misled them.  The

19   argument that I'm making is this:  Obviously we have to

20   assume that the judge read that, that the judge read the

21   application, that these activated computers, wherever

22   they are located, is what the government is trying to

23   search.  So obviously we have to assume the judge read

24   that.

25        When she issued the warrant, when we look at

1   what -- the warrant that she signed, it doesn't say that

2   they are allowed to search any computer wherever it's

3   located.  It says they're allowed to search property

4   located in the Eastern District of Virginia.

5           So I think the connection there is she read

6   that and declined to authorize a warrant for any

7   computer, wherever it's located.  She said, now, we're

8   only going to -- I'm only authorizing this for property

9   located in the Eastern District of Virginia.  So by --

10          THE COURT:  And how are you getting to that

11  conclusion?

12          MR. ALFARO:  Well, Judge, I guess what I'm

13  saying is if the judge would have authorized a computer

14  anywhere, anywhere in the United States, wouldn't that

15  have been in the warrant that the judge signed saying

16  anywhere, wherever they're located.

17          THE COURT:  Well, didn't she sign the warrant,

18  or didn't -- yeah.

19          MR. ALFARO:  She did.  She did, Judge.  So if

20  we look at the search and seizure warrant, it says an

21  application by federal law enforcement officer or

22  attorney for the government requests search of the

23  following person or property located in the, blank,

24  district of blank.  So it's the Eastern District of

25  Virginia.

1    I think that if she was intentionally

2 authorizing computers wherever they are located, meaning

3 anywhere in the world, she would have prescribed

4 "Eastern District of Virginia and elsewhere," or

5 "wherever they are located."  Because that information

6 is omitted from the warrant, I think we can -- I think

7 the Court is allowed to consider the analysis that the

8 warrant that Judge Buchanan signed circum- -- left out,

9 or didn't authorize, a computer anywhere but the Eastern

10 District of Virginia.

11    Should the Court deny that analysis, then the

12 next question is the judge intentionally authorized a

13 warrant that searched computers wherever they are

14 located, meaning outside -- potentially outside of her

15 own district, then that is a direct violation of Rule

16 41(b).

17    I think every single Court with the ex- -- has

18 analyzed this, with the exception of two judges inside

19 the Eastern District of Virginia, which would make sense

20 because the defendants in those cases are within the

21 district.  Every other judge has ruled that this warrant

22 is a violation of Rule 41.

23    THE COURT:  Well, magistrate judges are

24 authorized under Rule 41, I believe it's (b)(4), to

25 issue GPS tracking warrants, are they not?

1          MR. ALFARO:  They are, your Honor, I would

2     argue.

3          THE COURT:  So is the NIT not analogous to -- I

4     mean, if we were back in the 1980s and we were talking

5     about a warehouse in North Carolina or Virginia that

6     stored large volumes of VHS tapes of child porn and it

7     had a perimeter security fence; and if you were a

8     customer of this warehouse, you had to come to the

9     security perimeter fence and punch in a code to get past

10    the gate that then would allow you into the warehouse to

11    fill up your basket full of VHS tapes full of porn, and

12    law enforcement was investigating that trying to find

13    out who these further distributors of child porn were

14    and so they go and make application to put a tracking

15    device on a vehicle, clearly the magistrate judge had

16    the authority to do that, regardless of the fact that

17    the vehicle might leave the jurisdiction in which the

18    device had been attached to the vehicle.  True?

19         MR. ALFARO:  That's correct, your Honor.

20         THE COURT:  So how is this any different in

21    principle?  I realize it doesn't envision the technology

22    that was deployed here, but in substance how is it any

23    different than a GPS tracking device?

24         MR. ALFARO:  There, your Honor, we would -- we

25    would suggest that this Court adopt the analysis

1    prescribed in the Michaud case, the Arterbury case, and

2    the Levin case.  Rule (b)(4) says a magistrate judge

3    with authority in the district has authority to install

4    within the district a tracking device, blah-blah,

5    blah-blah, to track the movement of a person or property

6    located within the district.

7          So there -- and when we're talking about a

8    tracking device, the government has to go to a car

9    that's located within the district, controlled by the

10   defendant, place the tracking device on while it's in

11   the district and then monitor it.

12         Once it leaves the district, that is still okay

13   because it attached the beeper of property that's

14   located within the district.

15         THE COURT:  Well, but in the virtual -- I mean,

16   if we were in the 1980s, Mr. Jean might have jumped in

17   his car, got on Interstate 40 and driven all the way

18   across the country to North Carolina for this warehouse

19   where the VHS tapes containing the child porn were

20   located.

21         But in the day and age that we live, he didn't

22   jump on the interstate; he jumped on the Internet.  And

23   he didn't go to a physical warehouse; he went to a

24   warehouse full of pornography that was on a server in

25   North Carolina, or by that point it had moved to

1  Virginia.

2         And he didn't have to knock on the door and go

3  inside a warehouse, but what he did have to do was enter

4  his user code, his ID, and only while he was on the

5  Internet connection.  He's the one that knocked on the

6  door of this server that was located in Virginia, and

7  only after that door was open and the two computers were

8  communicating was he infected with this malware or good

9  ware, whatever you want to call it.

10        Why isn't that, in principle, the exact same

11  thing that would have happened if the FBI was

12  investigating this back in the 1980s?

13        MR. ALFARO:  Because as the testimony came out

14  through today, the installation didn't occur when he

15  made -- when he knocked on the door of the server that's

16  in Virginia.

17        THE COURT:  But the infection would not have

18  occurred but for his entry into the Eastern District of

19  Arkansas where the server was located.

20        MR. ALFARO:  That's true, your Honor, but the

21  rule doesn't prescribe that.  The rule is specific that

22  it says that the installation has to occur in the

23  issuing district.

24        So just because the defendant knocked on the

25  door doesn't mean that the tracking device was installed

1   while he was knocking on the door or when he walked

2   through the door.  It wasn't installed until he left the

3   district, and I --

4        THE COURT:  What if the NIT had been attached

5   to the file that was being downloaded?  How would that

6   be any different than if he physically walked in this

7   warehouse and they put a tracking device in the VHS tape

8   that contained the child pornography?

9        MR. ALFARO:  Well, now I'm too many analogies,

10   Judge.  Can you restate your question?

11        THE COURT:  Sure.  In the 1980s when child

12   pornography was on videotapes, if the government wanted

13   to track it -- and perhaps I'm mixing my technologies,

14   but let's assume the 1980s they had the ability to put

15   some sort of tracking device in the actual VHS tape.

16        MR. ALFARO:  My question would be where was the

17   VHS tape when the tracking device was put on it because

18   if it was put on outside the district of the issuing

19   warrant, then we would have a clear 41(b) violation.  So

20   just like --

21        THE COURT:  But in my analogy in the 1980s, he

22   jumped in his car, got on the interstate, went to a

23   physical warehouse in Virginia, picked up his bucket

24   load of VHS tapes, and inside one of those VHS tapes was

25   a tracking device, and he left the State of Virginia

1  with the tracking device.

2          MR. ALFARO:  And that's assuming -- and I think

3  here's the issue with it, with the technology, Judge.

4  The tracking device, once you put it on the VHS tape,

5  it's recording information.  Regardless of where it's

6  being moved, it's collected information.

7          Here the NIT, once this -- once the person

8  knocks on the door and he walks through to get his VHS

9  tape, it's not collecting information.  It has to --

10          THE COURT:  No, he's infected within .27

11  seconds was the testimony.

12          MR. ALFARO:  Well, that's correct, Judge, but

13  it still has to be -- it still has to be installed in a

14  district outside of the authority of the magistrate

15  judge.  So it's unlike a beeper in the sense that a

16  beeper, or the GPS, once you enable it, it's recording

17  everything.

18          Here it went back to his computer, but it

19  wasn't recording anything on the way there.  It wasn't

20  until it was at his computer that it activated and

21  started reviewing information.  So, therefore, the

22  installation was not only not in the district; the

23  information was collected outside of the district.  So,

24  therefore, (b)(4) would be completely inapplicable,

25  Judge.

1          THE COURT:  Well, ultimately if it's the act of

2   going to this virtual warehouse that is residing in

3   Virginia, where the tracking device becomes attached, I

4   mean, but for knocking on the door of this virtual

5   warehouse in Virginia, he would never have been infected

6   with this tracking device.

7          MR. ALFARO:  That's true, Judge, but that still

8   requires the warrant to fit before.  So I think the

9   Court in the Michaud case answered the question more

10  specifically than I am able to.

11         For (b)(4) to apply, the property has to be

12  located in the Eastern District of Virginia when it's

13  installed.  So the question is when is the GPS or when

14  is the NIT installed.  Well, we know it's not installed

15  when it's in the District of Virginia.  So it falls

16  there.  The next --

17         THE COURT:  Well, if he init- -- I mean, this

18  gets me back to my question of let's assume that the NIT

19  had been attached to a file that was being downloaded

20  from the server that was located in Virginia.  Would you

21  be objecting to that?

22         MR. ALFARO:  I believe we would, your Honor,

23  because it's not -- the triggering aspect here is when

24  the information is being revealed.

25         THE COURT:  Well, no, because you've already

1  agreed that if the tracking instrument is attached in

2  Virginia, there's nothing wrong with the fact that it

3  reports information after it crosses the border in North

4  Carolina.

5         MR. ALFARO:  So I guess what I'm saying here is

6  if he's just clicking on the device -- on the file that

7  initiates the download, it's still the same thing

8  because the NIT has to travel across state lines to do

9  what it does.  It can't not travel across state lines to

10 do what it does.

11        So I guess what I'm saying is the knocking on

12 the door isn't a (b)(4) question.  The (b)(4) question

13 is when is it put there to do what it does then.

14        So the knocking on the door isn't the mechanism

15 that starts the analysis.  It's when it was put on the

16 device so it can do what it does.  And because the

17 compute -- because we all know, even Alfin -- excuse me.

18        Special Agent Alfin testified that it didn't do

19 anything at all until it was put on the computers in a

20 different state.  Because of that, the computer was not

21 in the State of Virginia ever, nor was the installation

22 at in the State of Virginia, it cannot be equivalent to

23 a tracking device.  Therefore, (b)(4) fails.

24        THE COURT:  Does one have a reasonable

25 expectation of privacy to their Internet -- to their IP

1  address?

2         MR. ALFARO:  Judge, I don't think that's what

3  this case is about.  I mean, I think that's what the

4  government wants to make it about.  First, so I don't

5  take up too much of your time --

6         THE COURT:  Well, there can't be a violation if

7  there's no reasonable expectation of privacy.

8         MR. ALFARO:  There's a reasonable expectation

9  of privacy in your computer and here's the illustration

10 I would like to point out to the judge --

11        THE COURT:  I would agree, but there's been

12 testimony today from the special agent that the

13 computer, if we think of it as a house, was not rummaged

14 through, it wasn't searched; rather, it was -- it

15 harvested the address.

16        MR. ALFARO:  And, your Honor, what I -- the

17 distinction that I would make is this:  The Fourth

18 Amendment contemplates different protections.  It's not

19 just in the information that the government is getting.

20 It's where and how.  And I think the Supreme Court

21 precedent on that is very clear.

22        So here's the -- here's where I've divulged

23 that.  The Supreme Court in Riley versus California said

24 you have a reasonable expectation in your electronic

25 device, in your cellphone.

1          The government responded with, well, all we

2    want to do is take the phone from his person, open up

3    the phone and just get the call logs.  We can do that

4    because if some -- if we used a pen register and you're

5    conveying that to a third party, we can get that.  And

6    the Court said, no, you can't do that because you're not

7    getting it from a third party; you're actually taking it

8    from the defendant.  And it doesn't matter what you are

9    getting.  The nature of the phone, the nature of the

10   evolution of technology and the privacy of -- the right

11   to privacy that we have in our technology, the Court

12   said, no, you cannot do that without a warrant.

13          So what the Supreme Court there is saying, we

14   don't care the type of information that you're getting;

15   it's how you're getting it.

16          And to add another layer to that, we see that

17   in the Supreme Court's analysis in <u>Kyllo</u>.  There the

18   government is using technology that's not available to

19   the general public and that the Court there saw as

20   invasive.  All that they were gathering was the heat

21   waves emanating from the house.  And the government's --

22   I mean, the Supreme Court said we don't care what type

23   of information you're getting; you're getting it from

24   one of the most constitutionally protected areas that we

25   see and that's the house.

1                And to liken that to this case even better, the

2     government, one, did not collect this information from a

3     third party.  I know that they got the IP address

4     information from the administrative subpoena, but before

5     that step, they needed to secure the IP address, and

6     they got directly from my client on his personal

7     computer while it was inside his house.

8                So that would be -- so the analogy here is

9     this:  If they want my defendant's phone numbers, they

10    could install a pen register when he's conveying that to

11    a third party or when he's using the regular Internet.

12    But what they can't do is get that same information by

13    kicking the door down, using his AT&T phone bill and

14    then writing those numbers down.

15               So that is what this case is about, Judge.

16    It's not about getting some IP address from a third

17    party.  It's about mass hacking of 100,000 individuals

18    where the government is directly putting software,

19    unbeknownst to them, on their computer.  So I submit

20    that this case is about a reasonable expectation of

21    privacy that an individual has in the information in

22    their computer.  Doesn't matter if it's an IP address.

23    It matters if it's an IP address from a third party but

24    not when taken directly from the defendant as in that

25    Riley case, Judge.

1          So because of that, that is what this case is

2     about.  And I think we can all agree that a reasonable

3     person, or that society is not prepared to recognize as

4     reasonable no expectation that the government isn't

5     going to use this evidence to hack into your computer,

6     that they may have a valid reason -- we're investigating

7     child pornography -- but that doesn't allow them to

8     circumvent the Fourth Amendment or Rule 41(b), which

9     they knew they were running afoul of, Judge, and we know

10    that because of the testimony you heard today.

11         Before, in the early NITs, they asked in a

12    search warrant to properly locate it within this

13    judicial district or elsewhere.  Then In Re case in

14    Texas is one of the first judges to say, no, I'm not

15    going to issue this warrant.

16         The government said, when he was giving his

17    closing argument, that the In Re case doesn't matter.

18    What's important here, why this matters, this case

19    matters is because the FBI didn't know where these

20    people were at.  That's exactly what the In Re: Warrant

21    case was about.  The judge read the warrant; didn't know

22    who this was going to be targeted to because the FBI did

23    not know where this single person was at.  So it denied

24    it on Rule 41 grounds, Judge.

25         They also -- the government also said that the

1    defendant isn't prejudiced because all we got was the IP

2    address.  I believe they make that in their motion.

3    That's not the test for prejudice, Judge.  It's clear

4    that the test for prejudice was would this search have

5    happened had the rule been followed, and I think the

6    answer to that is clear.

7            So not only do we have a constitutional

8    infirmity because this case is not about the IP address;

9    it's about his computer --

10           THE COURT:  Would they have obtained the IP

11   address if they had gone over to the district judge's

12   chambers and got that judge to sign the warrant?

13           MR. ALFARO:  Would they have got the -- yeah,

14   they could have done that, Judge, but that doesn't

15   change the fact that they violated Rule 41.  Just

16   because they could have, just because they could have

17   doesn't negate the 41 violation.

18           THE COURT:  No, but it affects the prejudice

19   argument.

20           MR. ALFARO:  Well, Judge, I don't think it

21   affects the prejudice argument because the definition of

22   prejudice per the Eighth Circuit is this:  Had the rule,

23   Rule 41(b), been followed to the letter, would the

24   search have occurred.  It's not, "Well, couldn't we have

25   got this information from somewhere else."  That's not

1  the analysis that the Court makes.  It's had the rule

2  been followed.  And had the rule been followed, a

3  magistrate judge could not have exercised this, this

4  warrant.  So I think it would be prejudicial to say, oh,

5  we could have got this some other way.

6        That's like saying, "Well, we could have got a

7  warrant to search your phone because we had -- we could

8  have got a warrant to search your phone, but we decided

9  not to do it."  Well, just because they could have got a

10  warrant and didn't do it doesn't mean that the Fourth

11  Amendment isn't violated.

12        So because of that analysis and I think with

13  that understanding, had this Rule 41 been followed to

14  the letter, this judge would not have issued this

15  warrant because no warrant would have existed because

16  they would have said, no, I can't do that.  Therefore,

17  this warrant would not have allowed the government to do

18  exactly what it did in this case.

19        Regarding reckless disregard of procedure,

20  Judge, I'm not alleging that the government is just

21  trying to skirt everyone's civil liberties.  I think the

22  government has recognized they're in a position where

23  they had this new technology that no one really knows

24  about but them, and they need to execute it.  But that

25  does not give carte blanche to violate these rules, and

1    I think what's important here is these other district

2    court cases have stated it flies in the face of this

3    good faith to say that the government can request a

4    warrant that so blatantly violates Rule 41(b) as acted

5    in good faith.

6            They knew that they had a hurdle after the In

7    Re: Warrant out of the Southern District of Texas,

8    meaning that judge denied a warrant because it didn't

9    subscribe to the jurisdictional requirements of Rule

10   41(b).

11           So the government proposed legislation citing

12   that exact case saying this is an unnecessary hurdle for

13   us to go over; so, let's change this.  But before the

14   rule is changed, they seek a warrant that does exactly

15   what they just put on notice is not allowable:  To issue

16   a warrant that is not tied to this jurisdictional

17   requirement under Rule 41(b).

18           Regarding that analysis, Judge, I would point

19   the Court to an additional case that is I think

20   persuasive, and I have a copy.  It's United States of

21   America versus William Barber.  The cite there is

22   5:15-CR-443 out of the District of Kansas.  Now, this is

23   not a case involving the NIT, but the analysis I think

24   is similar.

25           Here the FBI requested a warrant for an e-mail

1  address from a district judge in Maryland.  The warrant

2  was addressed to Google, which is in the Northern

3  District of California, for the contents of an e-mail.

4        Now, the face of the warrant said that

5  information was in Maryland, but the affidavit said the

6  information -- that the information was stored in

7  California.

8        A second warrant was issued, the same manner,

9  which led to the arrest of the defendant.  The defendant

10 made the same exact Rule 41(b) argument there, and the

11 Court went on to talk about that this warrant violated

12 Rule 41(b) because a magistrate judge there did not --

13 in Maryland did not have the authority to issue a

14 warrant outside of its jurisdiction in another state in

15 California.

16       So not only was that a Rule 41(b) violation,

17 but the Court explicitly said that it finds persuasive

18 the cases that suggest that the good faith exception

19 does not apply to warrants that are invalid from their

20 inception.

21       So just like the argument in Arterbury and

22 Levin, Judge, I think that should this Court find a Rule

23 41(b) violation that the good faith exception does not

24 apply because Leon says nothing about what happens when

25 a warrant is void at its inception, meaning a void

1  that could -- a warrant that could have never existed in

2  the first place.  And because of the reasons cited and

3  the cases that I've mentioned and in this Barber case, I

4  think the Court should be persuaded that the good faith

5  exception should not apply and that all the evidence and

6  all the fruit of that evidence should be suppressed.

7       Lastly, Judge, just to make a good record, I

8  recognize that no other Courts have agreed that the

9  warrant was not supported by probable cause.  I will say

10 that it's troubling to us -- to me that Agent Alfin

11 recognized a discrepancy in the website and didn't

12 inform the affiant of such.  And the reason I say that

13 is because although the government is correct that they

14 make a statement in a footnote in this multipage

15 affidavit for warrant that they would circumscribe

16 whenever they wanted to of who they -- of when they

17 would direct the NIT in requiring more affirmative

18 steps, the warrant specifically wanted to be allowed to

19 deploy the NIT whenever they logged in.

20      So I think what turns on the probable cause

21 then is what could the government prove to strengthen

22 that there's probable cause just by logging on, just by

23 entering the information and clicking okay that there

24 was sufficient probable cause that this site was

25 dedicated to child pornography.

1          You heard testimony that this site was actually

2     accessible through the regular Internet, that there are

3     indexes or things to do on Tor that index sites, and

4     it's possible that someone could have found this site

5     through these Tor search engines, or indexes.  And when

6     we look at the page, the description obviously had

7     changed.  We don't know the age of the female.

8          There's no argument that it meets a legal

9     definition of child pornography, and there's no argument

10    that they can prove that anyone -- that every single

11    person who got to that site knew what they were getting

12    into, Judge.  And so for all those reasons, we request

13    that the judge suppress -- the Court suppress all the

14    evidence.  Thank you, Judge.

15          THE COURT:  Mr. Alfaro, thank you very much.

16    It was very well said.

17          The Court is going to take the motion under

18    advisement and we'll get a ruling out as quickly as we

19    can.  Very much appreciate how well prepared everyone

20    was today.  I do appreciate the people that have -- our

21    witnesses that have traveled from a great distance.

22          These are very significant, important issues

23    before the Court, and I certainly appreciate the efforts

24    that have been gone to, to present this testimony to the

25    Court today.  We're adjourned.

1                    (Proceedings adjourned at 5:54 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Dana Hayden, Federal Official Realtime Court

4    Reporter, in and for the United States District Court

5    for the Western District of Arkansas, do hereby certify

6    that pursuant to Section 753, Title 28, United States

7    Code that the foregoing is a true and correct transcript

8    of the stenographically reported proceedings held in the

9    above-entitled matter and that the transcript page

10   format is in conformance with the regulations of the

11   Judicial Conference of the United States.

12          Dated this 8th day of July 2016.

13

14

15

16            _____

17            Dana Hayden, CCR, RMR, CRR
              Federal Official Court Reporter

18

19

20

21

22

23

24

25

## 1

**1** [5] - 3:5, 20:18, 22:2, 22:4, 142:8
**1,000-mile-long** - 119:16
**100** [6] - 66:13, 102:15, 106:19, 154:18, 154:19, 169:22
**100,000** [20] - 65:1, 65:6, 65:7, 65:12, 65:13, 65:17, 65:18, 66:2, 66:5, 66:6, 66:7, 66:13, 67:4, 72:18, 72:20, 76:3, 78:6, 123:8, 124:17, 196:17
**12** [1] - 79:13
**128** [1] - 3:12
**129** [1] - 3:12
**13** [4] - 29:13, 37:6, 40:24, 42:10
**13-day** [1] - 40:22
**132** [2] - 3:13, 3:15
**133** [2] - 3:13, 3:15
**135** [1] - 181:20
**14** [1] - 2:14
**15** [2] - 20:23, 93:17
**152** [1] - 2:21
**16** [1] - 108:10
**169** [1] - 2:21
**17** [1] - 29:14
**172** [2] - 136:11, 136:25
**172.30** [3] - 136:1, 136:21, 142:10
**172.30.blah** [1] - 136:13
**174** [2] - 2:5, 2:6
**18** [4] - 29:8, 29:12, 39:12, 39:20
**183** [1] - 2:7
**19** [2] - 4:25, 5:4
**192.168** [1] - 138:21
**192.168-dot** [1] - 138:24
**1980s** [6] - 187:4, 188:16, 189:12, 190:11, 190:14, 190:21
**19th** [6] - 25:2, 33:16, 34:11, 34:15, 35:6, 80:25
**1:08** [1] - 1:10

## 2

**2** [6] - 3:6, 22:7, 25:8, 25:10, 142:16,

146:13
**20** [2] - 12:2, 126:8
**200,000** [1] - 78:4
**2000** [2] - 108:11, 108:12
**2002** [1] - 104:6
**2007** [5] - 104:8, 114:8, 114:19, 117:8, 125:14
**2009** [3] - 14:18, 181:20
**2012** [5] - 118:9, 121:10, 121:20, 121:22, 158:6
**2013** [4] - 104:8, 116:3, 122:1, 124:22
**2014** - 14:19, 14:20, 18:7, 20:23, 25:1, 32:17, 33:4, 53:5, 53:6, 53:7, 99:9, 104:9, 115:1
**2015** [12] - 4:9, 25:2, 33:16, 34:11, 34:15, 36:5, 40:18, 40:19, 42:3, 73:16, 81:1, 81:2
**2016** [4] - 1:10, 2:3, 176:25, 205:12
**203** [1] - 2:8
**204** [1] - 2:9
**205** [1] - 2:10
**20th** [5] - 40:18, 58:3, 81:2, 104:23, 133:13
**22** [2] - 3:5
**227** [1] - 176:25
**23** [4] - 1:10, 2:3, 111:3, 111:10
**24** [1] - 111:3
**249-9040** [1] - 1:15
**25** [3] - 3:6, 112:9
**27** [6] - 3:7, 86:22, 87:1, 87:2, 191:10
**28** [2] - 5:1, 205:6
**280** [1] - 1:19

## 3

**3** [5] - 3:7, 26:4, 27:6, 27:8, 166:17
**30** [1] - 42:4
**30-minute** - 24:13
**30-page** [1] - 12:2
**31** [4] - 3:8, 111:5, 111:10
**31st** [1] - 108:15
**32** [3] - 111:5, 111:10, 112:4
**33** [4] - 111:5, 111:10, 112:4, 181:13
**33-page** [1] - 175:13

## 35

**35** [1] - 1:24
**3739** [1] - 1:19
**3:20** [1] - 93:19
**3:35** [1] - 93:19
**3rd** [1] - 36:5

## 4

**4** [5] - 3:8, 28:15, 31:15, 31:17, 166:18
**40** [1] - 188:17
**40-something** [1] - 183:24
**409** [1] - 176:25
**41** [18] - 12:3, 12:23, 82:11, 83:8, 99:11, 175:19, 176:6, 177:6, 177:8, 178:3, 181:14, 182:22, 186:22, 186:24, 197:24, 198:15, 198:17, 199:13
**41(b** [10] - 13:1, 118:14, 190:19, 197:8, 198:23, 200:4, 201:10, 201:12, 201:16, 201:23
**41(b)** [3] - 186:16, 200:10, 200:17
**41(b)(4** [1] - 12:23
**414** [1] - 1:14
**442-2306** [1] - 1:20
**46a** [3] - 168:9, 183:25, 184:2
**479** [2] - 1:15, 1:20
**4th** [2] - 40:18, 42:3

## 5

**5** [3] - 34:8, 51:2, 55:9
**50** [1] - 2:14
**555** [1] - 181:20
**5:15** [1] - 174:15
**5:15-CR-443** [1] - 200:22
**5:15-CR-50087-001** [2] - 1:5, 4:4
**5:54** [1] - 204:1

## 6

**69** [2] - 87:20, 88:4

## 7

**7-Z-i-p** [1] - 23:12
**7-Zip** [7] - 23:11, 23:14, 23:18, 23:23, 23:24, 24:13, 51:11

**70** [2] - 42:11, 148:7
**70.178** [6] - 139:20, 142:4, 142:8, 142:21, 147:11, 148:11
**72** [1] - 42:12
**72701** [1] - 1:25
**72703** [1] - 1:20
**72901** [1] - 1:14
**74** [1] - 42:12
**753** [1] - 205:6
**7z** [4] - 22:23, 23:10, 51:6, 51:17

## 8

**8** [1] - 160:14
**80** [1] - 2:15
**8th** [1] - 205:12

## 9

**9/11** [2] - 158:14, 159:2
**91** [1] - 2:15
**93** [1] - 2:16
**94** [2] - 2:16, 182:2
**96** [1] - 2:4
**97** [1] - 2:20
**9th** [1] - 4:9

## A

**A-I-f-i-n** [1] - 14:8
**abbreviation** [4] - 29:16, 29:17, 29:18
**abiding** [2] - 115:16, 122:23
**ability** [9] - 36:20, 37:15, 84:23, 84:25, 88:19, 109:22, 145:19, 146:11, 190:14
**able** [33] - 7:7, 16:20, 33:6, 33:7, 33:14, 40:21, 42:5, 43:4, 45:13, 47:13, 47:23, 61:1, 76:1, 77:5, 77:10, 79:1, 98:5, 102:1, 102:2, 106:22, 107:8, 116:14, 118:19, 122:6, 141:15, 141:21, 143:12, 145:4, 150:9, 173:5, 174:1, 183:4, 192:10
**above-entitled** [1] - 205:9
**abrasive** [1] - 177:13
**absolutely** [3] - 36:9,

176:18, 180:22
**abuse** [4] - 7:20, 30:25, 31:12, 157:12
**abused** [1] - 30:13
**academy** [1] - 15:14
**accept** [2] - 105:22, 105:23
**access** [35] - 7:18, 8:10, 9:5, 16:16, 17:4, 17:5, 18:23, 19:2, 19:9, 20:3, 24:24, 37:25, 42:18, 42:19, 45:13, 46:17, 53:17, 53:21, 53:25, 58:23, 58:25, 69:13, 83:25, 85:19, 88:21, 95:25, 96:8, 96:10, 100:15, 101:1, 101:6, 119:13, 163:20, 163:23, 168:3
**accessed** [14] - 10:17, 15:21, 17:1, 17:2, 18:10, 42:6, 42:11, 64:6, 71:25, 72:6, 72:18, 76:4, 86:5, 101:7
**accesses** [1] - 17:8
**accessible** [9] - 16:3, 53:11, 103:7, 103:11, 103:18, 164:18, 175:4, 203:2
**accessing** [7] - 22:12, 27:4, 43:25, 152:8, 179:22, 181:22, 182:9
**accident** [1] - 151:5
**accidentally** [1] - 20:15
**accomplished** [1] - 182:8
**according** [6] - 9:12, 10:13, 11:3, 41:19, 122:20, 177:10
**account** [22] - 22:14, 22:15, 25:18, 25:19, 25:20, 25:22, 25:23, 26:9, 26:16, 33:25, 34:2, 40:15, 40:16, 42:1, 44:22, 44:23, 46:15, 66:15, 67:1, 74:14, 146:12, 156:18
**accounts** [18] - 40:9, 45:22, 65:2, 65:6, 65:7, 65:11, 65:15, 65:17, 66:2, 66:7, 66:14, 71:25, 72:18, 76:3, 76:6, 78:4, 150:9

**accuracy** [1] - 78:18
**accurate** [7] - 38:24, 42:7, 58:5, 78:15, 100:10, 159:19, 160:23
**accurately** [2] - 132:12, 145:24
**accusing** [1] - 160:21
**achieve** [1] - 170:17
**ACLU** [7] - 6:4, 98:1, 155:12, 155:16, 155:17, 155:24, 156:4
**ACLU's** [4] - 97:23, 154:7, 154:10, 155:22
**act** [1] - 192:1
**acted** [4] - 36:17, 37:13, 180:22, 200:4
**acting** [1] - 39:15
**action** [1] - 36:22
**actions** [2] - 39:14, 40:19
**activate** [1] - 38:13
**activated** [2] - 184:21, 191:20
**activating** [4] - 149:20, 150:2, 150:7, 184:7
**active** [6] - 18:10, 34:13, 46:2, 63:6, 65:2, 75:9
**actively** [7] - 19:24, 33:24, 46:3, 68:1, 87:6, 155:14, 155:15
**activist** [2] - 157:7, 157:9
**activities** [5] - 10:2, 10:4, 12:24, 45:22, 102:6
**activity** [8] - 27:25, 40:6, 43:5, 45:3, 139:11, 174:25, 175:17, 181:16
**actual** [9] - 38:1, 42:1, 65:22, 85:9, 89:8, 149:20, 150:2, 150:8, 190:15
**adapter** [2] - 44:6, 44:9
**add** [1] - 195:16
**added** [1] - 125:3
**addition** [3] - 93:13, 95:17, 95:21
**additional** [2] - 17:12, 200:19
**additionally** [2] - 86:16, 94:21
**address** [212] - 5:4, 9:9, 9:11, 10:19,

10:20, 10:22, 11:16, 16:18, 17:9, 17:13, 26:18, 26:20, 26:22, 26:23, 41:11, 41:12, 42:16, 42:17, 42:20, 42:24, 43:3, 43:4, 43:8, 43:13, 43:18, 43:21, 43:24, 44:1, 44:2, 44:4, 44:5, 44:11, 44:13, 44:15, 46:21, 46:24, 47:5, 47:7, 47:10, 47:11, 47:14, 47:22, 47:24, 48:1, 48:2, 48:4, 48:10, 48:13, 53:15, 63:3, 74:9, 74:14, 77:4, 77:6, 77:12, 84:16, 88:18, 89:4, 89:14, 89:21, 89:23, 90:2, 90:8, 90:20, 92:11, 92:16, 92:17, 92:23, 92:25, 93:1, 93:2, 94:16, 96:1, 103:21, 105:9, 105:14, 110:1, 113:4, 113:13, 127:5, 127:11, 128:16, 129:9, 129:10, 129:13, 129:14, 129:15, 129:18, 129:20, 129:25, 130:1, 130:2, 130:7, 130:8, 130:10, 130:12, 130:13, 130:16, 133:7, 134:17, 134:18, 134:20, 135:22, 135:23, 135:24, 135:25, 136:1, 136:2, 136:8, 136:9, 136:10, 136:11, 136:21, 136:25, 137:1, 137:9, 137:10, 137:23, 137:24, 138:3, 138:12, 138:14, 138:21, 139:1, 139:2, 139:12, 139:14, 139:15, 139:16, 139:19, 139:20, 140:7, 140:21, 141:1, 141:6, 141:7, 141:8, 141:12, 141:13, 141:15, 142:1, 142:3, 142:4, 142:10, 142:21, 144:2, 144:18, 144:21, 145:5, 146:12, 146:14, 146:15, 147:3,

147:11, 147:13, 147:21, 148:1, 148:2, 148:7, 148:10, 148:13, 148:15, 148:17, 148:19, 148:21, 148:23, 148:24, 148:25, 149:2, 149:4, 149:12, 149:14, 149:20, 150:2, 150:8, 150:10, 150:13, 150:16, 150:19, 151:1, 151:11, 151:13, 151:16, 164:13, 180:2, 180:8, 182:16, 183:16, 194:1, 194:15, 196:3, 196:5, 196:16, 196:22, 196:23, 198:2, 198:8, 198:11, 201:1
**addressed** [1] - 201:2
**addresses** [22] - 9:20, 45:17, 53:25, 74:22, 74:23, 75:2, 75:6, 75:19, 76:18, 77:9, 77:13, 77:16, 134:19, 138:16, 138:17, 138:18, 138:19, 138:22, 139:22, 141:24, 141:25, 142:6
**addressing** [1] - 179:20
**adds** [1] - 23:16
**adjourned** [2] - 203:25, 204:1
**Adjournment............
.................... [1] -
2:9
**administrative** [16] -
10:20, 11:15, 33:25, 34:2, 43:6, 45:17, 47:14, 74:12, 75:4, 90:5, 90:17, 141:16, 142:16, 145:5, 147:14, 196:4
**administrator** [20] -
20:24, 21:1, 21:7, 21:15, 21:17, 21:23, 26:19, 32:16, 33:21, 35:2, 35:6, 36:19, 46:11, 53:16, 54:21, 55:3, 59:14, 103:7, 103:15, 175:7
**administrator's** [5] -
34:14, 35:9, 54:7, 55:7, 80:21

**administrators** [2] -
46:15, 59:14
**admissions** [2] - 11:9, 49:7
**admit** [2] - 128:22, 132:17
**admitted** [4] - 22:2, 25:8, 27:6, 31:15
**ADMITTED** [2] - 3:4, 3:11
**adopt** [1] - 187:25
**ads** [1] - 180:13
**advanced** [2] - 106:18, 175:17
**advertise** [3] - 21:18, 27:23, 45:2
**advertised** [3] - 18:8, 27:19, 70:22
**advertisement** [4] -
15:8, 18:12, 28:10, 35:16
**advertising** [1] - 20:7
**advise** [2] - 7:10, 49:11
**advisement** [1] -
203:18
**advisement............
. [1] - 2:8
**advises** [1] - 162:9
**advisory** [1] - 99:8
**affects** [2] - 198:18, 198:21
**affiant** [3] - 56:7, 81:9, 202:12
**affidavit** [8] - 9:12, 35:18, 36:2, 78:3, 183:23, 184:3, 201:5, 202:15
**affidavits** [1] - 100:2
**afforded** [1] - 17:23
**affords** [2] - 16:7, 17:6
**afield** [2] - 126:17, 137:20
**afoul** [1] - 197:9
**afterwards** [1] - 69:25
**age** [3] - 29:12, 188:21, 203:7
**aged** [1] - 29:13
**agencies** [4] - 21:7, 72:23, 101:20, 171:18
**agency** [1] - 53:8
**Agent** [37] - 5:15, 13:17, 15:21, 22:6, 27:10, 38:23, 50:19, 70:5, 93:23, 93:25, 94:4, 100:9, 100:24, 102:8, 103:1, 104:21, 104:24, 106:1, 113:4,

127:15, 129:17, 129:19, 130:4, 130:13, 131:8, 133:6, 134:22, 137:8, 137:21, 138:11, 143:3, 143:8, 148:13, 150:4, 183:4, 193:18, 202:10
**agent** [16] - 5:17, 5:20, 13:18, 14:10, 14:17, 15:6, 54:12, 54:19, 65:20, 71:24, 80:20, 92:6, 93:16, 96:23, 102:22, 194:12
**AGENT** [2] - 5:21, 5:23
**agent's** [1] - 71:21
**agents** [5] - 45:13, 49:1, 161:2, 179:13, 182:2
**ago** [5] - 26:7, 108:11, 116:16, 123:18, 156:12
**agree** [6] - 163:25, 165:13, 166:4, 166:10, 194:11, 197:2
**agreed** [2] - 193:1, 202:8
**ahead** [2] - 50:9, 147:25
**aid** [1] - 55:17
**aided** [1] - 55:15
**aiming** [1] - 169:9
**airline** [1] - 158:13
**airlines** [1] - 159:12
**airplane** [1] - 69:13
**akin** [1] - 79:7
**Albany** [3] - 14:19, 14:23, 14:24
**Alfaro** [40] - 1:18, 4:6, 5:25, 6:10, 50:9, 50:15, 50:19, 51:5, 52:23, 56:20, 57:1, 66:19, 68:20, 70:4, 71:7, 76:13, 91:1, 91:16, 96:19, 97:2, 102:20, 119:6, 120:2, 126:18, 126:21, 127:19, 130:20, 132:20, 133:5, 133:24, 141:18, 142:23, 142:25, 143:24, 151:24, 153:19, 169:17, 173:15, 183:13, 203:15
**ALFARO** [81] - 6:2, 22:3, 25:9, 27:7, 31:16, 50:16, 50:18,

52:13, 52:22, 56:22, 56:24, 64:20, 66:20, 66:23, 68:22, 69:9, 71:4, 71:21, 76:24, 78:24, 79:19, 80:6, 80:11, 91:2, 91:5, 91:13, 93:4, 96:20, 97:4, 97:12, 97:16, 111:19, 112:2, 118:12, 119:19, 119:23, 126:20, 127:17, 128:21, 128:24, 130:18, 132:17, 133:2, 133:12, 133:16, 141:19, 144:11, 146:25, 147:17, 151:25, 153:13, 159:25, 169:18, 169:20, 173:14, 174:6, 174:13, 174:20, 183:14, 183:16, 184:2, 184:17, 185:12, 185:19, 187:1, 187:19, 187:24, 189:13, 189:20, 190:9, 190:16, 191:2, 191:12, 192:7, 192:22, 193:5, 194:2, 194:8, 194:16, 198:13, 198:20

**Alfaro's** [3] - 12:2, 69:20, 102:17
**Alfaro........** [1] - 2:21
**Alfaro..........** [3] - 2:14, 2:15, 2:20
**ALFIN** [3] - 5:21, 5:23, 14:2
**Alfin** [37] - 2:13, 5:15, 5:22, 13:17, 14:7, 15:21, 22:6, 27:10, 38:23, 50:19, 70:5, 93:23, 93:25, 94:4, 100:24, 102:8, 104:22, 104:25, 106:1, 127:15, 129:17, 129:19, 130:4, 130:14, 131:8, 133:7, 134:23, 137:8, 137:21, 138:11, 143:3, 143:8, 148:13, 183:4, 193:17, 193:18, 202:10
**Alfin's** [4] - 100:9, 102:22, 103:1, 113:5
**allegation** [1] - 4:10

**allegations** [1] - 7:13
**alleged** [2] - 7:17, 142:9
**allegedly** [2] - 10:16, 60:10
**alleging** [2] - 76:21, 199:20
**Allen** [1] - 4:3
**ALLEN** [1] - 1:6
**allow** [7] - 9:2, 37:18, 60:17, 164:15, 164:22, 187:10, 197:7
**allowable** [1] - 200:15
**allowed** [11] - 20:2, 58:23, 85:13, 164:21, 173:19, 181:7, 185:2, 185:3, 186:7, 199:17, 202:18
**allowing** [1] - 7:18
**allows** [6] - 10:3, 42:25, 43:20, 60:21, 138:13, 175:22
**alone** [1] - 90:20
**alterations** [1] - 94:20
**altered** [2] - 95:5, 96:4
**alternatively** [1] - 18:3
**amalgamation** [1] - 39:5
**Amazon** [1] - 175:3
**Amendment** [11] - 13:13, 68:14, 145:24, 156:14, 156:16, 158:2, 176:8, 177:17, 194:18, 197:8, 199:11
**America** [1] - 200:21
**AMERICA** [1] - 1:3
**American** [1] - 97:22
**amount** [2] - 73:17, 86:24
**analogies** [1] - 190:9
**analogous** [1] - 187:3
**analogy** [7] - 87:16, 88:5, 88:7, 88:12, 140:24, 190:21, 196:8
**analysis** [9] - 186:7, 186:11, 187:25, 193:15, 195:17, 199:1, 199:12, 200:18, 200:23
**analyze** [3] - 94:14, 173:9, 173:25
**analyzed** [6] - 73:6, 75:14, 94:19, 122:8, 123:24, 186:18
**angle** [3] - 78:18,

79:24, 80:4
**animals** [2] - 30:25, 118:5
**anonymity** [3] - 10:4, 74:24, 102:3
**anonymous** [5] - 16:10, 90:1, 90:2, 122:22, 122:23
**answer** [21] - 52:10, 52:18, 52:21, 60:18, 71:15, 71:17, 72:12, 72:14, 73:21, 73:22, 74:4, 74:21, 80:10, 82:1, 124:23, 149:24, 153:19, 154:23, 183:5, 183:10, 198:6
**answered** [4] - 66:11, 153:18, 154:25, 192:9
**answering** [1] - 71:17
**answers** [1] - 135:12
**ANTHONY** [1] - 1:6
**Anthony** [2] - 4:3, 47:17
**apologize** [4] - 66:24, 67:7, 133:12, 147:25
**appear** [2] - 22:17, 23:4, 142:6
**appeared** [3] - 35:24, 36:4, 150:13
**appearing** [2] - 29:17, 97:25
**application** [26] - 9:12, 37:21, 37:22, 55:13, 55:16, 78:3, 82:3, 104:20, 104:23, 111:11, 113:20, 113:22, 114:2, 114:19, 115:24, 121:18, 123:4, 124:12, 129:6, 143:25, 175:13, 176:13, 179:14, 184:21, 185:21, 187:14
**applications** [3] - 82:7, 104:11, 125:25
**applied** [3] - 10:23, 79:6, 178:6
**apply** [5] - 182:2, 192:11, 201:19, 201:24, 202:5
**applying** [1] - 181:4
**appointment** [1] - 133:23
**appreciate** [2] - 28:13, 50:6, 50:13, 126:15, 156:5, 174:16, 203:19, 203:20,

203:23
**apprehended** [1] - 73:19
**approach** [4] - 67:10, 67:14, 127:17, 130:18
**approaching** [2] - 110:25, 176:9
**appropriate** [2] - 6:8, 115:19
**approval** [2] - 83:2, 181:15
**approved** [1] - 81:4
**approving** [1] - 81:6
**April** [3] - 4:15, 6:12, 14:17
**AR** [1] - 1:14
**archives** [2] - 23:25, 24:9
**area** [4] - 47:23, 48:3, 48:15, 176:3
**areas** [5] - 17:24, 30:5, 84:11, 152:17, 195:24
**arena** [1] - 99:2
**argue** [1] - 187:2
**Argument** [2] - 2:6, 2:7
**ARGUMENT** [2] - 174:23, 183:15
**argument** [19] - 79:3, 118:20, 119:7, 145:7, 174:19, 178:15, 179:8, 179:16, 184:11, 184:16, 184:18, 184:19, 197:17, 198:19, 198:21, 201:10, 201:21, 203:8, 203:9
**arguments** [2] - 118:12, 183:17
**ARKANSAS** [2] - 1:1, 1:10
**Arkansas** [27] - 1:19, 1:20, 1:25, 7:15, 10:24, 16:18, 47:18, 47:21, 48:3, 48:21, 48:24, 60:10, 60:12, 68:17, 77:7, 110:6, 116:13, 127:2, 127:4, 146:16, 156:9, 156:10, 157:16, 171:9, 179:6, 189:19, 205:5
**arm** [1] - 67:7
**arrest** [2] - 35:1, 201:9
**arrested** [3] - 33:15, 36:19, 73:19
**arrived** [1] - 25:13

**arriving** [1] - 44:24
**art** [3] - 109:13, 114:4, 117:23
**Arterbury** [2] - 188:1, 201:21
**article** [1] - 125:17
**articulate** [1] - 76:25
**articulated** [1] - 116:5
**aside** [2] - 24:18, 180:20
**aspect** [2] - 77:1, 192:23
**aspects** [1] - 81:25
**assigned** [10] - 14:11, 14:19, 14:20, 14:24, 42:21, 89:14, 137:10, 139:2, 141:2, 141:7
**assist** [1] - 76:22
**assisted** [1] - 81:5
**associate** [1] - 77:15
**Associated** [3] - 114:12, 115:2, 125:16
**associated** [8] - 23:2, 43:5, 44:5, 44:11, 47:12, 50:25, 52:25, 156:19
**assume** [6] - 60:20, 147:22, 184:20, 184:23, 190:14, 192:18
**assumed** [2] - 75:15, 148:16, 150:14
**assuming** [2] - 5:11, 191:2
**assurances** [1] - 144:15
**assured** [1] - 69:10
**AT&T** [2] - 42:22, 196:13
**attach** [2] - 9:7, 167:23
**attached** [9] - 10:16, 93:9, 182:15, 187:18, 188:13, 190:4, 192:3, 192:19, 193:1
**attachment** [4] - 41:8, 63:3, 84:2, 85:7
**attack** [5] - 78:18, 80:5, 117:24, 118:1, 177:21
**attacking** [4] - 78:21, 146:5, 146:7, 147:1
**attacks** [1] - 123:7
**attempt** [7] - 20:17, 32:15, 37:6, 59:15, 70:7, 79:10, 88:22
**attempted** [1] - 65:3

**attempting** [5] - 37:25, 38:19, 52:18, 87:17, 103:5

**attempts** [3] - 20:3, 100:17, 105:16

**attend** [4] - 6:17, 6:18, 159:24, 160:5

**attended** [1] - 15:15

**attorney** [3] - 155:5, 170:11, 185:22

**Attorney's** [2] - 1:13, 8:16

**audience** [1] - 133:17

**AUDIENCE** [2] - 133:18, 133:22

**August** [6] - 18:7, 25:1, 32:17, 53:4, 53:6, 122:1

**authorities** [1] - 103:6

**authority** [17] - 8:18, 13:2, 38:15, 82:12, 82:17, 83:9, 85:8, 85:12, 86:1, 99:12, 119:18, 175:11, 187:16, 188:3, 191:14, 201:13

**authorization** [4] - 81:19, 180:23, 181:4, 181:25

**authorize** [4] - 116:4, 168:2, 185:6, 186:9

**authorized** [12] - 47:4, 59:7, 59:10, 82:15, 99:18, 175:23, 178:15, 180:25, 181:5, 185:13, 186:12, 186:24

**authorizing** [5] - 113:21, 177:1, 184:6, 185:8, 186:2

**automatically** [1] - 59:8

**autopilot** [1] - 183:6

**available** [8] - 19:5, 23:15, 31:10, 37:17, 71:18, 165:14, 172:17, 195:18

**Avenue** [1] - 1:14

**average** [1] - 162:22

**avoid** [1] - 49:22

**avoiding** [1] - 175:15

**aware** [18] - 18:6, 44:18, 57:5, 78:4, 79:4, 80:1, 81:18, 118:22, 155:19, 164:25, 165:2, 165:5, 165:7, 165:8, 167:2, 167:22, 168:4, 176:5

**awkward** [1] - 62:1

## B

**b)(2** [1] - 12:23

**b)(4** [7] - 186:24, 188:2, 191:24, 192:11, 193:12, 193:23

**babies** [1] - 157:12

**bachelor's** [1] - 98:11

**background** [3] - 46:5, 76:13, 106:4

**backwards** [1] - 51:2

**bad** [4] - 146:8, 157:25, 163:11, 171:6

**bag** [2] - 149:6, 151:6

**balance** [2] - 153:5, 154:13

**bans** [1] - 19:24

**barber** [2] - 200:21, 202:3

**based** [15] - 21:5, 23:1, 24:18, 26:12, 29:6, 39:19, 66:25, 69:18, 69:19, 96:13, 105:2, 107:25, 111:17, 116:11, 177:20

**basket** [1] - 187:11

**bearing** [1] - 39:1

**bears** [1] - 13:6

**became** [2] - 18:10, 81:13

**become** [1] - 18:6

**becomes** [1] - 192:3

**bed** [1] - 161:22

**beeper** [3] - 188:13, 191:15, 191:16

**beers** [1] - 161:14

**BEFORE** [1] - 1:9

**began** [4] - 33:10, 33:11, 55:23, 80:25

**begin** [1] - 86:15

**beginning** [1] - 49:16

**behind** [7] - 87:13, 87:14, 106:5, 138:13, 144:5, 146:14, 146:22

**belief** [2] - 72:13, 73:24

**believes** [2] - 142:3, 148:9

**belonged** [1] - 48:2

**below** [3] - 22:22, 30:19, 30:20

**bench** [1] - 70:3

**Bench** [1] - 67:22

**benefit** [2] - 17:12, 171:21

**benefits** [5] - 17:7,

17:23, 23:17, 91:17, 170:2

**Benton** [4] - 47:18, 47:21, 48:21, 146:16

**best** [3] - 76:24, 132:15, 181:13

**bestiality** [1] - 30:18

**better** [13] - 28:12, 38:13, 50:8, 71:8, 80:4, 91:15, 119:7, 170:18, 170:19, 171:1, 181:7, 196:1

**between** [14] - 3:15, 14:18, 29:13, 32:17, 42:2, 42:3, 125:23, 131:9, 132:2, 134:15, 137:2, 166:15, 171:25

**bias** [2] - 160:1, 160:2

**big** [5] - 13:3, 101:13, 131:22, 161:12, 176:20

**big-picture** [1] - 13:3

**bill** [1] - 196:13

**billed** [1] - 122:21

**billions** [1] - 54:3

**Bing** [2] - 19:21, 70:16

**bit** [14] - 38:15, 68:15, 72:3, 104:9, 113:13, 127:10, 127:15, 130:15, 131:9, 139:9, 153:4, 153:24, 154:13, 179:15

**black** [5] - 29:22, 29:23, 30:1, 121:6, 176:4

**blacklisted** [1] - 20:3

**blah** [8] - 136:13, 188:4, 188:5

**blah-blah** [4] - 136:13, 188:4, 188:5

**blanche** [1] - 199:25

**blank** [3] - 150:6, 185:23, 185:24

**blatantly** [1] - 200:4

**blend** [1] - 102:2

**blocked** [1] - 87:23

**Blvd** [1] - 1:19

**board** [8] - 22:22, 23:5, 26:19, 27:15, 51:19, 51:25, 52:14, 52:25

**board-style** [1] - 27:15

**boarding** [5] - 158:13, 159:2, 159:3, 159:4, 159:5

**boards** [1] - 7:20

**bodies** [1] - 99:4

**bomb** [1] - 114:15

**Bondage** [1] - 30:16

**border** [1] - 193:3

**bottom** [1] - 27:2

**bounce** [1] - 101:3

**box** [2] - 30:1, 97:10

**boxes** [1] - 103:15

**boys** [2] - 29:8, 29:25

**branch** [1] - 90:15

**break** [5] - 23:20, 50:11, 94:14, 115:15, 135:6

**breakdown** [1] - 62:8

**breaks** [1] - 145:8

**breast** [1] - 29:10

**brief** [5] - 93:23, 111:8, 114:17, 175:19, 175:24

**briefed** [1] - 49:18

**briefing** [1] - 5:5

**briefly** [8] - 15:25, 16:1, 53:13, 98:9, 100:8, 144:12, 169:23, 183:16

**briefs** [1] - 174:16

**bring** [2] - 119:19, 123:2

**broad** [1] - 12:15

**broadband** [1] - 137:11

**broader** [2] - 38:15, 85:9

**broken** [1] - 144:6

**BROOKS** [1] - 1:9

**Brooks** [1] - 38:23

**brought** [5] - 58:12, 159:20, 161:1, 165:3, 183:3

**browse** [2] - 46:3, 100:12

**browser** [36] - 16:11, 18:24, 18:25, 19:4, 53:17, 57:9, 70:6, 70:25, 100:6, 100:11, 100:15, 100:18, 100:20, 100:23, 101:2, 103:22, 105:7, 105:13, 105:14, 105:17, 107:2, 105:9, 107:12, 107:13, 107:15, 107:17, 107:25, 109:5, 109:6, 115:12, 117:11, 121:3, 121:12, 122:14, 136:12, 174:5

**browser's** [1] - 107:25

**browsers** [2] - 106:11, 115:16

**brush** [1] - 12:15

**Buchanan** [4] - 55:25, 56:11, 57:2, 186:8

**bucket** [1] - 190:23

**Budget** [1] - 171:12

**build** [1] - 106:14

**building** [1] - 144:7

**bulk** [2] - 81:7, 123:6

**bunch** [7] - 28:22, 31:19, 101:3, 117:20, 129:9, 131:23

**burden** [1] - 13:6

**Bureau** [2] - 14:10, 14:15

**burned** [1] - 113:6

**business** [5] - 10:2, 43:15, 83:4, 86:18, 154:10

**BY** [11] - 14:5, 50:18, 80:19, 91:5, 93:8, 94:3, 97:16, 152:5, 169:20, 174:23, 183:15

**bypass** [2] - 115:11, 158:22

## C

**cake** [1] - 171:24

**California** [5] - 179:6, 194:23, 201:3, 201:7, 201:15

**caller** [2] - 87:19, 87:22

**candor** [1] - 126:14

**candy** [3] - 21:10, 21:15, 21:20

**cannot** [13] - 16:15, 17:10, 136:11, 162:9, 165:24, 170:3, 170:4, 170:15, 170:22, 170:23, 178:4, 193:22, 195:12

**capabilities** [4] - 70:16, 70:19, 70:20, 95:7

**capability** [6] - 16:10, 19:2, 63:25, 84:21, 84:22, 96:4

**capable** [2] - 7:9, 61:24

**capacity** [3] - 97:25, 131:4, 156:4

**captured** [1] - 137:4

**captures** [1] - 24:15

**car** [3] - 188:8, 188:17, 190:22

**card** [3] - 44:7, 113:7

5

**care** [6] - 5:12, 156:17, 158:1, 195:14, 195:22
**Carnegie** [1] - 116:17
**Carolina** [15] - 6:12, 8:1, 33:8, 34:5, 36:11, 36:12, 57:17, 57:21, 57:22, 58:9, 58:21, 187:5, 188:18, 188:25, 193:4
**carte** [1] - 199:25
**Case** [1] - 14:13
**case** [122] - 4:2, 5:18, 7:4, 12:18, 15:6, 18:2, 35:20, 37:11, 37:20, 44:18, 46:8, 47:17, 48:20, 60:9, 60:23, 62:19, 64:18, 65:24, 67:24, 68:6, 68:16, 73:5, 77:3, 81:11, 88:13, 98:24, 99:14, 99:15, 99:25, 100:1, 103:1, 104:21, 105:3, 114:8, 114:10, 114:16, 114:19, 115:8, 116:3, 116:8, 116:11, 116:21, 117:8, 117:9, 117:10, 117:20, 118:9, 118:13, 120:13, 120:14, 121:10, 121:13, 121:18, 121:19, 121:21, 121:22, 122:11, 122:18, 125:14, 130:4, 137:15, 141:14, 142:15, 144:3, 146:15, 162:21, 167:19, 167:20, 172:20, 172:22, 173:1, 173:5, 173:7, 173:12, 174:4, 175:15, 175:23, 176:1, 176:2, 176:14, 176:15, 176:17, 176:19, 177:18, 177:23, 178:6, 178:12, 178:13, 178:22, 178:25, 179:24, 180:22, 181:8, 181:19, 181:20, 182:1, 182:24, 183:1, 188:1, 188:2, 192:9, 194:3, 196:1, 196:15, 196:20, 196:25, 197:1,

197:13, 197:17, 197:18, 197:21, 198:8, 199:18, 200:12, 200:19, 200:23, 202:3
**CASE** [1] - 1:5
**cases** [21] - 64:19, 65:11, 68:1, 68:2, 83:24, 105:1, 116:12, 117:3, 119:24, 156:16, 156:24, 165:2, 165:3, 165:6, 166:7, 172:18, 183:3, 186:20, 200:2, 201:18, 202:3
**categorical** [5] - 85:13, 86:8, 89:3, 89:17, 90:16
**categorically** [3] - 83:17, 84:9, 145:25
**categories** [2] - 31:19, 63:1
**category** [1] - 30:1
**caught** [4] - 122:4, 123:23, 168:22, 172:23
**caused** [1] - 77:25
**cautioned** [1] - 26:19
**CCR** [2] - 1:23, 205:17
**cellphone** [2] - 44:9, 194:25
**cellphones** [2] - 126:2, 138:7
**Center** [1] - 99:21
**certain** [13] - 4:18, 4:22, 11:19, 12:5, 49:18, 76:14, 109:16, 112:7, 127:3, 144:13, 144:14, 145:2, 161:15
**certainly** [11] - 9:23, 23:14, 53:2, 54:15, 73:21, 73:24, 83:21, 115:1, 159:6, 174:1, 203:23
**certainty** [1] - 64:1
**CERTIFICATE** [1] - 205:1
**Certificate**.................[1] - 2:10
**certified** [2] - 15:18, 15:19
**certify** [1] - 205:5
**cetera** [1] - 29:25
**chain** [7] - 11:6, 11:13, 90:3, 145:7, 145:8, 146:3, 161:24
**challenging** [1] -

76:20
**chambers** [2] - 135:15, 198:12
**chance** [5] - 79:23, 124:15, 124:18, 153:14, 153:15
**change** [17] - 21:2, 34:23, 34:25, 35:8, 35:14, 44:12, 56:11, 61:10, 63:21, 135:3, 143:10, 150:18, 175:25, 176:1, 176:4, 198:15, 200:13
**changed** [32] - 34:9, 34:12, 34:16, 56:17, 61:21, 64:3, 80:7, 136:7, 136:10, 136:11, 137:2, 139:9, 139:12, 139:14, 139:17, 139:19, 139:23, 141:10, 141:11, 143:2, 148:20, 148:24, 148:25, 150:16, 150:17, 151:12, 151:13, 151:16, 164:13, 172:14, 200:14, 203:7
**changes** [9] - 44:14, 61:12, 61:16, 61:18, 61:24, 87:13, 99:10, 135:5, 154:6
**characterization** [1] - 102:17
**charged** [4] - 4:10, 4:12, 75:12, 121:14
**Charleston** [1] - 6:12
**chase** [1] - 161:11
**chat** [4] - 51:20, 51:21, 51:23, 52:25
**check** [1] - 103:15
**child** [61] - 4:11, 4:14, 7:19, 7:20, 11:18, 15:1, 15:9, 15:21, 17:22, 18:9, 18:13, 19:14, 19:24, 20:7, 20:10, 21:13, 21:16, 23:2, 23:4, 23:6, 23:7, 23:10, 23:21, 23:24, 24:20, 26:13, 27:24, 28:7, 28:11, 29:11, 30:7, 30:18, 30:24, 31:4, 31:5, 31:12, 32:4, 35:17, 38:1, 38:20, 41:1, 49:8, 51:9, 52:5, 53:1, 64:13, 70:22, 75:9, 75:14, 88:22,

157:11, 182:11, 187:6, 187:13, 188:19, 190:8, 190:11, 197:7, 202:25, 203:9
**children** [7] - 7:21, 15:16, 15:20, 29:11, 29:13, 30:25, 45:2
**Children** [1] - 14:13
**choice** [1] - 96:12
**Christopher** [4] - 2:19, 6:3, 97:4, 97:19
**CHRISTOPHER** [1] - 97:13
**churn** [1] - 158:12
**CI** [1] - 79:20
**circles** [1] - 9:25
**Circuit** [5] - 98:21, 176:16, 177:10, 179:24, 198:22
**circum** [1] - 186:8
**circumscribe** [1] - 202:15
**circumstances** [2] - 95:2, 123:5
**circumvent** [2] - 163:16, 197:8
**cite** [3] - 176:25, 181:19, 200:21
**cited** [4] - 98:20, 114:16, 178:22, 202:2
**citing** [2] - 178:5, 200:11
**city** [1] - 160:7
**civil** [1] - 199:21
**Civil** [1] - 97:22
**claim** [1] - 23:9
**claiming** [1] - 10:7
**clarify** [5] - 52:13, 53:23, 65:10, 78:25, 91:10
**classic** [1] - 138:22
**clear** [19] - 18:14, 24:21, 46:6, 65:15, 70:14, 70:19, 73:20, 92:9, 94:18, 99:14, 103:2, 116:24, 176:13, 177:7, 179:11, 190:19, 194:21, 198:3, 198:6
**clearing** [1] - 96:16
**clearly** [2] - 183:19, 187:15
**clerk** [3] - 7:4, 135:15, 135:16
**click** [2] - 25:21, 87:7
**clicked** [5] - 31:20, 31:24, 32:6, 45:25, 125:19

**clicking** [6] - 22:10, 26:8, 31:22, 32:9, 193:6, 202:23
**clicks** [1] - 86:14
**client** [8] - 132:3, 134:12, 136:18, 136:20, 141:16, 171:25, 196:6
**clients** [2] - 157:20, 157:25
**clipped** [1] - 31:14
**clock** [1] - 108:18
**close** [1] - 56:15
**closed** [4] - 69:22, 140:3, 158:24, 159:24
**closed-door** [1] - 159:24
**closest** [1] - 178:5
**Closing** [2] - 2:6, 2:7
**closing** [1] - 197:17
**CLOSING** [2] - 174:23, 183:15
**clothed** [1] - 22:20
**clueless** [1] - 146:19
**CNN.com** [1] - 16:13
**code** [46] - 51:15, 61:13, 61:14, 84:4, 85:5, 87:12, 87:21, 93:9, 93:14, 100:3, 105:21, 105:23, 106:3, 106:13, 107:22, 107:23, 109:8, 109:20, 110:19, 110:21, 112:5, 112:7, 114:23, 115:10, 125:3, 127:14, 128:14, 128:15, 128:18, 128:19, 129:9, 129:14, 129:15, 129:23, 130:11, 132:24, 141:4, 149:21, 150:5, 173:6, 173:7, 173:10, 173:12, 187:9, 189:4
**Code** [2] - 39:13, 205:7
**collaboration** [1] - 123:19
**collateral** [1] - 126:3
**colleague** [1] - 135:17
**colleagues** [1] - 157:18
**collect** [18] - 9:9, 47:4, 62:23, 62:24, 63:1, 63:14, 84:1, 84:20, 92:11, 109:25, 110:15, 111:14,

126:6, 129:14, 143:6, 145:2, 149:5, 196:2

**collected** [45] - 40:6, 40:12, 41:5, 41:6, 42:14, 45:7, 45:9, 45:14, 45:16, 45:18, 45:23, 47:10, 47:12, 48:19, 62:9, 63:2, 63:12, 63:16, 75:19, 77:9, 83:19, 83:21, 83:24, 84:1, 89:6, 89:24, 91:25, 92:7, 93:3, 94:9, 94:10, 94:15, 112:8, 112:9, 114:21, 116:13, 127:1, 130:12, 139:25, 144:21, 146:1, 150:5, 161:24, 191:6, 191:23

**collecting** [6] - 59:20, 62:11, 62:13, 110:4, 147:21, 191:9

**collection** [2] - 79:2, 110:17

**collectively** [2] - 83:15

**collects** [19] - 46:25, 47:3, 61:5, 61:7, 92:13, 113:4, 127:3, 127:4, 127:5, 127:6, 128:14, 128:19, 129:6, 129:7, 129:8, 129:9, 129:15, 129:23, 149:22

**college** [1] - 131:6

**colorful** [1] - 134:1

**columns** [1] - 142:7

**combative** [1] - 72:10

**combination** [1] - 131:25

**Comcast** [1] - 42:22

**coming** [6] - 16:15, 47:6, 67:7, 92:25, 180:6

**commands** [3] - 84:15, 85:1, 85:2

**commented** [1] - 75:8

**Commission** [4] - 159:15, 160:4, 160:11, 172:9

**commit** [1] - 38:19

**committee** [3] - 99:7, 99:8, 115:5

**common** [7] - 18:23, 24:19, 26:25, 43:17, 65:10, 106:18, 180:15

**commonly** [1] - 131:3

**communicate** [4] -

42:25, 79:5, 88:20, 149:1

**communicating** [5] - 85:20, 85:23, 86:12, 87:3, 189:8

**communication** [9] - 88:15, 131:14, 132:2, 132:9, 134:15, 142:5, 162:18, 180:6

**Communication** [1] - 3:15

**communications** [1] - 134:12

**Communications** [1] - 141:8

**communities** [3] - 73:7, 75:9, 75:14

**community** [3] - 39:7, 116:19, 117:24

**companies** [1] - 172:10

**company** [3] - 102:4, 160:13, 160:24

**compel** [3] - 4:22, 5:1, 49:17

**compensation** [1] - 98:8

**complained** [2] - 115:4, 160:24

**complete** [1] - 87:9

**completed** [1] - 175:12

**completely** [6] - 69:20, 102:15, 162:11, 176:15, 191:24

**complex** [2] - 135:6, 145:20

**complicated** [2] - 106:12, 113:14

**complied** [1] - 177:17

**comply** [2] - 83:8, 181:14

**complying** [1] - 171:18

**component** [1] - 60:14

**components** [1] - 11:23

**compress** [1] - 23:15

**compression** [1] - 23:12

**compromise** [1] - 72:13

**compromised** [2] - 105:21, 124:20

**compute** [1] - 193:17

**computer** [141] - 4:13, 9:8, 10:17, 11:2, 11:18, 15:17, 19:8,

26:4, 27:3, 39:7, 40:1, 41:13, 44:8, 44:15, 45:5, 46:21, 47:20, 60:7, 60:9, 60:12, 60:15, 60:21, 60:25, 61:15, 61:17, 61:18, 61:24, 62:13, 62:21, 63:4, 63:5, 63:6, 63:11, 63:22, 63:23, 64:2, 64:4, 64:11, 64:23, 84:6, 84:8, 84:11, 84:15, 84:18, 84:23, 84:25, 85:6, 85:20, 86:17, 87:12, 87:15, 92:1, 92:12, 92:14, 92:18, 94:5, 94:11, 95:25, 96:5, 98:11, 98:13, 105:6, 107:14, 109:13, 109:21, 109:23, 110:1, 110:6, 110:7, 110:18, 110:19, 110:22, 110:23, 111:13, 111:14, 111:20, 112:5, 112:7, 112:8, 112:19, 113:9, 114:5, 114:14, 114:23, 115:10, 116:1, 116:13, 116:19, 117:23, 120:7, 122:8, 127:4, 127:8, 128:1, 128:15, 128:20, 129:8, 129:16, 130:3, 130:12, 131:10, 135:23, 136:23, 138:5, 138:6, 138:23, 139:9, 140:14, 143:17, 148:4, 148:15, 149:5, 149:9, 164:9, 173:10, 174:4, 178:16, 179:23, 180:7, 182:15, 184:7, 184:8, 184:9, 185:2, 185:7, 185:13, 186:9, 191:18, 191:20, 193:20, 194:9, 194:13, 196:7, 196:19, 196:22, 197:5, 198:9

**computer's** [4] - 96:1, 149:20, 150:2, 150:24

**computer-readable** [1] - 173:10

**computer-related** [1] - 11:2

**computers** [27] - 16:6, 43:1, 43:20, 60:1, 61:22, 64:5, 65:18, 71:11, 73:10, 86:11, 86:12, 87:3, 90:13, 105:22, 124:4, 138:4, 138:7, 143:18, 168:2, 169:12, 181:24, 184:14, 184:21, 186:2, 186:13, 189:7, 193:19

**conceal** [2] - 10:3, 179:1

**concealed** [3] - 9:21, 17:9, 17:15

**concede** [2] - 176:7, 179:17

**concern** [5] - 69:7, 73:20, 94:21, 94:23, 108:11

**concerned** [2] - 17:20, 116:4

**concerns** [1] - 67:25

**conclude** [1] - 12:20

**conclusion** [2] - 95:14, 185:11

**condition** [3] - 64:7, 65:8, 66:2

**conditions** [1] - 66:3

**conduct** [4] - 10:2, 50:9, 181:11, 182:13

**confer** [1] - 50:7

**conference** [4] - 6:11, 7:8, 67:22, 70:3

**Conference** [1] - 205:11

**confessed** [1] - 152:10

**confession** [1] - 137:15

**confessions** [1] - 11:8

**confident** [1] - 77:3

**confidential** [2] - 79:7, 79:13

**confidentiality** [2] - 143:14, 170:3

**configuration** [1] - 103:16

**configure** [1] - 103:10

**configured** [7] - 16:25, 18:16, 19:18, 27:15, 53:19, 95:19, 103:8

**confirm** [1] - 33:7

**conformance** [1] - 205:10

**confronted** [1] - 179:20

**confused** [4] - 127:16,

129:17, 130:15, 167:18

**confusion** [1] - 127:10

**connect** [10] - 16:9, 16:12, 17:16, 42:19, 43:20, 44:10, 47:2, 91:13, 144:25, 165:1

**connected** [5] - 4:23, 37:12, 43:3, 146:16, 164:23

**connecting** [2] - 43:16, 62:1

**connection** [19] - 43:11, 43:12, 43:14, 44:8, 91:18, 93:14, 103:12, 103:13, 127:8, 137:7, 137:8, 138:3, 166:15, 171:25, 172:3, 181:16, 182:1, 185:5, 189:5

**connections** [2] - 19:1, 101:3

**conscious** [1] - 82:24

**consider** [1] - 186:7

**considered** [2] - 39:4, 180:21

**consistent** [1] - 180:3

**consistently** [2] - 179:19, 179:21

**Constitution** [1] - 158:1

**constitutional** [2] - 76:21, 198:7

**constitutionality** [1] - 144:9

**constitutionally** [4] - 11:25, 13:9, 13:11, 195:24

**constraints** [1] - 13:12

**construed** [1] - 49:7

**consultant** [3] - 99:25, 159:21, 161:1

**consulted** [5] - 81:13, 81:16, 81:24, 82:6, 82:8

**contact** [1] - 110:2

**contain** [2] - 30:24, 40:9

**contained** [11] - 12:2, 18:8, 24:3, 27:1, 30:10, 30:12, 32:4, 38:10, 41:4, 181:15, 190:8

**containing** [3] - 4:13, 45:21, 188:19

**contains** [9] - 21:12, 24:14, 26:11, 27:16, 28:8, 40:13, 40:14, 40:17, 94:12

**contemplated** [1] - 177:1
**contemplates** [1] - 194:18
**contends** [1] - 12:22
**content** [2] - 30:23, 84:25
**contention** [1] - 12:6
**contents** [7] - 28:2, 32:15, 129:23, 131:24, 148:12, 173:17, 201:3
**context** [2] - 39:11, 52:4
**continuation** [1] - 29:3
**continue** [2] - 41:3, 58:25
**continued** [2] - 8:9, 101:19
**continuing** [1] - 118:23
**contract** [5] - 159:17, 159:20, 159:22, 160:22, 160:25
**contractor** [1] - 108:3
**contrary** [1] - 183:10
**contribute** [1] - 35:21
**contributed** [2] - 55:23, 55:24
**control** [10] - 8:4, 9:6, 37:14, 40:23, 42:10, 58:7, 61:16, 65:1, 95:10, 166:6
**controlled** [3] - 45:10, 184:9, 188:9
**controlling** [1] - 178:3
**controls** [1] - 151:18
**controversial** [1] - 115:3
**conversation** [3] - 6:23, 83:11, 83:13
**convey** [1] - 56:7
**conveyed** [1] - 79:16
**conveying** [2] - 195:5, 196:10
**Coordination** [1] - 14:13
**coordination** [1] - 15:6
**copy** [21] - 8:3, 33:10, 36:13, 51:14, 57:19, 58:6, 58:10, 61:12, 111:2, 122:6, 123:10, 124:21, 131:8, 133:11, 143:9, 152:18, 172:24, 173:21, 200:20
**core** [2] - 12:3, 29:16

**corner** [2] - 22:16, 150:14
**correct** [57] - 8:22, 21:25, 24:24, 24:25, 28:24, 32:25, 34:6, 41:15, 42:8, 45:6, 51:15, 53:9, 53:10, 53:12, 54:8, 55:10, 55:14, 55:21, 56:4, 56:6, 57:7, 58:2, 58:25, 59:6, 59:9, 59:24, 59:25, 60:4, 60:8, 60:11, 61:20, 62:11, 65:5, 74:16, 78:1, 78:16, 80:24, 85:16, 85:21, 90:10, 90:19, 91:7, 92:22, 108:20, 146:21, 154:1, 154:3, 156:7, 157:3, 158:7, 162:18, 162:23, 173:17, 187:19, 191:12, 202:13, 205:7
**correcting** [1] - 118:22
**correctly** [4] - 77:4, 85:15, 103:9, 107:1
**corresponded** [1] - 74:14
**counsel** [2] - 5:10, 56:14
**counsel's** [2] - 160:5, 160:10
**Count** [1] - 4:12
**counterparts** [1] - 76:9
**countries** [9] - 73:14, 73:15, 73:18, 75:21, 75:23, 76:1, 76:11, 103:6, 163:18
**country** [7] - 16:19, 48:1, 73:9, 177:23, 180:4, 188:18
**counts** [1] - 4:9
**Counts** [1] - 4:10
**County** [4] - 47:18, 47:21, 48:21, 146:16
**couple** [4] - 4:16, 6:13, 68:3, 106:6, 123:18
**course** [9] - 8:1, 39:17, 42:1, 51:13, 69:4, 71:15, 72:14, 83:4, 170:23
**COURT** [139] - 1:1, 4:1, 5:19, 5:22, 5:24, 6:5, 13:18, 13:21, 14:1, 22:4, 25:10, 27:8, 31:17, 39:21, 49:15, 50:4, 50:8,

50:15, 52:19, 56:19, 56:23, 64:24, 66:1, 66:19, 66:21, 67:11, 67:13, 67:18, 67:21, 68:20, 69:2, 69:8, 69:15, 69:18, 71:6, 71:24, 72:16, 74:5, 74:11, 74:18, 76:3, 76:12, 77:17, 79:12, 79:25, 80:9, 80:12, 80:17, 80:19, 90:23, 91:1, 91:3, 91:15, 93:8, 93:16, 93:20, 93:24, 94:1, 96:18, 96:21, 96:23, 96:25, 97:2, 97:6, 97:9, 102:16, 111:22, 112:3, 119:5, 119:21, 124:24, 125:12, 126:15, 127:18, 129:2, 130:19, 132:22, 133:1, 133:3, 133:10, 137:21, 140:20, 140:25, 141:17, 141:20, 142:8, 142:13, 142:19, 142:22, 143:20, 145:14, 147:9, 147:22, 149:18, 149:24, 150:1, 150:7, 150:24, 151:8, 151:22, 152:2, 153:17, 154:8, 154:24, 155:6, 160:2, 168:5, 168:8, 169:17, 174:7, 174:9, 174:12, 174:14, 174:21, 182:14, 183:11, 183:13, 183:25, 184:4, 185:10, 185:17, 186:23, 187:3, 187:20, 188:15, 189:17, 190:4, 190:11, 190:21, 191:10, 192:1, 192:17, 192:25, 193:24, 194:6, 194:11, 198:10, 198:18, 203:15
**Court** [73] - 1:24, 2:10, 4:7, 5:5, 5:7, 6:16, 7:12, 7:22, 8:24, 9:17, 9:24, 10:16, 11:10, 11:23, 12:20, 37:4, 37:19, 41:7, 42:14, 68:5, 71:14, 73:21, 76:16, 76:22,

77:17, 77:23, 77:24, 77:25, 78:2, 102:16, 114:25, 118:13, 118:19, 120:3, 133:8, 133:11, 135:7, 135:10, 137:22, 167:19, 168:10, 175:20, 176:22, 177:5, 178:15, 178:19, 178:20, 184:6, 186:7, 186:11, 186:17, 187:25, 192:9, 194:20, 194:23, 195:6, 195:11, 195:13, 195:19, 195:22, 199:1, 200:19, 201:11, 201:17, 201:22, 202:4, 203:13, 203:17, 203:23, 203:25, 205:3, 205:4, 205:17
**court** [18] - 4:25, 5:2, 6:13, 39:15, 81:20, 82:15, 82:20, 82:21, 83:1, 83:6, 83:12, 98:23, 99:1, 135:12, 178:9, 182:19, 182:25, 200:2
**Court's** [11] - 4:1, 7:1, 7:4, 7:8, 13:3, 13:5, 71:16, 71:22, 74:4, 181:18, 195:17
**Court..................** [2] - 2:15, 2:16
**courthouse** [1] - 135:19
**courtroom** [9] - 6:6, 7:10, 16:16, 26:1, 43:11, 68:3, 68:21, 109:11, 133:21
**Courts** [4] - 115:20, 126:13, 166:25, 202:8
**courts** [7] - 98:21, 98:22, 161:20, 176:5, 177:22, 179:17, 182:4
**cover** [2] - 121:22, 175:7
**covering** [1] - 98:7
**covert** [1] - 101:23
**Cox** [6] - 42:22, 141:7, 142:18, 142:19, 147:13, 150:10
**craft** [7] - 23:2, 24:19, 26:13, 26:25, 34:17, 51:9, 65:10
**crafting** [1] - 158:12

**crash** [2] - 108:13, 108:19
**crashes** [2] - 108:7, 108:8
**crawling** [1] - 180:16
**create** [1] - 159:3
**created** [11] - 7:18, 20:23, 25:16, 26:10, 54:10, 101:14, 101:22, 102:3, 102:4, 159:4, 159:10
**creating** [1] - 159:1
**creator** [2] - 20:24, 26:10
**credentials** [1] - 159:23
**credibility** [2] - 160:3, 178:20
**credit** [1] - 23:9
**crime** [2] - 160:21, 175:10
**Crimes** [1] - 14:13
**crimes** [8] - 15:2, 15:3, 15:10, 15:16, 15:19, 38:19, 166:10
**criminal** [10] - 10:2, 14:25, 15:2, 39:12, 39:17, 43:5, 99:8, 175:17, 178:18, 181:16
**Criminal** [3] - 12:4, 14:12, 99:7
**criminals** [5] - 106:22, 107:7, 118:1, 124:3, 169:5
**criticism** [1] - 150:24
**criticize** [1] - 167:1
**cross** [10] - 22:22, 23:5, 50:9, 51:19, 51:24, 51:25, 52:1, 52:3, 52:14, 52:25
**Cross** [3] - 2:14, 2:15, 2:21
**CROSS** [3] - 50:17, 91:4, 152:4
**cross-board** [6] - 22:22, 23:5, 51:19, 51:25, 52:14, 52:25
**Cross-Examination** [3] - 2:14, 2:15, 2:21
**cross-examination** [1] - 50:9
**CROSS-EXAMINATION** [3] - 50:17, 91:4, 152:4
**cross-post** [5] - 51:24, 52:1, 52:3
**crosses** [1] - 193:3
**crowd** [1] - 102:2
**CRR** [2] - 1:23, 205:17

**cSoghoian** [2] - 156:22, 156:23
**cSSoghoian** [1] - 156:21
**cubbyholes** [1] - 84:11
**culpable** [2] - 11:8, 11:19
**cure** [1] - 171:5
**curious** [1] - 137:22
**current** [2] - 14:21, 32:2
**custody** [3] - 145:7, 145:8, 161:24
**custom** [1] - 107:14
**customer** [3] - 74:16, 160:14, 187:8
**customer's** [1] - 139:3
**customers'** [1] - 172:11
**cut** [4] - 52:18, 131:21, 131:23, 161:11
**cyber** [1] - 98:18

# D

**D.C** [3] - 159:11, 160:7, 160:20
**Dan** [1] - 13:17
**Dana** [3] - 1:23, 205:3, 205:17
**dangerous** [1] - 115:13
**DANIEL** [1] - 14:2
**daniel** [1] - 2:13
**Daniel** [2] - 5:15, 14:7
**dark** [3] - 118:19, 118:24, 122:2
**Darknet** [1] - 9:15
**data** [78] - 40:10, 40:11, 41:4, 41:5, 41:6, 45:7, 58:20, 63:9, 63:10, 63:14, 63:18, 63:19, 72:5, 79:2, 87:13, 94:8, 94:12, 94:20, 94:23, 95:2, 95:5, 96:4, 96:10, 96:11, 96:14, 100:4, 128:9, 128:11, 130:16, 131:9, 131:12, 131:20, 132:12, 134:23, 134:24, 135:2, 136:3, 136:4, 136:6, 136:20, 136:23, 136:25, 137:2, 138:23, 139:3, 139:8, 139:25, 140:8, 140:9, 141:9,

141:11, 143:5, 143:9, 143:11, 143:15, 143:16, 149:16, 149:22, 151:17, 151:20, 152:14, 152:21, 160:14, 161:24, 162:19, 170:3, 170:4, 170:8, 170:9, 170:16, 170:25, 171:2, 172:1, 172:4, 172:11
**database** [1] - 83:25
**databases** [1] - 47:24
**date** [17] - 35:24, 36:3, 36:5, 40:14, 41:10, 43:4, 43:9, 47:11, 89:21, 89:23, 90:9, 118:7, 120:12, 120:18, 121:3, 121:4, 122:13
**Dated** [1] - 205:12
**dated** [1] - 20:23
**dates** [4] - 8:13, 108:14, 162:6
**days** [7] - 37:6, 40:24, 42:10, 88:10, 124:8, 168:14, 168:16
**dealing** [4] - 64:18, 64:19, 77:14, 182:4
**dean** [2] - 40:4, 168:12
**Dean** [17] - 4:5, 5:11, 13:14, 22:5, 25:11, 27:9, 31:18, 49:15, 80:13, 96:18, 96:25, 152:2, 153:23, 155:6, 155:9, 174:21, 183:11
**DEAN** [63] - 1:13, 5:14, 13:16, 13:23, 14:5, 22:1, 25:7, 27:5, 31:13, 49:14, 50:3, 50:6, 50:13, 51:3, 52:10, 52:17, 56:13, 64:17, 65:23, 67:10, 67:12, 67:15, 67:20, 67:23, 69:5, 69:16, 70:2, 71:19, 80:14, 90:25, 91:11, 93:6, 93:22, 93:25, 94:3, 96:17, 96:22, 97:1, 102:12, 111:16, 118:11, 119:1, 128:25, 132:19, 133:17, 133:20, 137:13, 138:1, 152:3, 152:5, 153:16, 154:9, 155:8, 160:1, 168:7, 168:11, 169:16,

173:11, 174:8, 174:22, 174:24, 183:2, 183:12
**Dean** ......... [1] - 2:16
**Dean** ........... [1] - 2:14
**Dean** ............. [1] - 2:21
**death** [1] - 157:18
**debated** [1] - 83:11
**December** [6] - 4:9, 20:23, 32:17, 33:4, 53:7, 108:15
**decent** [1] - 122:15
**decided** [1] - 199:8
**deciding** [1] - 24:16
**decision** [8] - 82:25, 157:1, 157:2, 176:12, 176:16, 176:22, 181:18, 182:6
**decisions** [1] - 157:6
**declarations** [1] - 104:21
**declined** [3] - 98:4, 116:4, 185:6
**dedicated** [9] - 20:7, 21:16, 28:6, 28:10, 35:16, 64:13, 157:11, 174:25, 202:25
**deem** [1] - 39:14
**default** [1] - 170:19
**defect** [1] - 119:15
**defend** [1] - 115:7
**defendant** [24] - 1:7, 47:17, 74:3, 88:13, 95:22, 110:22, 116:1, 130:6, 137:6, 139:18, 140:12, 148:17, 164:12, 177:21, 178:5, 178:22, 179:15, 188:10, 189:24, 195:8, 196:24, 198:1, 201:9
**Defendant** [1] - 2:5
**DEFENDANT** [3] - 1:17, 2:18, 183:15
**defendant's** [30] - 48:20, 63:11, 63:22, 64:2, 64:4, 85:5, 90:21, 92:1, 110:6, 110:7, 110:19, 110:21, 110:23, 111:14, 120:7, 130:2, 136:23, 137:23, 138:23, 139:9, 140:14, 140:15, 143:17, 148:22, 149:4,

149:9, 150:15, 164:9, 178:14, 196:9
**Defendant's** [6] - 111:1, 127:21, 130:22, 140:10, 141:23, 167:25
**DEFENDANT'S** [1] - 3:10
**Defendant** ............ [1] - 2:7
**defendants** [2] - 157:18, 186:20
**Defender's** [1] - 1:18
**defender's** [1] - 156:12
**defense** [27] - 4:16, 11:10, 11:22, 56:14, 63:12, 73:5, 78:14, 78:20, 83:22, 85:3, 94:11, 97:4, 101:18, 108:2, 124:25, 128:22, 131:2, 155:5, 157:19, 157:24, 161:21, 164:8, 173:3, 174:2, 175:18, 175:23, 180:18
**Defense** [1] - 129:2, 132:18
**defined** [2] - 109:17, 156:14
**definitely** [1] - 153:10
**definition** [2] - 198:21, 203:9
**degree** [3] - 98:11, 98:12, 98:14
**delegated** [1] - 12:5
**deliberate** [3] - 177:14, 178:2, 181:10
**deliver** [8] - 109:5, 113:23, 115:25, 117:14, 162:15, 162:16, 170:22, 170:23
**delivered** [5] - 109:21, 109:24, 112:6, 125:6, 169:2
**delivers** [2] - 104:15, 170:2
**delivery** [2] - 113:21, 168:2
**demonstrate** [2] - 79:1, 144:19
**demonstrated** [2] - 158:15, 158:21
**denied** [3] - 119:4, 197:23, 200:8
**DENIS** [1] - 1:13
**Denis** [2] - 4:5, 143:22

Denis.Dean@usdoj.gov [1] - 1:15
**deny** [2] - 145:13, 186:11
**denying** [1] - 167:21
**department** [2] - 101:18
**Department** [1] - 99:11
**depict** [2] - 29:13, 35:24
**depicted** [1] - 22:18
**depicting** [1] - 27:24
**depicts** [2] - 24:16, 30:21
**deploy** [15] - 46:6, 59:7, 59:16, 62:2, 62:4, 71:12, 80:23, 85:9, 85:12, 87:8, 119:17, 119:18, 144:1, 146:11, 202:19
**deployed** [20] - 37:9, 38:3, 38:21, 39:25, 45:4, 46:4, 47:19, 47:20, 51:17, 61:19, 67:8, 85:10, 86:2, 86:8, 88:9, 95:20, 119:2, 150:1, 150:25, 187:22
**deployment** [6] - 45:25, 65:3, 82:2, 82:9, 94:13, 146:1
**deploys** [1] - 59:24
**derived** [1] - 4:18
**describe** [8] - 25:12, 32:3, 35:22, 37:19, 100:8, 111:11, 126:25, 127:11
**described** [27] - 17:7, 24:9, 32:8, 34:17, 34:18, 37:2, 37:4, 37:12, 37:21, 40:7, 41:7, 41:8, 41:21, 45:15, 46:1, 46:23, 63:7, 84:9, 86:2, 100:25, 106:1, 114:20, 127:5, 138:11, 164:6, 165:20, 165:21
**describing** [8] - 104:22, 111:2, 111:6, 113:18, 126:23, 166:15, 167:14, 170:12
**description** [6] - 84:15, 100:9, 113:5, 114:7, 166:20, 203:6
**DESCRIPTION** [2] - 3:4, 3:11

**design** [2] - 106:25, 107:13

**designed** [10] - 84:19, 88:23, 100:15, 100:16, 105:8, 105:15, 105:16, 108:13, 129:14, 149:19

**desktop** [1] - 44:8

**despite** [4] - 36:18, 53:18, 73:15

**destination** [10] - 134:10, 134:16, 134:18, 135:25, 136:8, 139:5, 139:12, 139:14, 141:24, 149:11

**destroying** [1] - 75:25

**detached** [2] - 176:10, 177:19

**detail** [2] - 75:22, 177:25

**detailed** [1] - 66:12

**details** [1] - 123:5

**detected** [1] - 96:6

**determine** [5] - 37:15, 37:24, 48:2, 57:13, 146:14

**determined** [1] - 46:10

**determining** [1] - 90:14

**developed** [2] - 9:24, 12:18

**developing** [1] - 88:2

**development** [2] - 29:10, 29:11

**deviant** [1] - 7:21

**device** [25] - 43:23, 44:8, 44:16, 47:1, 138:13, 144:15, 187:15, 187:18, 187:23, 188:4, 188:8, 188:10, 189:25, 190:7, 190:15, 190:17, 190:25, 191:1, 191:4, 192:3, 192:6, 193:6, 193:16, 193:23, 194:25

**devices** [5] - 43:1, 43:16, 43:20, 43:25, 138:8

**DHS** [2] - 126:12, 126:13

**Diego** [1] - 99:22

**difference** [4] - 142:24, 143:1, 176:20

**different** [19] - 6:17, 40:10, 51:24, 78:16,

84:7, 89:25, 116:25, 143:18, 144:6, 170:7, 176:15, 179:18, 187:20, 187:23, 190:6, 193:20, 194:18

**difficult** [5] - 23:20, 102:14, 116:22, 162:15, 173:9

**digit** [1] - 108:14

**diminished** [1] - 179:21

**Direct** [2] - 2:14, 2:20

**direct** [20] - 50:24, 51:12, 53:3, 55:5, 55:12, 57:8, 57:16, 60:19, 70:10, 92:13, 102:8, 111:3, 164:4, 164:15, 168:8, 168:13, 168:19, 169:6, 186:15, 202:17

**DIRECT** [2] - 14:4, 97:15

**directly** [4] - 92:17, 196:6, 196:18, 196:24

**director** [1] - 115:6

**disabling** [1] - 180:17

**disagreement** [1] - 109:10

**disclaimer** [1] - 20:1

**disclose** [4] - 6:25, 75:11, 75:18, 123:3

**disclosed** [3] - 75:20, 124:5, 125:24

**disclosing** [1] - 79:9

**discovered** [4] - 32:14, 32:15, 95:13, 163:10

**discovery** [1] - 4:22

**discrepancy** [3] - 56:7, 133:6, 202:11

**discrete** [1] - 84:10

**discuss** [2] - 31:5, 120:8

**discussed** [1] - 184:10

**discussing** [1] - 103:24

**discussion** [1] - 7:19

**disease** [1] - 171:5

**disingenuous** [1] - 180:16

**disobey** [1] - 181:3

**display** [3] - 4:24, 29:1, 132:16

**displayed** [4] - 28:19, 32:12, 41:14, 54:25, 55:6, 134:22

**disposal** [1] - 36:20

**dispute** [1] - 8:14

**disregard** [6] - 118:16, 119:3, 177:14, 178:3, 181:3, 199:19

**disseminated** [1] - 75:8

**dissertation** [3] - 158:5, 158:9, 161:5

**dissident** [1] - 163:16

**distance** [1] - 203:21

**distinction** [1] - 194:17

**distribute** [1] - 38:1

**distributed** [2] - 24:8, 65:20

**distributing** [2] - 23:21, 31:11

**distribution** [3] - 18:13, 28:10, 35:17

**distributors** [1] - 187:13

**district** [5] - 6:13, 81:10, 81:20, 82:15, 82:20, 82:21, 83:1, 83:6, 83:12, 176:18, 177:2, 177:3, 181:25, 182:19, 182:25, 185:24, 186:15, 186:21, 188:3, 188:4, 188:6, 188:9, 188:11, 188:12, 188:14, 189:23, 190:3, 190:18, 191:14, 191:22, 191:23, 197:13, 198:11, 200:1, 201:1

**DISTRICT** [2] - 1:1, 1:1

**District** [46] - 1:19, 7:15, 8:5, 8:17, 10:6, 10:24, 11:14, 12:7, 12:10, 12:11, 13:8, 35:19, 36:14, 37:1, 41:9, 45:10, 48:24, 56:8, 58:11, 63:17, 68:17, 76:19, 81:22, 82:8, 83:7, 85:24, 121:20, 121:21, 167:12, 176:23, 183:20, 184:14, 185:4, 185:9, 185:24, 186:4, 186:10, 186:19, 189:18, 192:12, 192:15, 200:7, 200:22, 201:3, 205:4, 205:5

**districts** [2] - 179:18, 182:2

**division** [2] - 14:19, 14:25

**Division** [1] - 14:12

**DIVISION** [1] - 1:2

**divulged** [1] - 194:22

**docket** [2] - 4:2, 4:3

**Doctor** [3] - 143:20, 147:23, 153:24

**doctor** [1] - 171:3

**doctrines** [1] - 12:18

**document** [4] - 63:8, 73:3, 125:17, 140:10

**Document** [3] - 4:25, 5:1, 5:4

**documents** [6] - 102:25, 104:24, 105:3, 116:11, 133:9, 142:15

**dogs** [3] - 107:18, 107:19, 107:20

**DOJ** [1] - 126:12

**dollars** [2] - 107:3, 121:7

**domestically** [1] - 71:14

**done** [15] - 24:9, 54:4, 59:1, 73:17, 83:3, 86:10, 86:14, 94:18, 110:14, 117:25, 144:3, 147:5, 157:25, 171:11, 198:14

**door** [16] - 114:1, 159:24, 161:2, 165:10, 189:2, 189:6, 189:7, 189:15, 189:25, 190:1, 190:2, 191:8, 192:4, 193:12, 193:14, 196:13

**dots** [1] - 144:25

**double** [1] - 125:19

**double-clicked** [1] - 125:19

**down** [20] - 33:1, 41:23, 46:16, 48:7, 48:15, 58:7, 58:9, 58:19, 78:19, 93:16, 94:14, 96:21, 96:23, 114:1, 135:6, 144:6, 154:8, 196:13, 196:14

**download** [9] - 18:22, 19:4, 19:5, 19:7, 24:17, 32:11, 86:16, 88:22, 193:7

**downloaded** [10] - 41:2, 60:6, 110:7, 110:9, 110:12, 110:13, 121:16,

190:5, 192:19

**downloading** [7] - 86:15, 86:18, 87:4, 93:10, 93:12, 114:13, 125:4

**downloads** [2] - 125:7, 125:10

**downside** [1] - 166:24

**dozen** [7] - 83:18, 84:6, 89:17, 104:10, 115:3, 143:18

**Dr** [11] - 6:3, 6:5, 6:9, 6:19, 6:22, 97:4, 147:4, 147:17, 152:6, 169:21, 173:16

**draft** [2] - 125:17, 179:9

**drinking** [1] - 118:5

**drinks** [1] - 68:23

**driven** [1] - 188:17

**drug** [1] - 79:14

**drugged** [1] - 107:19

**due** [4] - 53:13, 57:8, 57:11

**duly** [4] - 13:20, 14:3, 97:8, 97:14

**during** [17] - 24:21, 25:4, 40:20, 41:20, 42:6, 42:10, 51:13, 64:25, 69:3, 70:5, 72:1, 72:7, 76:4, 78:5, 88:16, 92:13, 179:10

**duties** [2] - 14:21, 15:23

**duty** [1] - 126:14

**E**

**e-mail** [8] - 26:18, 26:20, 26:22, 26:23, 122:21, 122:22, 200:25, 201:3

**early** [2] - 73:16, 197:11

**earth** [1] - 182:1

**ease** [2] - 28:21, 158:21

**easier** [1] - 120:8

**easiest** [1] - 134:5

**easily** [2] - 175:4

**East** [1] - 1:24

**Eastern** [33] - 8:5, 8:17, 10:6, 11:14, 12:7, 12:10, 12:11, 13:8, 35:19, 36:14, 36:25, 41:9, 45:10, 56:8, 58:11, 63:16, 76:19, 81:22, 82:8,

83:6, 85:24, 121:20, 167:12, 183:20, 184:14, 185:4, 185:9, 185:24, 186:4, 186:9, 186:19, 189:18, 192:12
**easy** [1] - 51:3
**eat** [1] - 118:3
**eaten** [1] - 171:24
**edit** [1] - 103:16
**educated** [1] - 8:23
**educating** [2] - 161:20
**education** [2] - 6:14, 98:9
**effective** [2] - 10:7, 122:15
**effort** [2] - 55:5, 114:13
**efforts** [3] - 7:24, 181:14, 203:23
**eight** [1] - 177:22
**Eighth** [3] - 177:10, 179:24, 198:22
**either** [13] - 11:24, 13:11, 22:19, 49:20, 71:16, 81:11, 104:25, 113:6, 114:3, 155:1, 156:11, 165:3, 166:11
**elect** [1] - 82:18
**elected** [1] - 6:17
**electronic** [1] - 194:24
**elicit** [1] - 49:20
**ELMO** [1] - 13:25
**elsewhere** [3] - 121:22, 186:4, 197:13
**emanating** [1] - 195:21
**employ** [2] - 108:25, 171:20
**employed** [9] - 14:9, 38:16, 97:21, 97:22, 101:15, 108:3, 118:7, 152:19, 159:14
**employee** [3] - 135:8, 155:12, 160:4
**employee's** [1] - 135:8
**employees** [3] - 102:5, 104:14, 161:16
**employs** [1] - 152:16
**enable** [2] - 27:3, 191:16
**encounter** [2] - 161:4, 161:8
**encountered** [2] - 33:23, 34:13

**encounters** [2] - 158:8, 161:9
**encourage** [2] - 155:18, 155:21
**encouraged** [1] - 24:10
**encrypt** [8] - 22:23, 23:22, 23:25, 91:9, 143:4, 149:17, 172:10, 172:11
**encrypted** [21] - 23:18, 23:19, 24:9, 91:18, 92:2, 92:5, 92:8, 94:6, 94:8, 96:12, 143:11, 145:3, 152:21, 154:20, 169:24, 170:8, 171:10, 171:14, 171:15, 171:16, 171:25
**Encryption** [1] - 154:5
**encryption** [26] - 23:19, 94:21, 95:1, 143:13, 149:7, 152:19, 152:22, 153:3, 153:6, 154:11, 154:17, 169:22, 170:2, 170:7, 170:8, 170:9, 170:13, 170:15, 170:20, 170:22, 170:24, 171:1, 171:20, 171:22, 172:8
**end** [11] - 6:20, 7:9, 70:3, 105:17, 126:25, 129:11, 141:21, 142:12, 169:14, 171:13, 171:17
**ended** [2] - 115:6, 159:13
**enforcement** [26] - 8:2, 8:15, 9:11, 11:1, 12:13, 21:6, 39:14, 39:23, 53:8, 72:23, 74:20, 76:1, 79:21, 83:15, 83:17, 165:15, 166:8, 175:9, 177:17, 178:6, 180:22, 181:14, 182:19, 184:5, 185:21, 187:12
**engage** [6] - 7:19, 10:1, 10:4, 147:4, 161:17, 161:19
**engaged** [2] - 27:25, 45:3
**engine** [2] - 19:24,

70:8, 70:9, 70:15, 71:1
**engineer** [1] - 106:11
**engineers** [3] - 107:24, 108:2, 108:23
**engines** [3] - 19:20, 70:18, 203:5
**English** [4] - 31:8, 128:2, 135:6
**enter** [6] - 25:15, 26:17, 26:20, 26:22, 26:23, 189:3
**entered** [2] - 85:14, 85:15
**entering** [1] - 202:23
**entire** [5] - 24:17, 25:4, 83:25, 86:21, 121:6
**entirely** [2] - 20:6, 91:22
**entirety** [1] - 28:9, 83:20
**entitled** [2] - 30:2, 205:9
**entity** [3] - 95:15, 96:7, 101:13
**entry** [2] - 114:7, 189:18
**enumerated** [1] - 112:9
**envelope** [12] - 129:24, 130:8, 131:24, 140:2, 140:24, 148:6, 148:9, 148:10, 148:12, 149:13, 150:14
**envelopes** [1] - 131:23
**envision** [1] - 187:21
**equivalent** [1] - 193:22
**Erika** [1] - 7:4
**errant** [1] - 80:2
**erroneously** [1] - 176:12
**error** [7] - 77:5, 77:14, 79:2, 79:5, 79:20, 79:21, 107:23
**essence** [2] - 107:5, 144:25
**essentially** [14] - 44:16, 84:16, 101:2, 103:11, 103:14, 107:12, 118:2, 130:7, 131:7, 131:25, 134:11, 138:12, 141:13, 156:6
**established** [2] -

25:18, 44:23
**Esterbrook** [1] - 7:4
**estimate** [3] - 64:8, 65:21, 67:2
**estimated** [1] - 64:12
**estimating** [1] - 65:5
**estimation** [2] - 65:19, 66:17
**et** [1] - 29:25
**ethical** [1] - 39:23
**European** [1] - 99:4
**evaluate** [1] - 115:21
**evaluating** [1] - 99:10
**evasive** [1] - 153:16
**evening** [2] - 34:10, 80:25
**event** [2] - 8:23, 38:12
**events** [3] - 11:6, 99:20, 99:22
**eventually** [4] - 90:20, 104:5, 121:13, 147:14
**evidence** [22] - 4:18, 11:4, 11:11, 11:18, 12:19, 49:8, 75:25, 79:23, 94:10, 143:7, 149:6, 151:6, 164:4, 164:6, 172:4, 177:14, 179:12, 181:9, 197:5, 202:5, 202:6, 203:14
**evident** [4] - 150:21, 152:15, 170:5
**evolution** [1] - 195:10
**ex** [2] - 168:24, 186:17
**ex-government** [1] - 168:24
**exact** [10] - 36:3, 63:19, 66:9, 66:12, 94:10, 143:9, 159:8, 189:10, 200:12, 201:10
**exactly** [12] - 10:14, 34:22, 40:25, 42:16, 124:21, 134:24, 136:17, 146:16, 178:1, 197:20, 199:18, 200:14
**exam** [1] - 114:15
**Examination** [9] - 2:14, 2:14, 2:15, 2:15, 2:16, 2:16, 2:20, 2:21, 2:21
**EXAMINATION** [9] - 14:4, 50:17, 80:18, 91:4, 93:7, 94:2, 97:15, 152:4, 169:19
**examination** [2] - 50:9, 70:10
**example** [5] - 17:15,

27:21, 31:22, 46:10, 82:20
**exceed** [1] - 182:11
**except** [1] - 9:19
**exception** [5] - 39:22, 186:18, 201:18, 201:23, 202:5
**exchange** [1] - 119:25
**excited** [1] - 157:2
**exclusionary** [1] - 181:19
**excuse** [4] - 40:13, 40:22, 128:24, 193:17
**execute** [4] - 62:20, 85:1, 119:10, 199:24
**executed** [6] - 48:24, 49:4, 54:20, 77:21, 80:21, 130:14
**execution** [6] - 4:19, 33:17, 49:2, 54:9, 55:22, 80:25
**executive** [1] - 160:12
**exercised** [2] - 145:21, 199:3
**EXHIBIT** [1] - 3:1
**Exhibit** [25] - 20:18, 22:7, 26:4, 27:6, 28:15, 31:15, 31:17, 34:8, 51:2, 55:9, 111:1, 127:21, 129:2, 130:22, 130:23, 130:24, 131:17, 131:20, 131:25, 132:7, 132:10, 140:11, 141:23, 167:25
**exhibit** [8] - 13:24, 22:2, 28:17, 31:14, 85:4, 128:22, 131:16, 133:25
**Exhibits** [2] - 132:18, 133:3
**exhibits** [5] - 5:6, 13:25, 103:23, 132:11, 133:11
**exist** [5] - 19:15, 20:6, 54:3, 106:8, 106:20
**existed** [3] - 20:13, 199:15, 202:1
**existence** [4] - 18:20, 63:24, 103:5, 175:6
**existing** [4] - 22:14, 25:19, 25:20, 120:21
**exists** [1] - 52:5
**expanded** [1] - 99:12
**expect** [4] - 103:4, 129:5, 171:17, 182:2
**expectation** [10] - 179:19, 179:21,

180:1, 180:9, 193:25, 194:7, 194:8, 194:24, 196:20, 197:4
**expected** [1] - 30:11
**expenses** [1] - 98:6
**experience** [18] - 21:5, 23:1, 24:19, 26:12, 29:6, 29:13, 51:8, 66:25, 83:1, 96:13, 98:10, 99:19, 100:19, 104:1, 105:2, 106:17, 113:18, 120:6
**expert** [9] - 73:5, 98:4, 98:8, 99:3, 111:19, 152:11, 160:3, 173:9, 174:2
**experts** [4] - 107:11, 109:7, 109:12, 109:14
**explain** [12] - 52:2, 98:9, 105:4, 111:24, 120:3, 130:22, 131:16, 133:7, 147:18, 158:17, 158:20, 170:1
**explained** [1] - 54:14
**explaining** [1] - 118:24
**explanatory** [1] - 175:13
**explicitly** [2] - 183:22, 201:17
**exploit** [60] - 60:20, 60:23, 60:24, 61:2, 61:13, 61:15, 61:21, 61:23, 61:25, 62:3, 62:4, 62:6, 62:7, 107:11, 107:22, 109:5, 109:22, 110:9, 110:12, 110:13, 113:23, 113:25, 115:12, 116:25, 119:7, 119:10, 119:11, 120:4, 120:13, 121:14, 121:16, 122:7, 122:24, 122:25, 123:4, 123:6, 123:10, 123:12, 124:9, 124:10, 124:13, 124:16, 124:17, 125:7, 125:11, 165:10, 165:13, 165:21, 165:23, 166:21, 166:22, 172:16, 172:21, 172:23, 172:24,

173:4, 173:21, 173:25, 174:5
**exploitation** [5] - 15:10, 21:16, 75:9, 75:14, 182:11
**exploited** [3] - 107:6, 107:11, 122:11
**exploits** [4] - 120:15, 121:7, 123:25, 124:4
**expression** [1] - 102:3
**extension** [1] - 136:14
**extensions** [2] - 135:19, 144:7
**extent** [2] - 49:19, 52:20
**extract** [1] - 128:6
**extracted** [1] - 128:8
**extraordinarily** [1] - 145:20
**extreme** [1] - 76:25
**extremely** [4] - 106:11, 115:3, 116:22, 152:7

## F

**face** [3] - 162:2, 200:2, 201:4
**Facebook** [3] - 163:20, 163:21, 163:23
**facial** [1] - 144:9
**facilitate** [1] - 113:6
**facility** [4] - 36:14, 36:25, 123:20, 151:18
**fact** [34] - 7:5, 7:11, 18:11, 19:22, 30:24, 33:8, 35:2, 35:7, 39:21, 53:18, 56:16, 64:3, 73:15, 79:9, 83:8, 83:24, 125:14, 129:18, 135:1, 147:12, 148:14, 149:19, 152:16, 159:22, 163:20, 166:21, 168:20, 170:15, 175:24, 178:12, 178:13, 187:16, 193:2, 198:15
**fact-specific** [2] - 178:12, 178:13
**factory** [1] - 113:6
**facts** [4] - 76:16, 115:22, 156:17, 183:1
**factually** [1] - 81:14
**failed** [1] - 49:16
**fails** [2] - 179:8,

193:23
**fair** [4] - 48:18, 62:12, 88:7, 162:3
**fairly** [3] - 12:15, 23:19, 106:18
**faith** [9] - 180:20, 180:21, 181:6, 182:3, 200:3, 200:5, 201:18, 201:23, 202:4
**fake** [6] - 138:19, 139:1, 139:20, 158:13, 159:2, 159:3
**fall** [1] - 99:9
**falls** [2] - 124:13, 192:15
**false** [3] - 151:2, 151:3, 151:4
**familiar** [8] - 28:2, 37:8, 42:15, 51:21, 51:23, 117:3, 117:9, 183:1
**familiarity** [1] - 82:21
**fan** [2] - 161:12, 161:13
**far** [6] - 17:20, 38:2, 117:5, 126:17, 137:20, 178:11
**fashion** [2] - 8:24, 9:8
**fast** [3] - 50:20, 121:25
**fast-forward** [1] - 121:25
**faster** [1] - 54:12
**favor** [1] - 118:14
**FAYETTEVILLE** [2] - 1:2, 1:10
**Fayetteville** [2] - 1:20, 1:25
**FBI** [99] - 5:15, 8:7, 10:12, 10:19, 10:20, 14:11, 14:17, 14:20, 15:14, 15:19, 33:4, 36:13, 36:14, 36:19, 36:22, 37:1, 37:5, 37:17, 37:21, 37:24, 38:20, 39:8, 40:8, 40:23, 41:11, 42:6, 42:10, 45:10, 45:21, 47:22, 57:16, 58:3, 58:7, 59:2, 59:4, 63:18, 64:25, 72:2, 72:5, 72:8, 80:22, 81:15, 82:18, 83:15, 86:9, 86:19, 88:1, 91:9, 95:9, 95:10, 95:11, 95:15, 96:5, 104:4, 108:3, 115:2, 115:6, 116:15, 116:16, 116:22, 118:7, 124:7, 125:2,

131:1, 132:3, 136:5, 142:15, 143:19, 146:10, 150:8, 151:2, 152:18, 158:9, 158:10, 158:22, 158:25, 161:2, 161:4, 161:8, 161:12, 161:14, 161:22, 164:15, 164:22, 168:13, 168:19, 171:15, 177:18, 178:1, 179:7, 179:9, 179:12, 179:13, 189:11, 197:19, 197:22, 200:25
**FBI's** [2] - 8:4, 95:18
**FBI-controlled** [1] - 45:10
**feature** [1] - 88:4
**featured** [1] - 35:25
**February** [12] - 25:2, 33:16, 34:11, 34:14, 35:6, 36:4, 36:5, 40:18, 58:3, 80:25, 81:2, 104:23
**feces** [1] - 30:17
**fed** [1] - 107:19
**Federal** [13] - 1:18, 1:24, 12:4, 14:10, 14:15, 99:6, 99:21, 159:15, 160:4, 160:10, 172:9, 205:3, 205:17
**federal** [11] - 4:12, 4:14, 8:11, 38:19, 39:11, 98:21, 99:1, 101:20, 156:11, 180:24, 185:21
**fee** [1] - 98:5
**feed** [1] - 109:7
**female** [4] - 34:20, 36:1, 45:2, 203:7
**females** [4] - 22:18, 27:25, 34:18, 36:1
**fence** [2] - 187:7, 187:9
**Fetish** [1] - 30:15
**fetishes** [1] - 30:4
**few** [11] - 91:2, 91:13, 112:15, 117:3, 126:10, 143:13, 159:13, 159:21, 161:1, 161:6, 169:18
**fi** [9] - 44:7, 90:13, 113:7, 138:10, 138:20, 138:25, 139:1, 139:18
**fictional** [1] - 31:11
**field** [2] - 45:21,

149:13
**fields** [1] - 134:9
**fifteen** [1] - 174:18
**figure** [2] - 47:25, 104:17
**file** [19] - 23:18, 24:2, 24:4, 24:14, 93:9, 128:5, 128:7, 129:4, 132:4, 132:6, 134:22, 135:24, 139:16, 142:5, 148:22, 149:2, 190:5, 192:19, 193:6
**filed** [4] - 4:16, 4:25, 5:1, 73:3
**filenames** [3] - 22:23, 23:22, 24:1
**files** [6] - 23:16, 84:8, 84:22, 84:23, 125:3
**filing** [1] - 75:10
**fill** [2] - 73:2, 187:11
**filter** [1] - 163:18
**filtered** [1] - 163:24
**filtering** [1] - 163:16
**final** [1] - 31:9
**fine** [7] - 7:6, 49:25, 71:22, 108:16, 108:17, 133:16, 141:19
**fired** [1] - 159:16
**Firefox** [7] - 100:13, 107:24, 115:15, 115:17, 123:13, 123:14, 123:16
**firm** [1] - 13:9
**First** [1] - 68:14
**first** [43] - 4:17, 11:12, 12:12, 14:3, 16:8, 18:22, 19:3, 22:12, 24:22, 28:18, 38:4, 48:5, 53:3, 88:12, 88:21, 89:2, 94:7, 95:8, 97:14, 98:25, 104:7, 105:18, 105:21, 105:25, 109:18, 110:8, 114:8, 114:9, 117:14, 118:8, 119:9, 127:24, 134:2, 136:1, 137:3, 140:16, 142:4, 156:10, 169:22, 183:18, 194:4, 197:14, 202:2
**fit** [2] - 30:4, 192:8
**five** [10] - 4:9, 6:23, 15:13, 28:19, 42:2, 43:12, 70:1, 151:16, 158:13, 159:2
**Five** [1] - 4:12

**five-minute** [1] - 6:23
**fix** [2] - 120:21, 159:12
**fixed** [1] - 116:20
**flaw** [5] - 107:13, 115:12, 116:20, 122:9, 159:13
**flawed** [1] - 169:23
**flaws** [7] - 106:7, 107:5, 107:6, 107:8, 108:22, 109:1, 109:2
**flew** [1] - 159:10
**flexibility** [1] - 175:22
**flexibly** [1] - 175:21
**flies** [1] - 200:2
**flight** [1] - 98:7
**Florida** [9] - 33:15, 33:20, 54:7, 55:17, 55:20, 55:24, 56:2, 56:3, 80:25
**flow** [2] - 90:4, 90:8
**flowed** [1] - 11:12
**fly** [1] - 158:22
**focus** [2] - 17:25, 76:15
**focused** [1] - 98:15
**follow** [1] - 104:19
**followed** [6] - 177:13, 198:5, 198:23, 199:2, 199:13
**following** [2] - 184:6, 185:23
**follows** [2] - 14:3, 97:14
**followup** [2] - 80:14, 153:20
**food** [1] - 98:7
**foolish** [1] - 162:11
**foothold** [1] - 119:17
**footnote** [1] - 202:14
**FOR** [2] - 1:12, 1:17
**forced** [2] - 75:11, 159:12
**forces** [1] - 60:14
**foregoing** [1] - 205:7
**foreign** [10] - 31:3, 53:8, 72:23, 73:14, 73:17, 75:21, 76:11, 106:21, 107:7, 117:25
**forensic** [2] - 15:17, 143:7
**forensically** [4] - 94:9, 94:19, 96:12, 172:4
**forever** [2] - 165:14, 165:24
**forfeiture** [1] - 4:10
**forgive** [1] - 134:5
**form** [2] - 128:2, 170:12
**format** [1] - 205:10

**formatting** [1] - 129:10
**former** [1] - 104:14
**Fort** [1] - 1:14
**forth** [6] - 8:13, 37:22, 131:9, 134:14, 162:18, 162:19
**forthcoming** [2] - 117:5, 173:2
**forthright** [1] - 166:25
**forum** [9] - 31:20, 31:23, 38:6, 38:8, 38:9, 38:10, 86:3, 86:5, 86:6
**forums** [1] - 31:19
**forward** [2] - 121:25, 131:15
**forwarded** [1] - 136:7
**foundation** [3] - 69:19, 111:17, 119:2
**four** [8] - 4:10, 8:8, 10:13, 43:12, 101:15, 104:4, 108:14, 150:18
**four-digit** [1] - 108:14
**four-week** [1] - 10:13
**Fourth** [10] - 13:12, 145:23, 156:14, 156:15, 158:2, 176:7, 177:17, 194:17, 197:8, 199:10
**fourth** [1] - 79:17
**framed** [1] - 151:10
**Franciscan** [1] - 154:4
**frank** [1] - 127:13
**frankly** [3] - 78:6, 82:1, 177:6
**Franks** [1] - 56:15
**free** [10] - 49:22, 102:4, 119:13, 121:16, 122:21, 131:5, 156:6, 156:9, 156:11, 157:16
**Freedom** [6] - 122:3, 122:11, 122:17, 124:22, 168:21, 172:22
**freely** [2] - 19:5, 23:15
**frequently** [4] - 17:22, 51:12, 68:24, 131:5
**front** [4] - 20:20, 81:20, 114:1, 128:18
**fruit** [2] - 90:14, 202:6
**fruits** [2] - 13:10, 90:6
**frustrating** [1] - 169:14
**FTC** [2] - 160:22, 160:24
**full** [6] - 75:22, 94:12,

101:15, 187:11, 188:24
**fully** [2] - 13:1, 87:9
**function** [2] - 6:21, 19:19
**functionality** [2] - 19:20, 100:21
**functions** [2] - 18:25, 70:16
**fund** [1] - 101:19
**funders** [1] - 101:19
**funding** [1] - 107:4
**furtherance** [1] - 28:6
**future** [1] - 171:20

**G**

**gag** [3] - 68:5, 68:18, 69:16
**gain** [3] - 87:17, 119:17, 171:21
**gained** [1] - 109:22
**gaining** [2] - 8:10, 9:4
**gate** [1] - 187:10
**gathering** [1] - 195:20
**general** [9] - 37:8, 46:14, 51:20, 86:4, 106:7, 140:24, 160:5, 160:10, 195:19
**generalities** [1] - 168:10
**generally** [27] - 4:20, 6:15, 7:12, 18:21, 19:12, 19:21, 20:6, 24:7, 24:12, 28:8, 29:8, 29:13, 30:7, 32:3, 32:10, 37:19, 43:22, 44:12, 46:16, 46:25, 47:23, 52:7, 57:12, 57:15, 76:20, 83:2, 89:21
**generated** [5] - 40:5, 40:8, 41:16, 45:20, 86:21
**generic** [1] - 52:21
**genitals** [1] - 22:20
**gentlemen** [1] - 174:14
**geographical** [1] - 12:8
**geographically** [1] - 182:20
**geolocate** [1] - 47:23
**geolooked** [1] - 77:6
**girls** [3] - 29:9, 29:15, 29:25
**Girls** [5] - 27:22, 31:23, 31:25, 38:7, 44:25

**given** [14] - 7:5, 38:17, 43:2, 43:23, 71:21, 102:9, 106:3, 107:13, 112:17, 129:5, 140:11, 153:8, 153:20, 173:21
**goal** [1] - 182:9
**Google** [6] - 16:17, 18:20, 19:21, 70:16, 175:2, 201:2
**Google.com** [3] - 16:13, 16:16, 17:4
**government** [222] - 4:23, 7:22, 9:1, 10:5, 10:14, 10:23, 11:4, 11:9, 12:14, 12:22, 12:25, 13:6, 13:17, 36:25, 37:14, 45:9, 47:5, 60:25, 61:8, 63:22, 64:2, 67:23, 75:10, 75:18, 75:20, 76:5, 77:2, 77:11, 77:19, 78:4, 79:4, 84:22, 90:24, 90:25, 92:15, 93:20, 93:25, 100:4, 100:5, 101:11, 101:12, 101:13, 102:5, 103:2, 103:24, 104:2, 104:7, 104:14, 104:18, 105:18, 107:7, 107:8, 107:10, 107:14, 107:19, 107:20, 107:22, 109:12, 109:15, 109:19, 110:20, 111:12, 112:16, 112:19, 112:23, 113:3, 114:4, 114:9, 114:10, 114:12, 114:16, 114:22, 115:10, 116:5, 117:4, 117:14, 118:17, 118:21, 120:13, 121:9, 121:10, 121:14, 121:15, 122:4, 122:5, 122:10, 122:18, 122:20, 123:6, 123:9, 124:9, 124:14, 125:6, 125:9, 125:15, 125:20, 126:9, 127:9, 128:4, 128:5, 128:7, 128:9, 128:11, 128:13, 129:19, 129:20, 130:1, 130:5, 130:6,

130:11, 132:4, 132:6, 132:13, 132:16, 134:13, 134:21, 134:23, 134:24, 135:4, 135:21, 136:16, 136:22, 137:1, 137:3, 138:16, 139:4, 139:6, 139:7, 140:2, 140:11, 140:16, 140:17, 140:18, 140:21, 141:4, 141:11, 142:3, 143:3, 143:4, 143:5, 143:10, 143:11, 143:25, 144:12, 144:19, 145:1, 147:6, 148:8, 148:9, 148:14, 148:21, 149:3, 149:10, 150:12, 150:17, 151:15, 151:18, 151:19, 152:14, 152:16, 152:20, 153:13, 159:23, 160:14, 161:10, 161:16, 161:18, 163:16, 164:7, 164:10, 165:20, 167:6, 168:16, 168:22, 168:24, 168:25, 169:1, 169:2, 169:4, 169:9, 169:13, 169:21, 170:11, 170:21, 171:8, 171:11, 171:23, 172:1, 172:2, 172:8, 172:15, 172:18, 172:20, 172:22, 173:1, 173:5, 183:17, 184:9, 184:12, 184:18, 184:22, 185:22, 188:8, 190:12, 194:4, 194:19, 195:1, 195:18, 196:2, 196:18, 197:4, 197:16, 197:25, 199:17, 199:20, 199:22, 200:3, 200:11, 202:13, 202:21
**Government** [14] - 2:4, 3:15, 13:15, 51:2, 55:9, 106:23, 107:4, 123:18, 123:22, 124:6, 152:24, 159:14, 171:14, 171:18
**GOVERNMENT** [3] -

1:12, 2:11, 174:23
**GOVERNMENT'S** [1] -
3:3
**government's** [24] -
5:14, 7:13, 9:6,
11:20, 22:4, 27:8,
63:11, 77:18, 78:11,
82:10, 105:21,
109:16, 115:24,
131:10, 131:11,
136:10, 139:15,
140:19, 142:11,
148:25, 149:14,
153:15, 164:13,
195:21
**Government's** [10] -
20:18, 22:2, 22:7,
25:8, 25:10, 26:4,
27:6, 28:15, 31:15,
34:8
**Government...........**
[1] - 2:6
**governments** [3] -
106:21, 107:7,
117:25
**GPS** [4] - 186:25,
187:23, 191:16,
192:13
**graduate** [1] - 158:11
**granted** [3] - 119:4,
175:11, 178:10
**gray** [1] - 176:3
**great** [2] - 16:1,
203:21
**grossly** [1] - 181:10
**grounds** [1] - 197:24
**growth** [1] - 29:10
**guarantee** [4] - 153:4,
154:12, 162:12,
162:13
**guaranteed** [1] - 166:2
**guard** [2] - 107:18
**guarding** [1] - 74:20
**guess** [11] - 60:19,
64:12, 64:14, 64:15,
79:19, 111:9,
112:21, 144:11,
185:12, 193:5,
193:11
**guessing** [1] - 21:4
**guilty** [2] - 157:21,
157:23
**guy** [2] - 68:12, 78:20

### H

**hack** [3] - 106:22,
123:22, 197:5
**hacked** [2] - 123:19,
172:12

**hacker** [1] - 40:2
**hacking** [5] - 15:2,
15:3, 117:1, 124:3,
196:17
**hacks** [1] - 124:15
**half** [5] - 83:18, 84:6,
89:17, 104:10,
116:16
**half-dozen** [4] - 83:18,
84:6, 89:17, 104:10
**hallway** [1] - 6:23
**hand** [15] - 10:23,
22:16, 39:2, 44:21,
64:10, 74:18, 77:21,
83:22, 86:21, 88:21,
94:22, 95:3, 97:7,
128:8, 150:14
**handing** [1] - 130:21
**hands** [5] - 115:14,
124:14, 166:13,
171:3, 171:6
**hang** [1] - 132:22
**happy** [1] - 160:22
**hard** [11] - 21:10,
21:14, 21:20,
105:17, 106:14,
106:25, 108:19,
108:21, 117:2,
162:22, 163:1
**hard-end** [1] - 105:17
**Hardcore** [5] - 27:22,
31:23, 31:25, 38:8,
44:25
**hardcore** [1] - 29:19
**hardwired** [2] - 44:7,
44:16
**harvest** [7] - 87:1,
90:6, 140:20, 144:2,
146:11, 148:1,
148:14
**harvested** [12] - 88:24,
89:18, 90:16,
137:24, 141:1,
147:12, 148:2,
148:4, 151:1,
184:14, 194:15
**harvesting** [1] - 77:20
**harvests** [1] - 86:9
**Hayden** [3] - 1:23,
205:3, 205:17
**HC** [1] - 29:18
**headquarters** [2] -
5:16, 14:12
**hear** [3] - 7:7, 59:6,
92:5
**heard** [9] - 15:25,
102:8, 109:10,
112:24, 150:12,
151:22, 177:22,
197:10, 203:1

**hearing** [11] - 4:8, 5:3,
7:9, 49:16, 49:19,
49:24, 56:15, 67:19,
69:4, 69:22, 146:24
**HEARING** [2] - 1:9,
2:1
**hearings** [1] - 39:2
**heat** [1] - 195:20
**heavily** [3] - 31:6,
73:6, 75:14
**held** [3] - 179:21,
180:1, 205:8
**help** [13] - 72:18,
76:17, 85:17, 87:16,
90:11, 90:12, 91:21,
95:2, 124:23,
142:23, 143:23,
165:17, 174:2
**helpful** [1] - 119:22
**helping** [1] - 161:21
**hereby** [1] - 205:5
**Herring** [1] - 181:18
**hidden** [5] - 16:22,
16:24, 17:1, 17:5,
17:6, 17:8, 17:10,
17:13, 17:14, 17:15,
17:21, 18:16, 18:21,
19:2, 19:15, 19:18,
21:11, 21:12, 21:13,
21:21, 32:18, 36:17,
37:13, 53:19, 70:11,
70:17, 101:6, 101:7,
101:8, 101:10,
163:14
**hide** [5] - 102:1, 102:5,
103:5, 138:13,
163:15
**high** [5] - 92:20,
165:22, 166:16,
166:20, 170:14
**high-level** [1] - 166:20
**highway** [1] - 119:16
**history** [1] - 118:17
**hit** [5] - 116:7, 167:6,
169:8, 169:10,
169:13
**hitting** [1] - 116:2
**hole** [5] - 118:1, 118:4,
118:6, 120:11, 123:7
**holes** [1] - 145:12
**home** [20] - 34:9, 35:5,
43:23, 44:1, 99:16,
119:20, 125:19,
128:16, 130:17,
135:21, 135:23,
136:5, 138:17,
138:21, 139:3,
139:18, 140:15,
141:6, 179:17
**Home** [1] - 3:6

**homepage** [7] - 25:13,
35:8, 54:23, 54:24,
103:22, 162:8, 169:3
**honest** [2] - 162:14,
173:24
**Honor** [106] - 5:14,
5:23, 6:2, 6:4, 13:16,
13:23, 22:1, 25:7,
25:9, 27:5, 27:7,
31:13, 31:16, 40:3,
49:14, 50:3, 50:13,
50:16, 52:10, 52:22,
56:13, 56:22, 56:24,
65:23, 66:23, 67:10,
67:20, 67:23, 68:22,
69:10, 70:2, 71:5,
71:19, 71:21, 72:15,
74:10, 74:17, 75:6,
76:8, 78:24, 79:19,
80:11, 80:15, 80:24,
81:23, 85:11, 85:16,
85:22, 88:7, 88:12,
89:1, 89:6, 89:11,
89:15, 90:10, 90:19,
90:25, 93:6, 93:11,
93:18, 93:22, 96:17,
96:20, 96:22, 96:24,
97:1, 97:12, 111:16,
118:11, 118:12,
119:1, 119:23,
127:17, 128:21,
128:25, 130:18,
132:17, 132:25,
133:2, 137:13,
138:1, 141:19,
144:11, 146:25,
152:1, 152:3,
153:16, 169:16,
169:18, 173:11,
174:6, 174:8,
174:13, 174:20,
178:8, 180:11,
182:7, 183:12,
183:14, 184:17,
187:1, 187:19,
187:24, 189:20,
192:22, 194:16
**honor** [1] - 5:21
**HONORABLE** [1] - 1:9
**hop** [1] - 135:3
**hope** [2] - 149:11,
153:13
**hopefully** [1] - 8:22
**hoping** [1] - 150:17
**Hopkins** [1] - 98:14
**horrible** [1] - 166:11
**host** [3] - 17:22,
86:12, 88:25
**hosted** [1] - 33:8
**Hosting** [6] - 122:3,

122:11, 122:18,
124:22, 168:21,
172:22
**hosting** [4] - 33:6,
34:1, 53:14, 122:2
**hostname** [2] - 41:12,
63:5, 96:1
**hotel** [1] - 98:7
**hour** [1] - 69:7
**hours** [5] - 34:10,
35:1, 40:15, 41:19,
42:4
**house** [16] - 47:21,
84:13, 90:14,
107:18, 107:21,
137:11, 138:4,
138:8, 138:13,
144:7, 148:24,
158:23, 194:13,
195:21, 195:25,
196:7
**House** [2] - 168:17,
171:15
**household** [3] - 43:15,
43:18, 141:2
**Houston** [1] - 116:10
**human** [4] - 107:23,
128:2, 132:2, 132:9
**human-readable** [2] -
132:2, 132:9
**humans** [2] - 106:9,
106:10, 108:1
**hundred** [2] - 6:13,
108:8
**hundreds** [6] - 16:5,
73:2, 115:17, 121:7,
123:15, 124:10
**hung** [1] - 71:9
**hunt** [1] - 118:4
**hurdle** [2] - 200:6,
200:12
**husband** [1] - 138:5

### I

**ID** [4] - 9:4, 87:19,
87:22, 189:4
**idea** [5] - 24:3, 32:24,
34:23, 156:2, 179:4
**identical** [1] - 64:3
**identification** [2] -
22:7, 127:21
**identified** [12] - 36:6,
63:2, 65:9, 72:12,
72:21, 74:19, 84:2,
84:21, 85:7, 104:2,
111:24, 164:25
**identifier** [6] - 44:5,
44:17, 112:10,
112:14, 112:17,

180:7
**identifier's** [1] -
112:18
**identify** [22] - 32:19,
32:20, 33:11, 33:14,
36:21, 37:7, 37:18,
43:4, 45:18, 47:7,
47:15, 57:9, 76:2,
76:10, 95:11,
100:17, 100:22,
116:17, 116:23,
164:15, 164:22,
168:20
**identifying** [8] - 9:10,
17:9, 59:20, 78:15,
88:18, 113:2,
172:16, 182:9
**identities** [2] - 9:20,
10:3
**identity** [8] - 10:9,
105:11, 125:20,
146:14, 163:10,
175:1, 178:18, 179:2
**ignore** [1] - 181:17
**ignored** [1] - 159:9
**III** [5] - 81:12, 81:18,
82:3, 82:7, 82:23
**IIIs** [1] - 81:21
**illegal** [8] - 21:14,
23:14, 24:5, 84:24,
161:23, 164:1,
164:3, 174:25
**illegally** [1] - 164:2
**illegitimate** [1] - 163:6
**illustration** [1] - 194:9
**image** [2] - 23:7, 56:5
**images** [12] - 4:13,
11:5, 22:17, 28:9,
28:17, 29:12, 30:12,
32:4, 32:11, 32:12,
41:1
**imagine** [1] - 171:19
**immediately** [4] -
32:12, 58:8, 58:10,
87:14
**immune** [1] - 178:18
**impact** [2] - 7:1, 61:10
**impersonated** [3] -
114:12, 115:2,
125:16
**implementation** [1] -
38:2
**implying** [2] - 51:25,
70:20
**importance** [4] -
33:22, 94:17,
126:14, 144:17
**important** [18] - 89:5,
113:19, 114:25,
115:18, 120:4,

123:3, 134:7,
134:19, 134:20,
136:15, 136:16,
138:15, 139:24,
141:14, 197:18,
200:1, 203:22
**importantly** [1] - 34:11
**impossible** [5] -
23:20, 57:13,
102:10, 102:14,
102:23
**improper** [1] - 12:16
**impropriety** [1] -
77:22
**improvements** [1] -
101:17
**IN** [2] - 133:18, 133:22
**inadvertently** [2] -
118:18, 124:5
**inapplicable** [1] -
191:24
**inception** [2] - 201:20,
201:25
**incident** [3] - 11:6,
11:19, 11:20
**include** [5] - 22:23,
24:6, 40:21, 148:13,
149:23
**included** [1] - 82:3
**including** [5] - 15:1,
30:16, 40:6, 98:21,
106:23
**inconsistent** [1] -
181:17
**incorrect** [2] - 155:22,
156:1
**incredibly** [1] - 20:14
**independent** [1] -
40:12
**independently** [1] -
33:6
**INDEX** [1] - 3:1
**index** [10] - 19:13,
27:14, 27:16, 28:16,
28:18, 28:19, 29:20,
44:24, 70:22, 203:3
**Index** [1] - 3:8
**indexes** [2] - 203:3,
203:5
**Indiana** [2] - 98:15,
158:6
**indicate** [1] - 23:10
**indicated** [3] - 30:11,
34:24, 174:15
**indicates** [1] - 12:14
**indicating** [3] - 23:5,
35:3, 55:1
**indication** [1] - 65:13
**indicative** [2] - 27:18,
51:8

**indicted** [1] - 4:9
**indictment** [1] - 7:14
**individual** [16] - 37:25,
48:3, 54:10, 63:24,
65:18, 65:22, 66:9,
66:18, 89:7, 90:3,
95:4, 95:6, 95:8,
96:7, 112:22, 196:21
**individual's** [1] - 48:8
**individuals** [21] - 15:7,
39:6, 53:13, 57:14,
58:22, 65:14, 66:6,
67:3, 72:6, 72:11,
72:20, 73:18, 74:19,
74:21, 75:3, 75:11,
75:23, 76:11, 131:3,
196:17
**industry** [1] - 160:6
**infected** [4] - 135:22,
189:8, 191:10, 192:5
**infection** [1] - 189:17
**infirmity** [2] - 76:21,
198:8
**inform** [1] - 202:12
**informant** [2] - 79:8,
79:13
**informatics** [1] - 98:13
**information** [179] -
4:22, 9:10, 10:8,
10:23, 11:11, 11:15,
17:9, 27:1, 33:5,
33:7, 35:21, 36:20,
40:11, 40:13, 40:14,
40:17, 40:21, 41:11,
41:14, 41:24, 42:13,
43:6, 45:12, 45:14,
45:16, 45:23, 47:3,
47:6, 47:19, 48:17,
48:19, 49:18, 51:11,
53:7, 59:21, 61:7,
62:9, 62:11, 62:13,
62:16, 63:1, 63:7,
63:13, 63:21, 64:1,
64:4, 68:1, 69:6,
72:23, 73:9, 73:25,
74:8, 75:7, 75:13,
76:14, 76:22, 77:20,
78:1, 78:9, 79:16,
80:2, 80:3, 80:7,
81:8, 83:16, 83:17,
83:20, 83:21, 83:23,
83:25, 84:2, 84:7,
84:9, 84:10, 84:20,
85:6, 85:14, 86:8,
86:19, 86:24, 87:1,
88:19, 88:23, 89:5,
89:8, 89:17, 89:18,
89:24, 90:4, 90:7,
90:16, 91:6, 91:17,
92:7, 92:14, 92:16,

93:3, 94:4, 94:15,
105:5, 105:15,
109:25, 110:3,
110:4, 110:15,
111:15, 112:15,
113:10, 113:12,
114:20, 114:22,
114:25, 115:21,
116:13, 116:15,
117:6, 118:18,
120:5, 123:14,
125:24, 126:6,
126:11, 127:1,
127:3, 127:6, 127:9,
128:14, 128:19,
129:7, 129:12,
129:22, 130:10,
133:13, 134:21,
136:9, 139:25,
144:4, 144:6,
144:16, 144:22,
145:9, 145:20,
145:25, 146:13,
147:12, 148:3,
148:19, 149:2,
150:19, 150:22,
151:13, 170:5,
172:19, 173:2,
180:6, 181:23,
184:9, 184:13,
186:5, 191:5, 191:6,
191:9, 191:21,
191:23, 192:24,
193:3, 194:19,
195:14, 195:23,
196:2, 196:4,
196:12, 196:21,
198:25, 201:5,
201:6, 202:23
**informed** [4] - 49:3,
49:6, 49:8, 100:6
**init** [1] - 192:17
**initiate** [1] - 88:14
**initiates** [1] - 193:7
**innocent** [13] - 24:4,
115:16, 116:2,
116:6, 124:3, 126:4,
126:7, 157:23,
165:5, 167:6,
168:20, 169:5, 169:7
**inquire** [2] - 50:2,
97:11
**inquiry** [3] - 69:15,
69:20, 82:5
**inside** [9] - 23:24,
24:1, 107:21, 130:8,
140:19, 186:18,
189:3, 190:24, 196:7
**install** [3] - 19:8,
188:3, 196:10

**installation** [4] -
189:14, 189:22,
191:22, 193:21
**installed** [7] - 120:17,
189:25, 190:2,
191:13, 192:13,
192:14
**instance** [3] - 78:2,
84:1, 144:1
**instances** [5] - 32:12,
46:9, 62:15, 91:19,
91:24
**instantaneous** [1] -
86:10
**instantaneously** [1] -
86:10
**instructed** [1] - 153:17
**instructions** [6] -
26:15, 60:21, 86:16,
107:14, 109:23,
111:13
**instructive** [1] -
175:13
**instructor** [1] - 15:18
**instrument** [1] - 193:1
**integrity** [3] - 170:25,
171:2, 171:21
**intends** [3] - 5:8,
111:12, 115:10
**intent** [1] - 36:7
**intentional** [2] -
177:14, 178:2
**intentionally** [3] -
80:3, 186:1, 186:12
**intercepted** [2] -
151:8, 170:3
**interest** [4] - 33:20,
158:10, 158:22,
159:1
**interested** [2] - 30:8,
89:22
**interesting** [5] - 90:11,
122:3, 143:21,
146:23, 156:15
**internal** [12] - 136:2,
136:14, 138:16,
138:17, 138:19,
138:22, 139:1,
139:6, 139:20,
141:5, 142:11, 172:3
**internally** [1] - 136:3
**international** [1] -
76:9
**internationally** [1] -
71:14
**Internet** [91] - 9:18,
9:19, 9:20, 10:4,
16:4, 16:5, 16:9,
16:10, 16:12, 16:23,
17:3, 18:25, 19:17,

42:18, 42:20, 42:21,
42:22, 43:1, 43:3,
43:7, 43:10, 43:11,
43:13, 43:17, 43:21,
43:22, 43:24, 43:25,
44:10, 44:14, 47:2,
47:5, 47:15, 48:9,
48:11, 48:15, 48:17,
53:12, 53:17, 53:25,
54:3, 69:14, 70:25,
74:12, 74:15, 85:20,
89:9, 89:12, 89:19,
91:7, 91:18, 92:10,
100:12, 101:1,
103:12, 103:13,
103:19, 115:11,
121:16, 131:20,
131:21, 135:2,
136:24, 137:7,
137:8, 138:2, 138:9,
139:4, 139:10,
140:13, 141:3,
143:15, 146:15,
149:11, 150:13,
150:22, 162:17,
162:20, 163:24,
164:19, 171:2,
172:6, 179:22,
180:5, 180:10,
180:12, 188:22,
189:5, 193:25,
196:11, 203:2
**interpretation** [2] -
82:10, 133:8
**interpreted** [1] -
175:21
**interpreting** [1] -
143:1
**interrupt** [3] - 133:10,
141:18, 143:20
**interstate** [3] - 119:12,
188:22, 190:22
**Interstate** [1] - 188:17
**interview** [1] - 11:20
**introduce** [2] - 5:12,
5:25
**invalid** [1] - 201:19
**invalidate** [1] - 78:10
**invasion** [1] - 120:6
**invasive** [1] - 195:20
**invented** [1] - 87:19
**investigate** [5] - 15:7,
166:12, 172:10,
175:10, 175:16
**investigated** [2] -
14:25, 101:25
**investigating** [4] -
45:13, 187:12,
189:12, 197:6
**investigation** [22] -

8:2, 8:9, 15:12, 18:1,
24:21, 33:9, 67:9,
70:5, 73:10, 73:16,
75:7, 76:10, 82:13,
82:22, 88:1, 115:5,
158:24, 159:1,
168:21, 174:24,
179:10, 181:17
**Investigation** [2] -
14:11, 14:16
**investigations** [7] -
15:16, 71:13, 72:14,
73:4, 73:23, 74:2,
101:24
**Investigative** [1] -
14:12
**investigative** [9] -
7:24, 8:20, 17:25,
33:1, 37:3, 37:17,
101:21, 103:25,
146:2
**investigators** [2] -
90:1, 101:23
**invited** [1] - 6:22
**involved** [11] - 18:2,
46:10, 74:8, 81:11,
81:13, 81:14, 82:6,
83:10, 104:17,
156:16, 158:3
**involves** [1] - 180:6
**involving** [10] - 15:16,
15:19, 30:24, 38:20,
51:9, 117:9, 117:10,
119:25, 157:12,
200:23
**IP** [170] - 9:9, 9:10,
9:20, 10:19, 10:20,
10:22, 11:16, 16:18,
17:8, 17:13, 41:11,
42:16, 42:17, 42:20,
42:24, 43:3, 43:4,
43:8, 43:13, 43:21,
43:24, 44:1, 44:13,
45:17, 46:21, 46:24,
47:5, 47:6, 47:10,
47:11, 47:14, 47:22,
47:24, 48:1, 48:2,
48:10, 48:13, 53:15,
53:25, 74:9, 74:22,
74:23, 75:2, 75:5,
75:19, 76:18, 77:3,
77:6, 77:9, 77:12,
77:13, 77:15, 88:18,
89:3, 89:13, 89:21,
89:22, 89:23, 90:2,
90:8, 90:19, 92:11,
92:15, 92:17, 92:23,
92:25, 93:1, 93:2,
94:16, 103:21,
105:9, 105:14,

113:13, 127:11,
129:8, 129:10,
129:12, 129:14,
129:15, 129:18,
129:20, 130:7,
130:12, 130:13,
130:16, 133:7,
134:17, 134:18,
134:19, 134:20,
135:21, 135:23,
135:25, 136:2,
136:8, 136:9,
136:10, 137:9,
137:10, 137:23,
138:3, 138:13,
138:18, 138:22,
139:1, 139:5,
139:11, 139:12,
139:14, 139:22,
140:21, 141:1,
141:8, 141:13,
141:14, 141:24,
141:25, 142:6,
142:10, 144:2,
144:17, 144:21,
145:5, 146:12,
146:14, 147:3,
147:11, 147:13,
147:21, 148:1,
148:13, 148:15,
148:17, 148:19,
148:21, 148:22,
149:2, 149:4,
149:20, 149:22,
150:2, 150:8,
150:10, 150:13,
150:15, 150:19,
151:1, 151:11,
151:13, 151:16,
164:13, 180:2,
180:7, 182:16,
193:25, 196:3,
196:5, 196:16,
196:22, 196:23,
198:1, 198:8, 198:10
**iPad** [1] - 138:6
**iPhone** [1] - 170:9
**Iranian** [2] - 123:19,
123:22
**irrelevant** [3] - 64:18,
64:20, 65:24
**ISP** [1] - 140:22
**Israel** [1] - 123:19
**issuance** [2] - 12:5,
81:16
**issue** [33] - 5:5, 5:6,
6:15, 9:1, 12:8, 13:4,
13:7, 47:14, 49:21,
68:5, 76:23, 82:12,
83:9, 114:6, 144:10,

146:24, 156:8,
156:13, 158:19,
159:6, 159:9,
173:13, 176:6,
177:6, 178:4,
179:20, 182:5,
184:6, 186:25,
191:3, 197:15,
200:15, 201:13
**issued** [10] - 11:13,
11:17, 11:24, 77:25,
79:17, 120:21,
140:21, 184:25,
199:14, 201:8
**issues** [13] - 4:23, 6:4,
7:2, 12:1, 12:3,
118:22, 126:16,
156:15, 156:17,
158:3, 175:18,
178:23, 203:22
**issuing** [7] - 13:2,
77:23, 77:24, 77:25,
182:21, 189:23,
190:18
**items** [6] - 41:6, 41:7,
63:2, 83:18, 84:7,
89:3
**itself** [5] - 9:7, 10:17,
21:12, 35:14, 122:22

## J

**jailbait** [2] - 29:7, 29:8
**jam** [1] - 126:4
**James** [1] - 98:12
**Jean** [18] - 4:3, 4:5,
4:8, 4:11, 7:14, 7:23,
11:7, 11:20, 12:13,
47:17, 49:6, 64:18,
65:25, 74:7, 78:16,
95:24, 140:21,
188:16
**JEAN** [1] - 1:6
**Jean's** [22] - 10:17,
11:3, 11:16, 11:18,
60:9, 62:19, 62:20,
92:18, 94:5, 94:11,
95:25, 96:5, 99:25,
130:12, 141:1,
141:6, 141:25,
142:3, 142:9,
147:11, 150:10,
178:16
**jeopardize** [1] - 73:22
**Jersey** [1] - 98:22
**job** [2] - 15:23, 181:7
**Joe** [1] - 50:19
**Joe_Alfaro@fd.org**
[1] - 1:21
**Johns** [1] - 98:14

**join** [1] - 102:7
**Jose** [1] - 1:18
**journalistic** [1] - 76:15
**journals** [1] - 98:19
**judge** [82] - 8:17, 9:1,
10:6, 10:11, 10:15,
11:14, 12:7, 13:1,
15:25, 49:11, 57:5,
79:6, 79:16, 80:4,
80:23, 81:11, 81:16,
81:20, 81:24, 82:6,
82:7, 82:11, 82:15,
82:17, 82:19, 82:20,
82:21, 83:1, 83:3,
83:6, 83:7, 83:9,
83:12, 83:19, 100:6,
111:19, 115:9,
115:24, 116:2,
116:3, 119:8,
124:11, 133:12,
135:13, 135:17,
143:25, 144:14,
145:17, 146:10,
146:20, 165:21,
166:5, 166:16,
166:21, 167:2,
175:11, 182:21,
182:24, 182:25,
183:21, 184:12,
184:20, 184:23,
185:13, 185:15,
186:12, 186:21,
187:15, 188:2,
191:15, 194:2,
194:10, 197:21,
198:12, 199:3,
199:14, 200:8,
201:1, 201:12,
203:13
**Judge** [43] - 11:1,
11:17, 38:23, 52:13,
55:25, 56:11, 57:2,
76:25, 79:11, 79:24,
91:14, 93:5, 112:2,
116:10, 133:16,
133:19, 135:10,
168:7, 168:11,
173:14, 183:17,
184:2, 185:12,
185:19, 186:8,
190:10, 191:3,
191:12, 191:25,
192:7, 196:15,
196:25, 197:9,
197:24, 198:3,
198:14, 198:20,
199:20, 200:18,
201:22, 202:7,
203:12, 203:14
**judge's** [5] - 12:11,

13:8, 135:14, 177:2,
198:11
**judges** [12] - 6:13,
6:21, 12:6, 99:19,
115:21, 117:7,
118:23, 125:24,
166:6, 186:18,
186:23, 197:14
**judgment** [1] - 144:24
**Judicial** [2] - 99:21,
205:11
**judicial** [7] - 6:11,
6:14, 81:3, 81:5,
99:5, 165:19, 197:13
**judiciary** [1] - 115:5
**July** [3] - 14:18, 14:20,
205:12
**jump** [1] - 35:13,
188:22
**jumped** [3] - 188:16,
188:22, 190:22
**June** [2] - 1:10, 2:3
**jurisdiction** [4] - 12:8,
181:15, 187:17,
201:14
**jurisdictional** [2] -
200:9, 200:16
**jury** [2] - 68:9, 68:17
**Justice** [1] - 99:11
**justifying** [1] - 172:8

## K

**Kansas** [2] - 176:23,
200:22
**Kay** [1] - 154:5
**keep** [2] - 21:3, 118:23
**keeping** [3] - 107:18,
112:23, 118:19
**kept** [1] - 101:10
**key** [2] - 152:23,
175:18
**kick** [1] - 133:20
**kicked** [1] - 161:2
**kicking** [1] - 196:13
**kicks** [1] - 114:1
**kids** [1] - 30:20
**kind** [12] - 18:18,
56:15, 56:16, 98:8,
107:12, 117:24,
121:8, 137:17,
146:8, 165:9, 174:4
**kinds** [10] - 120:15,
129:4, 157:19,
157:24, 170:7
**Kinky** [1] - 30:15
**knock** [1] - 189:2
**knocked** [3] - 189:5,
189:15, 189:24
**knocking** [4] - 190:1,

192:4, 193:11,
193:14
**knocks** [1] - 191:8
**knowing** [16] - 4:11,
20:16, 24:5, 72:19,
76:17, 76:22, 79:8,
95:17, 149:3, 149:8,
149:15, 151:15,
169:4, 179:3,
182:14, 182:17
**knowingly** [1] - 4:13
**knowledge** [15] -
19:12, 46:5, 53:4,
83:14, 83:16, 84:4,
95:22, 119:9,
132:15, 142:13,
168:19, 169:6,
172:14, 175:5,
180:15
**known** [23] - 7:16,
9:15, 9:25, 79:20,
79:21, 95:6, 95:9,
95:10, 95:19, 95:24,
96:2, 96:8, 103:20,
120:16, 120:22,
123:13, 136:24,
147:7, 152:21,
178:24, 181:16,
181:25
**knows** [1] - 199:23
**Kyllo** [1] - 195:17

## L

**Lab** [2] - 101:14,
101:16
**labeled** [2] - 11:8,
30:15
**lack** [2] - 38:12, 114:6
**laid** [2] - 10:5, 177:25
**language** [6] - 31:2,
31:3, 31:6, 50:25,
115:9, 167:1
**laptop** [13] - 4:13,
17:16, 17:18, 33:22,
33:24, 34:14, 35:9,
44:7, 44:15, 54:21,
54:23, 54:25, 55:3
**large** [2] - 118:7,
187:6
**larger** [1] - 73:11
**largest** [1] - 101:19
**last** [12] - 6:11, 14:7,
31:10, 56:24, 71:8,
71:10, 97:18,
126:10, 126:12,
153:24, 168:17,
171:12
**lastly** [1] - 202:7
**latest** [1] - 120:17

**latter** [1] - 102:18
**law** [40] - 4:12, 4:14,
7:4, 8:2, 8:11, 8:15,
9:11, 11:1, 12:13,
12:18, 21:6, 39:14,
39:22, 53:8, 72:23,
74:19, 75:25, 79:21,
83:15, 83:17, 98:15,
98:19, 115:16,
122:23, 154:5,
154:10, 165:14,
166:8, 175:9, 176:3,
177:17, 178:6,
178:22, 180:21,
181:14, 182:9,
182:19, 184:5,
185:21, 187:12
**law-abiding** [2] -
115:16, 122:23
**lawful** [1] - 182:13
**lawyer** [2] - 170:21,
174:3
**lawyers** [2] - 157:24,
161:21
**lay** [2] - 111:17,
118:20
**layer** [1] - 195:16
**laying** [1] - 119:2
**layman** [1] - 76:25
**layman's** [3] - 43:19,
111:8, 111:9
**layperson** [1] - 114:3
**lead** [4] - 5:17, 10:9,
65:20, 164:11
**leading** [2] - 35:1,
98:19
**learn** [1] - 19:3
**learned** [5] - 104:9,
114:11, 129:20,
130:5, 130:6
**least** [21] - 7:13, 11:8,
25:25, 68:25, 74:7,
118:18, 118:19,
122:19, 136:9,
139:13, 139:15,
139:19, 139:23,
141:10, 147:6,
148:20, 148:24,
150:16, 151:12,
151:14, 173:1
**leave** [2] - 133:19,
187:17
**leaves** [1] - 188:12
**leaving** [3] - 55:17,
55:24, 68:21
**led** [7] - 11:15, 11:16,
11:17, 12:13,
147:15, 148:24,
201:9
**left** [18] - 22:16, 49:10,

61:9, 68:3, 87:12,
87:14, 136:23,
138:23, 140:14,
140:15, 143:17,
150:14, 159:18,
164:8, 180:20,
186:8, 190:2, 190:25
**left-hand** [2] - 22:16,
150:14
**legal** [11] - 39:24,
51:12, 51:13, 73:13,
84:24, 99:2, 104:18,
111:18, 160:8,
160:20, 203:8
**legislation** [1] -
200:11
**legislative** [2] - 99:4,
154:6
**legitimate** [3] - 9:23,
163:4, 163:5
**legs** [1] - 22:20
**Leon** [1] - 201:24
**less** [4] - 67:4, 91:23,
170:24, 170:25
**letter** [13] - 115:7,
129:23, 129:24,
129:25, 130:9,
140:24, 148:5,
148:6, 150:6, 151:9,
198:23, 199:14
**level** [9] - 19:11,
41:23, 77:14, 92:19,
92:20, 165:22,
166:16, 166:20,
170:14
**levels** [1] - 179:18
**Levin** [4] - 157:1,
176:12, 188:2,
201:22
**Liberties** [1] - 97:22
**liberties** [1] - 199:21
**likely** [5] - 87:9, 91:23,
172:12, 172:13
**liken** [1] - 196:1
**limited** [3] - 86:24,
182:8, 182:20
**linchpin** [1] - 77:2
**line** [13] - 29:22,
29:23, 51:10, 56:14,
56:24, 134:14,
136:1, 142:4, 142:5,
142:8, 147:3, 166:17
**lines** [4] - 24:18,
106:12, 193:8, 193:9
**link** [19] - 11:12,
12:12, 18:10, 19:10,
21:8, 21:9, 22:9,
22:10, 22:15, 23:7,
23:8, 24:13, 25:21,
26:8, 31:23, 31:24,

32:11, 52:7, 77:5
**linked** [1] - 21:15
**links** [12] - 18:7, 18:8,
19:12, 19:14, 20:7,
20:9, 21:12, 27:23,
28:9, 30:12, 70:21,
90:3
**Linux** [1] - 113:11
**lion** [1] - 118:2
**list** [5] - 19:14, 20:3,
20:9, 38:9, 158:22
**listed** [3] - 20:2, 29:24,
30:6
**listening** [1] - 103:1
**lists** [2] - 19:16, 19:21
**live** [1] - 188:21
**load** [1] - 190:24
**loaded** [1] - 132:6
**loads** [1] - 87:10
**locally** [1] - 10:24
**locate** [2] - 16:20,
197:12
**located** [43] - 7:24,
7:25, 14:14, 18:14,
21:23, 32:19, 34:4,
36:10, 36:12, 47:18,
62:14, 76:6, 121:19,
121:21, 167:5,
167:10, 167:24,
176:19, 178:24,
179:5, 181:23,
182:17, 183:20,
184:3, 184:8,
184:22, 185:3,
185:4, 185:7, 185:9,
185:16, 185:23,
186:2, 186:5,
186:14, 188:6,
188:9, 188:14,
188:20, 189:6,
189:19, 192:12,
192:20
**location** [14] - 10:9,
17:14, 21:3, 33:5,
37:15, 57:10, 101:5,
101:9, 103:5,
105:11, 105:24,
121:19, 163:15
**log** [13] - 22:13, 25:12,
25:17, 27:10, 27:11,
38:4, 41:12, 88:13,
113:9, 131:12,
163:21, 167:4
**log-on** [1] - 41:12
**logged** [21] - 33:24,
34:1, 35:10, 40:16,
41:20, 42:4, 44:22,
46:7, 46:11, 55:3,
59:8, 59:15, 65:7,
65:12, 78:7, 127:7,

138:20, 148:5,
167:10, 167:23,
202:19
**logging** [6] - 27:13,
38:18, 57:10, 58:24,
59:9, 202:22
**login** [2] - 24:23,
169:3
**logo** [23] - 22:19,
22:21, 25:4, 34:12,
34:16, 34:23, 34:25,
35:4, 35:7, 35:11,
35:12, 35:22, 35:23,
35:25, 36:4, 55:6,
55:8, 55:9, 55:12,
56:12, 56:16
**logs** [5] - 37:22, 59:20,
59:23, 85:22, 195:3
**look** [17] - 20:19,
48:11, 54:1, 84:23,
108:21, 108:25,
111:23, 114:4,
127:22, 145:1,
152:7, 166:17,
174:5, 183:25,
184:25, 185:20,
203:6
**looked** [4] - 127:13,
148:15, 169:11,
183:3
**looking** [12] - 20:21,
22:8, 28:14, 29:20,
34:8, 84:6, 117:20,
129:20, 130:7,
130:8, 175:6, 180:14
**looks** [4] - 18:24,
26:23, 73:8, 150:5
**lose** [2] - 165:14,
166:11
**losing** [1] - 173:12
**loss** [1] - 178:3
**lost** [2] - 173:6, 184:15
**love** [1] - 30:20
**loved** [1] - 126:5
**loves** [1] - 102:4
**low** [1] - 92:19
**low-level** [1] - 92:19
**lucky** [2] - 152:7,
152:12

**M**

**M-a-g-a-n-a** [1] -
176:24
**MAC** [16] - 41:11,
44:3, 44:5, 44:10,
44:11, 44:14, 63:3,
84:16, 96:1, 110:1,
113:4, 113:5, 127:5,
128:16, 130:9, 148:2

**Mac** [1] - 113:11
**machine** [2] - 1:22,
128:6
**Madison** [1] - 98:12
**Magana** [1] - 176:24
**Magistrate** [2] - 11:1,
116:10
**magistrate** [50] - 8:17,
9:1, 10:6, 10:11,
10:15, 11:13, 12:6,
12:7, 12:11, 13:1,
13:7, 36:8, 38:14,
80:4, 80:23, 82:11,
82:17, 82:19, 82:25,
83:2, 83:9, 83:12,
83:19, 116:3, 119:8,
144:14, 145:10,
145:18, 146:9,
146:20, 175:11,
175:23, 176:10,
177:19, 178:4,
178:23, 179:13,
180:24, 181:5,
182:21, 182:24,
183:8, 183:9,
184:12, 186:23,
187:15, 188:2,
191:14, 199:3,
201:12
**magnitude** [1] - 72:20
**magnitudes** [2] -
72:17, 78:8
**Mail** [4] - 122:21,
122:24, 169:2, 169:5
**mail** [9] - 26:18, 26:20,
26:22, 26:23,
119:25, 122:21,
122:22, 200:25,
201:3
**main** [4] - 135:9,
135:12, 135:20,
163:9
**maintain** [1] - 10:12
**maintained** [1] - 8:7
**Major** [1] - 14:13
**major** [1] - 15:6
**majority** [4] - 17:25,
31:8, 59:18, 176:5
**malfunctions** [1] -
166:23
**malicious** [7] - 39:5,
39:10, 39:15, 39:18,
39:19, 39:22, 166:14
**malware** [16] - 8:21,
9:3, 9:5, 9:7, 9:13,
10:16, 12:25, 38:24,
39:4, 39:8, 39:18,
109:11, 109:13,
114:13, 189:8
**man** [1] - 157:17

**managed** [1] - 76:5
**Management** [2] -
106:24, 171:12
**management** [1] - 8:5
**mandated** [1] - 164:18
**manner** [14] - 7:21,
8:11, 17:3, 34:21,
39:24, 71:18, 84:19,
94:9, 94:18, 123:7,
150:25, 152:13,
201:8
**manually** [1] - 19:22
**Manuel** [1] - 1:18
**March** [2] - 40:18, 42:3
**margin** [1] - 156:14
**marked** [4] - 20:18,
110:25, 127:20,
130:21
**market** [1] - 121:6
**Maryland** [10] - 14:14,
14:21, 15:5, 153:3,
153:11, 154:4,
170:11, 201:1,
201:5, 201:13
**mask** [3] - 101:4,
175:1, 178:17
**masked** [1] - 9:21
**mass** [1] - 196:17
**Massachusetts** [2] -
98:22, 157:1
**master's** [1] - 98:12
**material** [17] - 23:13,
23:18, 23:25, 24:1,
24:4, 24:5, 24:7,
24:11, 27:19, 30:8,
35:13, 46:17, 54:4,
55:23, 68:18, 86:15
**materials** [1] - 100:1
**matter** [25] - 4:1, 4:7,
4:15, 39:1, 44:21,
53:21, 54:2, 54:5,
64:10, 67:15, 83:21,
85:17, 86:20, 88:21,
94:22, 95:3, 139:7,
143:2, 173:8, 176:6,
177:7, 195:8,
196:22, 197:17,
205:9
**matter's** [1] - 68:8
**matters** [6] - 15:1,
15:17, 15:19,
196:23, 197:18,
197:19
**mean** [36] - 22:25,
29:7, 30:2, 52:14,
52:16, 60:10, 76:13,
77:18, 78:13, 79:18,
89:8, 101:13,
103:10, 116:19,
119:12, 137:21,

155:15, 157:19,
164:17, 165:2,
165:6, 165:12,
168:5, 168:8, 169:8,
169:10, 171:4,
178:11, 187:4,
188:15, 189:25,
192:4, 192:17,
194:3, 195:22,
199:10
**meaning** [7] - 39:11,
39:19, 77:11, 186:2,
186:14, 200:8,
201:25
**means** [11] - 33:1,
43:19, 52:1, 52:3,
52:7, 75:25, 109:19,
137:12, 155:2,
175:25, 178:21
**meant** [2] - 49:15,
103:20
**measure** [1] - 74:24
**meat** [1] - 107:19
**mechanism** [4] -
59:24, 62:2, 62:3,
193:14
**media** [4] - 68:2,
68:12, 69:3, 69:12
**meet** [1] - 159:11
**meeting** [1] - 159:24
**meets** [1] - 203:8
**Mellon** [1] - 116:17
**member** [1] - 95:22
**members** [7] - 36:21,
37:7, 68:17, 69:22,
73:6, 79:14, 95:12
**mention** [1] - 62:5
**mentioned** [5] - 6:10,
55:13, 71:24, 117:3,
202:3
**merely** [2] - 46:7,
148:15
**mess** [1] - 150:23
**message** [3] - 26:10,
27:15, 46:1
**messages** [1] - 131:14
**messed** [1] - 170:6
**messing** [1] - 172:5
**met** [6] - 6:9, 64:6,
65:8, 66:2, 161:13,
177:25
**method** [5] - 23:21,
37:17, 114:7,
152:15, 159:8
**methodology** [4] -
89:9, 146:7, 146:8
**methods** [1] - 152:15
**Michaud** [7] - 98:24,
99:14, 162:21,
167:19, 167:20,

188:1, 192:9
**Microsoft** [5] - 120:18,
120:20, 121:4,
124:1, 124:2
**midnight** [1] - 108:18
**might** [18] - 6:24, 8:9,
10:1, 50:4, 76:14,
78:19, 79:12,
100:22, 109:7,
117:14, 117:15,
120:8, 137:17,
138:21, 163:19,
177:12, 187:17,
188:16
**million** [2] - 108:16,
160:14
**millions** [6] - 54:2,
106:12, 107:3,
115:17, 123:16,
124:11
**mind** [2] - 13:14,
108:14
**minute** [1] - 6:23
**minutes** [7] - 53:22,
54:2, 54:5, 70:1,
88:10, 93:17, 174:19
**mirror** [1] - 21:20
**mischaracterizes** [1] -
102:13
**mischaracterizing** [1]
- 165:16
**miscommunication**
[1] - 147:24
**misconduct** [1] -
181:10
**misconfiguration** [4] -
53:14, 103:14,
164:14, 164:17
**misconfigured** [2] -
103:3, 103:17
**mislead** [1] - 36:7
**misled** [3] - 179:13,
184:12, 184:18
**misrepresentation** [1]
- 144:23
**misrepresentations**
[1] - 144:20
**misrepresenting** [2] -
118:18, 145:12
**miss** [2] - 109:1
**missing** [2] - 114:21,
115:8
**mistake** [1] - 147:6
**mistaken** [3] - 146:25,
147:18
**mistakes** [8] - 106:9,
106:10, 106:15,
106:16, 108:1,
108:4, 109:1
**mixing** [1] - 190:13

**mode** [1] - 69:13
**modem** [4] - 43:2, 43:23, 47:1, 141:2
**moderators** [1] - 46:15
**modified** [4] - 100:13, 100:14, 149:16, 150:19
**modifies** [1] - 129:10
**moment** [1] - 108:18
**money** [3] - 155:16, 155:18
**monitor** [3] - 20:19, 26:5, 188:11
**monitored** [3] - 72:1, 72:8, 88:9
**month** [1] - 99:22
**months** [7] - 15:13, 42:2, 95:14, 124:2, 159:21, 161:1, 180:13
**Moreno** [1] - 176:24
**Moreno-Magana** [1] - 176:24
**morning** [1] - 81:1
**most** [13] - 10:7, 19:23, 27:21, 33:22, 67:1, 89:5, 105:9, 121:3, 121:4, 139:18, 141:14, 182:4, 195:24
**mostly** [1] - 38:25
**Motion** [1] - 2:8
**MOTION** [2] - 1:9, 2:1
**motion** [27] - 4:17, 4:21, 4:24, 5:1, 5:3, 5:4, 5:9, 8:25, 11:22, 12:2, 13:5, 49:17, 50:5, 76:17, 91:12, 111:1, 137:15, 137:19, 147:20, 167:21, 179:15, 180:19, 183:17, 198:2, 203:17
**motions** [3] - 4:17, 8:14, 174:15
**motivation** [1] - 10:1
**Mountain** [1] - 1:24
**move** [13] - 52:11, 54:12, 56:18, 57:20, 67:6, 128:21, 132:17, 147:9, 151:23, 155:6, 158:4, 168:7, 168:11
**moved** [4] - 36:23, 57:18, 188:25, 191:6
**movement** [1] - 188:5
**Mozilla** [2] - 108:24, 123:13
**MR** [144] - 1:13, 5:14,

6:2, 13:16, 13:23, 14:5, 22:1, 22:3, 25:7, 25:9, 27:5, 27:7, 31:13, 31:16, 49:14, 50:3, 50:6, 50:13, 50:16, 50:18, 51:3, 52:10, 52:13, 52:17, 52:22, 56:13, 56:22, 56:24, 64:17, 64:20, 65:23, 66:20, 66:23, 67:10, 67:12, 67:15, 67:20, 67:23, 68:22, 69:5, 69:9, 69:16, 70:2, 71:4, 71:19, 71:21, 76:24, 78:24, 79:19, 80:6, 80:11, 80:14, 90:25, 91:2, 91:5, 91:11, 91:13, 93:4, 93:6, 93:22, 93:25, 94:3, 96:17, 96:20, 96:22, 97:1, 97:4, 97:12, 97:16, 102:12, 111:16, 111:19, 112:2, 118:11, 118:12, 119:1, 119:19, 119:23, 126:20, 127:17, 128:21, 128:24, 128:25, 130:18, 132:17, 132:19, 133:2, 133:12, 133:16, 133:17, 133:20, 137:13, 138:1, 141:19, 144:11, 146:25, 147:17, 151:25, 152:3, 152:5, 153:13, 153:16, 154:9, 155:8, 159:25, 160:1, 168:7, 168:11, 169:16, 169:18, 169:20, 173:11, 173:14, 174:6, 174:8, 174:13, 174:20, 174:22, 174:24, 183:2, 183:12, 183:14, 183:16, 184:2, 184:17, 185:12, 185:19, 187:1, 187:19, 187:24, 189:13, 189:20, 190:9, 190:16, 191:2, 191:12, 192:7, 192:22, 193:5, 194:2, 194:8, 194:16, 198:13, 198:20
**multimedia** [1] -

100:19
**multipage** [1] - 202:14
**multiple** [13] - 11:22, 23:4, 23:16, 28:17, 43:16, 43:20, 52:5, 65:15, 73:14, 90:13, 138:4, 141:10, 172:24
**murder** [1] - 174:4
**must** [2] - 175:25, 180:21
**muted** [1] - 7:9

## N

**name** [22] - 6:10, 10:21, 14:6, 14:7, 41:12, 48:4, 50:19, 74:13, 89:13, 97:17, 97:18, 97:19, 113:9, 117:16, 120:23, 148:4, 151:9, 152:9, 152:10, 153:25, 163:22
**name/no** [1] - 87:24
**names** [5] - 27:18, 29:3, 81:5, 117:21, 134:9
**Naples** [4] - 33:15, 33:20, 80:22, 81:6
**narrow** [4] - 48:7, 48:15, 86:1, 182:8
**narrowly** [1] - 181:5
**national** [4] - 6:11, 15:1, 15:2, 69:23
**nature** [15] - 15:3, 36:16, 38:17, 57:8, 57:11, 64:21, 72:22, 74:1, 102:9, 118:24, 120:6, 162:17, 180:5, 195:9
**Naval** [2] - 101:14, 101:16
**naval** [1] - 101:23
**navigate** [2] - 38:6, 46:16
**Navy** [3] - 9:25, 101:22, 101:25
**nearby** [1] - 126:4
**nearly** [2] - 102:14, 102:22
**Nebraska** [4] - 118:9, 120:13, 121:20, 121:21
**necessarily** [3] - 30:4, 87:2, 163:12
**necessary** [8] - 9:14, 10:8, 37:11, 76:16, 81:14, 153:21, 175:9, 181:8

**necessitated** [1] - 179:7
**necessity** [1] - 49:22
**need** [20] - 17:4, 18:22, 19:10, 42:19, 49:11, 49:24, 67:14, 75:17, 77:4, 81:4, 92:20, 102:1, 146:3, 165:9, 165:10, 170:17, 170:18, 199:24
**needed** [3] - 96:9, 125:10, 196:5
**needs** [5] - 68:25, 124:12, 136:6, 147:19, 178:20
**nefarious** [1] - 139:11
**negate** [1] - 198:17
**negative** [1] - 68:13
**negligent** [1] - 181:10
**nerds** [3] - 128:3, 134:4
**net** [2] - 150:24
**network** [64] - 8:20, 15:22, 16:2, 16:3, 16:8, 16:14, 16:21, 16:24, 18:15, 18:24, 19:1, 19:4, 19:15, 36:17, 37:2, 43:18, 44:2, 44:6, 44:7, 44:9, 46:24, 57:11, 63:9, 63:10, 63:14, 70:13, 70:23, 72:24, 85:24, 90:13, 92:2, 92:8, 100:4, 100:7, 100:10, 100:16, 100:24, 101:2, 102:4, 102:7, 102:9, 103:25, 107:2, 113:7, 119:13, 131:1, 131:7, 136:17, 138:11, 138:17, 140:15, 140:19, 141:6, 142:11, 143:16, 145:4, 149:23, 163:21, 169:25, 170:9, 170:13, 171:10, 178:17
**neutral** [2] - 176:9, 177:19
**never** [6] - 110:20, 136:21, 139:9, 141:21, 192:5, 202:1
**nevertheless** [1] - 7:5
**New** [5] - 14:19, 14:23, 14:24, 98:22, 115:7
**new** [11] - 21:8, 22:15, 25:21, 25:22, 26:9, 35:3, 35:11, 35:12,

65:11, 126:11, 199:23
**news** [3] - 115:4, 163:17, 163:18
**next** [14] - 4:1, 22:21, 31:1, 33:9, 48:6, 99:22, 108:17, 109:3, 109:20, 131:16, 171:19, 180:12, 186:12, 189:6
**nexus** [1] - 146:2
**nice** [1] - 161:13
**Ninth** [1] - 98:21
**NIT** [283] - 3:15, 5:16, 8:19, 35:18, 35:22, 35:23, 37:3, 37:4, 37:9, 37:11, 37:16, 37:19, 37:21, 38:3, 38:13, 38:16, 38:24, 39:3, 39:7, 39:9, 39:17, 40:6, 40:12, 41:5, 41:6, 41:8, 42:14, 44:20, 45:4, 45:7, 45:23, 45:25, 46:4, 46:6, 46:11, 46:25, 47:3, 47:19, 47:20, 47:22, 48:13, 48:14, 48:19, 51:14, 55:13, 55:16, 55:19, 56:9, 57:3, 57:14, 59:3, 59:4, 59:7, 59:10, 59:16, 59:19, 59:24, 60:1, 60:6, 60:12, 60:13, 60:14, 60:21, 61:2, 61:3, 61:4, 61:5, 61:7, 61:25, 62:2, 62:4, 62:5, 62:8, 62:10, 62:16, 62:19, 63:1, 63:2, 63:19, 63:21, 64:5, 64:16, 64:22, 65:4, 65:6, 65:20, 65:22, 66:3, 66:10, 67:8, 71:11, 72:11, 74:9, 80:2, 80:23, 81:1, 81:16, 81:19, 82:2, 82:9, 83:5, 83:16, 84:4, 84:19, 85:8, 85:9, 85:13, 86:2, 86:4, 86:7, 86:8, 86:16, 86:18, 86:21, 87:8, 88:9, 88:11, 88:15, 88:17, 88:20, 89:2, 89:18, 89:24, 90:17, 91:25, 92:7, 92:11, 92:13, 92:17, 92:24, 92:25, 93:3, 93:9, 93:13, 94:6, 94:8, 94:13,

94:15, 95:5, 95:11,
95:17, 95:19, 96:11,
99:16, 99:17, 100:3,
103:25, 104:2,
104:5, 104:6, 104:7,
104:21, 104:22,
105:5, 105:19,
109:3, 109:11,
109:15, 109:17,
109:20, 109:24,
109:25, 110:8,
110:10, 110:14,
110:19, 110:22,
110:24, 111:2,
111:6, 111:11,
111:12, 112:11,
112:16, 112:17,
112:24, 113:2,
113:3, 113:18,
113:20, 113:21,
113:22, 113:24,
114:10, 115:19,
116:1, 116:4, 116:7,
116:12, 116:21,
117:1, 117:14,
118:7, 119:17,
120:5, 121:15,
121:23, 122:6,
122:25, 125:3,
125:7, 125:24,
126:23, 127:3,
127:8, 127:14,
129:18, 129:21,
130:14, 130:16,
131:10, 132:3,
134:12, 134:16,
134:25, 135:2,
135:4, 135:20,
135:22, 136:4,
136:5, 136:18,
136:19, 136:20,
137:19, 137:24,
139:8, 139:17,
139:25, 140:12,
141:1, 143:5, 143:9,
144:1, 144:13,
144:22, 146:1,
146:11, 147:2,
147:12, 147:20,
148:1, 148:2,
148:10, 148:12,
148:16, 149:19,
150:1, 152:14,
164:5, 165:1, 165:6,
167:7, 168:2,
168:20, 168:23,
169:2, 169:12,
171:8, 171:20,
171:25, 172:18,
173:6, 173:17,
176:7, 182:14,

184:7, 187:3, 190:4,
191:7, 192:14,
192:18, 193:8,
200:23, 202:17,
202:19
**NIT-infected** [1] -
135:22
**NITs** [11] - 99:12,
99:23, 104:3,
104:11, 104:15,
104:17, 113:19,
119:2, 124:8,
165:25, 197:11
**NN** [1] - 29:16
**NO** [3] - 1:5, 3:4, 3:11
**no-fly** [1] - 158:22
**nobody** [2] - 178:25,
182:1
**none** [1] - 177:22
**nonfictional** [1] -
31:12
**nonnude** [1] - 29:17
**normal** [4] - 16:13,
53:12, 83:3, 100:18
**normally** [5] - 17:4,
103:4, 105:12,
107:16, 109:24
**North** [4] - 7:25, 33:8,
34:5, 36:11, 36:12,
57:17, 57:20, 57:22,
58:9, 58:21, 187:5,
188:18, 188:25,
193:3
**Northern** [1] - 201:2
**notable** [3] - 121:17,
122:17, 129:4
**note** [3] - 7:3, 171:23,
173:4
**notebook** [2] - 13:24
**noted** [1] - 39:2
**notes** [1] - 69:24
**nothing** [13] - 12:16,
77:19, 87:11, 87:14,
93:6, 101:16,
108:25, 114:2,
121:5, 137:14,
182:3, 193:2, 201:24
**notice** [3] - 35:7,
56:17, 200:15
**notified** [1] - 56:11
**notion** [1] - 12:3
**nowadays** [1] - 162:12
**nuclear** [2] - 123:20,
123:22
**nude** [1] - 22:21
**nullifying** [1] - 144:23
**number** [56] - 4:3,
15:15, 19:16, 40:15,
42:18, 46:8, 47:24,
48:13, 65:12, 66:10,

66:12, 67:2, 67:4,
68:20, 71:13, 71:25,
73:4, 73:13, 74:20,
74:21, 74:22, 75:1,
75:2, 75:5, 75:11,
75:16, 75:18, 75:21,
76:10, 76:18, 77:8,
79:1, 87:18, 87:22,
87:24, 88:4, 88:9,
94:7, 94:24, 95:6,
95:7, 98:18, 98:20,
101:20, 112:22,
113:2, 113:6,
122:15, 122:23,
134:9, 135:9,
135:13, 135:20,
142:19
**numbering** [1] - 89:9
**numbers** [5] - 64:9,
75:10, 118:8, 196:9,
196:14
**numerous** [3] - 18:9,
83:24, 111:21

## O

**oath** [1] - 94:1
**object** [5] - 56:13,
67:13, 71:19,
111:16, 137:13
**objecting** [2] - 68:11,
192:21
**objection** [20] - 22:3,
25:9, 27:7, 31:16,
56:20, 64:17, 65:24,
77:18, 78:11, 78:22,
91:11, 102:12,
112:3, 119:6,
128:25, 132:19,
137:25, 143:22,
159:25, 173:11
**objective** [2] - 88:1,
146:2
**objectively** [1] -
180:23
**observe** [1] - 35:12
**observed** [3] - 18:11,
55:3, 61:16
**observer** [1] - 24:2
**obstructive** [1] - 67:24
**obtain** [7] - 10:8,
10:21, 85:13, 89:3,
149:19, 150:1, 179:9
**obtained** [6] - 11:2,
24:2, 150:3, 173:20,
177:18, 198:10
**obviously** [11] - 7:1,
12:10, 60:25, 72:25,
87:18, 101:13,
145:11, 183:4,

184:19, 184:23,
203:6
**occasions** [1] - 68:25
**occur** [4] - 59:12,
87:3, 189:14, 189:22
**occurred** [9] - 34:23,
56:1, 56:4, 59:11,
80:22, 177:4,
177:12, 189:18,
198:24
**occurring** [1] - 174:25
**occurs** [2] - 86:11,
87:6
**OF** [4] - 1:1, 1:3, 1:9,
205:1
**offer** [1] - 98:5
**OFFERED** [2] - 3:4,
3:11
**offers** [2] - 154:6,
163:20
**office** [8] - 51:15,
55:24, 126:5, 144:7,
149:14, 156:12,
160:5, 160:10
**Office** [8] - 1:13, 1:18,
8:16, 106:24,
120:19, 120:20,
121:4, 171:12
**officer** [4] - 39:14,
81:3, 81:5, 185:21
**officers** [1] - 79:21
**offices** [1] - 45:21
**Official** [3] - 1:24,
205:3, 205:17
**OFFICIAL** [1] - 205:1
**officials** [5] - 159:11,
161:10, 168:17,
168:24, 169:1
**offline** [1] - 72:25
**often** [1] - 21:3
**old** [5] - 107:3, 121:10,
121:12, 122:13,
122:14
**omitted** [1] - 186:6
**once** [28] - 27:10,
31:20, 32:6, 32:14,
36:22, 45:7, 45:12,
58:6, 58:22, 60:12,
121:13, 136:9,
139:13, 139:15,
139:23, 140:18,
148:20, 148:25,
150:16, 150:17,
151:12, 151:14,
172:1, 188:12,
191:4, 191:7, 191:16
**One** [1] - 4:10
**one** [83] - 6:14, 12:2,
17:17, 20:9, 21:19,
23:16, 23:24, 25:12,

25:14, 27:21, 29:1,
32:9, 38:11, 40:11,
43:2, 43:10, 43:13,
43:24, 52:20, 64:10,
68:20, 71:4, 72:3,
74:8, 75:10, 82:12,
93:4, 93:23, 99:22,
100:25, 103:4,
103:23, 105:8,
106:2, 107:8, 108:8,
109:12, 112:16,
117:16, 117:17,
118:12, 118:14,
119:6, 119:16,
120:12, 121:25,
122:19, 123:7,
124:15, 125:13,
127:14, 132:23,
134:1, 137:10,
138:3, 138:13,
139:6, 139:19,
141:25, 143:14,
150:22, 160:7,
160:14, 163:19,
164:17, 167:20,
170:2, 170:20,
171:19, 172:5,
175:18, 179:22,
189:5, 190:24,
193:24, 195:24,
196:2, 197:14,
199:23
**ones** [2] - 109:18,
126:5
**ongoing** [4] - 71:13,
72:14, 73:23, 74:1
**Onion** [1] - 9:15
**online** [11] - 25:1,
36:25, 37:5, 58:12,
69:25, 88:25, 122:7,
123:11, 162:23,
163:1, 172:25
**onwards** [1] - 137:4
**op** [1] - 161:23
**open** [15] - 38:11,
46:4, 60:24, 61:1,
61:3, 61:8, 61:9,
86:7, 125:18,
133:21, 136:12,
165:10, 172:6,
189:7, 195:2
**opened** [7] - 45:1,
84:12, 86:3, 86:5,
115:5, 131:1, 140:3
**opening** [2] - 38:9,
38:11
**operate** [3] - 16:25,
18:16, 18:21
**operated** [4] - 9:14,
70:13, 110:20,

144:13
**operates** [1] - 9:18
**operating** [12] - 32:18,
41:13, 63:4, 84:17,
110:1, 113:10,
127:6, 129:6,
129:12, 130:10,
148:3, 181:21
**Operation** [5] - 118:9,
120:12, 121:9,
121:17, 172:20
**operation** [15] - 37:8,
65:21, 75:22, 95:9,
95:13, 95:18, 105:1,
117:15, 117:18,
117:25, 118:10,
122:1, 122:4,
124:22, 172:21
**operational** [5] -
58:14, 58:15, 58:16,
58:18, 58:22
**operations** [5] - 118:6,
120:9, 120:11,
167:7, 171:20
**operator** [2] - 17:10,
33:12
**operators** [2] - 17:13,
17:24
**opinion** [11] - 20:11,
38:25, 39:3, 39:13,
39:19, 74:2, 102:11,
102:19, 102:22,
102:25, 150:9
**opinions** [1] - 180:3
**opportunity** [4] -
22:13, 50:1, 54:15,
153:20
**oppose** [1] - 50:5
**opposed** [3] - 36:1,
82:19, 182:24
**option** [2] - 23:23,
132:8
**options** [1] - 103:16
**order** [18] - 19:9,
19:12, 26:16, 38:3,
39:15, 45:18, 68:5,
68:19, 69:16, 72:19,
74:7, 78:8, 95:4,
100:21, 102:5,
145:13, 173:16,
173:18
**orders** [4] - 71:14,
72:15, 72:17, 73:22
**organization** [4] -
43:16, 43:17, 63:24,
79:14
**organizations** [4] -
106:23, 115:4,
136:2, 143:19
**organized** [1] - 99:20

**originally** [1] - 134:16
**originates** [1] - 92:16
**otherwise** [2] - 13:11,
116:14
**ourselves** [1] - 146:9
**out-of-date** [2] -
120:18, 122:13
**outside** [23] - 12:10,
24:1, 48:14, 62:14,
67:18, 69:4, 69:25,
76:6, 83:18, 95:15,
121:24, 135:19,
138:18, 176:18,
177:3, 181:3,
182:17, 186:14,
190:18, 191:14,
191:23, 201:14
**overbroad** [1] - 161:23
**override** [2] - 88:2,
88:3
**overrule** [3] - 56:19,
119:5, 137:25
**overruled** [3] - 64:24,
66:1, 112:3
**own** [9] - 26:24, 30:9,
51:10, 100:7,
136:10, 155:10,
159:5, 161:18,
186:15
**owner** [2] - 17:10,
33:12

# P

**p.m** [4] - 1:10, 93:19,
204:1
**packets** [4] - 131:22,
132:1, 144:6, 164:8
**Page** [7] - 2:2, 2:12,
2:18, 3:6, 3:7, 112:9,
183:23
**page** [35] - 22:11,
22:15, 24:23, 25:3,
25:23, 26:6, 27:2,
27:14, 27:16, 28:16,
28:18, 28:20, 29:2,
29:17, 30:1, 31:1,
31:9, 32:1, 34:9,
34:12, 44:24, 54:24,
55:1, 55:2, 55:6,
55:7, 55:8, 87:9,
93:12, 93:13,
121:22, 169:3,
203:6, 205:9
**Pages** [2] - 3:8, 111:3
**pages** [5] - 31:15,
54:1, 70:22, 106:3,
181:13
**paid** [1] - 98:3
**paint** [1] - 12:15

**panel** [1] - 68:9
**panels** [1] - 160:7
**paper** [2] - 31:14,
140:1
**paper-clipped** [1] -
31:14
**paperwork** [1] - 8:19
**par** [1] - 88:5
**paragraph** [3] -
111:10, 168:9,
183:25
**paragraphs** [4] -
111:5, 111:10,
111:23, 112:4
**parallel** [2] - 125:22,
125:23
**paraphernalia** [1] -
11:3
**parcel** [1] - 131:22
**pardon** [1] - 127:7
**Parker** [1] - 1:14
**parliament** [1] - 99:4
**part** [10] - 15:22, 28:5,
48:1, 76:9, 82:5,
102:18, 119:16,
158:5, 158:19,
159:22
**participate** [2] - 6:18,
18:1
**participated** [2] - 54:6,
54:9
**particular** [20] - 6:20,
32:10, 44:6, 46:1,
47:13, 74:9, 79:15,
89:7, 89:12, 90:2,
93:12, 99:24,
107:14, 135:5,
135:8, 170:12,
175:6, 175:10,
182:23
**particularity** [3] -
176:9, 177:24,
180:25
**particularly** [3] -
117:25, 124:10,
149:2
**parties** [2] - 68:6,
101:10
**parties'** [1] - 8:14
**party** [8] - 5:7, 159:18,
195:5, 195:7, 196:3,
196:11, 196:17,
196:23
**passed** [3] - 84:12,
137:4, 172:2
**passes** [1] - 158:13,
159:2, 159:4, 159:5
**passionate** [3] -
156:8, 156:13,
157:15

**passive** [1] - 46:2
**password** [7] - 9:4,
24:3, 25:16, 37:23,
38:5, 85:15, 85:19
**past** [2] - 107:6, 187:9
**patched** [1] - 124:2
**path** [1] - 135:3
**pause** [6] - 13:18,
97:6, 107:9, 109:9,
117:13, 120:14
**pay** [1] - 121:6
**paying** [1] - 98:6
**peace** [2] - 22:24,
24:18
**Peeing** [1] - 30:16
**peer** [2] - 180:2
**peer-to-peer** [1] -
180:2
**pen** [2] - 195:4, 196:10
**penalty** [1] - 157:18
**pending** [1] - 68:8
**penetrative** [2] -
27:25, 45:3
**penis** [1] - 29:10
**people** [90] - 5:10,
10:1, 30:6, 31:5,
32:23, 43:12, 57:10,
58:23, 66:21, 73:11,
73:12, 75:15, 75:16,
78:6, 78:17, 88:2,
101:15, 102:2,
102:7, 104:16,
105:20, 106:1,
106:8, 106:13,
108:17, 108:25,
112:6, 114:24,
115:11, 115:15,
115:16, 115:17,
116:2, 116:6,
116:23, 117:1,
117:21, 117:22,
118:8, 120:16,
120:19, 120:24,
121:6, 121:11,
121:13, 122:5,
122:12, 122:14,
122:23, 123:8,
123:13, 123:16,
124:11, 124:17,
126:4, 126:7,
139:18, 155:18,
155:21, 158:3,
158:21, 159:5,
161:13, 161:14,
162:9, 163:6, 163:9,
163:12, 163:14,
163:18, 163:19,
163:23, 163:25,
164:1, 164:2,
166:12, 166:13,

166:22, 167:4,
167:6, 167:9,
167:23, 169:4,
169:5, 169:7,
172:24, 176:19,
180:15, 197:20,
203:20
**people's** [1] - 124:3
**per** [2] - 88:12, 198:22
**percent** [5] - 102:15,
106:19, 154:18,
154:19, 169:22
**percentage** [2] - 28:5,
64:13
**perfect** [10] - 106:11,
107:4, 108:11,
154:20, 162:9,
162:12, 162:13,
162:15, 170:22,
170:23
**perfectly** [2] - 127:13,
173:24
**performed** [1] - 45:23
**perhaps** [2] - 146:18,
190:13
**perimeter** [2] - 187:7,
187:9
**period** [18] - 8:8,
10:13, 24:22, 25:4,
32:21, 37:6, 40:18,
40:22, 40:23, 41:21,
41:22, 58:19, 72:1,
72:7, 78:5, 103:18,
103:20, 123:15
**permissible** [2] -
11:25, 39:24
**permission** [7] -
71:16, 74:4, 113:20,
113:22, 144:1,
146:10, 160:5
**person** [27] - 25:25,
33:13, 57:9, 78:14,
78:16, 79:22, 89:13,
112:23, 112:25,
114:3, 117:16,
117:17, 117:18,
124:15, 127:7,
129:8, 135:12,
148:5, 162:22,
174:1, 185:23,
188:5, 191:7, 195:2,
197:3, 197:23,
203:11
**PERSON** [2] - 133:18,
133:22
**personal** [4] - 39:3,
74:2, 97:25, 196:6
**personally** [2] - 38:25,
83:14
**Personnel** [1] - 106:24

**persons** [3] - 8:9, 9:21, 12:9
**perspective** [4] - 60:17, 81:12, 92:19
**persuaded** [1] - 202:4
**persuasive** [2] - 200:20, 201:17
**pertain** [1] - 12:9
**pertained** [1] - 6:15
**pertaining** [1] - 7:20
**pertinent** [1] - 142:15
**pets** [1] - 30:20
**Ph.D** [3] - 97:13, 98:14, 158:6
**phone** [18] - 42:17, 69:11, 69:12, 87:18, 87:21, 87:22, 87:23, 88:3, 88:8, 195:2, 195:3, 195:9, 196:9, 196:13, 199:7, 199:8
**Phone** [1] - 1:20
**phones** [2] - 43:20, 126:4
**phonetic** [1] - 163:17
**physical** [2] - 188:23, 190:23
**physically** [3] - 47:18, 57:20, 190:6
**pick** [1] - 88:8
**picked** [1] - 190:23
**picture** [3] - 13:3, 34:9, 156:18
**piece** [8] - 41:24, 89:5, 106:14, 109:20, 123:20, 140:1, 146:12, 170:20
**pieces** [8] - 89:17, 90:4, 90:7, 90:15, 90:16, 106:12, 112:15, 113:12
**pillars** [1] - 177:16
**pin** [1] - 119:24
**piped** [1] - 7:8
**place** [15] - 8:18, 9:2, 9:18, 10:1, 73:16, 79:15, 83:13, 86:22, 110:18, 111:25, 122:1, 150:6, 176:13, 188:10, 202:2
**placed** [4] - 8:3, 23:24, 68:19, 69:17
**places** [2] - 135:5, 163:24
**Plaintiff** [1] - 1:4
**platform** [1] - 9:22
**play** [2] - 8:20, 123:17
**Playpen** [134] - 7:16, 7:17, 7:25, 9:14, 18:4, 18:6, 18:7,

18:10, 18:14, 18:19, 18:20, 19:9, 19:11, 19:13, 20:12, 20:15, 20:22, 20:24, 21:3, 21:8, 21:16, 21:23, 21:24, 22:10, 22:12, 22:19, 22:21, 23:6, 23:8, 23:11, 24:8, 24:24, 24:25, 25:12, 25:13, 25:17, 25:24, 26:10, 26:16, 27:4, 27:11, 27:13, 27:15, 28:2, 29:4, 30:15, 30:18, 31:2, 31:7, 31:8, 31:11, 31:25, 32:14, 32:18, 33:6, 33:21, 33:25, 34:1, 35:10, 35:15, 36:13, 36:17, 36:21, 37:7, 37:13, 37:16, 37:23, 38:4, 38:7, 40:9, 41:20, 42:4, 44:22, 45:1, 45:19, 47:13, 50:25, 52:4, 53:4, 53:8, 53:11, 53:15, 53:16, 53:18, 54:11, 54:25, 57:17, 57:23, 58:3, 58:6, 60:3, 65:8, 65:9, 65:17, 66:7, 66:13, 67:1, 70:6, 70:7, 70:21, 70:24, 71:25, 72:7, 72:24, 73:4, 85:19, 85:21, 95:10, 95:12, 95:23, 102:10, 103:21, 105:1, 105:20, 106:2, 110:8, 112:18, 114:20, 115:8, 115:23, 116:23, 117:19, 121:9, 121:19, 152:8, 157:10, 165:1, 167:1, 167:3, 167:5, 167:10, 167:23, 175:2, 182:10
**playpen** [1] - 161:23
**pleasure** [3] - 5:19, 5:24, 6:5
**pledged** [1] - 126:13
**plenty** [1] - 161:9
**plus** [1] - 4:9
**point** [26] - 4:20, 8:12, 8:15, 11:1, 19:9, 37:24, 45:4, 49:12, 56:21, 59:2, 73:24, 75:15, 78:13, 79:20, 87:19, 126:22, 128:21, 137:1, 140:3, 147:19,

151:19, 176:22, 179:5, 188:25, 194:10, 200:18
**poisoned** [2] - 125:6, 125:9
**police** [1] - 181:9
**policy** [4] - 126:11, 126:14, 126:15, 168:15
**poorly** [1] - 46:19
**pop** [2] - 47:19, 180:13
**pop-up** [1] - 180:13
**popular** [2] - 19:23, 27:21
**porn** [9] - 20:10, 21:14, 23:6, 23:8, 70:22, 187:6, 187:11, 187:13, 188:19
**pornographic** [1] - 175:5
**pornography** [49] - 4:11, 4:14, 7:19, 7:20, 11:5, 11:18, 15:1, 15:9, 15:22, 17:22, 18:9, 18:13, 19:14, 19:24, 20:7, 23:3, 23:4, 23:11, 23:21, 23:24, 24:20, 26:13, 27:24, 28:7, 28:11, 29:11, 30:7, 30:18, 30:24, 31:4, 31:5, 32:4, 35:17, 38:1, 38:20, 41:1, 49:8, 51:9, 52:6, 53:1, 64:14, 88:22, 157:11, 188:24, 190:8, 190:12, 197:7, 202:25, 203:9
**portion** [1] - 41:14
**posed** [1] - 34:20
**posing** [1] - 22:21
**position** [4] - 71:23, 124:25, 146:9, 199:22
**positions** [1] - 5:9
**positive** [1] - 151:4
**positives** [2] - 151:2, 151:3
**possessed** [1] - 11:5
**possessing** [1] - 4:13
**possession** [1] - 28:7
**possibility** [1] - 20:12
**possible** [10] - 52:24, 68:9, 79:5, 80:16, 106:15, 107:23, 115:21, 154:15, 177:8, 203:4
**possibly** [3] - 68:5,

78:9, 78:10
**Post** [3] - 122:20, 168:23, 168:25
**post** [29] - 20:22, 20:23, 21:1, 21:8, 21:22, 23:8, 24:7, 24:10, 24:12, 24:13, 24:14, 35:2, 38:12, 45:1, 46:4, 51:24, 52:1, 52:3, 52:14, 86:5, 86:7, 86:15, 86:16, 86:17, 87:7, 156:23, 161:22, 162:1, 169:3
**post-login** [1] - 169:3
**posts** [9] - 32:2, 32:5, 32:9, 38:11, 40:25, 42:5, 42:12, 51:19, 52:25
**Posts** [1] - 3:5
**potential** [1] - 68:16
**potentially** [2] - 90:12, 186:14
**Potpourri** [2] - 30:2, 30:3
**powerful** [1] - 121:2
**powers** [1] - 12:5
**practical** [1] - 154:6
**practice** [2] - 115:6, 115:7
**precedence** [1] - 178:11
**precedent** [1] - 194:21
**precise** [1] - 8:13
**predecessor** [1] - 104:11
**preferred** [4] - 22:23, 23:10, 23:21, 51:6
**prejudice** [9] - 177:11, 178:14, 178:19, 178:24, 198:3, 198:4, 198:18, 198:21, 198:22
**prejudiced** [1] - 198:1
**prejudicial** [1] - 199:4
**prelog** [1] - 55:2
**prelog-on** [1] - 55:2
**premarked** [4] - 22:7, 26:3, 28:14, 34:7
**premise** [2] - 69:21, 176:23
**preparation** [1] - 55:16
**prepare** [3] - 13:23, 35:18, 180:16
**prepared** [5] - 51:16, 55:20, 107:22, 197:3, 203:19
**preparing** [1] - 55:17
**prepubescent** [8] -

22:18, 27:24, 30:7, 34:18, 34:20, 35:25, 36:1, 45:2
**prescribe** [1] - 189:21
**prescribed** [2] - 186:3, 188:1
**present** [10] - 6:24, 33:17, 35:5, 48:23, 79:15, 79:18, 143:7, 145:16, 150:9, 203:24
**presented** [12] - 22:11, 25:3, 26:8, 27:14, 119:9, 137:18, 140:11, 145:9, 145:19, 147:13, 174:16, 179:13
**presenting** [1] - 81:15
**Press** [3] - 114:12, 115:2, 125:16
**presumably** [1] - 39:24
**presumptively** [1] - 177:3
**preteen** [2] - 29:23, 29:25
**Preteen** [5] - 27:22, 31:23, 31:24, 38:7, 44:25
**pretrial** [1] - 4:17
**pretty** [7] - 30:21, 34:23, 100:10, 113:5, 115:13, 124:18, 162:16
**prevent** [6] - 74:1, 75:25, 87:21, 91:20, 91:21, 95:2
**preventing** [1] - 126:4
**preview** [5] - 22:24, 24:6, 24:11, 32:12, 85:4
**previews** [1] - 32:7
**previous** [3] - 35:25, 95:22, 167:6
**previously** [17] - 24:10, 25:15, 25:16, 25:17, 32:7, 37:4, 37:12, 41:7, 44:23, 46:9, 59:1, 94:23, 95:1, 130:21, 159:8, 177:16, 177:23
**primary** [4] - 16:7, 18:12, 20:24, 39:4
**principal** [2] - 6:3, 97:23
**principle** [2] - 187:21, 189:10
**print** [1] - 159:3
**printed** [2] - 129:24,

130:13
**prints** [1] - 129:11
**Privacy** [1] - 97:24
**privacy** [18] - 152:11, 153:4, 154:12, 162:23, 162:25, 170:16, 170:17, 179:16, 179:19, 179:22, 180:2, 180:9, 193:25, 194:7, 194:9, 195:10, 195:11, 196:21
**probable** [13] - 37:24, 38:18, 146:4, 146:5, 176:9, 177:20, 177:21, 177:24, 180:24, 202:9, 202:20, 202:22, 202:24
**problem** [3] - 133:15, 171:5, 183:18
**problems** [2] - 161:15, 183:18
**procedure** [3] - 118:16, 175:15, 199:19
**Procedure** [2] - 12:4, 99:7
**proceed** [3] - 13:15, 56:23, 142:23
**proceeded** [1] - 10:12
**proceeding** [4] - 39:12, 39:17, 99:5, 99:10
**proceedings** [5] - 7:7, 73:13, 98:23, 204:1, 205:8
**Proceedings** [1] - 1:22
**process** [9] - 46:2, 77:10, 89:19, 109:4, 110:5, 119:10, 120:4, 178:19
**processed** [1] - 140:18
**production** [3] - 15:8, 28:7, 49:17
**professionals** [1] - 131:6
**program** [9] - 6:14, 6:15, 123:23, 129:11, 130:24, 131:13, 134:8, 134:14, 158:12
**programmed** [1] - 135:22
**programming** [2] - 120:5, 128:1
**prohibition** [1] - 52:24

**Project** [2] - 19:6, 108:24
**project** [3] - 97:24, 158:10, 158:12
**projector** [1] - 133:14
**prompt** [1] - 90:23, 96:19, 174:7
**prong** [1] - 178:14
**proof** [1] - 90:12
**propensity** [1] - 80:1
**proper** [4] - 13:12, 78:25, 87:17, 118:16
**properly** [2] - 29:2, 197:12
**properties** [1] - 143:13
**property** [8] - 12:9, 183:19, 185:3, 185:8, 185:23, 188:5, 188:13, 192:11
**proposed** [3] - 99:11, 175:25, 200:11
**prosecution** [1] - 103:23
**protect** [7] - 100:16, 100:21, 105:9, 105:11, 121:5, 162:22, 170:15
**protected** [1] - 195:24
**protection** [3] - 154:6, 171:21, 179:16
**protections** [1] - 194:18
**protective** [2] - 173:16, 173:18
**protocols** [1] - 145:21
**prove** [2] - 202:21, 203:10
**provide** [13] - 43:7, 74:25, 75:1, 89:19, 102:5, 105:15, 153:4, 154:12, 162:9, 163:13, 163:23, 172:21, 172:22
**provided** [20] - 23:18, 51:14, 63:8, 63:12, 74:13, 81:7, 100:5, 110:21, 131:2, 132:5, 132:6, 132:15, 132:16, 134:21, 141:5, 147:7, 164:7, 171:22, 173:18
**provider** [21] - 10:21, 42:21, 42:23, 42:25, 43:7, 43:24, 44:14, 47:15, 48:9, 48:11, 48:12, 48:16, 48:17, 74:13, 74:15, 89:10,

89:13, 89:20, 136:24, 140:22, 141:3
**provides** [4] - 17:12, 21:9, 88:18, 143:13
**providing** [1] - 166:20
**proving** [1] - 13:6
**provision** [1] - 177:15
**Public** [1] - 1:18
**public** [20] - 7:6, 69:23, 75:7, 104:7, 104:9, 104:10, 104:12, 119:12, 119:16, 126:10, 160:11, 161:17, 161:19, 161:20, 165:4, 166:10, 166:20, 168:15, 172:17, 195:19
**publication** [1] - 69:24
**publicized** [1] - 159:8
**publicly** [3] - 48:10, 71:18, 95:13
**publish** [1] - 124:21
**published** [9] - 98:19, 122:7, 123:1, 123:11, 123:25, 126:12, 160:9, 168:23, 172:25
**pull** [3] - 16:18, 28:22, 149:23
**punch** [2] - 87:21, 187:9
**purport** [1] - 27:23
**purported** [2] - 45:2, 128:12
**purporting** [1] - 125:17
**purpose** [9] - 7:18, 18:12, 20:16, 89:2, 100:11, 105:10, 109:25, 175:2, 179:11
**purposes** [14] - 4:8, 20:6, 22:8, 51:12, 51:13, 78:20, 90:14, 163:4, 163:5, 163:7, 164:1, 164:3, 166:14, 182:15
**pursuant** [1] - 205:6
**purview** [1] - 67:17
**put** [33] - 6:8, 35:3, 37:5, 37:22, 43:6, 45:14, 56:17, 59:19, 81:20, 119:24, 123:14, 129:5, 129:24, 131:24, 133:14, 134:1, 140:1, 141:23, 146:9, 148:5,

148:23, 149:5, 187:14, 190:7, 190:14, 190:17, 190:18, 191:4, 193:13, 193:15, 193:19, 200:15
**puts** [1] - 85:18
**putting** [3] - 36:24, 117:6, 196:18
**puzzle** [1] - 170:20

## Q

**Quantico** [1] - 15:14
**questioning** [5] - 56:14, 56:25, 119:22, 147:3, 169:15
**questions** [12] - 49:10, 54:13, 57:2, 57:6, 72:10, 81:25, 91:2, 91:14, 142:23, 146:6, 147:11, 153:21
**quibble** [1] - 106:6
**quick** [1] - 91:15
**quickly** [4] - 86:14, 86:20, 86:23, 203:18
**quite** [3] - 68:15, 154:15, 177:6
**quote** [2] - 154:4, 154:11
**quoted** [3] - 153:12, 168:23, 168:25

## R

**radar** [1] - 159:6
**raise** [2] - 97:7, 184:11
**raised** [3] - 94:22, 143:23, 175:18
**ran** [6] - 6:22, 110:18, 110:20, 110:22, 130:12, 150:5
**rather** [3] - 131:22, 163:15, 194:14
**Re** [6] - 116:8, 178:5, 197:13, 197:17, 197:20, 200:7
**reach** [2] - 138:18, 139:17
**reached** [5] - 136:11, 136:21, 138:25, 139:4, 143:19
**reaches** [1] - 149:11
**react** [1] - 73:7
**read** [16] - 5:5, 25:21, 26:1, 73:7, 104:12, 104:24, 111:5, 128:6, 168:10,

174:15, 184:20, 184:23, 185:5, 197:21
**readable** [3] - 132:2, 132:9, 173:10
**readily** [1] - 10:3
**reading** [1] - 102:25
**ready** [1] - 133:19
**real** [11] - 26:20, 26:22, 31:12, 103:21, 123:6, 123:9, 138:18, 139:2, 139:5, 149:4, 163:22
**realize** [1] - 187:21
**realizing** [1] - 6:24
**really** [29] - 30:20, 90:17, 100:25, 104:8, 106:14, 106:24, 108:19, 108:21, 111:11, 112:4, 115:9, 117:20, 121:2, 121:12, 124:12, 125:23, 128:3, 128:5, 131:8, 134:7, 134:19, 136:6, 137:9, 171:6, 199:23
**realtime** [1] - 1:22
**Realtime** [1] - 205:3
**reason** [23] - 39:4, 39:16, 68:4, 75:6, 82:14, 94:7, 95:4, 96:10, 101:22, 106:21, 123:2, 129:16, 134:20, 139:23, 143:4, 163:9, 163:19, 163:22, 182:23, 183:9, 197:6, 202:12
**reasonable** [10] - 180:1, 180:23, 182:12, 193:24, 194:7, 194:8, 194:24, 196:20, 197:2, 197:4
**reasonableness** [1] - 179:10
**reasonably** [4] - 48:2, 79:13, 82:16, 153:18
**reasons** [12] - 38:22, 78:11, 94:7, 94:25, 96:13, 101:21, 123:21, 167:20, 168:15, 177:9, 202:2, 203:12
**rebuttal** [1] - 80:16
**receipt** [2] - 4:11, 28:7
**receive** [2] - 37:25, 42:24

**received** [36] - 3:12,
3:14, 3:16, 11:4,
15:13, 22:4, 25:10,
27:8, 31:17, 33:4,
37:1, 41:11, 47:22,
53:7, 59:7, 63:13,
63:18, 85:12, 96:4,
107:3, 122:24,
129:3, 132:23,
133:3, 134:23,
137:2, 140:8, 140:9,
140:17, 140:18,
141:11, 143:10,
148:9, 150:11,
151:19, 172:1
**receives** [1] - 113:2
**receiving** [4] - 92:24,
124:12, 142:12,
151:13
**recent** [2] - 176:22,
181:18
**reception** [1] - 6:20
**recess** [2] - 93:17,
93:19
**recipient** [1] - 87:23
**reckless** [4] - 118:15,
119:3, 181:10,
199:19
**recognize** [2] - 197:3,
202:8
**recognized** [2] -
199:22, 202:11
**recommending** [1] -
27:2
**reconstruct** [2] -
131:14, 132:8
**record** [13] - 4:25, 5:2,
5:13, 6:8, 6:25, 7:3,
14:6, 16:2, 42:15,
69:5, 78:25, 141:8,
202:7
**recorded** [8] - 1:22,
63:18, 123:1,
131:10, 141:5,
160:19, 164:10,
172:3
**recording** [21] - 100:5,
131:1, 131:7,
136:17, 136:19,
137:4, 141:9, 143:6,
143:8, 148:19,
151:17, 152:18,
160:7, 160:9,
160:11, 160:12,
160:17, 164:7,
191:5, 191:16,
191:19
**recordings** [1] - 160:8
**recovered** [4] - 74:8,
74:22, 75:2, 84:12

**redacted** [1] - 94:12
**Redirect** [2] - 2:16,
2:21
**REDIRECT** [2] - 94:2,
169:19
**reduced** [1] - 100:20
**refer** [5] - 9:13, 39:8,
44:4, 70:17, 161:4
**reference** [6] - 23:22,
24:6, 29:8, 30:17,
52:15, 158:9
**referenced** [4] -
164:15, 170:11,
179:25, 180:8
**referred** [9] - 8:19,
16:22, 16:24, 18:3,
19:23, 37:3, 38:24,
39:18, 44:2
**referring** [3] - 70:9,
106:16, 116:9
**refers** [1] - 70:15
**reflects** [1] - 35:23
**refrain** [1] - 71:16
**refuse** [1] - 105:14
**regalbegal** [15] -
41:17, 41:20, 42:1,
42:6, 42:11, 44:18,
44:19, 44:22, 44:23,
46:14, 77:5, 78:16,
95:24, 152:9, 152:10
**regarding** [11] - 40:5,
133:7, 147:19,
173:17, 176:23,
178:2, 178:14,
181:19, 182:10,
199:19, 200:18
**regardless** [4] - 156:3,
177:5, 187:16, 191:5
**regional** [1] - 48:15
**register** [9] - 22:15,
25:21, 25:22, 26:8,
26:16, 27:10, 65:11,
195:4, 196:10
**registered** [3] - 40:15,
42:3, 48:10
**Registration** [1] - 3:7
**registration** [3] -
25:23, 26:6, 26:9
**regular** [17] - 9:19,
16:4, 16:10, 16:12,
18:25, 19:17, 53:17,
70:25, 71:1, 92:9,
101:1, 103:13,
103:19, 164:19,
196:11, 203:2
**regulation** [1] - 170:18
**regulations** [1] -
205:10
**reiterate** [2] - 21:22,
163:25

**reject** [2] - 105:16
**rejected** [2] - 178:7,
178:10
**relate** [1] - 180:14
**related** [11] - 5:17,
11:2, 15:15, 26:13,
39:2, 40:11, 67:15,
74:3, 99:14, 100:1,
105:3
**relates** [2] - 125:1,
147:20
**relating** [1] - 49:8
**relation** [1] - 15:12
**relative** [1] - 72:20
**relayed** [1] - 88:24
**released** [1] - 157:17
**relevance** [4] - 71:20,
118:11, 124:25,
159:25
**relevant** [5] - 8:25,
78:19, 91:12,
134:17, 143:24
**reliable** [2] - 144:16,
149:3
**reliance** [1] - 180:23
**relied** [2] - 176:12,
176:14
**reluctant** [1] - 75:1
**remained** [1] - 35:14
**remains** [1] - 34:17
**remember** [6] - 36:3,
108:10, 154:15,
161:7, 162:6, 170:10
**reminds** [1] - 6:7
**renew** [2] - 65:23,
160:24
**renewed** [4] - 159:17,
159:20, 159:23,
160:23
**repeat** [2] - 92:4,
175:19
**repercussions** [1] -
166:11
**rephrase** [4] - 52:19,
52:22, 60:13, 112:1
**replaced** [1] - 34:19
**report** [9] - 40:14,
40:22, 41:4, 41:15,
41:16, 41:19, 42:13,
84:20, 168:17
**reported** [5] - 75:8,
75:13, 78:1, 95:14,
205:8
**Reporter** [3] - 1:24,
205:4, 205:17
**reporter** [1] - 69:23
**REPORTER** [2] -
154:8, 205:1
**Reporter's** [1] - 2:10
**reports** [7] - 40:5,

40:8, 40:9, 45:15,
45:20, 49:1, 193:3
**reposts** [2] - 22:23,
23:5
**represent** [4] - 132:12,
145:25, 157:18,
174:3
**representations** [1] -
77:23
**represented** [10] - 4:4,
4:5, 10:14, 78:3,
83:19, 144:12,
144:13, 146:19,
147:2, 180:18
**representing** [1] -
98:1
**represents** [1] -
181:13
**request** [5] - 74:3,
82:2, 82:14, 200:3,
203:12
**requested** [5] - 8:18,
144:1, 177:18,
184:5, 200:25
**requesting** [1] - 120:5
**requests** [2] - 105:16,
185:22
**require** [1] - 12:19
**required** [4] - 81:21,
171:13, 173:25
**requirement** [2] -
177:25, 200:17
**requirements** [2] -
176:8, 200:9
**requires** [2] - 26:21,
192:8
**requiring** [1] - 202:17
**research** [4] - 98:19,
98:20, 105:2, 117:4
**Research** [2] - 101:14,
101:16
**researched** [2] -
98:17, 104:16
**researcher** [1] - 157:8
**researchers** [2] -
122:8, 131:6
**researching** [2] -
104:1, 104:3
**residence** [14] - 11:3,
33:15, 33:21, 33:23,
34:14, 48:8, 48:20,
49:9, 54:10, 55:7,
55:20, 80:22, 81:6,
90:21
**resident** [4] - 7:14,
46:25, 47:1, 87:12
**residential** [9] - 10:25,
11:16, 74:14, 90:6,
90:18, 137:7, 137:8,
138:2, 147:15

**residing** [2] - 146:15,
192:2
**resolve** [1] - 136:14,
177:7
**resolving** [1] - 76:23
**resourced** [1] - 106:22
**respective** [1] - 5:9
**respects** [2] - 9:18,
176:8
**respond** [1] - 155:4
**responded** [1] - 195:1
**responds** [1] - 88:11
**response** [8] - 12:14,
21:2, 67:16, 129:21,
147:1, 148:16,
150:11, 179:25
**responses** [1] - 8:14
**responsibilities** [2] -
14:22, 15:4
**responsive** [1] - 167:8
**rest** [4] - 50:12, 68:25,
69:11, 170:8
**restarted** [1] - 58:17
**restate** [2] - 12:1,
190:10
**restricted** [3] - 38:2,
38:21, 59:18
**Rests**........................
.... [1] - 2:4
**Rests**........................
..... [1] - 2:5
**result** [4] - 13:10,
94:5, 94:13, 150:25
**results** [1] - 19:25
**retail** [1] - 180:11
**rethink** [1] - 75:24
**retrieved** [1] - 181:24
**return** [3] - 80:2, 85:6,
144:16
**returned** [4] - 45:8,
45:9, 45:12, 83:16
**returning** [2] - 27:11,
151:1
**reuse** [2] - 66:14, 67:1
**reused** [1] - 66:14
**reveal** [1] - 105:23
**revealed** [4] - 115:1,
125:19, 160:13,
192:24
**revealing** [1] - 101:24
**review** [9] - 35:1, 36:6,
54:4, 61:12, 63:12,
66:25, 82:6, 105:3,
116:11
**reviewed** [15] - 30:23,
49:1, 52:6, 61:14,
83:6, 83:23, 100:1,
100:2, 100:3,
104:12, 104:20,
104:23, 110:24,

111:21, 142:14
**reviewing** [3] -
145:17, 145:18,
191:21
**richness** [1] - 100:19
**Riley** [2] - 194:23,
196:25
**risen** [1] - 73:1
**risk** [6] - 116:2, 123:6,
123:9, 123:17,
166:19, 166:22
**risks** [4] - 124:13,
126:3, 165:22,
172:16
**RMR** [2] - 1:23, 205:17
**road** [1] - 78:19
**roll** [1] - 158:2
**room** [9] - 17:16,
17:17, 17:19, 51:20,
51:23, 68:25, 69:11,
84:5
**rooms** [2] - 51:21,
52:25
**root** [2] - 11:23, 34:2
**rough** [2] - 64:14,
64:15
**route** [1] - 136:3
**Router** [1] - 9:16
**router** [5] - 138:10,
138:20, 138:25,
139:18
**router's** [1] - 139:2
**rule** [18] - 52:5, 76:17,
118:14, 171:18,
175:20, 175:25,
176:2, 176:3,
177:13, 177:15,
181:19, 189:21,
198:5, 198:22,
199:1, 199:2, 200:14
**Rule** [29] - 12:3, 12:23,
13:1, 82:11, 83:8,
99:10, 175:19,
176:6, 177:6, 177:8,
178:3, 181:14,
182:22, 186:15,
186:22, 186:24,
188:2, 197:8,
197:24, 198:15,
198:23, 199:13,
200:4, 200:9,
200:17, 201:10,
201:12, 201:16,
201:22
**ruled** [3] - 83:7, 176:6,
186:21
**rules** [3] - 99:9,
104:18, 199:25
**Rules** [2] - 12:4, 99:6
**ruling** [3] - 167:21,

177:5, 203:18
**rummage** [3] - 84:8,
84:13, 84:22
**rummaged** [1] -
194:13
**run** [21] - 16:22, 17:15,
60:14, 60:22, 61:25,
85:5, 101:4, 105:23,
108:7, 108:16,
109:8, 109:23,
109:24, 110:13,
110:14, 114:23,
127:8, 143:18,
155:24, 163:14,
169:12
**running** [9] - 32:20,
57:22, 58:3, 103:8,
120:18, 121:2,
121:11, 163:13,
197:9
**runs** [4] - 16:4, 109:6,
129:16, 152:24

## S

**S-o-g-h-o-i-a-n** [1] -
97:20
**S-u-i-n-g** [1] - 180:1
**safe** [5] - 32:21, 73:12,
75:15, 75:24
**safety** [1] - 26:24
**San** [1] - 99:22
**satisfied** [1] - 176:7
**satisfy** [1] - 69:15
**savannah** [1] - 118:2
**save** [4] - 80:15,
122:6, 124:21
**saved** [4] - 122:25,
123:10, 131:12,
172:24
**saves** [1] - 182:3
**savvy** [1] - 25:25
**saw** [8] - 31:19, 54:23,
55:7, 55:8, 93:2,
122:8, 195:19
**SC** [1] - 29:16
**SC/NN** [1] - 29:15
**Scat** [1] - 30:17
**scenario** [1] - 117:19
**scenarios** [1] - 151:21
**scenes** [3] - 106:5,
144:5, 146:22
**scholar** [1] - 157:8
**school** [2] - 114:15,
158:11
**School** [1] - 154:5
**Schumer** [1] - 159:7
**science** [4] - 39:7,
98:11, 116:19,
117:23

**scientist** [1] - 174:5
**scope** [4] - 75:22,
182:7, 182:11,
182:21
**screen** [8] - 24:15,
32:13, 35:9, 54:25,
130:24, 132:11,
132:14, 148:8
**Screen** [1] - 3:13
**script** [1] - 127:25
**Script** [1] - 3:12
**scrupulous** [1] - 69:24
**scrutinized** [1] - 73:6
**seal** [12] - 3:12, 3:14,
3:16, 128:24, 129:1,
129:3, 132:18,
132:19, 132:23,
133:4, 151:6, 166:2
**sealed** [4] - 149:6,
165:24, 166:1, 166:4
**sealing** [1] - 133:15
**seals** [1] - 166:6
**search** [75] - 4:19, 9:2,
10:25, 13:10, 19:20,
19:24, 33:17, 37:2,
41:8, 48:23, 49:2,
49:3, 54:6, 54:9,
54:20, 55:19, 55:20,
55:22, 56:1, 56:2,
70:7, 70:8, 70:9,
70:15, 70:18, 70:24,
71:1, 76:19, 77:20,
77:21, 77:25, 80:20,
80:24, 83:1, 84:3,
84:7, 84:25, 90:6,
99:17, 100:2,
110:17, 111:18,
113:25, 137:14,
144:23, 147:15,
165:24, 165:25,
166:3, 167:12,
175:14, 175:22,
177:1, 177:2,
177:12, 177:18,
178:16, 182:3,
183:7, 183:8,
183:18, 184:1,
184:6, 184:23,
185:2, 185:3,
185:20, 185:22,
197:12, 198:4,
198:24, 199:7,
199:8, 203:5
**searchable** [1] - 70:13
**searched** [4] - 176:13,
183:19, 186:13,
194:14
**searching** [2] - 30:6,
84:18
**seat** [2] - 13:21, 97:10

**seated** [1] - 5:10
**second** [19] - 26:7,
41:2, 41:4, 50:7,
71:4, 74:11, 74:24,
75:3, 82:5, 84:14,
89:7, 93:4, 99:1,
109:7, 117:19,
118:10, 132:22,
161:3, 201:8
**seconds** [4] - 86:22,
87:2, 191:11
**secretive** [1] - 72:16
**secretly** [1] - 160:17
**section** [20] - 14:13,
21:10, 21:15, 21:20,
27:23, 30:3, 30:6,
30:9, 30:10, 30:15,
30:18, 30:23, 31:2,
31:25, 32:2, 32:10,
44:25, 184:4
**Section** [1] - 205:6
**sections** [8] - 27:19,
27:21, 29:4, 30:16,
31:3, 31:7, 31:10,
157:11
**secure** [11] - 100:14,
106:14, 106:19,
106:20, 106:25,
108:20, 154:20,
155:2, 155:4,
170:17, 196:5
**security** [24] - 15:1,
15:2, 15:17, 17:23,
23:17, 27:2, 98:13,
98:18, 109:13,
115:12, 122:8,
162:9, 162:12,
162:13, 162:15,
162:16, 170:16,
170:23, 170:24,
180:18, 187:7, 187:9
**see** [47] - 5:10, 16:15,
17:10, 20:19, 20:20,
24:15, 27:12, 31:21,
32:1, 32:7, 32:11,
32:23, 35:9, 35:10,
42:5, 47:5, 54:21,
54:23, 55:1, 76:14,
77:8, 78:7, 78:8,
78:21, 91:11, 92:15,
94:15, 106:5,
114:25, 125:8,
129:20, 131:14,
134:7, 134:8,
134:10, 138:21,
143:15, 146:23,
147:18, 148:16,
157:16, 162:2,
166:15, 195:16,
195:25

**seeing** [3] - 6:7, 68:12,
148:7
**seek** [7] - 74:21,
82:19, 83:2, 100:22,
145:5, 182:19,
200:14
**seeking** [6] - 11:11,
80:22, 82:20,
179:12, 181:1,
181:15
**seem** [3] - 34:22,
72:10, 165:9
**sees** [3] - 87:23,
92:17, 135:20
**seize** [1] - 33:10
**seized** [8] - 8:2, 36:12,
36:18, 49:9, 57:17,
57:24, 57:25, 105:5
**seizing** [1] - 58:10
**seizure** [2] - 12:9,
185:20
**select** [1] - 53:13
**Senate** [1] - 115:4
**Senator** [1] - 159:7
**send** [23] - 26:21,
61:2, 61:3, 84:16,
84:17, 87:1, 88:4,
88:20, 111:13,
115:10, 124:17,
129:18, 136:20,
140:20, 144:15,
149:10, 149:14,
150:4, 150:7,
169:24, 184:8
**sending** [7] - 48:5,
87:22, 91:6, 91:17,
131:22, 151:12,
182:16
**sends** [9] - 47:4, 61:7,
62:16, 86:9, 86:18,
92:14, 112:16,
113:3, 128:15
**sense** [5] - 52:21,
60:16, 177:11,
180:10, 186:19,
191:15
**sensitive** [2] - 72:19,
105:10
**sent** [40] - 9:7, 10:19,
45:16, 45:20, 48:9,
51:15, 63:19, 63:21,
63:22, 64:1, 64:4,
91:25, 92:1, 92:2,
92:8, 92:9, 93:10,
93:11, 93:14, 94:5,
94:8, 96:11, 110:15,
112:10, 116:12,
125:16, 128:9,
128:11, 131:9,
135:2, 136:19,

25

139:3, 140:13,
143:9, 148:6, 149:9,
149:22, 162:3,
171:2, 182:15
**separate** [3] - 49:17,
81:18, 81:19
**separately** [3] - 93:10,
93:11, 137:6
**September** [1] - 14:18
**sequence** [2] - 80:20,
141:22
**serial** [2] - 112:22,
113:6
**series** [3] - 11:6,
12:12, 134:11
**serious** [1] - 168:15
**servant** [1] - 7:6
**serve** [2] - 48:12,
74:12
**server** [51] - 7:24, 8:3,
8:4, 8:7, 21:2, 33:5,
36:10, 36:12, 36:22,
37:5, 45:10, 53:14,
57:17, 57:20, 57:22,
58:2, 58:4, 58:6,
58:9, 58:11, 59:19,
63:11, 63:16, 85:21,
85:23, 88:25, 103:7,
103:15, 110:2,
110:5, 110:20,
110:21, 112:20,
130:1, 132:3, 136:5,
136:6, 137:3,
140:18, 143:6,
150:12, 171:9,
172:1, 172:2,
188:24, 189:6,
189:15, 189:19,
192:20
**servers** [4] - 34:1,
34:3, 101:3, 101:7
**service** [44] - 16:9,
16:23, 16:24, 16:25,
17:1, 17:5, 17:6,
17:8, 17:10, 17:14,
17:16, 18:17, 32:18,
32:19, 36:18, 37:14,
42:21, 42:23, 43:7,
43:22, 43:24, 44:14,
47:15, 48:9, 48:11,
48:16, 48:17, 53:19,
70:18, 74:12, 74:15,
89:9, 89:12, 89:20,
101:8, 101:9,
103:17, 122:2,
122:21, 122:22,
136:24, 141:3,
161:17, 161:19
**services** [12] - 16:22,
17:13, 17:18, 17:21,

18:22, 19:2, 19:16,
19:18, 21:13, 101:7,
163:13, 163:14
**session** [4] - 6:17,
6:18, 86:13, 87:5
**set** [10] - 4:15, 8:13,
40:11, 41:4, 49:19,
60:21, 100:20,
106:25, 151:9, 171:8
**sets** [2] - 40:10, 99:8
**Setser** [2] - 11:1,
11:17
**setting** [1] - 103:17
**settings** [2] - 27:2,
170:19
**seven** [1] - 31:14
**several** [6] - 26:11,
72:2, 99:20, 118:21,
177:9, 180:13
**sexual** [4] - 27:25,
29:9, 45:3, 157:12
**sexually** [3] - 7:21,
30:13, 34:20
**share** [8] - 23:10,
23:12, 31:4, 44:1,
52:7, 72:23, 73:8,
173:19
**sharing** [1] - 24:11
**shark** [1] - 130:25
**shat** [1] - 161:22
**Shell** [1] - 3:12
**shell** [1] - 127:25
**shop** [1] - 180:12
**short** [1] - 9:16
**shorthand** [1] - 1:22
**shortly** [1] - 87:19
**shot** [2] - 130:24,
148:8
**Shot** [1] - 3:13
**shots** [2] - 132:11,
132:14
**show** [17] - 20:17,
29:9, 68:12, 77:10,
77:12, 79:17,
118:15, 132:1,
135:24, 136:19,
140:12, 140:14,
140:15, 140:16,
160:6, 179:10
**showed** [1] - 85:4
**showing** [5] - 19:25,
22:6, 26:3, 34:7,
127:20
**shown** [1] - 29:2
**shows** [8] - 40:19,
77:11, 134:15,
136:4, 136:17,
140:17, 141:9,
149:13
**shut** [3] - 58:7, 58:9,

58:19
**side** [4] - 22:19,
131:11, 151:12,
151:14
**sides** [1] - 174:17
**sign** [5] - 82:19,
137:11, 151:6,
185:17, 198:12
**signed** [10] - 10:11,
10:25, 37:5, 57:3,
59:4, 149:6, 183:22,
185:1, 185:15, 186:8
**significant** [4] - 35:13,
39:1, 145:8, 145:23,
203:22
**signing** [1] - 82:22
**signs** [1] - 29:9
**silently** [1] - 46:5
**similar** [9] - 6:4, 9:17,
9:19, 40:1, 42:17,
84:14, 116:12,
125:25, 200:24
**similarity** [1] - 87:25
**similarly** [2] - 17:14,
18:25
**simple** [2] - 84:15,
85:1
**simplified** [1] - 8:24
**simplify** [1] - 43:10
**single** [11] - 28:8,
29:1, 34:20, 36:1,
44:9, 53:21, 134:15,
139:9, 186:17,
197:23, 203:10
**site** [31] - 19:9, 19:23,
24:24, 25:12, 33:21,
34:24, 59:15,
102:11, 103:3,
103:8, 103:21,
105:20, 106:2,
106:3, 110:8, 112:6,
112:18, 112:24,
116:23, 117:1,
117:22, 124:20,
152:8, 171:14,
181:22, 202:24,
203:1, 203:4, 203:11
**sites** [6] - 19:13,
19:19, 21:16, 118:8,
163:17, 203:3
**situation** [1] - 123:17
**six** [1] - 42:2
**Sixth** [1] - 176:16
**sketched** [1] - 69:19
**skilled** [1] - 114:3
**skills** [1] - 173:24
**skirt** [1] - 199:21
**sleep** [1] - 107:20
**sleeves** [1] - 158:2
**slide** [1] - 29:2

**slight** [1] - 25:2
**slightly** [2] - 34:16,
67:4
**slow** [1] - 154:8
**small** [4] - 75:16,
124:15, 131:23,
132:1
**smaller** [2] - 23:16,
73:11
**Smith** [2] - 1:14,
116:10
**so-and-so** [1] - 135:11
**so-called** [1] - 165:5
**social** [5] - 6:20, 68:2,
68:12, 69:3, 69:12
**society** [2] - 39:13,
197:3
**soft** [1] - 29:16
**software** [51] - 16:11,
16:12, 16:17, 17:2,
17:5, 18:23, 19:5,
19:8, 23:12, 23:15,
23:23, 26:17, 26:21,
39:6, 63:8, 104:5,
106:8, 106:9,
106:12, 106:13,
106:15, 106:19,
106:20, 106:25,
107:10, 108:6,
108:8, 108:12,
108:15, 108:18,
108:20, 108:21,
108:24, 113:24,
113:25, 114:10,
115:13, 115:14,
120:16, 120:24,
121:3, 122:15,
123:20, 123:23,
147:4, 163:2,
170:18, 180:3,
196:18
**SOGHOIAN** [2] -
97:13, 154:2
**Soghoian** [17] - 2:19,
6:3, 6:5, 6:9, 6:19,
6:22, 67:25, 97:5,
97:19, 97:21, 147:4,
147:17, 152:6,
153:25, 154:12,
169:21, 173:16
**solely** [1] - 174:25
**soliciting** [1] - 78:10
**solve** [2] - 166:9,
171:4
**someone** [14] - 20:3,
20:14, 53:20, 53:24,
59:8, 59:23, 101:25,
102:10, 102:23,
124:18, 150:12,
162:13, 172:23,

203:4
**someplace** [1] - 46:22
**sometime** [2] - 25:1,
34:10
**sometimes** [9] -
19:23, 50:19, 70:17,
108:6, 108:7, 119:3,
119:4, 178:9, 178:10
**somewhat** [3] - 4:23,
90:2, 184:15
**somewhere** [4] - 8:5,
16:18, 16:19, 198:25
**soon** [2] - 85:14,
86:14
**sophisticated** [1] -
124:19
**sorry** [23] - 41:3,
41:25, 51:4, 51:25,
53:23, 60:16, 61:6,
66:20, 91:10, 92:4,
110:10, 111:10,
112:13, 117:12,
125:7, 140:5, 140:6,
141:18, 143:20,
154:9, 157:22,
167:16, 168:24
**sort** [17] - 5:7, 8:21,
9:20, 79:2, 107:18,
112:21, 117:13,
118:20, 121:6,
123:5, 124:4,
138:19, 139:20,
140:24, 149:6,
175:22, 190:15
**sought** [8] - 8:16,
12:25, 35:19, 37:1,
85:12, 146:1,
181:24, 182:24
**sound** [3] - 94:9,
96:12, 172:4
**sounded** [1] - 52:17
**source** [14] - 12:4,
61:14, 127:14,
132:24, 134:10,
134:15, 134:18,
138:24, 139:11,
142:8, 149:21,
173:6, 173:7, 173:12
**sources** [1] - 141:24
**South** [1] - 6:12
**Southern** [1] - 200:7
**speaker** [1] - 6:19
**speakers** [1] - 6:21
**speaking** [3] - 7:12,
99:21, 170:14
**special** [10] - 14:10,
14:17, 15:6, 17:4,
18:22, 100:11,
107:10, 113:4,
120:25, 194:12

**Special** [24] - 5:15, 13:17, 27:10, 93:23, 94:4, 100:9, 100:24, 103:1, 106:1, 127:15, 129:17, 129:19, 130:4, 130:13, 131:7, 134:22, 137:8, 138:11, 143:3, 143:7, 148:13, 150:4, 183:4, 193:18
**special-purpose** [1] - 100:11
**specific** [25] - 35:7, 35:20, 35:24, 36:5, 39:11, 40:17, 40:19, 44:18, 46:9, 47:11, 48:10, 52:15, 74:6, 74:21, 83:18, 84:10, 84:11, 86:2, 92:21, 162:6, 166:8, 168:8, 178:12, 178:13, 189:21
**specifically** [10] - 18:19, 26:15, 30:5, 51:1, 67:25, 82:14, 100:16, 167:4, 192:10, 202:18
**specifics** [2] - 74:25, 170:10
**specify** [1] - 177:2
**Speech** [1] - 97:23
**speech** [4] - 153:2, 153:7, 154:5, 170:11
**speeches** [2] - 153:8, 154:16
**spell** [1] - 97:17
**spelled** [2] - 12:24, 14:7
**spent** [2] - 28:1, 42:3
**split** [1] - 28:17
**spoken** [4] - 99:20, 99:23, 104:14, 104:16
**spread** [1] - 22:20
**Sprint** [1] - 160:13
**stage** [1] - 109:7
**stand** [4] - 13:22, 93:16, 96:21, 96:23
**standpoint** [2] - 111:24, 145:24
**stands** [2] - 8:20, 102:19
**start** [6] - 52:16, 73:10, 75:24, 110:11, 133:25, 180:13
**started** [4] - 29:9, 124:3, 169:22, 191:21

**starting** [1] - 126:17
**starts** [2] - 93:12, 193:15
**State** [6] - 98:24, 127:2, 127:4, 190:25, 193:21, 193:22
**state** [13] - 14:6, 26:15, 61:8, 67:13, 97:17, 98:22, 99:3, 101:18, 121:24, 193:8, 193:9, 193:20, 201:14
**statement** [7] - 62:12, 71:22, 102:22, 153:9, 154:14, 165:16, 202:14
**statements** [4] - 11:7, 11:12, 11:19, 49:6
**states** [3] - 21:1, 21:7, 21:17
**STATES** [2] - 1:1, 1:3
**States** [12] - 1:13, 4:2, 4:4, 39:13, 75:12, 76:7, 176:24, 185:14, 200:20, 205:4, 205:6, 205:11
**stating** [2] - 37:22, 176:11
**Steele** [1] - 1:19
**stenographically** [1] - 205:8
**step** [18] - 74:11, 74:24, 75:3, 89:2, 89:7, 90:8, 105:4, 105:5, 105:18, 105:21, 105:25, 109:3, 119:9, 142:16, 145:11, 146:13, 175:12, 196:5
**stepped** [1] - 69:4
**steps** [12] - 48:7, 74:8, 89:25, 111:25, 126:23, 175:7, 175:9, 178:17, 179:1, 179:9, 202:18
**still** [31] - 19:10, 29:11, 35:15, 35:16, 36:19, 37:15, 58:14, 58:23, 69:16, 73:18, 73:23, 74:23, 86:17, 87:3, 88:24, 90:20, 94:1, 101:14, 103:12, 107:4, 109:1, 166:1, 169:23, 172:4, 188:12, 191:13, 192:7, 193:7
**Stingray** [1] - 126:1

**Stingrays** [2] - 126:3, 126:9
**stolen** [1] - 172:13
**stop** [3] - 32:24, 112:12, 140:5
**stored** [3] - 84:10, 187:6, 201:6
**stories** [1] - 31:12
**story** [1] - 69:25
**stream** [4] - 63:9, 132:2, 140:8, 140:9
**Stream** [1] - 3:15
**Street** [1] - 1:24
**street** [1] - 48:4
**strength** [1] - 144:20
**strengthen** [1] - 202:21
**stresses** [1] - 126:14
**strike** [1] - 102:17
**strong** [3] - 23:19, 67:7, 125:23
**strong-arm** [1] - 67:7
**strongest** [1] - 181:16
**stronghold** [1] - 77:11
**struck** [1] - 108:18
**structurally** [1] - 39:25
**students** [2] - 131:6, 154:11
**stuff** [6] - 5:17, 68:10, 68:11, 128:17, 146:22, 149:8
**stumble** [3] - 20:15, 102:10, 102:23
**Stuxnet** [1] - 123:21
**style** [1] - 27:15
**subcategories** [2] - 29:21, 29:24
**subforum** [3] - 28:8, 38:6, 86:3
**subforums** [6] - 27:16, 27:18, 28:19, 29:4, 29:24, 30:14
**subject** [6] - 65:3, 65:6, 65:22, 66:3, 67:3, 151:1
**subjects** [1] - 75:21
**submit** [3] - 89:16, 178:9, 196:19
**submitted** [2] - 55:25, 111:1
**subpoena** [25] - 10:21, 11:15, 11:17, 43:7, 47:14, 48:5, 48:9, 48:12, 74:12, 75:4, 89:10, 89:12, 89:16, 89:19, 90:5, 90:18, 141:16, 142:16, 142:20, 145:6, 147:14, 148:23, 149:15, 196:4

**subpoenas** [1] - 45:17
**subscribe** [1] - 200:9
**subscriber** [1] - 48:4
**subsequent** [1] - 104:21
**subsequently** [3] - 10:22, 123:1, 123:11
**substance** [1] - 187:22
**substantively** [1] - 12:22
**subtle** [1] - 108:5
**successful** [1] - 77:19
**successfully** [6] - 62:20, 71:11, 72:11, 109:6, 130:14
**succinctly** [1] - 72:4
**sufficient** [1] - 202:24
**suggest** [3] - 72:6, 187:25, 201:18
**suggestive** [1] - 34:21
**suggests** [1] - 151:4
**Suing** [1] - 179:25
**Suite** [1] - 1:19
**summarize** [1] - 144:12
**summarizing** [1] - 57:7
**summary** [4] - 8:24, 38:23, 45:21, 182:7
**support** [3] - 5:8, 50:5, 155:21
**supported** [1] - 202:9
**supports** [2] - 155:14, 155:15
**supposed** [2] - 62:10, 62:23
**suppress** [9] - 4:18, 4:24, 4:25, 11:11, 91:12, 137:19, 147:20, 203:13
**suppressed** [2] - 12:19, 202:6
**suppression** [8] - 4:8, 5:4, 137:15, 146:24, 177:8, 177:10, 179:8, 181:8
**Supreme** [7] - 175:20, 181:18, 194:20, 194:23, 195:13, 195:17, 195:22
**supreme** [1] - 98:22
**surprised** [2] - 78:6, 172:7
**surveillance** [8] - 98:17, 99:23, 104:19, 125:25, 126:1, 152:11, 160:6, 161:15
**sustain** [1] - 77:17

**sustained** [2] - 78:12, 78:23
**swapped** [2] - 139:1, 139:5
**sworn** [7] - 13:19, 13:20, 14:3, 55:22, 81:1, 97:8, 97:14
**system** [13] - 7:8, 41:13, 63:4, 84:17, 110:2, 113:10, 119:13, 127:6, 129:7, 129:12, 130:10, 148:3, 180:18

**T**

**table** [1] - 5:11
**tactic** [1] - 166:9
**taint** [1] - 68:8
**tainted** [2] - 68:18, 79:23
**talks** [1] - 134:12
**tamper** [4] - 150:21, 152:15, 170:5
**tamper-evident** [4] - 150:21, 152:15, 170:5
**tampered** [10] - 94:24, 95:5, 96:14, 135:1, 143:12, 149:8, 151:7, 152:22, 164:5, 170:5
**tampering** [1] - 91:20, 95:2
**tape** [5] - 190:7, 190:15, 190:17, 191:4, 191:9
**tapes** [5] - 187:6, 187:11, 188:19, 190:24
**target** [5] - 60:6, 114:5, 118:7, 163:17
**targeted** [18] - 64:5, 64:16, 64:22, 66:10, 117:15, 117:18, 122:19, 122:20, 123:9, 125:15, 128:15, 128:20, 129:15, 169:1, 169:7, 169:8, 169:10, 197:22
**targeting** [1] - 122:5
**task** [1] - 87:9
**tax** [1] - 174:3
**teach** [1] - 15:19
**team** [2] - 104:15, 108:23
**tech** [1] - 25:25
**tech-savvy** [1] - 25:25

**technical** [7] - 12:17, 12:20, 60:17, 77:1, 92:19, 163:1, 175:12
**technicality** [1] - 157:17
**technically** [2] - 8:22, 124:19
**technique** [11] - 8:20, 9:13, 37:3, 38:21, 39:23, 78:15, 78:19, 104:1, 115:23, 179:7, 181:1
**techniques** [1] - 100:21
**technological** [1] - 145:21
**technologically** [1] - 175:17
**technologies** [4] - 53:20, 96:9, 161:16, 190:13
**technologist** [4] - 6:3, 97:23, 154:7, 154:10
**Technology** [1] - 97:24
**technology** [24] - 9:25, 15:8, 44:1, 46:23, 53:24, 64:21, 98:16, 98:18, 99:23, 104:11, 104:19, 111:24, 115:23, 118:25, 125:25, 144:5, 159:24, 166:16, 187:21, 191:3, 195:10, 195:11, 195:18, 199:23
**teed** [2] - 5:3
**teenager** [4] - 114:13, 114:14, 125:15, 125:18
**telephone** [1] - 135:9
**ten** [5] - 88:10, 107:3, 151:16, 174:18
**tens** [2] - 123:8, 162:5
**term** [10] - 4:19, 8:22, 29:6, 38:13, 39:7, 39:8, 109:13, 109:17, 109:18, 117:23
**terms** [9] - 22:25, 23:2, 23:3, 43:19, 45:24, 111:8, 111:9, 111:18, 111:20
**test** [5] - 55:11, 108:21, 108:25, 198:3, 198:4
**testified** [32] - 14:3, 34:4, 53:3, 54:6, 55:11, 57:16, 70:10,

97:14, 98:23, 98:24, 99:2, 99:3, 99:6, 99:9, 99:13, 110:24, 129:17, 130:4, 130:14, 131:8, 137:9, 137:22, 142:14, 143:8, 148:14, 150:15, 162:4, 162:21, 167:19, 168:13, 193:18
**testify** [5] - 5:16, 6:4, 55:15, 102:8, 156:9
**testifying** [4] - 69:7, 99:1, 149:18, 152:13
**testimony** [18] - 49:20, 50:4, 50:24, 98:3, 102:18, 103:2, 104:25, 147:10, 152:6, 152:20, 154:17, 174:16, 189:13, 191:11, 194:12, 197:10, 203:1, 203:24
**Texas** [3] - 116:3, 197:14, 200:7
**text** [3] - 34:16, 92:9, 94:18
**THASPRA** [1] - 163:17
**THE** [171] - 1:9, 1:12, 1:17, 4:1, 5:19, 5:22, 5:24, 6:5, 13:18, 13:21, 14:1, 22:4, 25:10, 27:8, 31:17, 39:21, 40:3, 49:15, 50:4, 50:8, 50:15, 52:19, 56:19, 56:23, 64:24, 66:1, 66:19, 66:21, 67:11, 67:13, 67:18, 67:21, 68:20, 69:2, 69:8, 69:15, 69:18, 71:6, 71:24, 72:9, 72:16, 72:22, 74:5, 74:10, 74:11, 74:17, 74:18, 75:5, 76:3, 76:8, 76:12, 77:17, 79:12, 79:25, 80:9, 80:12, 80:17, 80:19, 90:23, 91:1, 91:3, 91:15, 93:8, 93:16, 93:18, 93:20, 93:24, 94:1, 96:18, 96:21, 96:23, 96:24, 96:25, 97:2, 97:6, 97:9, 102:16, 111:22, 112:3, 119:5, 119:21, 124:24, 125:5, 125:12, 125:13, 126:15, 127:18,

128:23, 129:2, 130:19, 132:22, 132:24, 133:1, 133:3, 133:10, 133:14, 137:21, 140:20, 140:23, 140:25, 141:4, 141:17, 141:20, 142:2, 142:8, 142:9, 142:13, 142:18, 142:19, 142:21, 142:22, 143:20, 145:14, 147:9, 147:22, 149:18, 149:21, 149:24, 149:25, 150:1, 150:3, 150:7, 150:11, 150:24, 151:3, 151:8, 151:11, 151:22, 152:2, 153:17, 153:22, 154:8, 154:24, 155:6, 160:2, 168:5, 168:8, 169:17, 174:7, 174:9, 174:11, 174:12, 174:14, 174:21, 174:23, 182:14, 183:11, 183:13, 183:15, 183:25, 184:4, 185:10, 185:17, 186:23, 187:3, 187:20, 188:15, 189:17, 190:4, 190:11, 190:21, 191:10, 192:1, 192:17, 192:25, 193:24, 194:6, 194:11, 198:10, 198:18, 203:15
**themselves** [1] - 23:9
**thereby** [3] - 9:4, 144:23, 178:18
**therefore** [5] - 81:14, 191:21, 191:24, 193:23, 199:16
**therein** [1] - 28:3
**they've** [1] - 179:20
**thinks** [1] - 116:19
**third** [6] - 195:5, 195:7, 196:3, 196:11, 196:16, 196:23
**thorough** [1] - 62:8
**thousand** [1] - 108:9
**thousands** [8] - 16:5, 73:2, 105:19, 115:11, 121:7, 123:8, 162:5

**threats** [1] - 114:15
**three** [9] - 99:3, 101:15, 104:4, 117:12, 118:6, 150:18, 156:12, 158:23, 166:1
**throughout** [1] - 84:6
**throw** [1] - 159:18
**thumbnails** [1] - 32:7
**tie** [1] - 79:10
**tied** [2] - 48:20, 200:16
**timberline** [2] - 114:11, 125:15
**timeframe** [2] - 40:20, 65:2
**TIMOTHY** [1] - 1:9
**Title** [9] - 39:12, 39:20, 81:12, 81:18, 81:20, 82:3, 82:7, 82:22, 205:6
**titles** [4] - 27:18, 29:4, 32:1, 32:3
**TO** [1] - 91:12
**today** [31] - 4:2, 4:5, 4:7, 5:4, 5:12, 5:20, 5:24, 6:6, 6:16, 6:25, 7:5, 7:7, 7:10, 8:23, 8:25, 49:19, 49:21, 50:1, 97:25, 98:3, 103:24, 154:17, 164:4, 174:17, 179:16, 189:14, 194:12, 197:10, 203:20, 203:25
**toddler** [3] - 30:8, 30:10
**toddlers** [2] - 30:5, 30:13
**together** [3] - 31:15, 77:16, 79:10
**took** [13] - 40:19, 42:6, 58:10, 73:16, 83:13, 86:21, 95:10, 122:1, 158:10, 158:22, 175:7, 175:9, 179:9
**tool** [13] - 48:14, 100:11, 115:19, 126:1, 131:5, 134:4, 155:22, 165:14, 166:8, 166:9, 166:12, 180:6
**tools** [1] - 117:5
**top** [9] - 16:4, 28:16, 29:23, 103:12, 134:8, 150:13, 154:7, 154:10, 167:25
**topic** [5] - 32:1, 115:3, 119:24, 151:23, 157:15

**topics** [5] - 6:14, 28:23, 30:4, 38:10, 51:24
**Tor** [118] - 9:16, 9:17, 9:23, 15:22, 16:2, 16:3, 16:7, 16:8, 16:11, 16:14, 16:17, 16:21, 16:23, 17:2, 17:12, 17:21, 18:14, 18:23, 18:24, 19:1, 19:2, 19:3, 19:4, 19:6, 19:15, 19:18, 19:23, 19:24, 21:13, 36:16, 37:13, 53:19, 57:8, 57:11, 70:6, 70:8, 70:9, 70:12, 70:13, 70:22, 72:24, 85:24, 100:6, 100:7, 100:10, 100:11, 100:12, 100:14, 100:16, 100:17, 100:20, 100:22, 100:24, 101:2, 101:8, 101:11, 101:12, 101:14, 101:17, 101:20, 101:22, 102:3, 102:9, 103:7, 103:11, 103:12, 103:19, 105:7, 105:10, 105:13, 105:14, 107:2, 107:5, 107:12, 107:13, 107:15, 107:17, 107:25, 108:24, 109:6, 115:12, 116:18, 117:9, 117:10, 117:11, 119:13, 119:24, 120:9, 121:12, 122:13, 122:21, 122:24, 155:14, 155:16, 155:17, 155:18, 155:21, 162:8, 163:4, 163:5, 163:13, 163:19, 163:21, 164:1, 164:2, 164:3, 164:16, 164:18, 164:23, 169:2, 169:5, 178:16, 203:3, 203:5
**TOR** [1] - 15:22
**TOR's** [1] - 101:19
**Torpedo** [7] - 118:10, 120:12, 121:9, 121:18, 172:20, 173:1, 173:5
**total** [2] - 76:18, 78:4

totality [1] - 51:10
totally [2] - 68:12, 146:19
towards [2] - 66:10, 126:25
track [3] - 112:23, 188:5, 190:13
tracking [17] - 186:25, 187:14, 187:23, 188:4, 188:8, 188:10, 189:25, 190:7, 190:15, 190:17, 190:25, 191:1, 191:4, 192:3, 192:6, 193:1, 193:23
tracks [2] - 102:1, 126:2
Trade [4] - 159:15, 160:4, 160:11, 172:9
trade [10] - 15:9, 23:2, 24:19, 26:13, 26:25, 31:4, 34:17, 51:9, 65:10, 160:6
traditional [2] - 17:3, 19:19
trafficked [1] - 31:7
trafficking [1] - 79:14
training [13] - 15:11, 15:13, 21:5, 23:1, 24:19, 26:12, 66:25, 96:13, 98:9, 99:19, 106:17, 113:18, 156:11
trainings [1] - 15:15
transcript [2] - 205:7, 205:9
TRANSCRIPT [1] - 1:9
transcripts [1] - 104:25
transfer [3] - 135:13, 135:14, 135:17
transferred [6] - 36:14, 57:19, 58:16, 58:20, 135:18
transferring [1] - 86:23
transit [2] - 96:5, 96:15
translated [1] - 65:18
translation [4] - 43:19, 44:2, 46:24, 138:12
transmission [2] - 86:21, 94:13
transmit [4] - 9:10, 110:3, 116:14, 150:21
transmits [1] - 127:9
transmitted [13] - 60:1, 63:10, 89:24, 93:2, 112:19,

130:16, 131:21, 134:25, 136:18, 139:8, 139:10, 150:20, 152:14
transparency [2] - 165:19
transparent [2] - 126:13, 165:11
transport [1] - 170:13
travel [3] - 98:6, 193:8, 193:9
traveled [2] - 143:17, 203:21
treat [1] - 171:4
tree [1] - 90:15
trial [5] - 4:15, 13:24, 90:12, 137:18, 145:16
trick [1] - 114:13
tried [1] - 136:20
trigger [2] - 44:19
triggered [4] - 38:4, 46:12, 86:4, 87:8
triggering [6] - 38:12, 59:23, 64:7, 65:8, 66:2, 192:23
trip [1] - 54:16
troubling [1] - 202:10
true [32] - 17:13, 24:3, 33:5, 37:15, 53:15, 55:11, 57:12, 101:5, 155:11, 155:13, 162:8, 162:24, 163:3, 163:8, 163:12, 166:6, 167:3, 170:22, 187:18, 189:20, 192:7, 205:7
try [12] - 12:1, 36:7, 47:25, 54:16, 70:7, 70:24, 72:3, 76:25, 104:17, 106:14, 135:6, 149:5
trying [16] - 67:6, 67:24, 76:15, 77:15, 81:10, 144:25, 147:4, 149:1, 163:15, 169:13, 170:1, 176:1, 184:22, 187:12, 199:21
TSA [2] - 159:9, 159:10
turn [2] - 173:5, 173:22
turned [9] - 83:22, 85:2, 94:11, 100:4, 121:14, 121:15, 160:13, 172:18, 173:4

turning [1] - 59:4
turns [1] - 202:20
tweet [2] - 156:25, 161:22
tweeted [4] - 69:6, 157:5, 157:6, 162:5
tweeting [4] - 68:1, 68:4, 69:3, 69:12
tweets [2] - 73:5, 162:7
twice [1] - 150:18
Twitter [2] - 156:18, 156:24
two [52] - 8:8, 10:13, 16:7, 17:17, 21:8, 21:9, 21:10, 22:16, 22:18, 25:14, 31:10, 34:18, 35:25, 39:5, 40:10, 41:21, 63:9, 66:21, 68:25, 72:10, 74:7, 78:5, 81:24, 81:25, 86:11, 87:3, 88:2, 90:4, 90:7, 100:4, 100:25, 117:13, 120:9, 120:11, 120:15, 123:4, 128:13, 131:1, 131:7, 133:1, 134:7, 135:4, 138:6, 140:8, 140:9, 142:6, 158:8, 159:12, 168:16, 183:18, 186:18, 189:7
two-way [6] - 63:9, 100:4, 131:1, 131:7, 140:8, 140:9
two-week [2] - 41:21, 78:5
type [14] - 15:12, 16:9, 27:18, 53:20, 53:24, 99:2, 102:23, 136:13, 172:16, 175:10, 178:4, 178:19, 195:14, 195:22
typed [2] - 9:4, 103:21
types [2] - 15:7, 17:23
typically [1] - 70:15

U

U.S [12] - 8:16, 106:23, 107:4, 123:18, 123:22, 124:5, 152:24, 159:14, 171:13, 171:17, 179:25, 181:20
ultimately [7] - 10:9, 11:2, 13:6, 48:20, 166:6, 180:25, 192:1

unable [2] - 32:19, 32:20
unattractive [1] - 156:17
unaware [1] - 183:2
unbeknownst [1] - 196:19
unchanged [1] - 35:15
under [30] - 2:8, 3:12, 3:14, 3:16, 8:4, 9:6, 12:23, 29:8, 29:12, 29:24, 37:14, 39:15, 42:4, 58:7, 61:15, 94:1, 128:24, 128:25, 129:3, 132:18, 132:19, 132:23, 133:4, 142:8, 173:16, 181:16, 182:22, 186:24, 200:17, 203:17
understandably [1] - 39:6
unencrypted [3] - 92:5, 94:18, 172:3
unethical [1] - 40:2
UNIDENTIFIED [2] - 133:18, 133:22
Union [1] - 97:22
unique [15] - 44:5, 44:10, 44:16, 65:13, 66:13, 67:2, 72:6, 74:22, 75:2, 76:18, 112:10, 112:14, 112:17, 113:2, 180:7
unit [5] - 14:14, 14:22, 15:4, 15:7, 76:8
UNITED [2] - 1:1, 1:3
United [12] - 1:13, 4:2, 4:4, 39:13, 75:12, 76:7, 176:24, 185:14, 200:20, 205:4, 205:6, 205:11
University [7] - 98:12, 98:14, 98:15, 153:2, 153:11, 154:4, 158:6
unknowingly [2] - 60:2, 60:3
unlawful [1] - 163:7
unless [1] - 133:15
unlike [2] - 9:19, 191:15
unlikely [1] - 20:14
unmask [1] - 146:13
unnecessary [2] - 90:17, 200:12
unpleasant [4] - 158:8, 161:3, 161:7, 161:9
unreliable [1] - 79:8

unsealed [1] - 73:4
unsubstantiated [1] - 69:21
untruthful [1] - 79:22
up [63] - 5:4, 14:22, 16:5, 19:25, 22:16, 24:18, 28:17, 28:22, 35:1, 38:11, 46:4, 47:19, 48:11, 52:9, 54:17, 68:12, 68:21, 71:9, 77:6, 79:17, 86:7, 88:8, 96:16, 99:14, 103:17, 106:25, 109:17, 114:7, 115:6, 121:3, 121:4, 123:2, 125:18, 131:1, 131:21, 131:24, 135:24, 136:12, 137:11, 141:9, 141:17, 141:23, 146:3, 146:9, 149:13, 149:23, 151:10, 151:19, 153:24, 158:2, 159:13, 166:4, 171:8, 173:2, 174:18, 175:8, 179:18, 180:13, 183:4, 187:11, 190:23, 194:5, 195:2
up-to-date [2] - 121:3, 121:4
updated [1] - 19:22
updates [1] - 120:17
upper [1] - 22:16
urinate [1] - 68:24
URL [1] - 21:3
useful [1] - 95:3
user [99] - 7:15, 9:4, 9:9, 10:22, 16:8, 16:11, 17:8, 19:3, 19:7, 20:8, 22:9, 22:11, 22:13, 23:6, 24:12, 24:13, 24:15, 25:3, 25:13, 25:14, 25:19, 25:22, 26:7, 26:17, 27:3, 27:11, 27:17, 31:21, 31:23, 37:22, 38:4, 38:10, 40:8, 40:15, 40:16, 40:19, 40:25, 41:2, 41:4, 41:16, 44:19, 44:21, 44:24, 45:1, 45:22, 45:25, 46:3, 46:12, 47:2, 47:13, 47:16, 60:3, 64:6, 65:2, 65:6, 65:7, 65:17, 66:2, 66:7, 66:12, 66:13, 71:25,

72:18, 76:3, 76:5, 78:4, 85:14, 85:18, 85:22, 86:3, 86:4, 86:11, 86:14, 87:4, 87:20, 88:12, 88:19, 88:24, 90:1, 93:10, 93:11, 100:17, 101:9, 105:11, 105:12, 106:4, 112:18, 112:22, 124:20, 135:4, 164:15, 164:22, 164:24, 165:5, 182:17, 189:4

**user's** [10] - 9:8, 39:25, 46:5, 46:21, 87:12, 87:15, 105:14, 137:23, 146:12, 182:15

**username** [14] - 25:16, 37:23, 38:5, 63:6, 84:17, 85:15, 85:18, 96:2, 113:8, 127:6, 129:7, 129:11, 130:11, 148:4

**users** [47] - 7:18, 9:3, 10:10, 16:7, 23:10, 24:6, 24:10, 26:19, 31:4, 37:7, 37:12, 37:16, 37:18, 40:5, 45:18, 46:9, 46:14, 46:16, 47:7, 59:11, 59:13, 59:18, 64:15, 64:22, 65:11, 65:22, 66:9, 66:14, 67:1, 73:2, 100:21, 106:18, 116:17, 120:17, 122:16, 125:4, 163:20, 168:20, 169:1, 175:1, 178:16, 178:25, 180:10, 181:22, 182:9

**users'** [1] - 9:20

**uses** [6] - 9:23, 16:7, 101:12, 104:18, 123:6, 124:9

**utilize** [2] - 59:3, 59:10

**utilized** [3] - 38:15, 51:22, 82:13

**utilizing** [3] - 90:13, 93:1, 105:19

## V

**vacation** [1] - 7:5

**valid** [6] - 12:16, 13:9, 13:11, 94:19, 177:4, 197:6

**validity** [5] - 76:18,

---

77:9, 78:21, 125:1, 144:9

**validly** [1] - 11:24

**value** [2] - 76:15, 78:22

**variations** [2] - 23:3, 25:2

**variety** [2] - 14:25, 38:21

**various** [11] - 11:25, 12:18, 15:7, 21:13, 27:16, 30:3, 30:14, 31:3, 45:21, 96:9, 105:1

**vast** [1] - 67:25

**vehicle** [3] - 187:15, 187:17, 187:18

**verified** [1] - 145:6

**verify** [3] - 33:6, 145:4, 145:6

**Verizon** [1] - 42:22

**version** [9] - 63:4, 100:13, 110:2, 120:18, 121:3, 121:4, 121:12, 122:13, 148:3

**versus** [6] - 4:2, 82:25, 176:24, 179:25, 194:23, 200:21

**VHS** [10] - 187:6, 187:11, 188:19, 190:7, 190:15, 190:17, 190:24, 191:4, 191:8

**via** [2] - 1:22, 164:18

**viable** [2] - 32:25, 155:22

**video** [7] - 23:7, 24:13, 24:14, 24:15, 24:16, 24:17, 52:7

**Videos** [5] - 27:22, 31:23, 31:25, 38:7, 44:25

**videos** [9] - 27:24, 28:9, 29:12, 29:23, 29:25, 30:12, 32:4, 32:11, 100:20

**videotapes** [1] - 190:12

**view** [1] - 100:19

**viewed** [2] - 132:12, 133:8

**viewing** [3] - 31:22, 38:9, 87:5

**views** [1] - 7:1

**violate** [1] - 199:25

**violated** [3] - 198:15, 199:11, 201:11

**violates** [1] - 200:4

**violating** [1] - 182:10

---

**violation** [13] - 4:12, 4:14, 8:11, 12:21, 118:14, 177:8, 186:15, 186:22, 190:19, 194:6, 198:17, 201:16, 201:23

**violations** [2] - 12:17, 15:3

**Violent** [1] - 14:12

**Virginia** [71] - 8:6, 8:18, 10:7, 11:14, 12:7, 12:10, 12:11, 13:8, 15:14, 35:20, 36:15, 36:23, 37:1, 38:14, 41:9, 45:11, 56:8, 57:18, 57:19, 58:4, 58:12, 58:14, 58:15, 58:17, 58:21, 58:23, 59:19, 62:14, 62:17, 63:17, 76:20, 81:22, 82:8, 83:7, 85:24, 92:1, 99:18, 110:3, 110:5, 110:16, 121:20, 127:8, 167:12, 171:9, 181:21, 181:23, 181:24, 181:25, 182:18, 183:21, 184:15, 185:4, 185:9, 185:25, 186:4, 186:10, 186:19, 187:5, 189:1, 189:6, 189:16, 190:23, 190:25, 192:3, 192:5, 192:12, 192:15, 192:20, 193:2, 193:21, 193:22

**virtual** [3] - 188:15, 192:2, 192:4

**visit** [3] - 106:2, 112:6, 117:22

**visited** [2] - 105:20, 112:24

**visiting** [6] - 106:2, 116:17, 116:23, 117:1, 118:8, 169:5

**visits** [2] - 105:12, 112:18

**void** [4] - 73:2, 176:11, 201:25

**volumes** [1] - 187:6

**voluntarily** [1] - 181:22

**volunteering** [1] - 98:4

**volunteers** [1] - 101:4

**VS** [1] - 1:5

---

**vulnerabilities** [5] - 120:21, 120:23, 121:1, 123:24

**vulnerability** [4] - 107:11, 121:8, 121:10, 122:10

**vulnerable** [2] - 120:19, 124:11

## W

**wait** [1] - 141:20

**walk** [3] - 69:23, 69:24, 69:25

**walked** [2] - 190:1, 190:6

**walks** [1] - 191:8

**wants** [4] - 42:18, 42:19, 177:21, 194:4

**ware** [1] - 189:9

**warehouse** [11] - 187:5, 187:8, 187:10, 188:18, 188:23, 188:24, 189:3, 190:7, 190:23, 192:2, 192:5

**warning** [3] - 20:1, 23:5, 52:5

**Warrant** [4] - 116:8, 178:5, 197:20, 200:7

**warrant** [185] - 4:19, 5:6, 8:16, 9:2, 9:13, 10:6, 10:12, 10:25, 11:13, 11:24, 12:5, 12:8, 12:12, 12:16, 12:24, 13:2, 13:7, 13:8, 13:11, 33:18, 35:19, 35:21, 35:22, 35:23, 36:2, 36:6, 37:2, 37:4, 37:21, 41:9, 49:3, 54:7, 54:10, 54:20, 55:13, 55:16, 55:18, 55:19, 55:22, 56:8, 56:9, 56:18, 57:4, 59:4, 59:6, 59:10, 62:5, 63:2, 65:6, 65:9, 66:3, 67:3, 76:19, 77:21, 78:1, 78:10, 78:21, 79:3, 79:6, 79:9, 79:17, 80:21, 80:23, 80:24, 81:1, 81:4, 81:6, 81:8, 81:9, 81:17, 81:19, 82:12, 82:23, 83:5, 83:10, 84:3, 85:7, 89:2, 90:7, 99:15, 99:16, 99:17, 104:10, 104:20, 104:24, 110:24,

---

111:2, 111:11, 111:18, 111:20, 113:17, 113:21, 114:2, 114:19, 114:20, 115:23, 121:18, 121:19, 123:3, 124:12, 125:1, 129:6, 137:14, 137:19, 144:10, 144:22, 145:24, 147:2, 147:8, 161:23, 165:24, 167:1, 167:3, 167:9, 167:11, 167:22, 168:1, 175:14, 176:7, 176:8, 176:11, 176:12, 176:17, 177:1, 177:3, 177:19, 178:4, 178:6, 178:23, 179:10, 179:11, 179:14, 181:2, 181:13, 182:8, 182:12, 182:21, 183:7, 183:8, 183:19, 183:21, 184:1, 184:6, 184:25, 185:1, 185:6, 185:15, 185:17, 185:20, 186:6, 186:8, 186:13, 186:21, 190:19, 192:8, 195:12, 197:12, 197:15, 197:21, 198:12, 199:4, 199:7, 199:8, 199:10, 199:15, 199:17, 200:4, 200:8, 200:14, 200:16, 200:25, 201:1, 201:4, 201:8, 201:11, 201:14, 201:25, 202:1, 202:9, 202:15, 202:18

**warrant's** [1] - 166:3

**warranted** [2] - 177:9, 177:11

**warrants** [15] - 11:7, 12:12, 48:23, 49:2, 81:13, 81:15, 83:2, 100:2, 117:6, 165:25, 177:25, 178:9, 182:3, 186:25, 201:19

**wash** [1] - 171:6

**washes** [1] - 171:3

**Washington** [9] -

98:24, 114:11, 122:20, 159:11, 160:20, 162:4, 168:23, 168:25, 179:6
watch [1] - 100:20
watching [1] - 143:14
water [1] - 68:23
watering [5] - 118:1, 118:4, 118:6, 120:11, 123:7
waves - 195:21
ways [2] - 117:13, 150:21
weaknesses [1] - 169:24
web [1] - 122:2
Web [10] - 18:25, 29:1, 34:24, 59:15, 100:18, 100:19, 103:22, 106:11, 109:5, 136:12
website [199] - 7:15, 7:16, 7:17, 7:25, 8:3, 8:4, 8:10, 9:3, 9:5, 9:6, 9:14, 10:10, 10:12, 10:18, 16:9, 16:12, 16:13, 16:15, 16:23, 16:25, 18:2, 18:3, 18:4, 18:8, 18:11, 19:6, 19:10, 20:13, 20:15, 20:22, 20:25, 21:18, 21:23, 22:10, 22:12, 22:14, 23:7, 23:11, 24:7, 24:25, 25:14, 25:17, 25:24, 26:11, 26:16, 27:4, 27:12, 27:13, 27:14, 27:16, 27:17, 27:20, 27:22, 28:2, 28:6, 28:9, 29:5, 30:9, 30:11, 30:16, 30:18, 31:3, 31:7, 31:8, 31:11, 32:10, 32:14, 32:16, 32:22, 33:2, 33:8, 33:11, 33:12, 33:24, 33:25, 34:2, 34:13, 35:4, 35:8, 35:14, 35:15, 35:16, 36:13, 36:17, 36:18, 36:21, 36:24, 37:7, 37:9, 37:13, 37:16, 37:23, 38:5, 38:7, 38:17, 38:19, 40:9, 40:12, 40:16, 40:24, 40:25, 41:20, 42:4, 42:7, 42:11, 42:12, 42:19, 44:22, 44:24, 45:1, 45:19, 46:3, 46:7, 46:11,

46:17, 46:18, 47:8, 47:13, 51:1, 52:4, 52:15, 53:4, 53:9, 53:15, 53:16, 53:18, 53:21, 54:7, 54:11, 54:25, 55:4, 57:10, 57:19, 58:11, 58:12, 59:1, 59:5, 59:8, 59:9, 59:14, 60:3, 64:6, 65:1, 65:8, 65:12, 67:1, 70:6, 70:7, 70:15, 70:21, 70:24, 72:1, 72:7, 73:19, 76:4, 85:19, 85:23, 87:7, 88:14, 88:21, 93:12, 93:13, 95:11, 95:12, 95:23, 102:9, 102:24, 103:4, 103:11, 103:18, 105:12, 105:13, 116:14, 122:18, 155:20, 155:23, 155:24, 157:10, 159:4, 159:10, 164:16, 164:18, 165:1, 167:5, 167:10, 167:24, 171:14, 171:15, 174:24, 175:2, 175:5, 175:6, 180:11, 181:21, 182:10, 202:11
Website [4] - 3:5, 3:6, 3:7, 3:8
websites [38] - 15:22, 17:22, 17:24, 18:8, 18:9, 18:21, 19:13, 19:14, 19:15, 19:16, 19:22, 19:25, 20:1, 20:5, 20:8, 20:9, 20:10, 21:9, 21:10, 23:3, 23:4, 24:8, 24:20, 26:13, 26:25, 27:4, 47:25, 52:6, 54:3, 64:13, 70:12, 73:1, 91:9, 100:15, 101:1, 116:18, 122:19
week [6] - 6:12, 10:13, 41:21, 78:5, 154:16, 168:17
weeks [3] - 8:8, 158:23, 180:13
well-resourced [1] - 106:22
WESTERN [1] - 1:1
Western [6] - 1:19, 7:15, 10:24, 48:24, 68:17, 205:5
westlaw [1] - 176:25

whereas [1] - 100:18
White [2] - 168:16, 171:15
white [1] - 176:4
whodunit [2] - 137:16, 145:15
whole [3] - 84:13, 105:10, 137:11
wi [9] - 44:7, 90:13, 113:7, 138:10, 138:20, 138:25, 139:1, 139:18
wi-fi [9] - 44:7, 90:13, 113:7, 138:10, 138:20, 138:25, 139:1, 139:18
widely [1] - 75:8
wife [1] - 138:5
wiki [4] - 21:11, 21:12, 21:21, 70:11
wild [1] - 124:16
William [1] - 200:21
willing [3] - 157:16, 173:22, 176:7
window [6] - 60:24, 61:1, 61:3, 61:8, 61:10, 180:17
Windows [1] - 113:11
wiping [1] - 73:10
WIRE [1] - 130:25
wireless [1] - 43:12
Wireshark [8] - 3:13, 130:25, 131:3, 131:13, 132:7, 134:1, 148:8
wish [2] - 25:20, 163:13
wit [1] - 67:22
withdraw [1] - 173:14
withheld [1] - 80:3
witness [22] - 5:8, 5:12, 6:1, 13:20, 13:22, 49:23, 50:7, 52:21, 67:25, 68:21, 80:1, 80:15, 96:21, 97:8, 97:10, 102:13, 111:17, 111:19, 119:1, 153:14, 153:15, 153:17
WITNESS [28] - 40:3, 72:9, 72:22, 74:10, 74:17, 75:5, 76:8, 93:18, 96:24, 125:5, 125:13, 128:23, 132:24, 133:14, 140:23, 141:4, 142:2, 142:9, 142:18, 142:21, 149:21, 149:25, 150:3, 150:11,

151:3, 151:11, 153:22, 174:11
WITNESSES [2] - 2:11, 2:18
witnesses [10] - 5:11, 49:21, 67:17, 68:6, 69:17, 93:20, 97:3, 174:12, 174:13, 203:21
witnesses' [1] - 67:18
word [5] - 39:10, 39:19, 39:22, 62:7, 125:16
worded [1] - 46:19
words [4] - 39:5, 70:15, 74:23, 100:7
works [4] - 85:17, 100:8, 100:10, 135:2
world [11] - 16:6, 16:19, 17:21, 31:12, 101:24, 108:13, 124:5, 135:19, 138:18, 170:24, 186:3
worried [2] - 108:12, 108:17
worry [3] - 75:17, 77:4, 154:21
wrap [1] - 174:18
write [6] - 106:8, 106:13, 108:20, 120:16, 120:24
writing [2] - 115:6, 196:14
written [7] - 84:4, 104:25, 128:1, 128:2, 140:1, 149:12, 150:6
wrongful [1] - 181:9
wrote [5] - 107:10, 107:24, 151:9, 158:5, 168:17

Y

y'all [2] - 38:14, 174:18
year [17] - 4:16, 98:25, 108:11, 108:12, 116:16, 121:25, 126:12, 153:3, 159:9, 159:14, 160:15, 160:25, 161:18, 171:12, 171:13, 171:17, 171:20
years [16] - 98:18, 104:4, 107:3, 108:10, 118:21, 123:18, 126:8,

126:10, 156:12, 158:13, 159:2, 159:12, 159:13, 161:6, 161:10, 166:1
yielded [1] - 75:4
York [4] - 14:19, 14:23, 14:24, 115:7
yourself [2] - 121:5, 137:9

Z

zero [10] - 121:1, 122:12, 123:12, 123:24, 124:8, 124:10, 168:14, 168:16
zero-day [7] - 121:1, 122:12, 123:12, 123:24, 124:10
zero-days [3] - 124:8, 168:14, 168:16
Zoo [1] - 30:17
zoo [2] - 30:19, 30:20